**UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT**

Nos. 23-1900, 23-2043

RONALD KOONS et al.,
*Plaintiffs-Appellees,*

v.

MATTHEW J. PLATKIN et al.,
*Defendants-Appellants*

and

NICHOLAS P. SCUTARI et al.
*Intervenors-Defendants-Appellants*

AARON SIEGEL et al.,
*Plaintiffs-Appellees / Cross-Appellants,*

v.

MATTHEW J. PLATKIN et al.,
*Defendants-Appellants / Cross-Appellees*

and

NICHOLAS P. SCUTARI et al.
*Intervenors-Defendants-Appellants*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
(Nos. 22-cv-7463, 22-cv-7464 (RMB))

**OPENING BRIEF OF DEFENDANTS-APPELLANTS**

MATTHEW J. PLATKIN
  *Attorney General of New Jersey*

JEREMY M. FEIGENBAUM
  *Solicitor General*

ANGELA CAI
  *Deputy Solicitor General*

JEAN REILLY
  *Assistant Attorney General*

DAVID CHEN
VIVIANA HANLEY
SAMUEL RUBINSTEIN
  *Deputy Attorneys General*

Office of the New Jersey Attorney General
R.J. Hughes Justice Complex
25 Market Street, P.O. Box 080
Trenton, NJ 08625-0080
(609) 414-5954
angela.cai@njoag.gov

*Attorneys for Defendants-Appellants*
*New Jersey Attorney General*
*Matthew J. Platkin and Superintendent of*
*New Jersey State Police Colonel*
*Patrick Callahan*

# **TABLE OF CONTENTS**

TABLE OF CONTENTS..................................................................... i

TABLE OF AUTHORITIES ............................................................ iii

INTRODUCTION .............................................................................1

STATEMENT OF JURISDICTION....................................................4

STATEMENT OF ISSUES ................................................................4

STATEMENT OF RELATED CASES AND PROCEEDINGS ............4

STATEMENT OF THE CASE............................................................4

    A.   New Jersey Law. ....................................................................4

    B.   The Proceedings Below....................................................6

SUMMARY OF ARGUMENT ..........................................................8

STANDARD OF REVIEW ..............................................................11

ARGUMENT ...................................................................................11

I. THE DISTRICT COURT ERRED IN PRELIMINARILY ENJOINING MULTIPLE SENSITIVE PLACES RESTRICTIONS. ...........................................12

    A.   The Enjoined Sensitive-Places Restrictions Are Consistent With The Second Amendment. ................................................................12

        1.   The Sensitive-Place Restrictions Have Historical Support.........13

            a.   Within 100 feet of public gatherings requiring government permits (Section 7(a)(6))......................................................14

            b.   Entertainment venues (Section 7(a)(17)), Casinos (Section 7(a)(18) and N.J. Admin Code 13:69D-1.13), Movie sets (Section 7(a)(23)), Establishments serving alcohol (Section 7(a)(15)). .............................................................................16

            c.   Public libraries and museums (Section 7(a)(12)). ................19

d.    Public parks, beaches, and recreational facilities (Section 7(a)(10) and N.J. Admin. Code 7:2-2.17(b)); Zoos (Section 7(a)(9)). .................................................................................20

e.    Healthcare facilities (Section 7(a)(21)).................................22

f.    Public buses and private vehicles (Section 7(b)(1) and N.J. Admin. Code § 7:25-5.23(f)(5)). ........................................24

2.    The District Court's Contrary Conclusions Are Erroneous. .......26

B.    The State Can Restrict Firearms Where It Acts As Proprietor. ................34

II.  THE DISTRICT COURT ERRED IN ENJOINING APPLICATIONS OF THE PRIVATE-PROPERTY RULE. ..............................................................37

A.    The Private-Property Rule Is Constitutional. .............................................38

B.    The District Court's Approach Lacks Support..........................................44

III.  THE DISTRICT COURT ERRED IN ENJOINING THE LIABILITY-INSURANCE REQUIREMENT. ...........................................................48

CONCLUSION ................................................................................48

CERTIFICATION OF BAR MEMBERSHIP.........................................................56

CERTIFICATION OF COMPLIANCE .................................................................57

CERTIFICATION OF SERVICE........................................................................58

# TABLE OF AUTHORITIES

**Cases**                                                                    **Pages**

*Amalgamated Transit Union Local 85 v. Port. Auth.*
*of Allegheny Cnty.*,
  39 F.4th 95 (3d Cir. 2022) ....................................................................11

*Andrews v. State*,
  50 Tenn. 165 (Tenn. 1871) ..............................................................14, 30

*Bldg. & Const. Trades Council of Metro. Dist. v. Assoc.*
*Builders & Contractors of Mass./R.I., Inc.*,
  507 U.S. 218 (1993).................................................................................35

*Bonidy v. U.S. Postal Serv.*,
  790 F.3d 1121 (10th Cir. 2015) .............................................................35

*Camfield v. United States*,
  167 U.S. 518 (1897).................................................................................36

*Carr v. State*,
  34 Ark. 448 (Ark. 1879) ........................................................................25

*Cole v. Fisher*,
  11 Mass. 137 (Mass. 1814) ....................................................................52

*District of Columbia v. Heller*,
  554 U.S. 570 (2008)........................................................................passim

*Drake v. Filko*,
  724 F.3d 426 (3d Cir. 2013).....................................................................4

*English v. State*,
  35 Tex. 473 (Tex. 1872) ...............................................................14, 15, 30

*Ezell v. City of Chicago*,
  651 F.3d 684 (7th Cir. 2011) .................................................................33

*Florida v. Jardines,*
  569 U.S. 1 (2013) ........................................................................44, 46

*Frey v. Nigrelli,*
  No. 21-5334, 2023 WL 2473375 (S.D.N.Y. Mar. 13, 2023)................................24

*Gamble v. United States,*
  139 S.Ct. 1960 (2019) ........................................................................33

*Garcia v. San Antonio Metro. Transit Auth.,*
  469 U.S. 528 (1985) ........................................................................28

*GeorgiaCarry.org v. Georgia,*
  687 F.3d 1244 (11th Cir. 2012) ............................................................10, 38, 40

*GeorgiaCarry.org, Inc. v. U.S. Army Corps of Engineers,*
  212 F.Supp.3d 1348 (N.D. Ga. 2016) ........................................................35

*Gould v. Morgan,*
  907 F.3d 659 (1st Cir. 2018) ................................................................33

*Hill v. State,*
  53 Ga. 472 (Ga. 1874) ........................................................................14, 16

*I. & G.N. Ry. Co. v. Folliard,*
  1 S.W. 624 (Tex. 1886) ........................................................................24

*Lloyd Corp. Ltd. v. Tanner,*
  407 U.S. 551 (1972) ........................................................................45

*Maryland Shall Issue v. Montgomery Cnty.,*
  ___ F.Supp.3d ____, 2023 WL 4373260,
  (D. Md. July 6, 2023)................................................................20, 21, 22, 33, 44

*McKee v. Gratz,*
  260 U.S. 127 (1922) ........................................................................46

*Moody v. Ward,*
  13 Mass. 299 (Mass. 1816) ................................................................52

*Nat'l Ass'n for Gun Rights, Inc. v. City of San Jose*,
  618 F.Supp.3d 901 (N.D. Cal. 2022) ............................................50, 51, 52

*Nat'l Ass'n for Gun Rights, Inc. v. City of San Jose*,
  No. 22-501, Dkt. 107  (N.D. Cal. July 13, 2023) ............................50, 52

*New State Ice Co. v. Liebmann*,
  285 U.S. 262 (1932) ............................................................................28

*Nordyke v. King*,
  681 F.3d 1041 (9th Cir. 2012) (en banc) ............................................35

*NRA v. Bondi*,
  61 F.4th 1317 (2023), *vacated pending rehr'g en banc*,
  2023 WL 4542153 (11th Cir. July 14, 2023) ................................33, 34

*N.Y State Rifle & Pistol Ass'n v. Bruen*,
  142 S.Ct. 2111 (2022) ...................................................................passim

*Osorio-Martinez v. U.S. Att'y Gen.*,
  893 F.3d 153 (3d Cir. 2018) ...............................................................11

*Range v. Att'y Gen.*,
  69 F.4th 96 (3d Cir. 2023) (en banc) ..................................................12

*Reeves, Inc. v. Stake*,
  447 U.S. 429 (1980) ............................................................................35

*State v. Reando*,
  (Mo. 1878) ........................................................................................14

*State v. Shelby*,
  2 S.W. 468 (Mo. 1886) ............................................................14, 15, 30

*Thomas v. Chicago Park Dist.*,
  227 F.3d 921 (7th Cir. 2000) ..............................................................48

*United States v. Class*,
  930 F.3d 460 (D.C. Cir. 2019) ......................................................passim

v

*United States v. Greeno,*
  679 F.3d 510 (6th Cir. 2012) ...................................................33

*Virginia v. Moore*,
  553 U.S. 164 (2008)...........................................................41

*Welch v. Durand*,
  36 Conn. 182 (Conn. 1869).................................................52

*White v. Mass. Council of Const. Emps., Inc.*,
  460 U.S. 204 (1983)...........................................................35

*Zaitzeff v. City of Seattle*,
  484 P.3d 470 (Wash. App. Ct. 2021).................................22

## Statutes

### Federal

28 U.S.C. § 1292 ......................................................................4

28 U.S.C. § 1331 ......................................................................4

### State

1835 Mass. Acts. Ch. 134 § 6 ..........................................54-55

1756 Del. Act, *reprinted in Military Obligation*,
  Monograph 1, Vol. 2, Pt. 3 (1947)....................................17

1893 Fla. Acts (Fla. 1893) ....................................................50

1895 Mich. Laws 596, No. 436, § 44 ..................................21

Alaska Stat. Ann. § 11.61.220 ..............................................40

Ariz. Rev. Stat. § 13-3102(A).............................................28

D.C. Code § 7-2509.07(b).....................................................40

Ga. Code Ann. § 16-11-127 ....................................................................40

Haw. Rev. Stat. § 134-E .........................................................................40

La. Rev. Stat. § 40:1379.3(O) .................................................................40

Laws & Ordinances of City of New Orleans, ch. 1 art. 1,
    *reprinted in Jewell's Digest*, at 1 (1882) ............................................17

Laws of Terr. of N.M.  (1853) ................................................................17

Md. Code, Crim. Law § 6-411(c) .............................................................40

New Jersey Public Law 2022, Chapter 131 .....................................passim

N.Y. Penal Law § 256.01-d(1) .................................................................40

Ohio Rev. Code Ann. § 2923.126(B)(6)...................................................40

S.C. Code Ann. § 23-31-225 ....................................................................40

S.C. Code Ann. § 23-31-215(M)(8).........................................................40

Tenn. Laws c.22 § 6 (Tenn. 1801) ..........................................................50

## **Other Authorities**

Akhil Amar, *The Bill of Rights: Creation and Reconstruction* xiv (1998) .............33

Alexander Lemann, *Coercive Insurance and the Soul of Tort Law*,
    105 Georgetown Law Journal 55 (2016) ..............................................51

Am. Acad. of Actuaries, *Risk Pooling*,
    https://tinyurl.com/2hakh6x7 ..............................................................53

Ben-Shahar & Kyle D. Logue, *Outsourcing Regulation:*
    *How Insurance Reduces Moral Hazard*,
    111 Mich. L. Rev. 197 (2012)...............................................................51

G.R. Blakey, *Gaming, Lotteries, and Wagering*,
16 Rutgers L.J. 211 (1985) ..................................................................18

Kenneth S. Abraham, *The Rise and Fall of Commercial Liability
Insurance*, 87 Va. L. Rev. 85 (2001) ....................................................53

Kenneth S. Abraham, *The Liability Century* 5 (2008)............................53

D. Kopel & J. Greenlee, *The "Sensitive Places" Doctrine*,
13 Charleston L. Rev. (2018)................................................................26

K.T. Lash, *Re-Speaking the Bill of Rights: A New Doctrine
of Incorporation*,
97 Ind. L. Rev. 1439 (2022)..................................................................34

Nadav Shoked, *Property Law's Search for A Public*,
97 Wash. U.L. Rev. 1517 (2020) ..........................................................22

N. Penn. R.R. Rules & Regs. (1875),
https://tinyurl.com/rfy9s96b..................................................................24

Sidney Childress, *Peace Bonds—Ancient Anachronisms or Viable
Crime Prevention Devices*,
21 Am. J. Crim. L. 407 (1994)..............................................................51

Stephen G. Gilles & Nelson Lund, *Mandatory Liability Insurance
for Firearm Owners*,
18 Engage, J. of Federalist Soc'y Practice Grps. 13 (2013).....................48, 52, 54

Stmt., N.J. Casino Assoc.,
https://tinyurl.com/yfhhzhhy..................................................................18

## **INTRODUCTION**

For centuries, States like New Jersey have recognized their paramount interest in keeping residents safe. For just as long, States like New Jersey have understood that commonsense firearms laws play a critical role in achieving that goal. And while the Second Amendment takes certain policies off the table, the Supreme Court has repeatedly recognized that a range of firearm-safety measures remain permissible. *See N.Y State Rifle & Pistol Ass'n v. Bruen*, 142 S.Ct. 2111, 2133 (2022); *id.* at 2161-62 (Kavanaugh, J., concurring). That is, although the Second Amendment is not a blank check, history teaches that it is not "a regulatory straightjacket" either. *Id.* at 2133. That is why States have long responded to the risk of rampant gun violence with a wide array of firearms-safety measures.

In the wake of *Bruen*, the New Jersey Legislature took those lessons to heart. New Jersey recognized that it could no longer require individuals to establish their "justifiable need" to obtain a carry permit. Instead, the Legislature canvassed the firearms policies in other States, assessed the historical record, and (as relevant here) adopted three kinds of policies. First, the Legislature restricted carrying firearms at designated sensitive places to protect residents at, *inter alia*, courthouses, polling places, public assemblies, schools, playgrounds, zoos, parks, public libraries, public buses, bars, stadiums, casinos, and hospitals. Second, the Legislature protected the rights of property owners by ensuring that others could not carry firearms onto their

1

private property without permission first. Third, the Legislature required individuals to have liability insurance before carrying guns in public—to deter negligence and ensure compensation is available to victims of unintentional firearm misuse.

The district court erred in preliminarily enjoining vast swaths of this statute. Notably, the significant historical record below—including documentary and expert evidence—amply justifies each provision. State and local sensitive-place restrictions in the 18th and 19th Centuries restricted firearms at—among other places—locations where activities relating to governance, democracy, or other protected constitutional conduct occurs; where especially vulnerable or incapacitated populations gather; or where especially large crowds gather, including for social, recreational, educational, or scientific purposes. Because the States maintained these restrictions at the very time they were incorporating the Second Amendment via the Fourteenth, the States clearly understood these measures to be constitutional. And *Bruen*'s central teaching is that if the same or analogous firearms restrictions were consistent with historical understandings of the right, they are equally valid today.

The historical record also supports the private-property and liability-insurance provisions. New Jersey maintained the same protection for private property owners from 1722 to 1895, requiring individuals to obtain permission from the owner before carrying their guns on private property. It was not alone: six other colonies or States had similar measures, reflecting the widespread importance of property rights in our

2

American tradition. There is no reason that New Jersey would have less power to safeguard property rights and personal safety in 2023. And while the precise concept of liability insurance did not exist at the Founding or Reconstruction, States required arms-bearers to post financial sureties to deter firearm misuse, and to pay damages in strict liability schemes to ensure victim compensation.

In the decision below, the district court badly misunderstood *Bruen*'s analysis. The court repeatedly insisted the State provide even greater numbers of historical restrictions—even when the State supplied six or thirty, and even though no court had invalidated them. It demanded consensus among the States, even though policy variation is a hallmark of federalism. It frequently refused to allow New Jersey to analogize 18th- and 19th-Century restrictions to 21st-Century problems, despite the Supreme Court's instruction that States can draw on such analogies to craft solutions for combatting modern challenges. *Bruen*, 142 S.Ct. at 2132-33. And its decision will make New Jerseyans less safe, even as the scourge of gun violence continues unabated. This Court should reverse.

## STATEMENT OF JURISDICTION

The district court had subject-matter jurisdiction under 28 U.S.C. § 1331. This Court has subject-matter jurisdiction under 28 U.S.C. § 1292(a)(1). The State timely appealed. JA1-3.

## STATEMENT OF ISSUES

I.      Whether the district court erred in enjoining New Jersey's prohibitions on firearms in multiple sensitive locations.

II.      Whether the district court erred in enjoining New Jersey's prohibition on carrying firearms onto private property without the owner's consent.

III.      Whether the district court erred in enjoining New Jersey's requirement that an individual have liability insurance before carrying in public.

## STATEMENT OF RELATED CASES AND PROCEEDINGS

The State is unaware of any other pending challenges to the provisions of New Jersey Public Law 2022, Chapter 131, at issue in this appeal.

## STATEMENT OF THE CASE

**A. New Jersey Law.**

For nearly a century, New Jersey and several other states required individuals to demonstrate a special need for self-defense to obtain a public-carry permit. *See Bruen*, 142 S.Ct. at 2123-24 (collecting states); *Drake v. Filko*, 724 F.3d 426, 432 (3d Cir. 2013). After the Supreme Court held such requirements violated the Second Amendment right to armed self-defense, *Bruen*, 142 S.Ct. at 2122, the Legislature

4

enacted necessary updates to the law. On December 22, 2022, the Governor signed into law Chapter 131, which amends the prior firearm regulations. JA1431-69.

Mindful of *Bruen*'s requirements, Chapter 131 repeals the "justifiable need" requirement. Ch. 131 § 2. And as relevant here, the Legislature adopted three other kinds of restrictions, all already established in other jurisdictions: sensitive-place restrictions; private-property protections; and insurance provisions.

First, Chapter 131 prohibits knowingly carrying firearms into the following sensitive locations:[1]

- Certain government buildings and in the vicinity of public assemblies that require permits, because those places are "vital to the functioning of democracy and our system of government." *Id.* § 1(g)(1); *see id.* §§ 7(a)(1) (government buildings), (a)(2) (courts), (a)(3) (correctional facilities), (a)(5) (polling locations), (a)(6) (within 100 feet of a public assembly requiring a permit).

- Places where vulnerable or incapacitated populations gather, including those places with heightened concentrations of youth, *see id.* § 7(a)(7) (schools), (a)(8) (child care facilities), (a)(9) (nursery schools), (a)(10) (parks and playgrounds), (a)(11) (youth sporting events), (a)(12) (public libraries and museums); those with heightened concentrations of physically and/or mentally compromised persons, *see id.* § 7(a)(13) (shelters), (a)(14) (community residences for persons with disabilities); (a)(21) (medical facilities), (a)(22) (addiction and mental health treatment centers); and those providing intoxicating substances, *see id.* §§ 7(a)(15) (establishments serving alcohol), (a)(16) (cannabis).

---

[1] The statute exempts brief and incidental entries and when traveling along public rights-of-way. *Id.* §§ 7(a), (c), (e), (f), (g). The law also exempts individuals such as security personnel and law enforcement officers. *Id.* §§ 7(a), (e), (f), (g).

- Where crowds gather, including for social, recreational, literary, and scientific purposes, and thus where introduction of firearms would pose a special "threat to public safety," *id.* § 1(g)(5), including entertainment facilities, *id.* § 7(a)(17), casinos, *id.* § 7(a)(18), transportation hubs, *id.* § 7(a)(20), and movie sets, *id.* § 7(a)(23).

Section 7 also permits firearms in vehicles, but requires that they be "unloaded and contained in a closed and securely fastened case, gunbox, or locked unloaded in the trunk of the vehicle." *Id.* § 7(b)(1)-(2).

Second, Section 7(a)(24) prohibits bringing firearms onto another's "private property ... unless the owner has provided express consent." The Legislature found that "[t]he historical record ... supports restriction of firearm possession on private property when the owner has not given their consent." *Id.* § 1(h). And it found that requiring individuals to obtain owners' consent "is ... in line with both ... reasonable expectations and property rights." *Id.*

Third, Chapter 131 includes updated requirements for public carry, including safe-carry requirements, *id.* §§ 5, 6; a safety course, *id.* § 3; increased permit fees (which had gone unchanged for decades), *id.* § 2, 3; and requirements that individuals publicly carrying firearms have liability insurance, *id.* § 4.

## B. The Proceedings Below.

On the day that Chapter 131 went into effect, two sets of resident and firearm-advocacy organization plaintiffs filed suit. *See* JA264-85, JA286-344. The district court granted a TRO in *Koons* on January 9, restraining firearms regulations at

libraries and museums, entertainment venues, establishments serving alcohol, vehicles, and the private-property rule. *See* JA465-524. After *Siegel* was consolidated with *Koons*, the court issued another TRO on January 30, additionally enjoining restrictions at casinos and parks. JA759-806.

On May 16, the district court issued its preliminary injunction decision, JA6-244, which now also enjoined restrictions at zoos, permitted assemblies, film sets, and medical offices "set forth in Plaintiffs' declarations," JA7. The district court also enjoined the liability-insurance requirement. *Id.* But it *limited* its prior injunction of the private-property rule to curtilage and property held open to the public. *Id.*

The court denied Plaintiffs' requests to enjoin the restrictions at playgrounds, youth sports events, airports and transportation hubs, certain healthcare facilities and addiction treatment centers, and regulations relating to fish and game. *See* JA7-8. The court also rejected Plaintiffs' challenges to Chapter 131's permitting provisions, except to prohibit in-person interviews of references and to allow only collection of information "bearing on the applicant's dangerousness or risk of harm to the public." JA72. And the court rejected Plaintiffs' challenges to the exemptions for judges, prosecutors, and certain other government employees. JA8.

The State appealed and sought a stay of the injunction as to the sensitive-place and private-property provisions. On June 20, this Court granted a partial stay of the injunction as to the restrictions in zoos; parks, beaches, and recreation facilities;

public libraries or museums; establishments where alcohol is served; entertainment facilities; casinos; the medical facilities covered by the preliminary injunction; and within 100 feet of a permitted public gathering. *See* Dkt. 29.

## SUMMARY OF ARGUMENT

Chapter 131's sensitive-place restrictions, private-property rule, and liability-insurance provision all satisfy *Bruen*.

I.    A. Chapter 131's place-based restrictions fit easily within the historical tradition, from before the Founding through after Reconstruction, of States limiting firearms in particularly sensitive locations. These "longstanding" laws "forbidding the carrying of firearms in sensitive places," *District of Columbia v. Heller*, 554 U.S. 570, 626 (2008); *see also Bruen*, 142 S.Ct. at 2133; *id.* at 2162 (Kavanaugh, J., concurring), include 18th- and 19th-Century limits on carrying firearms in locations, *inter alia*, where activities relating to governance, democracy, and other protected constitutional activities occur; where especially vulnerable or incapacitated persons gather; or where particularly large crowds gather, including for social, recreational, educational, and/or scientific purposes, such that introduction of firearms would be especially volatile. Chapter 131's sensitive-place restrictions fall within these traditions. And many have historical "twins," too—that is, States adopted identical or near-identical restrictions in the 18th or 19th Centuries.

The district court erred in enjoining these restrictions. The court wrongly held that the State offered too few historical predecessors, even though *Bruen* found that one or two historical firearms prohibitions at courthouses, assemblies, and polling places alone established a sufficient historical tradition. It incorrectly deemed the evidence unrepresentative, even though no record evidence suggests that any court saw these historical restrictions as unconstitutional. It essentially demanded that the historical restriction be a "dead ringer" for the modern law, despite *Bruen*'s contrary instruction to consider "analogue[s]." 142 S.Ct. at 2133. And Plaintiffs err in insisting that only Founding-era laws are relevant, even though Reconstruction-era evidence supplies powerful proof of what restrictions the States understood to be consistent with the Fourteenth Amendment as they ratified it.

B.    Many of Chapter 131's sensitive-place restrictions can also be justified where the government is the proprietor. When States act as proprietors rather than sovereigns, their authority is akin to "private property owners," who have "the power to regulate conduct on [their] property." *United States v. Class*, 930 F.3d 460, 464 (D.C. Cir. 2019). That includes the power to restrict firearms. *Id.* at 463.

II.    Chapter 131's private-property rule satisfies both steps of *Bruen*'s test: it does not implicate the Second Amendment right, and it is justified by considerable historical evidence. Although the Second Amendment affords individuals a right to carry firearms publicly, carrying guns on another's property is a question of property

9

law, not constitutional right. *See GeorgiaCarry.org v. Georgia*, 687 F.3d 1244, 1264 (11th Cir. 2012). The record shows New Jerseyans neither believe nor desire that others can carry firearms on their property without obtaining their consent; Section 7(a)(24) effectuates that intent and expectation. And it does so the same way seven States protected property rights at the Founding and Reconstruction: by requiring persons to obtain consent from the owner. New Jersey maintained such a law from 1722 until 1895, and six other States had the same requirements in the 18th or 19th Centuries—the validity of which was never questioned.

Neither text nor history supports the district court's decision to enjoin Section 7(a)(24) as to curtilage and businesses open to the public. Private-property owners retain their right to exclude even on property open to the public, and Section 7(a)(24) effectuates that right. Further, an implied license to enter such businesses does not indicate whether that entry can include firearms; instead, the record again shows that owners do not believe that they have implicitly invited firearms onto their premises. Finally, none of the seven historical predecessors drew distinctions between businesses open to the public or curtilage and other forms of property.

III.    The liability-insurance provision satisfies *Bruen* too. Requiring liability insurance—likely covered by homeowner's or renter's insurance policies—does not infringe the self-defense right. And the insurance requirement comports with early surety laws (which required upfront payment of bonds to deter firearms misuse) and

10

strict liability regimes (which shifted the costs of firearms misuse from the victim to the user). Modern law accomplishes those goals via insurance.

## STANDARD OF REVIEW

"In reviewing the grant or denial of a preliminary injunction," this Court uses "a tripartite standard of review: findings of fact are reviewed for clear error, legal conclusions are reviewed de novo, and the decision to grant or deny an injunction is reviewed for abuse of discretion." *Osorio-Martinez v. U.S. Att'y Gen.*, 893 F.3d 153, 161 (3d Cir. 2018) (quotation omitted). The movant must establish "a reasonable probability of success on the merits" and "irreparable harm." *Amalgamated Transit Union Local 85 v. Port. Auth. of Allegheny Cnty.*, 39 F.4th 95, 102-03 (3d Cir. 2022). Courts also weigh the equities and public interest. *Id.*

## ARGUMENT

The Supreme Court has repeatedly recognized that "the right secured by the Second Amendment is not unlimited." *Bruen*, 142 S.Ct at 2128 (quoting *Heller*, 554 U.S. at 626). When assessing claims under the Second Amendment, courts engage in a two-step inquiry. First, courts must ask whether the Second Amendment right is implicated—*i.e.*, whether its "plain text covers an individual's conduct." *Id*. at 2126. If not, "the regulated activity is categorically unprotected." *Id.* (quotation omitted). Second, if the conduct is protected, courts ask if the restriction nevertheless accords with "the Nation's historical tradition of firearm regulation." *Id.*

States can establish historical traditions by identifying "historical twin[s]" or by relying on "historical analogue[s]." *Id.* at 2133 (emphasis omitted). In assessing whether an analogue is "relevantly similar" to the modern statute, courts ask whether the two laws "impose a comparable burden on the right of armed self-defense" and "whether that burden is comparably justified." *Id.* at 2132-33; *see id.* at 2133 (calling these the "how and why" of the laws). *Bruen*'s analysis offers neither "a regulatory straightjacket nor a regulatory blank check," *id.*: the inquiry focuses on whether it was understood historically that the Second and Fourteenth Amendments had taken the challenged "policy choice[] off the table" for the States. *Range v. Att'y Gen.*, 69 F.4th 96, 103 (3d Cir. 2023) (en banc) (quoting *Heller*, 554 U.S. at 636).

A straightforward application of *Bruen*'s two-step framework establishes that Chapter 131's sensitive-place restrictions, private-property protection, and insurance provision are constitutional. The preliminary injunction should be reversed.

## I.   THE DISTRICT COURT ERRED IN PRELIMINARILY ENJOINING MULTIPLE SENSITIVE PLACES RESTRICTIONS.

Chapter 131's sensitive-place provisions are all consistent with the Nation's historical tradition. Many are also justifiable as involving government property.

### A. The Enjoined Sensitive-Places Restrictions Are Consistent With The Second Amendment.

*Bruen* highlighted sensitive-place laws as a paradigmatic example of statutes with significant historical and analogical pedigrees. *See* 142 S.Ct at 2133 (holding

validity of "longstanding laws forbidding the carrying of firearms in sensitive places such as schools and government buildings" is "settled," and agreeing States "can use analogies to those historical regulations of sensitive places" to justify other sensitive-place provisions). Chapter 131's sensitive places fit that tradition.

       1.    <u>The Sensitive-Place Restrictions Have Historical Support.</u>

Laws prohibiting firearms in sensitive places have been part of our Nation's historical tradition for centuries—without doubt as to their constitutionality. Early English laws prohibited firearms in sensitive locations, *see, e.g.*, JA1223; JA1327-29; JA1330-31; JA1332; JA1687-89; JA1690-92, and colonies and Founding-era States did too. *See* JA1311-12 (collecting examples). As the States' populations grew and cheap revolvers flooded consumer markets, *see* JA1205-06, States codified a wider array of place-based prohibitions in the 19th Century. These laws establish that States can restrict firearms at least in places where, *inter alia*, activities relating to governance or democracy and protected constitutional conduct occur; where disproportionate concentrations of vulnerable or incapacitated persons can be found; or where particularly large crowds gather, whether for social, recreational, educational, and/or scientific purposes, such that introduction of firearms would make conditions especially volatile. Each of Chapter 131's sensitive places fit one or more of those traditions, and many are justified by identical or nearly-identical historical "twins" as well.

>    *a. Within 100 feet of public gatherings requiring government permits (Section 7(a)(6)).*

A robust historical tradition supports Chapter 131's prohibition on carrying within 100 feet of a public gathering. At least eight jurisdictions prohibited firearms at "public assemblies" or "public gatherings"—that is, they maintained nearly identical restrictions, known as historical "twins." *See* JA1249-51 (Tex. 1870); JA1510-12 (Tenn. 1869); JA1370 (Ga. 1870); JA1513-14 (Tex. 1871); JA1712-14 (Mo. 1874); JA1515-16 (Mo. 1879); JA2093-95 (Ariz. 1889); JA2096-98 (Okla. 1890). Local jurisdictions adopted similar measures. *See* JA1313-16, JA1350-51 (Columbia, Mo. 1890); JA1366 (Stockton, Kan. 1887).

The historical record indicates no "disputes regarding the lawfulness of such prohibitions." *Bruen*, 142 S.Ct. at 2133. Indeed, these laws were repeatedly upheld. *See English v. State*, 35 Tex. 473, 478-79 (Tex. 1872) (noting that such restrictions were justified by "the history of our whole country" and "not peculiar to [a few] State[s]" and that they reflected an "undisputed function[] of government … to ward off crimes against [society] by antecedent precautions"); *Hill v. State*, 53 Ga. 472, 475 (Ga. 1874); *State v. Shelby*, 2 S.W. 468, 469 (Mo. 1886); *Andrews v. State*, 50 Tenn. 165, 182 (Tenn. 1871); *State v. Reando* (Mo. 1878) (JA1365)[2]; *see also, e.g.,*

---

[2] The opinion below misreads *Reando* to suggest that court upheld the 1874 Missouri law only because it allowed open-carry. But *Reando* said the Constitution would *not*

JA1210-14 (historian discussing these precedents). Contemporaneous treatises and newspaper articles confirm that these laws were uncontroversial. *See, e.g.*, JA1715-16 (*Norman Transcript* 1890), JA1717 (*Mo. Republican* 1872), JA1718 (*Moniteau Journal* 1872), JA1696-1711 (B.V. Abbott, *Judge and Jury* 1880); JA1311-12, JA1343-44 (historian discussing contemporaneous treatise). Because *Bruen* asks whether the historical understanding of the self-defense right precluded these options, the lack of controversy is instructive.

Moreover, the rationales for these laws confirm that sensitive-place rules are valid when they (1) address the dangers inherent in gatherings where the introduction of firearms pose a particular threat or (2) protect the exercise of other constitutional (e.g., First Amendment) rights. As to the former, contemporaneous decisions and commentary emphasized that the laws reflected a need to protect individuals from violence and chaos in places where people were especially likely to congregate. *See, e.g.*, *English*, 35 Tex. at 478-79 (emphasizing that States may restricting carrying firearms "into a peaceable public assembly, as, for instance into a church, a lecture room, a ball room, or any other place where ladies and gentlemen are congregated

---

prevent Missouri from "prohibit[ing] a person from bearing arms, even openly" at sensitive places, suggesting that open carry in those sensitive places would "shock[]" the "moral sense of every well-regulated community." JA1365. And courts later upheld an 1883 version of Missouri's statute, which prohibited open and concealed carry. *See Shelby*, 2 S.W. at 469; JA1363-64.

together"); *Hill*, 53 Ga. at 475 (adding that bringing guns to an assembly was "a provocation to a breach of the peace" and "dangerous to human life"). As to the latter, *Bruen* held that States could restrict firearms at courthouses, legislative assemblies, and polling places—all places, like assemblies, where governmental and free speech activities are at their zenith. Not only is Chapter 131's permitted-gatherings section justified by historical "twins," it also maps onto two well-recognized categories of sensitive places.

> b. *Entertainment venues (Section 7(a)(17)), Casinos (Section 7(a)(18) and N.J. Admin Code 13:69D-1.13), Movie sets (Section 7(a)(23)), Establishments serving alcohol (Section 7(a)(15)).*

Building on the restrictions on public assemblies, dozens of jurisdictions also prohibited carrying where people gather for social and entertainment purposes. Early English laws prohibited firearms in these locations, focusing on fairs and markets. *See, e.g.*, JA1223 (1328 statute providing Englishmen may not "go nor ride armed by night nor by day, in Fairs [and] Markets"). In the late 18th Century, Virginia did the same. JA1508 (Va. 1786). And in 1816, New Orleans barred carrying firearms in "a public ball-room." JA1509. None of these laws were invalidated.

Recognizing the harm of introducing firearms into social and entertainment spaces, many Reconstruction-era States broadly prohibited firearms in a "ballroom, social party," JA1505-07 (Tex. 1870), "fair, race-course, or other public assembly," JA1510-12 (Tenn. 1869), and/or "any place where people may be assembled for …

16

social purposes," JA1287-89, 1515-16, 2090-92 (Mo. 1874, 1879, 1883); *see also, e.g.*, JA1513-14 (Tex. 1871) (broadly prohibiting firearms at "any circus, show, or public exhibition of any kind, or into a ball-room, social party, or social gathering"); JA1591-92 (Ga. 1870); JA2093-95 (Ariz. 1889); JA1373-74 (Okla. 1890); JA2099-102 (Mont. 1903); Laws of Terr. of N.M. at 69 (1853), https://tinyurl.com/mwd3dnb5 (banning firearms at "Balls or Fandangos"); Laws & Ordinances of City of New Orleans, ch. 1 art. 1, *reprinted in Jewell's Digest*, at 1 (1882), https://tinyurl.com/kmbx8fm3 (prohibiting arms in "any place of public entertainment or amusement").

Those concerns were magnified when alcohol was involved, which increased not only the risk of firearm misuse by intoxicated individuals, but also the risk that other inebriated patrons would be unable to defend themselves. So, in addition to the States that prohibited carry by individuals consuming alcohol, *see, e.g.*, JA1521-22 (Kan. 1867), multiple jurisdictions barred firearms wherever "intoxicating liquors are sold." *See* JA2096-98 (Okla. 1890); *see also supra* at 17 (1879 New Orleans prohibition at "any … tavern"); *id.* (1853 New Mexico prohibition in "room[s] adjoining said ball where Liquors are sold"). Furthermore, Connecticut banned alcohol sales near military encampments, where persons would be carrying arms. JA1517-20 (Conn. 1859); *see also* 1756 Del. Act, at 4, *reprinted in Military Obligation*, Monograph 1, Vol. 2, Pt. 3, at 13 (1947), https://tinyurl.com/57t7e2j5

(prohibition on bringing "any strong Liquor" to militia meeting, and prohibiting such meeting within a half mile "of any Inn or Tavern").

These restrictions amply justify Chapter 131's restriction on carrying firearms into entertainment facilities, casinos,[3] movie sets, and bars and restaurants serving alcohol. Initially, that many of these facilities did not exist at either the Founding or Reconstruction calls for drawing such analogies. For example, prior to 1950, there were "few exceptions to a general prohibition against gambling at the federal and state levels"—meaning no restrictions at casinos were necessary. *See* G. Robert Blakey, *Gaming, Lotteries, and Wagering*, 16 Rutgers L.J. 211, 212 (1985). Nor could the Founders have imagined a place like MetLife Stadium, with seating capacity roughly the size of Boston's population in 1830. But the States' core "how" and "why" is the same: just as States constitutionally could restrict carrying firearms to a show in 1871 or race-course in 1869, the Second Amendment does not forbid New Jersey from restricting firearms at a Taylor Swift concert or screening or

---

[3] The district court also erred in finding that Plaintiffs have standing to challenge the restriction at casinos. Plaintiffs claimed that Chapter 131 injured them by preventing carry in casinos. *See, e.g.*, JA313, 315. But regardless of whether this law remains in effect, every casino in New Jersey independently prohibits firearms. *See* JA3031-33; Stmt., N.J. Casino Assoc., https://tinyurl.com/yfhhzhhy. A court order enjoining Chapter 131 thus cannot redress Plaintiffs' alleged injury, because trespass law independently prevents their conduct. Nor can Plaintiffs challenge the higher penalties in Chapter 131. Because no plaintiff suggests he will still carry in violation of casino policy, there is no likelihood they will be subject to these penalties.

filing of *Barbie* today. *See Bruen*, 142 S.Ct. at 2133 (holding that "courts can use analogies to those historical regulations" to uphold any "modern regulations prohibiting the carry of firearms in new and analogous sensitive places").

### c. Public libraries and museums (Section 7(a)(12)).

Just as so many States historically restricted firearms at "public assemblies" and places of social and recreational gathering, States likewise restricted firearms at places for educational, literary, and scientific gatherings in the 19th Century. These laws repeatedly use the same formulations: they prohibited all firearms at "place[s] where persons are assembled for educational, literary or scientific purposes." *See* JA1505-07, JA1513-14 (Tex. 1870 & 1871); JA2087-89, 2090-92 (Mo. 1874 & 1883); *see also* JA2099-102 (Mont. 1903). Localities did the same. *See* JA1350-51 (Columbia, Mo. 1890); JA1366 (Stockton, Kan. 1887). And while still territories, Arizona in 1889 (JA2093-95) and Oklahoma in 1890 (JA2096-98) enacted similar laws. These, too, were locations where individuals were likely to gather and where introduction of firearms would be dangerous and chaotic. And like schools, which *Bruen* recognized as "sensitive," and like zoos and parks, discussed *infra* at 20-22, educational- and literary-focused spaces are frequented by vulnerable individuals— namely, children. No court invalidated these restrictions.

Public libraries and museums are precisely locations where individuals come to engage in educational, literary, or scientific enterprises. *See, e.g.*, *Maryland Shall*

*Issue v. Montgomery Cnty.* (*MSI*), ___ F.Supp.3d ____, 2023 WL 4373260, *12 (D. Md. July 6, 2023) (finding these historical restrictions "necessarily apply to public libraries"). And the rationales behind the modern and historic laws are comparable, as both prohibit firearms in these places to "prevent[] disruption of educational and literary activities and ensur[e] safety during those activities." *Id.* Still more, modern public libraries and museums are popular for families with children, *see* JA353-54 (plaintiff "frequently" takes 13-year-old son to public libraries and museums)—and children are a quintessential vulnerable group. In short, prohibiting firearms at public libraries and museums fits our historical tradition.

> ### d. Public parks, beaches, and recreational facilities (Section 7(a)(10) and N.J. Admin. Code 7:2-2.17(b)); Zoos (Section 7(a)(9)).

There is also an extensive body of historical carry restrictions in 19th-Century parks and zoos—again confirming States' authority to restrict firearms in locations where people gather, especially with children. Early recreational parks—including Central Park, Fairmount Park, and Lincoln Park—prohibited firearms. *See* JA1593 (1861), JA1594 (1870), JA1597 (1870). These parks also housed the first modern zoos, where the restrictions also applied. *See* JA1810-17.

Firearms prohibitions at parks were legion across the country, in densely-and sparsely-populated regions. *See* JA1840 (Mich. 1895); JA1866 (Minn. 1905); JA1931 (N.C. 1921); JA1933 (N.J. 1937); JA1938 (Hyde Park, Ill. 1875); JA1943

(Danville, Ill. 1883); JAx1946 (St. Louis, Mo. 1883); JA1952 (Salt Lake City, Utah 1888); JA1963 (Williamsport, Pa. 1890); JA1964 (Springfield, Mass. 1891); JA1967 (Grand Rapids, Mich. 1891); JA1971 (Lynn, Mass. 1891); JA1975 (Peoria, Ill. 1892); JA1980 (Spokane, Wash. 1892); JA1983 (Wilmington, Del. 1893); JA1987 (Canton, Ill. 1895); JA1991 (Indianapolis, Ind. 1896); JA1996 (Pittsburgh, Pa. 1893); JA2001 (Reading, Pa. 1897); JA2002 (Boulder, Colo. 1899); JA2003 (Oakland, Cal. 1909); JA2005 (Birmingham, Ala. 1917); *see also* Case No. 22-cv-7464, ECF 120, State's Supp'l Br. at 1-2 n.1 (listing additional 19th-Century prohibitions, including at parks in Trenton, San Francisco, and Brooklyn); 1895 Mich. Laws 596, No. 436, § 44, https://tinyurl.com/25b42z3b; JA1216 (historian noting record is likely incomplete since historical municipal laws "are much more challenging to identify" as they may not have "been preserved or digitized"). Early national parks similarly prohibited guns. *See* JA2008-82.

It is easy to see why many jurisdictions enacted parks restrictions without any constitutional controversy. Public parks, then and now, are for recreational activity, family congregation, or large group celebrations, *compare* JA1816-17 (historical use) *with* JA1130-31, 1112 (modern use), and restrictions on firearms "served to advance public safety and the peaceful enjoyment of parks." *MSI*, 2023 WL 4373260, at *11. And, of course, parks, beaches, and zoos are all locations where children, who are especially vulnerable to firearms violence, congregate. *See*

JA1130. Just as *Bruen* recognized the constitutionality of firearms restrictions at schools, and as the district court recognized that New Jersey could restrict firearms at "youth sport events" and "playgrounds" given the presence of children, JA192-93 (PI) & JA781-82, 787-88 (TRO), so too should restrictions on guns at parks, beaches, and zoos be affirmed. *See, e.g.*, *Zaitzeff v. City of Seattle*, 484 P.3d 470, 479 (Wash. Ct. App. 2021) (parks are sensitive due to children's presence). Those powerful rationales led historical governments to enact thirty "twins" to modern parks restrictions.[4]

### e. Healthcare facilities (Section 7(a)(21)).

The constitutionality of restrictions at healthcare facilities follows from the sensitive-place restrictions discussed above—in particular, restrictions at places with disproportionate concentrations of vulnerable or incapacitated persons.

Modern medical facilities were unknown to the Framers. The pre-industrial, Founding-era "norm" was the provision of "medical care at home." *MSI*, 2023 WL 4373260, at *14. "It was not until the late nineteenth century"—amid the Industrial Revolution—that "the professionalization of health care practices" was concentrated

---

[4] The district court focused on the Founding-era laws that prohibited weapons discharge at village greens. JA187-88. But colonial-era commons are not relevantly similar to modern parks, which were designed specifically to be "distinguishe[d]" from the "common spaces" of these early town squares. JA1805; Nadav Shoked, *Property Law's Search for A Public*, 97 Wash. U.L. Rev. 1517, 1557-58 (2020) (describing Boston Commons as a "grazing area[]" and noting "[t]he modern idea of the park emerged in the nineteenth century").

in medical facilities. *Id.* (citation omitted). Said another way, medical care simply did not involve congregating sick individuals into a single place. *See Bruen*, 142 S.Ct. at 2132 (emphasizing importance of analogical reasoning when "regulatory challenges posed by firearms" were unfathomable historically).

But the public-safety concerns these modern settings introduce are familiar. Like venues where children are present, medical facilities are hardly the first places where the patrons are disproportionately unable to defend themselves. *See Bruen*, 142 S.Ct. at 2133 (finding it "settled" that firearms restrictions are permissible at schools, where youth are uniquely vulnerable); *see also supra* at 17, 21-22 (explaining that the same is true of parks and zoos, again due to the presence of children, and at establishments serving liquor, given the presence of inebriated individuals). Medical facilities implicate the same problem: many individuals are vulnerable due to illness or incapacitation from treatment, such as an MRI or a colonoscopy. And just as the "why" of these laws is similar, so too is the "how": outright restrictions on firearms in sensitive places. Although firearms at medical facilities present a uniquely modern problem, the animating concerns and approaches remain the same.

> *f.  Public buses and private vehicles (Section 7(b)(1) and N.J.*
> *Admin. Code § 7:25-5.23(f)(5)).*

Chapter 131 does not prohibit individuals from bringing firearms into public buses and in their private vehicles, but it does require that the firearms be locked and unloaded. That restriction likewise finds historical support.

Begin with public buses. Notably, mass transportation did not emerge until the 19th century with the construction of railroads, *see Frey v. Nigrelli*, No. 21-5334, 2023 WL 2473375, at *19 (S.D.N.Y. Mar. 13, 2023), emphasizing the importance of analogical reasoning in this context. Even in that period, however, railroads were owned by private companies with the authority to set their own rules and regulations. Recognizing the danger posed by firearms on crowded cars, the railroad companies often prohibited the carrying of guns in the coach of railroad cars. *See id.* at *19 (documenting regulations); *I. & G.N. Ry. Co. v. Folliard*, 1 S.W. 624, 625 (Tex. 1886); N. Penn. R.R. Rules & Regs. at 13 (1875), https://tinyurl.com/rfy9s96b. And what laws did exist concerning mass transit also barred firearms at railroads. *See* JA1538 (Iowa 1876 law prohibiting "present[ing] or discharg[ing] any gun … at any railroad train, car or locomotive engine").

The evidence of private and public firearms restrictions in mass transportation stands for two important propositions. First, this historical evidence confirms that it was well understood mass transportation presented the kind of crowded and volatile situation that increased the danger of firearms—exactly the characteristics that can

24

make a place "sensitive" under the Second Amendment. *See supra* at 13-16. Second, this historical evidence reveals the widespread understanding that private proprietors of mass transportation could restrict firearms on their cars. The rule is no different when the government acts as proprietor of near-identical transportation services. *See infra* at 34-37 (discussing the government-as-proprietor doctrine). Public buses were nonexistent in the 18th and 19th Centuries, but what existed historically supports Chapter 131's restriction today.

So too for modern private automobiles. Even before the advent of modern cars, historical laws specifically addressed the dangers of carrying firearms while traveling, albeit by horse. *See, e.g.*, JA1252 (Tex. 1871 prohibition on carrying a pistol on someone's "person, saddle, or in his saddle-bags"); JA2833 (N.J. 1686 provision forbidding individuals to "ride or go armed with … [a] pistol"). And from the beginning of automobile travel, States understood they could restrict carrying loaded firearms within cars. *See, e.g.*, JA1542 (Iowa 1929 law barring firearms in "motor vehicle" unless "unloaded" and "contained in a case"); JA1547 (Maine 1919 statute prohibiting "loaded" firearm in "any motor vehicle"). The district court suggested these laws were hunting regulations, JA216, but nothing in their operative provisions is so limited. Rather, the historical rationale focuses on safety: to prevent the risk that an incident on the road turns deadly. *See, e.g.*, *Carr v. State*, 34 Ark. 448, 449 (Ark. 1879) (noting risks from persons traveling "about the streets, armed

in a manner which, upon a sudden fit of passion, might endanger the lives of others"). The same concerns are present in modern times.

2.    The District Court's Contrary Conclusions Are Erroneous.

The district court and Plaintiffs rejected this considerable body of historical evidence only by making five legal errors.

*First*, the court impermissibly and repeatedly rejected historical evidence as being insufficiently numerous. *E.g.*, JA179, 184, 192, 194, 198, 200, 207, 210, 212. Sometimes, it held the total number of state restrictions too few to qualify. *See* JA198 (rejecting at least five prohibitions at entertainment venues as "not enough"). Other times, it found restrictions insufficient because they did not cover a sufficiently high percentage of the population. *See* JA187 (disregarding dozens of parks restrictions), JA192. The court never clarified what number of twins or analogues would suffice, or what percentage must be covered, but throughout its opinion, it frequently cited this concern in dismissing considerable historical evidence.

That was error, as *Bruen* itself makes clear. *Bruen* expressly held that weapons prohibitions at both legislative assemblies and courthouses had sufficient pedigrees by pointing to sources that identified not more than *two* historical statutes prohibiting weapons at each. *See* 142 S.Ct. at 2133 (citing David Kopel & Joseph Greenlee, *The "Sensitive Places" Doctrine*, 13 Charleston L. Rev. 205, 229-36, 244-47 (2018) (one example for courthouses, two for legislative assemblies)). Nonetheless, *Bruen* found

26

these laws sufficient to justify modern restrictions because the Court was "aware of no disputes regarding the lawfulness of such prohibitions." *Id*. If multiple States had a restriction at the Founding or at Reconstruction, and none of them were invalidated, that strongly indicates the States saw the restriction as an available policy option.

As *Bruen* explains, the situation could be different if the State proffered just "three colonial regulations" and those laws "contradict[] the overwhelming weight of other evidence." 142 S.Ct. at 2142, 2153. Said another way, when the State can proffer just a few supporting statutes, and there is countervailing historical evidence from other jurisdictions revealing "a consensus view that States could not" maintain such measures, *id.* at 2147, the sparseness of the State's submission will bear on its force. *See id.* at 2142-47 (holding that, while a few colonial regulations supported New York's special-need requirement, more historical evidence suggested that law's unconstitutionality). But no countervailing evidence exists here. *Bruen* thus shows uncontroverted historical predecessors can prove constitutionality—regardless of the precise number of laws or population covered thereby.

*Second*, and relatedly, the district court wrongly put stock in the mere *lack* of laws in other jurisdictions. *See, e.g.*, JA184 (citing "lack of consensus" regarding a particular sensitive-place measure); JA179, 192, 194, 198. But any particular State's decision not to enact a particular policy at any particular time is not itself proof of a law's unconstitutionality. Then, as now, governments had myriad policy reasons to

adopt or eschew a particular regulation. Indeed, a range of States today allow permit-less carry, despite *Bruen*'s holding that permitting laws are constitutional. *Compare* 142 S.Ct. at 2161-62 (Kavanaugh, J., concurring) (emphasizing that *Bruen* "does not affect the existing licensing regimes—known as 'shall-issue' regimes—that are employed in 43 States"), *with* Ariz. Rev. Stat. § 13-3102(A), *as amended by* S.B. 1108 (2010), https://tinyurl.com/2p8kkn6a (removing carry licensing requirements). Such variation is the consequence of a federalist system, not proof of constitutional defect. *See Garcia v. San Antonio Metro. Transit Auth.*, 469 U.S. 528, 546 (1985) ("The essence of our federal system is that within the realm of authority left open to them under the Constitution, the States must be equally free to engage in any activity that their citizens choose for the common weal."); *New State Ice Co. v. Liebmann*, 285 U.S. 262, 311 (1932) (Brandeis, J., dissenting) (States serve as laboratories of democracy, adopting divergent policies).

There are many potential paths available to challengers to rebut the State's historical evidence. Challengers can show that a particular historical sensitive-place restriction was invalidated by contemporaneous judicial decisions. They can show other States declined to adopt that policy because of concerns about constitutionality. They can highlight commentators' doubt on constitutional grounds. Or they can point out that no State ever adopted a similar law, because the "lack of a distinctly similar historical regulation addressing [a persistent] problem" *anywhere* suggests

28

that the States viewed the policy as unavailable to them. *Bruen*, 142 S.Ct. at 2131. But Plaintiffs did not do any of it here. And the mere absence of uniform national policy says little about historical understandings of the Second Amendment in our federalist scheme. To hold otherwise would disempower States from maintaining laws they could have enacted centuries ago solely because other States historically preferred a different policy approach.

*Third*, the district court inappropriately dismissed the evidence from multiple jurisdictions. *See* JA172 (refusing to consider territorial laws); JA173-75 (refusing to consider state-court decisions that purportedly relied on the collective-rights rationale for the Second Amendment). To be sure, where historical evidence comes only from jurisdictions that never recognized the constitutional right to self-defense and "contradict[s]" historical evidence from the jurisdictions that did, the State's submission is unlikely to establish that the restriction can coexist with the Second Amendment. But where such evidence is confirmatory—*i.e.*, if it is consistent with laws adopted by jurisdictions that recognized the self-defense right—this additional evidence can underscore a widespread historical understanding.

That is the case here. To take one example, the language from territorial laws restricting public assemblies tracked almost verbatim the language of existing State laws. *See, e.g.*, JA1371-72 (Ariz. 1889); JA1373-74 (Okla. 1890); JA2810-11 (N.M.

1869).[5] That multiple States, localities, and territories enacted identical restrictions at assemblages for over thirty years throughout the Reconstruction era, and that none were invalidated, represents a powerful historical tradition.

So too with evidence from state courts. For example, the district court was wrong to claim that *English* relied only on the "militia-based" view of the Second Amendment to uphold sensitive-place restrictions. *See English*, 35 Tex. at 478-79 (noting Texas Constitution afforded individual right for "lawful defense" and affirming firearms restrictions in "peaceful public assembly," "lecture room[s]," and "ball room[s]"). Moreover, other courts—which plainly relied on the individual-rights view—upheld similar firearms restrictions. *See Shelby*, 90 Mo. at 305 ("The constitution secures to the citizen the right to bear arms in the defense of his home, person, and property."); *Andrews*, 50 Tenn. at 181 (characterizing armed self-defense as a "private right"). Neither Plaintiffs nor the district court identify a single opinion invalidating these historical sensitive-place restrictions.

*Fourth*, for the evidence the district court did consider, it wrongly demanded that historical analogues be nearly identical to the modern statute to count. In *Bruen*, the Supreme Court made crystal clear that an analogue need not be "a historical twin.

---

[5] The district court also incorrectly stated that New Mexico's law "only criminalized using or drawing a firearm." JA172. But that law made it "unlawful for any person to carry deadly weapons, either concealed or otherwise, on or about their persons within any of the settlements of this Territory." JA2811.

So even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster." 142 S.Ct. at 2133; *see also id.* at 2132 (emphasizing "cases implicating unprecedented societal concerns or dramatic technological changes may require a more nuanced approach," as today's challenges are not "the same as those that preoccupied the Founders in 1791 or the Reconstruction generation in 1868"). Rather, as detailed above, where a modern law operates in a similar manner as historical provisions (the "how") and is motivated by similar rationales (the "why") courts should uphold it. *Id.*

The decision below is internally inconsistent on this. The court acknowledged that some analogies were warranted, recognizing that restrictions at playgrounds and youth sporting events protect children like historical restrictions at schools. JA186, 192, 193. But it would not follow that logic to public libraries and zoos, even though youth congregate there, or urgent care centers, which also gather vulnerable people who cannot defend themselves. JA182, 193-95, 208-10; *see supra* at 17, 21-22, 23. And it failed to acknowledge that 19th-Century fairs, ballrooms, and social parties are akin to 21st-Century entertainment venues like bars and casinos, even though restrictions at these places address the risk inherent in crowded and chaotic social scenes—especially with intoxicated persons. *Compare* JA196-98, *with supra* at 13-16, 17. The decision below thus wrongly imposed a "regulatory straightjacket." *Bruen*, 142 S.Ct. at 2133.

31

The *Koons* Plaintiffs' proposed rule—on which the district court relied at least in part—is even more cramped. They contend that only places with security akin to "the TSA-secured areas of an airport" are sensitive. *See* Dkt. 24 at 9. And while the district court did not go quite so far, it emphasized security as a core factor in the analysis. *See* JA180. But that ignores that "[m]any 'schools' and 'government buildings'—the paradigmatic 'sensitive places' identified in *Heller I*—are open to the public, without any form of special security or screening." *Class*, 930 F.3d at 465; *see also supra* at 16-22 (discussing historical restrictions at other locations that were not marked by such extensive security). Instead, like schools and government buildings, "places are sensitive for purposes of the Second Amendment because of the people found there or the activities that take place there." *Id*. Those are the considerations on which New Jersey relies.

*Fifth*, Plaintiffs—but not the district court—wrongly insist that Founding-era evidence alone bears on the constitutional inquiry. But while this Court would need to address which period counts if evidence from the Founding and Reconstruction conflicted, it is "unnecessary to choose between" the two where—as here—no such contradiction exists. *Bruen*, 142 S.Ct. at 2163 (Barrett, J., concurring). Although there may be *more* historical evidence of widespread sensitive-place restrictions in the 19th Century, the lower number of analogues from the 18th Century is hardly a conflict. Particularly where Founding-era legislators saw no reason to enact laws on

a particular subject, later enactments can thus elucidate the scope of the right. *See Gamble v. United States*, 139 S.Ct. 1960, 1967 (2019) (relying on mid-19th-Century views of Double Jeopardy Clause); *id.* at 1980 (Thomas, J., concurring) (same).

But if this Court addresses the issue, it should clarify that Reconstruction-era evidence is especially useful. *Bruen*'s core teaching is that "[c]onstitutional rights are enshrined with the scope they were understood to have when the people adopted them," which favors the use of Reconstruction-era evidence. 142 S.Ct. 2136 (quoting *Heller*, 554 U.S. at 634-35). States are not bound by the Second Amendment but by the Fourteenth, which (largely) incorporated the Bill of Rights against them. *See id.* at 2137. It follows that "the Second Amendment's scope as a limitation on the States depends on how the right was understood when the Fourteenth Amendment was ratified." *Ezell v. City of Chicago*, 651 F.3d 684, 702 (7th Cir. 2011). Every circuit to consider this question to date is in accord. *See Gould v. Morgan*, 907 F.3d 659, 669 (1st Cir. 2018); *United States v. Greeno*, 679 F.3d 510, 518 (6th Cir. 2012); *see also NRA v. Bondi*, 61 F.4th 1317, 1322 (2023), *vacated pending rehr'g en banc*, 2023 WL 4542153 (11th Cir. July 14, 2023); *MSI*, 2023 WL 4373260, at *28-29.

A considerable body of scholarship agrees Reconstruction-era sources matter, and for good reason. *See Ezell*, 651 F.3d at 702 n.11 (collecting sources); *Bondi*, 61 F.4th at 1322 n.10 (collecting additional sources, including by "prominent judges and scholars—across the political spectrum"); Akhil Reed Amar, *The Bill of Rights:*

*Creation and Reconstruction* xiv, 223, 246 (1998); Kurt T. Lash, *Re-Speaking the Bill of Rights: A New Doctrine of Incorporation*, 97 Ind. L. Rev. 1439 at 1441, 1452-53 (2022). In short, "it makes no sense to suggest that the States would have bound themselves to an understanding of the Bill of Rights—including that of the Second Amendment—that they did not share when they ratified the Fourteenth." *Bondi*, 61 F.4th at 1322 (explaining *Bruen*'s "claim to democratic legitimacy" turns on citing evidence that reflects views of the Fourteenth Amendment). Moreover, as a practical matter, this is useful evidence: it shows how States understood they could respond to the increased public-safety threats in sensitive places that arose after commercial availability made portable handguns widespread in the mid-1800s. *See* JA1204-05. That bears directly on how States can respond to the same threats today.

### B. The State Can Restrict Firearms Where It Acts As Proprietor.

Although this Court should uphold Chapter 131's sensitive-place restrictions on historical grounds alone, many of its restrictions find support in an independent constitutional doctrine. When the State acts as proprietor rather than as sovereign—*e.g.*, operating a concert venue, library, museum, bus, or hospital—its role is akin to "private property owners" with "the power to regulate conduct on [their] property," including carrying firearms. *Class*, 930 F.3d at 464.

The Supreme Court has repeatedly held that the Constitution's limitations on States are lessened when they act as proprietors. The dormant Commerce Clause's

prohibition on discriminating against interstate commerce does not apply if "a state or local government enters the market as a participant." *White v. Mass. Council of Const. Emps., Inc.*, 460 U.S. 204, 208 (1983) (allowing Boston Mayor to require city-funded projects to hire Boston residents); *Reeves, Inc. v. Stake*, 447 U.S. 429, 439 (1980). Similarly, when the government is engaging in quintessential "private conduct," it is free from the Supremacy Clause's restrictions. *Bldg. & Const. Trades Council of Metro. Dist. v. Assoc. Builders & Contractors of Mass./R.I., Inc.*, 507 U.S. 218, 227-29 (1993) (holding that the State's action, as proprietor of the Boston Harbor cleanup job, not preempted by the National Labor Relations Act because "the Supremacy Clause does not require pre-emption of private conduct").[6]

The Second Amendment is no different. In upholding a ban on firearms at a federally-owned parking lot near the U.S. Capitol, the D.C. Circuit reasoned that the government, "like private property owners—has the power to regulate conduct on its property." *Class*, 930 F.3d at 464; *see also, e.g.*, *GeorgiaCarry.org, Inc. v. U.S. Army Corps of Engineers* ("*GeorgiaCarry II*"), 212 F.Supp.3d 1348 (N.D. Ga. 2016); *Bonidy v. U.S. Postal Serv.*, 790 F.3d 1121, 1123 (10th Cir. 2015); *Nordyke v. King*, 681 F.3d 1041, 1044 (9th Cir. 2012) (en banc). Allowing the government to

---

[6] Contra the district court, that rule does not apply to all "location[s] in which the government owns the land," JA128—like public roads or town squares—but instead applies if the State is acting like any other private proprietor could.

restrict firearms where it acts as proprietor "does not impinge upon a right protected by the Second Amendment" in the first place. *Class*, 930 F.3d at 463; *see also id.* at 465 (resolving this inquiry at the first step of the analysis and expressly declining to reach means-end scrutiny—thus surviving *Bruen*'s methodological change). Just as a private doctor's office or private museum can restrict firearms, University Hospital and the Smithsonian can each do the same. The Second Amendment is certainly not a "second-class right," *Bruen*, 142 S.Ct at 2156, but there is no reason this provision trumps the government's powers as proprietor any more than the other constitutional rights considered in *White*, *Reeves*, or *Boston Harbor* do.

The district court failed to properly consider these principles and precedents. The district court seemed to cabin these cases to a more limited scope—that States have greater leeway "when the government is acting as an employer." JA124. But the government-as-proprietor precedents have never been exclusively limited to the employment context, and the district court's conclusion was wholly nonresponsive to the broader point that "the government has, with respect to its own lands, the rights of an ordinary proprietor … precisely as a private individual." *Camfield v. United States*, 167 U.S. 518, 524 (1897). The district court found that the restriction in *Class* could be upheld because the parking lot at issue represented a sensitive place, JA125-26, but that ignores critical reasoning the D.C. Circuit provided. 930 F.3d at 464. The court rejected the market participant theory in a footnote, with little explanation.

*See* JA129 n.33. And while the court protested that Chapter 131 is not "tailored to achieving any given interest of the various government entities at issue," JA129, asking whether a law is sufficiently "tailored" to the government "interest" has no place in the Second Amendment analysis after *Bruen. See* 142 S.Ct. at 2127. Nor did cases like *White*, *Reeves*, or *Boston Harbor* consider it.

At the very least, the State is entitled to greater deference when it is restricting firearms at property it owns. Indeed, the Supreme Court's decisions make clear that restrictions in "government buildings"—the classic government-owned property— are "presumptively lawful." *Heller*, 554 U.S. at 626 & n.26; *see Bruen*, 142 S.Ct. at 2162 (Kavanaugh, J., concurring) (same). Although the Court has not clarified the precise import of that phrase, if a law is presumptively justified by the government-as-proprietor doctrine, it logically would mean that the challengers must offer *some* evidence to defeat that presumption. But Plaintiffs offer no history to show that the States lacked power to restrict firearms at government-run venues, museums, buses, and medical clinics; rather, all the record evidence cuts the other way.

## II.   THE DISTRICT COURT ERRED IN ENJOINING APPLICATIONS OF THE PRIVATE-PROPERTY RULE.

Section 7(a)(24) establishes that individuals cannot carry firearms onto private property without the owner's affirmative consent. That provision is constitutional. The district court's decision to enjoin Section 7(a)(24) as to any property open to the public and as to curtilage lacks support.

**A. The Private-Property Rule Is Constitutional.**

Section 7(a)(24) does not regulate any conduct that implicates the Second Amendment right, and it is consistent with extensive history.

1. The private-property rule does not implicate the Second Amendment right. *Heller* found that the Second Amendment protects an individual's self-defense right in their home, 554 U.S. at 628, and *Bruen* confirmed the right applies in public, 142 S.Ct. at 2134. But a third party's private property is different: whether someone can carry onto private property is the result of the *owner's* wishes, and not constitutional entitlement. *See GeorgiaCarry.org*, 687 F.3d at 1264 (agreeing Second Amendment does not "abrogate[] the well established property law, tort law, and criminal law that embodies a private property owner's exclusive right to be king of his own castle"); JA1604-11 (Blackstone discussing property owner right to exclude). Neither Plaintiffs nor the district court can therefore dispute that an owner is free to exclude firearms from her property. JA138; *see also GeorgiaCarry.org*, 687 F.3d at 1264 ("[T]he Second Amendment, whatever its full scope, certainly must be limited by the equally fundamental right of a private property owner to exercise exclusive dominion and control over its land").

Section 7(a)(24) is constitutional because it only seeks to effectuate the private property owner's expectations regarding firearms on her property. Where a property owner specifically excludes firearms from her property, Section 7(a)(24) gives that

exclusion effect. Where the owner specifically allows guns on her property, Section 7(a)(24) gives that permission full effect, too. But where the property owner is silent, the law must set a "default" interpretation for that silence—ideally one that reflects the owner's likeliest expectations and intent. *See, e.g.*, JA1556-90 (explaining that, to minimize the steps property owners must take to protect their rights, optimal default rules effectuate the owner's preference). And the unrebutted record evidence shows that few New Jerseyans believed an owner's mere silence grants permission to others to carry firearms on their property, and the majority agree silence should not constitute consent. *See* JA1570, JA1572 (19.3% of New Jersey respondents thought someone could carry a firearm onto a client's property without express permission; 15.8% believed customers could bring a gun into private business without express permission; and the sizable majority preferred that silence foreclose, rather than authorize, carrying on private property). Section 7(a)(24) brings state property law in line with both the intent and likely expectations of New Jerseyans.

There is no support for Plaintiffs' contrary view that the Second Amendment establishes a right to construe an owner's silence as consent to carry on her property, thus authorizing even the repairman to carry guns into a customer's home without requesting permission. Because the right to "control … private property occupied a special role in American society and in our freedom," a State will not violate the Second Amendment if it "vindicates" owners' preferences as to firearms within their

domain. *GeorgiaCarry.org*, 687 F.3d at 1264 (discussing "special role" that right to control one's "private property occupied" at the Founding). Plaintiffs cannot identify anything in the Second Amendment's text that would trump property law and offer no evidence disproving that Section 7(a)(24) advances New Jersey property owners' intent and expectations. And their theory would render similar laws across the country unconstitutional. *See, e.g.*, Alaska Stat. Ann. § 11.61.220; D.C. Code § 7-2509.07(b); Ga. Code Ann. § 16-11-127; La. Rev. Stat. § 40:1379.3(O); N.Y. Penal Law § 256.01-d(1); Ohio Rev. Code Ann. § 2923.126(B)(6); S.C. Code Ann. §§ 23-31-225, 23-31-215(M)(8); Haw. Rev. Stat. § 134-E; Md. Code, Crim. Law § 6-411(c). Since carrying firearms onto private property without the owner's consent is not protected conduct, Plaintiffs' challenge to Section 7(a)(24) fails at the first step.

2. History is in accord: From before the Founding through Reconstruction, multiple States barred carrying onto private property absent the owner's consent. *See* JA950-57, JA1143-52 (certifications from Joseph Klett, Director of N.J. State Archives, and Princeton Professor Hendrik Hartog, collecting relevant statutes).

New Jersey's historical tradition is especially clear. For over a century—from before the Founding through Reconstruction and beyond—state law made clear that any person "who carried his weapon on to private property presumptively trespassed, unless he had prior license from the property owner to do so." JA1148 (Hartog declaration). Laws from 1722 (JA952), 1751 (JA952-53), 1769 (JA953), 1771

(JA953), and 1846 (JA955-56), were in accord, and this regime was in place until at least 1895. (JA1151). The version in effect at the Founding and at Reconstruction is instructive: it barred "carry[ing] any Gun on any Lands not his own, and for which the owner pays taxes, or is in his lawful possession, unless he has license or permission, in writing, from the owner," JA953; *see also* JA955 (1846 law providing same). And neither the parties nor district court have identified any challenges to these laws. *See Bruen*, 142 S.Ct. at 2131; *Virginia v. Moore*, 553 U.S. 164, 170 (2008). It would be strange to conclude that *Bruen*'s analysis—which focuses on how the Second Amendment was historically understood—prevents New Jersey in 2023 from adopting the very same restriction it maintained from 1722 to 1895.

Nor was New Jersey the only State at the Founding or Reconstruction to enact laws to protect private property owners from unwanted firearms: at least three other colonies codified these same restrictions on trespass with guns in the 18th Century, and three other States did so in the 19th Century. *See* JA1634-38 (Pa. 1721); JA1639-42 (N.Y. 1763); JA1831-33 (Mass. 1789, applied to Dukes County); JA1531-36, JA1658-63 (La. 1865 & 1915); JA1643-46 (Tex. 1867); JA1647-57 (Ore. 1893). A number of these laws, like New Jersey's, could hardly be more on-point. Louisiana prohibited "carry[ing] firearms on the premises or plantations of any citizen, without the consent of the owner or proprietor." JA1533. Texas law made it "not lawful for any person or persons to carry firearms on the inclosed premises or plantation of any

citizen, without the consent of the owner or proprietor." JA1645. Oregon made it "unlawful for any person … being armed with a gun, pistol, or other firearm, to go or trespass upon any enclosed premises or lands without the consent of the owner or possessor thereof." JA1651. And none were invalidated. That the same prohibition existed across myriad States before, during, and after ratification of both the Second and Fourteenth Amendments is powerful historical evidence.

The district court committed two errors in rejecting this evidence. *First*, the district court incorrectly rejected the record evidence from New Jersey, New York, Pennsylvania, and Massachusetts. The district court recognized that the plain text of these historical statutes mirrored Section 7(a)(24), *see* JA151 , but discounted their relevance because of their purported *motive*—namely, that these historical laws were allegedly "designed to discourage poaching." JA151. But the district court's premise (that these laws were aimed at hunting and poaching) and conclusion (that these laws therefore cannot support Section 7(a)(24)) are both incorrect.

As to the former, the district court's historical assessment was erroneous. The undisputed record evidence shows that New Jersey's 1771 law reflected "multiple expressly stated purposes," including to protect the owners' private property rights. JA150; *see* JA1147 (Hartog explaining that laws often contained two distinct purposes during this period); JA952 (Klett). Indeed, the text makes clear the State's two separate purposes: "An Act for the preservation of deer and other game, *and* to

prevent trespassing with guns." JA1188 (emphasis added); *see also* JA1146, 1147 (Hartog discussing "enormous weight" given to the rights of property owners in early America, and noting the 1771 law sought to "protect the powerful right of the property owners to prevent armed individuals from coming on to their property without license"). The Act's structure follows suit: Section 1 does not mention poaching, but bars "carry[ing] any Gun on any Lands not his own, and for which the owner pays taxes, or is in his lawful possession, unless he has license or permission, in writing, from the owner or owners, or legal possessor," and Section 2 separately establishes hunting-related offenses. JA1173. Contemporaneous evidence—a 1753 newspaper, a 1880 synopsis of by a municipal organization, and a 1813 treatise for justices of the peace—confirm the New Jersey law prohibited trespass with guns regardless of intent to poach. *See* JA955, JA956, JA1623; *see also* JA1147 (Hartog confirming that New Jersey law applied "regardless of whether the carrying of guns was in order to hunt game"); JA952, JA957 (Klett confirming same).

In any event, it is irrelevant whether these laws were *motivated* by concerns with poaching. *Bruen* establishes there are two different classes of historical support for modern laws: historical "twins" and "analogues." 142 S.Ct. at 2133. When the State is relying on a historical analogue, it must show the historical and modern laws burdened self-deference in similar ways and for similar reasons—to show that it is fair to infer the constitutionality of the modern law from the validity of a materially-

distinct historical statute. *Id.* But "considerations of 'how and why'" are irrelevant when a State is relying upon a "twin"—that is, whenever "there is clear historical example of the exact same type of regulation." *MSI*, 2023 WL 4373260, at *11. For good reason: that the States maintained an identical private-property rule at the times when the Second and Fourteenth Amendments were adopted strongly indicates their view that the restriction was constitutional.

*Second*, the district court incorrectly rejected the predecessors from Louisiana, Texas, and Oregon as being insufficiently numerous. To be clear, the district court rightly acknowledged that "the Louisiana, Texas, and Oregon laws support the State and are analogous to" Section 7(a)(24). *See* JA157. After all, they are "dead ringers" for Section 7(a)(24). *Bruen*, 142 S.Ct. at 2133. And these laws were all in effect at or around Reconstruction—meaning that the States believed, at the precise time they were incorporating the Second Amendment, that they could maintain such private-property protections. *See supra* at 32-34. The district court's objection thus distilled once again to its incorrect belief that three statutes can never be enough, even if those laws were never challenged, which is inconsistent with *Bruen*'s conclusion that laws restricting firearms at courthouses and legislatures are valid. *See supra* at 26-27.

## B. The District Court's Approach Lacks Support.

Although preferable to Plaintiffs' blanket rule that they can carry on all private property (even homes) unless the owner expressly forbids it, the district court's line-

drawing enterprise falls short. The district court upheld Section 7(a)(24) as to homes and businesses not open to the public, but enjoined it as to property open to the public and as to curtilage. That approach fails at both steps of the analysis.

First, there is no textual or logical basis for this distinction—one that Plaintiffs did not advocate for and have not defended. The parties and district court all agree that property owners can decide whether to allow firearms onto their property. But because such property does not "lose its private character merely because the public is generally invited to use it for designated purposes," their rights remain dispositive whether the property is open to the public or not. *Lloyd Corp. Ltd. v. Tanner*, 407 U.S. 551, 569 (1972) (businesses open to the public have the private-property right to exclude and rejecting First Amendment claim that individuals had a superior right to distribute literature at a mall). Section 7(a)(24) can thus protect those rights.

Moreover, contrary to the district court's assumption, whether the public has an implied license *to enter* a property does not determine whether the public has an implied license *to carry a firearm* onto that property. Although individuals have an implied license to enter property open to the public, "a license" to enter—whether "express or implied"—"is limited … to a specific purpose." *Florida v. Jardines*, 569 U.S. 1, 9 (2013). As Justice Scalia colorfully explained, "[t]o find a visitor knocking on the door is routine (even if sometimes unwelcome); to spot that same visitor exploring the front path with a metal detector, or marching his bloodhound into the

garden before saying hello and asking permission, would inspire most of us to—well, call the police." *Id.* That commonsense point holds true here: That a business owner opens her coffeeshop to the public to buy coffee hardly means she has thereby invited patrons to do so armed, any more than the homeowner's decision to call a plumber to fix her bathroom sink reflects an implicit invitation for him to carry inside her home. And as explained above, the undisputed evidence indicates that business owners actually do not actually expect their silence to authorize firearms—and the district court cited no evidence to the contrary. *See supra* at 39.

Indeed, the district court's invocation of implied license *supports* the validity of Section 7(a)(24). The court explained that an implied license can be drawn from background norms or past practices. *See* JA139; *Jardines*, 569 U.S. at 9 (quoting *McKee v. Gratz*, 260 U.S. 127, 136 (1922) (Holmes, J.)). But nothing in the Second Amendment prevents the Legislature from bringing aspects of trespass law that had fallen out of step with owners' background expectations back in line with them. *See id*; JA1556-90. And the court did not—and could not—cite anything showing that the Second Amendment constitutionalized one version of trespass law over another.

Second, and as importantly, the district court's approach is wholly ahistorical. The historical property laws in the record applied broadly to, *e.g.*, "any Lands … for which the owner pays taxes," JA1173 (N.J. 1771), "the premises or plantations of

any citizen," JA1533 (La. 1865), or "inclosed premises," JA1645 (Tex. 1867).[7] The expert evidence confirms that such laws "applied to all privately held lands without limitation," with "text [that] was straightforward and unqualified on this question," JA1149; *see also* JA956-57, and no contrary record evidence exists. The district court's sole response was to demand evidence of these statutes being *enforced* at specific businesses. JA148. But *Bruen* nowhere requires the State provide evidence of specific enforcement across all potential applications; instead, *Bruen* focuses on the statutes that were in effect during the relevant historical periods. And that makes sense. The fact that multiple Legislatures enacted statutory text that protects property rights without carveouts for property open to the public shows that they did not believe such exemptions were constitutionally necessary. Moreover, there are many reasons—including resources, widespread compliance, or the like—why a law might not be enforced in a particularly location. And of special importance given the historical inquiry, enforcement records from these periods are difficult to unearth.

---

[7] The 1722 New Jersey and 1763 New York statutes referred to "improved or inclosed" property. But the term "inclosed" did not refer to fenced property, as it may sound to the modern ear. Rather, this referred to the myriad ways in which a property owner would have evidenced his possession/ownership of a parcel of land, at a period in which ownership records were harder to come by. *See* JA1149 (Hartog declaration); JA1605-06, (Blackstone and Locke discussing "inclosed" in this manner). As a result, the reference to "improved" property would certainly include any property at issue in this case.

*Cf.* JA1216. The district court's evidentiary demands would thus again impose a regulatory straightjacket on modern States.

### III. THE DISTRICT COURT ERRED IN ENJOINING THE LIABILITY-INSURANCE REQUIREMENT.

Legislatures often require individuals to obtain insurance before engaging in activities that could ultimately harm third parties. *See, e.g.*, *Thomas v. Chicago Park Dist.*, 227 F.3d 921, 925 (7th Cir. 2000), *aff'd*, 534 U.S. 316 (2002) (upholding ordinance requiring liability insurance before seeking permit to assemble or protest in park, to ensure financial coverage should a rally "degenerate into a riot"). Chapter 131 is the same: Section 4 requires arms bearers, before they may carry publicly, to procure insurance to cover "loss resulting from liability imposed by law for bodily injury, death, and property damage," to ensure that costs can be covered *if* the bearer unintentionally harms another. That requirement is constitutional.

First, the civil liability insurance provision does not infringe the self-defense right at all. Section 4 does not address who are "the people" that may carry firearms; does not impact "how" or which "Arms" they may carry; and does not limit "where" they may do so. All Section 4 does is ensure residents are financially accountable for any harm to a third party through unintentional misuse. But requiring residents to ensure funds are available to cover the cost of harm *if* they unintentionally misuse weapons—conduct that is not itself protected—is not a regulation that falls within the Second Amendment's scope. *See* Stephen G. Gilles & Nelson Lund, *Mandatory*

*Liability Insurance for Firearm Owners: Design Choices and Second Amendment Limits*, 14 Engage: J. of Federalist Soc'y Prac. Grps. 1822 (2013) (explaining that "mandatory liability insurance for firearms" helps ensure that appropriate "victim compensation" is available in cases of unintentional misuse); *id.* at 21 (adding there is "no general constitutional rule that citizens must be exempted from the obligation to internalize the costs of exercising their constitutional rights," and highlighting that while the Second Amendment protects the operation of firearms ranges, such ranges may be required to obtain liability insurance too).

Plaintiffs claim Section 4 infringes the self-defense right because it imposes the cost of buying insurance, but that does not violate the Second Amendment. To the contrary, as the district court found in discussing permitting fees, a "law does not substantially burden a constitutional right simply because it makes the right more difficult or expensive to exercise." JA82. The rule could hardly be otherwise: the background checks and safety course requirements that *Bruen* clearly saw as valid cost money too. *See* 142 S.Ct. at 2138 n.9; *id.* at 2162 (Kavanagh, J., concurring). Especially here, where many preexisting homeowner's or renter's insurance policies satisfy this requirement, *see* JA1391-95 (unrebutted evidence from insurance expert that such policies cover unintentional injury, loss, or death related to use of firearms), and where none of the plaintiffs allege financial inability to comply with Section 4, Plaintiffs' facial challenge fails at the threshold.

Second, Section 4 finds considerable historical support from historical surety laws and strict-liability regimes. As the only other court to address this issue found, centuries-old surety laws "bear striking analogical resemblances" to Section 4. *Nat'l Ass'n for Gun Rights, Inc. v. City of San Jose*, 618 F.Supp.3d 901, 916 (N.D. Cal. 2022) ("*NAGR I*"); *see also NAGR v. City of San Jose*, No. 22-501, Dkt. 107 ("SJ Op."), at 11 (N.D. Cal. July 13, 2023) ("*NAGR II*"). Beginning in the 18th Century, at least eleven jurisdictions codified laws requiring individuals to post bond before carrying. *See* JA2828-29 (Mass. 1795); JA2546-47 (Mass. 1835); JA2548-49 (Terr. of Wisc. 1838); JA2550-51 (Me. 1840); JA2552-53 (Mich. 1846); JA2516-17 (Va. 1847); JA2560-61 (Terr. of Minn. 1851); JA2562-63 (Or. 1854); JA2564-65 (D.C. 1857); JA2566-67 (Pa. 1860); JA2523-25 (W. Va. 1868); Tenn. Laws c.22 § 6 (Tenn. 1801), https://tinyurl.com/3bdyse3s; 1893 Fla. Acts at 71-72 (Fla. 1893), https://tinyurl.com/bdz56sw4; *see also* JA1196-1218 (historian discussing common-law tradition); JA2554-59- (early English law). . While some laws applied only if a citizen complaint raised "reasonable cause" to fear that the bearer would cause injury or breach the peace, *see, e.g.*, JA2546-47 (Mass. 1835); *Bruen*, 142 S.Ct. at 2148, others stated that anyone who went "armed with any … dangerous weapon, without reasonable cause to fear … injury" could be required to post bond, *see* JA2516-17 (Va. 1847); JA2523-25 (W. Va. 1868); *see supra*, 1893 Fla. L. at 71-72 (requiring all repeating-rifle carriers to post bond "conditioned on the proper and legitimate use

of the gun"). The sureties would be "forfeited if the wielder did in fact injure another or breach the peace." *NAGR I*, 618 F.Supp.3d at 917; *see also* Sidney Childress, *Peace Bonds—Ancient Anachronisms or Viable Crime Prevention Devices*, 21 Am. J. Crim. L. 407, 413 (1994); *e.g.*, JA2546-47 (Mass. 1835). There is no evidence that such laws were invalidated or challenged. *See Bruen*, 142 S.Ct. at 2133.

Surety laws thus provided one common and lawful way to require firearms-carriers to shoulder financial responsibility before carrying weapons in public—just like Chapter 131. In so doing, they aimed at "'prevention' of future harm." *NAGR I*, 618 F.Supp.3d at 917 (quoting *Bruen*, 142 S.Ct. at 2149). Similarly, the higher premiums that accompany irresponsible behavior and other measures employed by insurers create "incentives [for the insured] to reduce risk." Omri Ben-Shahar & Kyle D. Logue, *Outsourcing Regulation: How Insurance Reduces Moral Hazard*, 111 Mich. L. Rev. 197, 205 (2012); *id.* at 220 (discussing empirical studies showing that "workers' compensation regimes tend to … reduc[e] worker injury rates"); Alexander Lemann, *Coercive Insurance and the Soul of Tort Law*, 105 Geo. L.J. 55, 60-65 (2016) (noting insurers "create economic incentives for policyholders to abide by standards of care").

Thus, both surety and insurance "achieve their purposes through similar means, namely the threat of financial consequences (either through a peace bond or

higher premiums) for individuals deemed to be high-risk (either by a judge or an underwriter)." *NAGR II*, SJ Op., at 12.

19th-Century jurisdictions were also motivated by the desire to compensate victims of gun violence. As the Supreme Judicial Court of Massachusetts indicated in *Cole v. Fisher*, "[t]he party injured … by the discharge of a gun, even when the act is lawful, as at a military muster and parade, and under the orders of a commanding officer, is entitled to redress in a civil action, to the extent of his damage." 11 Mass. 137, 139 (Mass. 1814). Hence, courts historically imposed strict liability for gun accidents, ensuring that the victim would win a judgment even if the firearms-user acted negligently or without fault. *See id.* (finding it "immaterial" that defendant "accidentally wounded a bystander" when "uncocking his gun"); *Moody v. Ward*, 13 Mass. 299, 301 (Mass. 1816); *Welch v. Durand*, 36 Conn. 182, 186 (Conn. 1869) (similar). As *NAGR I* recognized, this evidences a "historical tradition of shifting the costs of firearm accidents from the victims to the owners of the implicated firearms," which is precisely the point of liability insurance. 618 F.Supp.3d at 917. Indeed, insurance effectuates a similar risk-shifting, imposing costs on the arms-bearer and creating a common risk pool that ensures victims can be compensated. *See* Gilles & Lund, *supra*, at 22.

Liability insurance is a modern innovation in American law—unknown at the Founding—that seeks to achieve analogous goals. "[L]iability insurance as we now

know it did not emerge until late in the nineteenth century." Kenneth S. Abraham, *The Rise and Fall of Commercial Liability Insurance*, 87 Va. L. Rev. 85, 86, n.6 (2001). But when liability insurance did emerge, it relied on modern economic innovations that improved on the mechanisms of surety and strict liability. Like surety statutes, it requires individuals to pay something upfront, whether a bond or a premium, to help deter misconduct. *See supra* at 50-52. And like the strict liability regimes, it helps ensure victims can obtain compensation if they are injured by unintentional firearms misuse. *See supra* at 52. And it does so in a particularly effective way: it both calibrates the level of the individual's premium to their risk, and pools those premiums to guarantee a stable compensation source. *See* Am. Acad. of Actuaries, *Risk Pooling*, https://tinyurl.com/2hakh6x7. Its innovations are why insurance and tort have become "inextricably linked" in modern times. Kenneth S. Abraham, *The Liability Century* 5 (2008).

The decision below, which conflicts with the only other federal-court decision to assess this issue, wrongly rejects these historical analogues. Most problematically, the district court seems to say that the only sufficient analogue for modern insurance provisions would be "earlier generations" "mandat[ing] that all arms bearers obtain insurance or post a bond to prevent injuries that may not occur." JA102. But as laid out above, such insurance simply did not exist at the Founding or Reconstruction— and liability insurance did not exist anywhere outside of the workplace context well

into the 20th Century. The States' failure to use a policy option that did not exist is not a basis to find it unconstitutional; rather, it underscores the importance of using analogical reasoning to consider whether prior and uncontroverted valid policies are relevantly similar to their modern-day descendants.

Nor do the district court's efforts to distinguish surety laws withstand scrutiny. Primarily, the district court emphasized that some 19th-Century surety laws applied only where community members asserted that the arms-bearer posed a risk, whereas insurance applies to everyone. JA102. But for one, only some state laws historically required such a showing, while others applied to everyone carrying arms. *See supra* at 50. For another, the burden imposed by insurance is also individually calibrated based on similar assessments: "Competitive pressures would lead insurance carriers to keep the premiums for low-risk gun owners low, while charging higher premiums to those who are more likely to cause injuries to other people." Gilles & Lund, *supra*, at 18. And the court misread the history in finding that Chapter 131 alone had criminal penalties. *Compare* JA99 (opinion), *with* 1835 Mass. Acts. Ch. 134 § 6, https://tinyurl.com/yknmefdr (violators could be incarcerated "during the period for

which he was required to give security, or until he shall so recognize").[8] Insurance may be a modern tool, but it reflects the States' longstanding rationales and policies.

## CONCLUSION

This Court should reverse, vacate the preliminary injunction, and remand to the district court for further proceedings.

Respectfully Submitted,

MATTHEW J. PLATKIN
Attorney General of New Jersey

By:    /s/ Angela Cai
Angela Cai
Deputy Solicitor General

Dated: July 20, 2023

---

[8] Finally, the district court concluded that surety laws contained a "carve-out for self-defense" (that is, individuals with reasonable cause to carry firearms did not need to supply a bond) but that Chapter 131's insurance provision did not. JA84. But *Bruen* makes clear that States cannot distinguish permissible and impermissible carrying based on whether the government believed the bearer had a sufficient self-defense need. *See* 142 S.Ct. at 2122. And in any event, Plaintiffs never sought such a carve-out from the insurance requirement or suggested they could satisfy one.

## CERTIFICATION OF BAR MEMBERSHIP

I certify that I am an attorney in good standing of the bar of the Third Circuit.

/s/ Angela Cai
Angela Cai
Deputy Solicitor General
Office of the New Jersey Attorney General
NJ Bar #121692014

Dated: July 20, 2023

## CERTIFICATION OF COMPLIANCE

I certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a monospaced typeface using Microsoft Word 2016, in Times New Roman, 14 point, type style. I further certify that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 12,937 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

I certify that the text of the paper copies of this brief and the text of the PDF version of this brief filed electronically with the Court today are identical. I further certify that prior to electronically filing this brief with the Court today it was scanned by McAfee VirusScan Enterprise 8.8, a virus detection software, and found to be free from computer viruses.

/s/ Angela Cai
Angela Cai
Deputy Solicitor General
Office of the New Jersey Attorney General

Dated: July 20, 2023

## CERTIFICATION OF SERVICE

On July 20, 2023, the undersigned caused this brief to be filed with the Clerk of the United States Court of Appeals for the Third Circuit via electronic filing. I further certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system with hardcopies to be sent via overnight mail when directed by the Court.

/s/ Angela Cai
Angela Cai
Deputy Solicitor General
Office of the New Jersey Attorney General

Dated: July 20, 2023