# UNITED STATES COURT OF APPEALS
## FOR THE THIRD CIRCUIT

---

Nos. 23-1900, 23-2043

---

RONALD KOONS et al.,
*Plaintiffs-Appellees,*

v.

MATTHEW J. PLATKIN et al.,
*Defendants-Appellants*

---

AARON SIEGEL et al.,
*Plaintiffs-Appellees / Cross-Appellants,*

v.

MATTHEW J. PLATKIN et al.,
*Defendants-Appellants / Cross-Appellees*

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
(Nos. 22-cv-7463, 22-cv-7464 (RMB))

---

**JOINT APPENDIX**

**VOLUME IX**

**JA3027 – JA3298**

---

MATTHEW J. PLATKIN
 *Attorney General of New Jersey*

JEREMY M. FEIGENBAUM
 *Solicitor General*

ANGELA CAI
 *Deputy Solicitor General*

JEAN REILLY
 *Assistant Attorney General*

DAVID CHEN
VIVIANA HANLEY
SAMUEL RUBINSTEIN
 *Deputy Attorneys General*

Office of the New Jersey Attorney General
R.J. Hughes Justice Complex
25 Market Street, P.O. Box 080
Trenton, NJ 08625-0080
(609) 414-5954
angela.cai@njoag.gov

*Attorneys for Defendants-Appellants*
*New Jersey Attorney General*
*Matthew J. Platkin and Superintendent of*
*New Jersey State Police Colonel*
*Patrick Callahan*

# JOINT APPENDIX
## TABLE OF CONTENTS

## VOLUME I                                                JA Page

Defendants' Notice of Appeal (ECF 126)[1] ..................................................... JA1

*Siegel* Plaintiffs' Notice of Cross-Appeal (ECF 128)........................................ JA4

Order Granting In Part And Denying In Part Plaintiffs' Motions for
    Preliminary Injunction (ECF 125)................................................................ JA6

Opinion Granting In Part And Denying In Part Plaintiffs' Motions for
    Preliminary Injunction (ECF 124)................................................................ JA10

## VOLUME II

*Koons* District Court docket sheet ..................................................................... JA245

*Koons* Complaint (ECF 1) ................................................................................. JA264

*Siegel* Complaint (Case No. 22-cv-7463, ECF 1)............................................. JA286

Defendants' Expedited Motion to Consolidate (Case No. 22-cv-7463,
    ECF 7)............................................................................................................ JA345

*Siegel* Plaintiffs' Motion for Temporary Restraining Order And For A
    Preliminary Injunction (Case No. 22-cv-7463, ECF 8)............................. JA349

    Declaration of Aaron Siegel (Ex. 2) .......................................................... JA352

    Declaration of Jason Cook (Ex. 3).............................................................. JA360

    Declaration of Joseph DeLuca (Ex. 4)........................................................ JA368

    Declaration of Nicole Cuozzo (Ex. 5) ........................................................ JA374

    Declaration of Timothy Varga (Ex. 6)........................................................ JA377

---

[1] ECF numbers are to the *Koons* docket (Case No. 1:22-cv-07464) unless otherwise indicated.

Declaration of Christopher Stamos (Ex. 7) .................................................. JA382

Declaration of Kim Henry (Ex. 8) .............................................................. JA385

Declaration of Scott Bach (Ex. 9)............................................................... JA388

Declaration of Daniel Schmutter (Ex. 10)................................................... JA391

*Koons* Plaintiffs' Motion for Order to Show Cause, Motion for
    Temporary Restraining Order, Motion for Preliminary Injunction
    (ECF 8).................................................................................................... JA438

Declaration of Ronald Koons (ECF 10) ...................................................... JA441

Declaration of Nicholas Gaudio (ECF 11) .................................................. JA446

Declaration of Jeffrey Muller (ECF 12) ...................................................... JA455

*Koons* Show Cause Order (ECF 13) ........................................................... JA462

## **VOLUME III**

Opinion on *Koons* Plaintiffs' Motion for Temporary Restraining Order
    (ECF 34)................................................................................................... JA465

Order re: *Koons* Plaintiffs' Motion for Temporary Restraining Order
    (ECF 35)................................................................................................... JA525

Transcript of *Koons* TRO Motion Hearing (ECF 37)...................................... JA527

Legislators' Motion to Intervene (ECF 47) ..................................................... JA625

Proposed Intervention Pleading (Ex. A).................................................. JA628

L. 2022, c. 131 (Ex. B) ............................................................................ JA655

Summary of legislative history of A4769 (Ex. C)..................................... JA682

A4769 – as introduced (Ex. D) ................................................................ JA687

Report of the Assembly Judiciary Committee (Ex. E) .............................. JA720

Report of the Assembly Appropriations Committee (Ex. F)...................... JA727

Report of the Assembly Oversight Committee (Ex. G) ............................. JA737

Report of the Senate Budget and Appropriations Committee (Ex. H) ....... JA745

*Siegel* Consolidation Order (ECF 50) ............................................................. JA753

Opinion on *Siegel* Plaintiffs' Motion for Temporary Restraining Order
  (ECF 51) ..................................................................................................... JA759

Order re: *Siegel* Plaintiffs' Motion for Temporary Restraining Order
  (ECF 52) ..................................................................................................... JA805

Order granting Legislators' Motion to Intervene (ECF 53) ............................ JA807

*Siegel* Plaintiffs' Letter seeking clarification of TRO Order (ECF 54) ............ JA810

Transcript of Siegel TRO Motion Hearing (ECF 56) ....................................... JA812

Supplemental Declaration of Aaron Siegel (ECF 64) ...................................... JA897

Supplemental Declaration of Jason Cook (ECF 65) ......................................... JA900

Supplemental Declaration of Joseph DeLuca (ECF 66) ................................... JA903

Supplemental Declaration of Timothy Varga (ECF 67) ................................... JA904

Declaration of Ria Jairam (ECF 68) ................................................................. JA907

*Koons* Amended Complaint (ECF 69) ............................................................. JA910

Declaration of Gil Tal (ECF 70) ....................................................................... JA933

Supplemental Declaration of Nicholas Gaudio (ECF 71) ............................... JA943

Stipulation & Order dismissing county prosecutors as defendants
  (ECF 73) ..................................................................................................... JA947

## **VOLUME IV**

Certification of Joseph R. Klett (ECF 76) ........................................................ JA950

1722 NJ Law "… against Carrying of Guns … by Persons not
  Qualified" (Ex. A) ..................................................................................... JA958

1751 Supplement to 1722 NJ Law "… against Carrying of Guns …
  by Persons not Qualified" (Ex. B) ........................................................... JA964

1769 NJ Law "… for the more effectual Preservation of Deer …"
(Ex. C) ................................................................................................. JA974

1771 NJ Law "… to prevent trespassing with Guns" (Ex. D) .................... JA980

NJ State Constitution of 1776 (Ex. E) ........................................................ JA986

1771 NJ Law "… to prevent trespassing with Guns" (Ex. F) ................... JA997

1753 Pennsylvania Gazette extract (Ex. G) ................................................ JA1005

1846 NJ Law Revision "… to prevent trespassing with Guns"
(original enrolled law) (Ex. H) ............................................................. JA1008

1846 NJ Law Revision "… to prevent trespassing with Guns"
(as printed in Revised Statutes of 1846) (Ex. I) ................................. JA1026

1852 NJ Supplement (Ex. J) ........................................................................ JA1032

First 1859 NJ Supplement (Ex. K) .............................................................. JA1036

Second 1859 NJ Supplement (Ex. L) .......................................................... JA1039

1866 NJ Supplement (Ex. M) ...................................................................... JA1043

1867 NJ Supplement (Ex. N) ....................................................................... JA1048

1873 NJ Supplement (Ex. O) ....................................................................... JA1051

1846 NJ Law relative to "Carrying guns, where prohibited"
(as printed in Revised Statutes of 1877) (Ex. P) ................................. JA1054

1846 NJ Law referred to as "An act to Prevent Trespassing with
Guns" (as included in 1880 synopsis of laws) (Ex. Q) ........................ JA1060

1895 NJ Law "to prevent trespassing with guns" (Ex. R) .......................... JA1067

1911 NJ Supplement (Ex. S) ....................................................................... JA1075

1928 Repeal of 1846 NJ Law (Ex. T) .......................................................... JA1081

N.J. Stat. Ann. § 2A:63-1 (Ex. U) ............................................................... JA1096

Certification of Sarah Adelman (ECF 77) ................................................... JA1099

Certification of George Fedorczyk (ECF 78) .................................................. JA1107

Certification of Bonny Fraser (ECF 79) ....................................................... JA1114

Certification of Steven Gorelick (ECF 80) ..................................................... JA1122

Certification of Robin Madden (ECF 81) ...................................................... JA1127

Certification of Judith A. Nason (ECF 82) .................................................... JA1132

Certification of David L. Rebuck (ECF 83) .................................................... JA1137

Declaration of Hendrik Hartog (ECF 84) ....................................................... JA1143

    Resume of Hendrik Hartog (Ex. A) .......................................................... JA1153

    1722 NJ Statute: "An Act to prevent killing of deer out of season, and against carrying of guns and hunting by persons not qualified." (Ex. B) ............................................................... JA1163

    1769 NJ Statute: "An Act for the more effectual preservation of deer in this Colony." (Ex. C) .................................................. JA1167

    1771 NJ Statute: "An Act for the preservation of deer and other game, and to prevent trespassing with guns." (Ex. D) ........................ JA1172

    1846 NJ Statute: "An Act for the preservation of deer and other game, and to prevent trespassing with guns." (Ex. E) ........................ JA1180

    Lucius Elmer's 1868 Digest of the Laws of New Jersey 362 (4th ed., Newark, 1868) (Ex. F) ......................................................... JA1186

    1895 NJ Public Law, ch. § 148 (Ex. G.) ...................................................... JA1194

**VOLUME V**

Declaration of Brennan Gardner Rivas (ECF 85) ............................................. JA1196

    Curriculum Vitae of Brennan Gardner Rivas (Ex. A) ............................... JA1219

    2 Edw. 3, c. 3 (1328) (Eng.) (Ex. B) ...................................................... JA1223

    25 Edw. 3, st. 5, c. 2, § 13 (1350) (Eng.) (Ex. C) ..................................... JA1224

    1786 Va. Laws 33, ch. 21 (Ex. D) ......................................................... JA1227

1835 Mass. Acts 750 (Ex. E) ...................................................................... JA1228

Francois Xavier Martin, A Collection of Statutes of the Parliament
    of England in Force in the State of North Carolina, 60-61
    (Newbern 1792) (Ex. F)............................................................................ JA1232

1821 Me. Laws 285, ch. 76, § 1 (Ex. G) ................................................... JA1235

1813 La. Acts 172, § 1 (Ex. H)................................................................... JA1242

Revised Statutes of the State of Arkansas, Adopted at the October
    Session of the General Assembly of Said State, A.D. 1837
    (Ex. I) ........................................................................................................ JA1247

1870 Tex. Gen. Laws 63, ch. 46, § 1 (Ex. J) ............................................ JA1249

1871 Tex. Gen. Laws 25, ch. 34 § 1 (Ex. K).............................................. JA1252

Penal Code of the State of Texas, (1879), Title X, Offenses Against
    the Public Peace, Chapter 4, Unlawfully Carrying Arms (Ex. L)........ JA1255

Ch. 22, 1869 Tenn. Pub. Acts 23 (36th Assembly, 1st Sess.) §2
    (Ex. M)...................................................................................................... JA1257

Act No. 285, 1870 Ga. Laws 421 (Ex. N) ................................................. JA1260

Revised Statutes of the State of Missouri (1879), ch.24, §1274
    (Ex. O) ...................................................................................................... JA1263

1890 Okla. Stat. 495-96 (Ex. P).................................................................. JA1266

Annotated Code of the General Statute Laws of the State of
    Mississippi (1892), "Crimes and Misdemeanors," §1030 (Ex. Q) ...... JA1269

Laws of Vermont, Special Session (1891), No. 85, §2 (Ex. R) ................ JA1272

1870 La. Acts 159-60, § 73 (Ex. S) ........................................................... JA1275

George Washington Paschal, A Digest of the Laws of Texas, 3rd ed.
    (1873) II: 1317-1318 (Ex. T)................................................................... JA1293

John Prentiss Poe, The Maryland Code: Public Local Laws,
    Adopted by the General Assembly of Maryland March 14, 1888
    (Vol. 2, 1888), 1457 (Ex. U) ................................................................. JA1296

1886 Md. Laws 315, ch. 189 §1 (Ex. V) ..................................... JA1298

1877 Va. Acts 305, Offenses Against The Peace, § 21 (Ex. W) ............... JA1299

Oscar F. Greene, Revised Ordinances of the City of Boulder (1899),
    157 (Ex. X) ......................................................... JA1303

"An Ordinance," San Antonio Express (San Antonio, Texas),
    December 23, 1870 (Ex. Y) ............................................ JA1304

Declaration of Patrick J. Charles (ECF 86) ................................ JA1305

Curriculum Vitae of Patrick J. Charles (Ex. 1) ........................... JA1319

2 Edw. 3, c. 3 (1328) (Eng.) (Ex. 2) ..................................... JA1326

Royal Proclamation as to the Wearing of Arms in the City, and at
    Westminster; and as to Playing at Games in the Palace at
    Westminster, Memorials of London and Life 268-69
    (H.T. Riley ed., 1868) (Ex. 3) ....................................... JA1327

John Carpenter, Liber Albus: The White Book of the City of
    London at 335 (Henry Thomas Riley ed., 1861) (Ex. 4) ................. JA1330

4 Hen 4, c. 29 (1403) (Eng.) (Ex. 5) ..................................... JA1332

An Act to Prevent Routs, Riots, and Tumultuous Assemblies, and
    the Evil Consequences Thereof, September Session, Chapter
    VIII (Mass. 1786) (Ex. 6) ............................................ JA1333

An Act for the More Speedy and Effectual Suppression of Tumults
    and Insurrections in the Commonwealth, January Session,
    Chapter IX (Mass. 1787) (Ex. 7) ...................................... JA1335

An Act to Prevent Routs, Riots, and Tumultuous Assemblies
    (N.J. 1797) (Ex. 8) .................................................. JA1339

An Act to Prevent Hunting with Fire-Arms in the City of New-
    York, and the Liberties Thereof (NY 1763) (Ex. 9) .................... JA1341

An Act Against Riots and Rioters (Pa. 1705) (Ex. 10) ..................... JA1342

William Rawle, A View of the Constitution of the United States 126
    (2d ed., 1829) (Ex. 11) .............................................. JA1343

3 Calendar of Close Rolls, Richard II, 1385-1389, at 399-400 (May 16, 1388, Westminster) (H.C. Maxwell-Lyte ed., 1914) (Ex. 12) ....... JA1345

1 Calendar of Close Rolls, Richard II, 1377-1381, at 34 (December 1, 1377, Westminster) (H.C. Maxwell-Lyte ed., 1914) (Ex. 13) ......... JA1347

1647 Md. Laws 216 (Ex. 14) ..................................................................... JA1348

1650 Md. Laws 273 (Ex. 15).................................................................... JA1349

Chapter XVII: Carrying Concealed Weapons—Firing Guns, Pistols, Fire Crackers, Etc., May 22, 1890, reprinted in General Ordinances of the Town of Columbia, In Boone County, Missouri 34, 35 (Lewis M. Switzler ed., 1890) (Ex. 16) .................... JA1350

1877 Mo. Laws 158, 166 (Ex. 17)............................................................. JA1352

Ordinance No. 577: An Ordinance Defining What Shall constitute Misdemeanors or Offenses Against the City of Webb City, and Providing Penalties Therefor, May 15, 1905, reprinted in Revised Ordinances of the City of Webb City, Missouri, 1905, at 99-100 (1905) (Ex. 18) ..................................................................... JA1354

An Ordinance in Relation to Carrying Deadly Weapons, July 17, 1894, The Revised Ordinances of the City of Huntsville, Missouri of 1894, at 58-59 (1894) (Ex. 19) ......................................... JA1356

1874 Mo. Laws 43 (Ex. 20)....................................................................... JA1361

1875 Mo. Laws 50 (Ex. 21)....................................................................... JA1362

1883 Mo. Laws 76 (Ex. 22)....................................................................... JA1364

*State v. Reando* (Mo. 1878) (Ex. 23)......................................................... JA1365

Ordinance No. 76: An Ordinance Prohibiting Deadly Weapons, July 1, 1887, reprinted in Stockton Review and Rooks County Record (KS), July 1, 1887 (Ex. 24).................................................... JA1366

Public Statutes of the State of Tennessee Since the Year 1858, at 108 (James H. Shankland ed., 1871) (Ex. 25)...................................... JA1368

1870 Tex. Gen. Laws 63 (Ex. 26)............................................................... JA1369

1870 Ga. Laws 421 (Ex. 27) ........................................................ JA1370

1889 Ariz. Sess. Laws 16 (Ex. 28) ............................................. JA1371

1890 Okla. Stat. 495 (Ex. 29) ..................................................... JA1373

A Digest of the Laws and Ordinances for the Government of the
City of Harrisburg, Pennsylvania in Force January 1, A.D. 1906,
at 557-58 (1906) (Ex. 30) ................................................... JA1375

The Revised Ordinances of Provo City, Utah 96 (1893) (Ex. 31) ............. JA1377

The Revised Ordinances of Payson City, Utah 84 (1893) (Ex. 32) ........... JA1378

The Revised Ordinances of Tooele City, Utah 87 (1893) (Ex. 33)............ JA1379

An Ordinance to Prohibit Intoxication, Breach of Peace, Carrying
Deadly Weapons, the Use of Obscene Language, the Discharge
of Fire-Arms, and to Close Places of Amusement on Sunday in
the City of Wallace, Kansas, Jan. 31, 1889, reprinted in Wallace
County Register (KS), Feb. 9, 1889, at 2 (Ex. 34) ............................... JA1381

Ordinance No. 97: Ordinance Related to Carrying Deadly Weapons,
May 17, 1882, reprinted in Burlington Democrat (KS), May 26,
1882, at 2 (Ex. 35) ............................................................... JA1383

Miscellaneous Ordinance, Jun. 24, 1871, reprinted in Abilene
Weekly Chronicle (KS), Jun. 29, 1871, at 3 (Ex. 36) ......................... JA1385

Declaration of Peter Kochenburger (ECF 87) .................................... JA1387

Curriculum Vitae of Peter Kochenburger (Ex. A)...................... JA1401

Declaration of Angela Cai and Exhibits Volume I (ECF 88).......................... JA1418

P.L. 2022 ch. 131, A4769/S3124, An Act concerning the sale and
possession of firearms and supplementing and amending
various parts of the statutory law (Ex. 1) ............................. JA1431

Compilation of Order, D.E. 41, *Christian v. Nigrelli*, No. 22-2987
(2d Cir. Dec. 12, 2022); Order, D.E. 75, *Antonyuk v. Hochul*,
No. 22-2908 (2d Cir. Dec. 7, 2022); Order, D.E. 53, *Hardaway
v. Nigrelli*, No. 22-2933 (2d Cir. Dec. 7, 2022) (Ex. 2) ...................... JA1470

Transcript of Preliminary Injunction Hearing, Corbett v. Hochul,
  1:22-cv-5867-LGS (S.D.N.Y. Nov. 29, 2022) (Ex. 3) ........................ JA1473

63 Proceedings and Acts of the Maryland General Assembly 338,
  § 5 (June 15-July 3, 1773) (Ex. 4) ...................................................... JA1504

1870 Tex. Gen. Laws 63 (Ex. 5) .................................................................. JA1505

1786 Va. Laws 25 (Ex. 6) ............................................................................ JA1508

Gen. Digest of the Ordinances & Res. of the Corp. of New Orleans
  371 (1831) (Ex. 7) ............................................................................... JA1509

1869-70 Tenn. Pub. Acts 23 (Ex. 8) ............................................................ JA1510

Art. 320, Tex. Act of April 12, 1871 (Ex. 9) .............................................. JA1513

Mo. Rev. Stat. 1879, at 224 (§ 1274) (Ex. 10) .......................................... JA1515

1859 Conn. Acts 62, ch. 82, § 5 (Ex. 11) ................................................... JA1517

1867 Kans. Sess. Laws 25 (Ex. 12) ............................................................ JA1521

1771 N.J. Laws 344, §1 (Ex. 13) ................................................................ JA1523

1865 La. Extra Acts 14, No. 10 § 1 (Ex. 14) .............................................. JA1531

1876 Iowa Acts 142, ch. 148, § 1 (Ex. 15) ................................................. JA1537

1929 Iowa Acts 90, § 30 (Ex. 16) ............................................................... JA1540

1919 Me. Laws 193 (Ex. 17) ....................................................................... JA1543

Ark. Rev. Stat. § 13, p. 280 (1838) (Ex. 18)............................................... JA1548

1839 Ala. Acts no. 77, § 1 (Ex. 19) ............................................................ JA1550

1821 Tenn. Acts ch. 13, § 1 (Ex. 20) .......................................................... JA1553

Ian Ayres & Spurthi Jonnalagadda, Guests with Guns: Public
  Support for "No Carry" Defaults on Private Land, 48 J. L.
  Medicine & Ethics 183, Table A4 (2020) (Ex. 21) .............................. JA1556

1873 Ga. Code 818, § 4528 (Ex. 22) ......................................................... JA1591

Fourth Annual Report of the Board of Commissioners of the Central
        Park 106 (1861) (Ex. 23) ....................................................................... JA1593

Acts of Assembly Relating to Fairmount Park 18 (1870) (Ex. 24) ............ JA1594

Michael John Sullivan, The Revised Ordinance of the City of St.
        Louis, Together with the Constitution of the United States,
        Constitution of the State of Missouri, the Scheme for the
        Separation of the Governments of the City and County of St.
        Louis, the Charter of the City, and a Digest of the Laws
        Applicable to the City 635 (1881), § 3 (Ex. 25) ................................... JA1595

Egbert Jamieson and Francis Adams, The Municipal Code of
        Chicago, Comprising the Laws of Illinois Relating to the City of
        Chicago and the Ordinances of the City Council, Codified and
        Revised 391 (1881). Art XLIII, § 1690 (Ex. 26) ................................. JA1596

Annual Reports of the City Officers and City Boards of the City of
        Saint Paul 689 (1889) (Ex. 27) .............................................................. JA1599

W.W. Thompson, A Digest of the Acts of Assembly Relating To,
        and the General Ordinances of the City of Pittsburgh, From
        1804 to Jan. 1, 1897 at 496 (2d Ed. 1897) (Ex. 28) ............................ JA1601

Excerpt from William Blackstone, Commentaries on the Laws of
        England, 3d. (10th ed. 1787) (Ex. 29) ................................................... JA1603

Excerpt from William Griffith, A Treatise on the Jurisdiction and
        Proceedings of Justices of the Peace in Civil Suits in New
        Jersey (1813) (Ex. 30) ........................................................................... JA1612

Excerpt from John Locke, Second Treatise of Government (1690)
        (Ex. 31) ................................................................................................. JA1625

1715 Md. Laws, ch. 26 § 7, as supplemented by 1766 Md. Laws
        ch. 6, at 90 (Ex. 32) .............................................................................. JA1630

1721 Pa. Act ch. 426 § 3, printed in Mitchell & Flanders, The
        Statutes at Large of Pa. 1682 to 1801, vol.2, at 255 (Ex. 33) .............. JA1634

1763 N.Y. Law ch. 1233 §1, printed in Laws of N.Y., 1691 to 1771,
        vol. 2, at 442 (Ex. 34) ........................................................................... JA1639

1867 Tex. Act Vol, 20, p. 90, at art. 6510, printed in Paschal, A
    Digest of the Laws of Tex. Ann., vol. 2, at 1321 (Ex. 35) ................... JA1643

1893 Ore. Act S.B. 15, § 1, at 79 (Ex. 36)................................................... JA1647

La. R.S. 821, § 1809, printed in R.H. Marr, Ann. Rev. Stat. La., vol.
    1, at 600 (1915) (Ex. 37)........................................................................ JA1658

1870 Tenn. Acts. ch. 13 (Ex. 38)................................................................ JA1664

1996 La. Sess. Law. Serv. 1st Ex. Sess. Act 4 (S.B.2), R.S.
    40.1379.3(O) (Ex. 39).............................................................................. JA1668

Bill 3730, 1996 S.C. Assemb., Rev. to § 23-31-210(M)(10) (Ex. 40)....... JA1674

29Excerpt from 1564 Stat. King Henry III (Ex. 41)................................... JA1687

Wingate, An Exact Abridgement of All Statutes In Force & Use
    From The Beginning Of Magna Carta Until 1641 (1666), at 591
    at § 9 (Ex. 42) ....................................................................................... JA1690

1776 Del. Const. art. 28 (Ex. 43)................................................................ JA1693

Excerpts from Benjamin Vaugahn Abbott, Judge and Jury: A
    Popular Explanation of Leading Topics in the Law of the Land
    (1880) (Ex. 44) ...................................................................................... JA1696

1874 Mo. Laws at 43, s. 1 (Ex. 45)............................................................ JA1712

The Norman Transcript, (Norman, Okla. Terr), Vol. 2, No. 5, Ed. 1
    (Nov. 22, 1890) (Ex. 46)........................................................................ JA1715

The Missouri Republican, (St. Louis, Mo.) (Nov. 20, 1872) (Ex. 47)....... JA1717

The Moniteau Journal (California, Mo.) (Oct. 3, 1872) (Ex. 48).............. JA1718

## **VOLUME VI**

Collected Venue Policies, NJ (Ex. 49) ...................................................... JA1719

Excerpts from R. Rosenzweig & E. Blackmar, *The Park And The
    People: A History Of Central Park* (Cornell Univ. Press 1992)
    (Ex. 50) ................................................................................................. JA1790

Declaration of Angela Cai and Exhibits Volume II (ECF 89)...........................JA1818

    1789 Mass. Acts ch.28, at 438 (Ex. 51).......................................JA1831

    1895 Mich. No. 436 Sec. 44, at 596 (Ex. 52) .............................JA1834

    1905 Minn. 620, Sec. 53 (Ex. 53)................................................JA1843

    1917 Wisc. Ch. 668, at 1243 Sec. 29.57(4) (Ex. 54)..................JA1872

    1921 N.C. Public Laws & Res. ch. 6 § 3, at 54 (Ex. 55)............JA1929

    1937 N.J. Rev. Stat. 32:14-13.1(8) (Ex. 56)...............................JA1932

    1875 Laws & Ord. Governing Village of Hyde Park at 310, § 6 (Ex.
        57)......................................................................................JA1935

    1883 Rev. Ord. of the City of Danville, ch.19 § 4, at 83 (Ex. 58) .............JA1941

    Tower Grove Park of the City of St. Louis 117 (1883) (Ex. 59)...............JA1945

    Rev. Ordinances of Salt Lake City 248, ch. 27 § 6 (1888) (Ex. 60) ..........JA1949

    Laws & Ordinances for the Gov't of the Mun. Corp. of the City of
        Williamsport, Pa. 141 (1891) (Ex. 61) .................................JA1953

    Park Ordinances, Springfield, Mass. (1891) (Ex. 62) ................................JA1964

    Compiled Ordinances of the City of Grand Rapids 163, § 432
        (1907) (enacted 1891, amended 1892 & 1897) (Ex. 63)......................JA1965

    3rd Ann. Rep. of the Park Comm'rs of the City of Lynn 23 (1891)
        (Ex. 64) ...............................................................................JA1970

    Laws & Ordinances of the City of Peoria, Illinois 667 (1892) (Ex.
        65).......................................................................................JA1973

    Mun. Code of the City of Spokane, Wash. 123 (1903) (enacted
        1892) (Ex. 66).......................................................................JA1977

    Charter of the City of Wilmington, Rules and Regulations of the
        Board of Park Commissioners, Part VII, § 7 (1893) (Ex. 67).............JA1982

    Rev. Ordinances of the City of Canton, Ill. 240 (1895) (Ex. 68)..............JA1984

Gen. Ordinances of the City of Indianapolis 648, § 1971 (1904)
(enacted 1896) (Ex. 69) ........................................................ JA1989

Digest of the Acts of Assembly Relating to & the Gen. Ordinances
of the City of Pittsburgh 496 (1897) (enacted 1893) (Ex. 70) ............. JA1995

Digest of the Laws & Ordinances for the Gov't of the Mun. Corp. of
the City of Reading, PA 240 (1897) (Ex. 71)...................................... JA2001

Rev. Ordinances of the City of Boulder, CO 157 (1899) (Ex. 72)............. JA2002

General Municipal Ordinances of the City of Oakland, Cal.,
Addendum at 15 (1909) (Ex. 73)........................................... JA2003

The Code of City of Birmingham, Alabama 662 (1917) (Ex. 74) ............. JA2004

Firearms Regulations in the National Parks, 1897-1936 (NPS 2008)
(Ex. 75) ............................................................................... JA2008

Sen Yuan Wu, N.J. Pop. 1790 to 2010, Div. Labor Market &
Demographic Rsch. (Dec. 2010) (Ex. 76)............................... JA2083

2021 Population Density: N.J. Counties, U.S. Census Bureau, Pop.
Div. (Apr. 2022), prepared by N.J. Dept. Labor & Workforce
Dev't (Ex. 77) ......................................................................... JA2086

1874 Mo. Laws 43 (§ 1) (Ex. 78) ................................................. JA2087

1883 Mo. Laws 76 (§ 1) (Ex. 79) ................................................. JA2090

1889 Ariz. Sess. Laws 17 (§ 3) (Ex. 80)...................................... JA2093

1890 Okla. Sess. Laws 496 (§ 7) (Ex. 81)................................... JA2096

1903 Mont. Laws. 49-50 (§ 3) (Ex. 82)....................................... JA2099

M. Kevane & W. Sundstrom, Development of Public Libraries in
the U.S., 1870-1930, Information & Culture, Vol 49, no. 2
(2014) (Ex. 83) .................................................................... JA2103

## VOLUME VII

Pop. of Mass. by Counties & Minor Civil Divs., Census Bulletin
(Nov. 8, 1990) (Ex. 84)........................................................ JA2132

1746 N.J. Laws ch. 102 (Ex. 85) ............................................... JA2139

1797 N.J. Laws (R.S. 572), at 367 (Ex. 86)................................ JA2144

1874 N.J. Laws (P.L. 1871, p.109) (Ex. 87)................................ JA2149

G. Fenich, A Chronology of (Legal) Gaming in the U.S., Gaming
    Rsch & Rev. J, vol.3, Iss.2 (1996) (Ex. 88).......................... JA2151

Report & Recommendations of the Governor's Advisory
    Commission on Gambling, Jun. 30, 1998 (Ex. 89) ............... JA2165

Port Authority of NY & NJ, Dec. 2021 Traffic Report, Aviation
    Dep't, https://www.panynj.gov/airports/en/statistics-general-
    info/Monthly_Airport_Activities.html (Ex. 90)................... JA2447

Caroline Norris, A History of Madness: Four Venerable Virginia
    Lunatic Asylums, Virginia Magazine of History & Biography,
    Vol. 125, Issue 2 (2017) (Ex. 91) ........................................ JA2450

1776 N.C. Sess. Laws 168 (Ex. 92)............................................ JA2478

1800 Ga. Laws 428 (Ex. 93)....................................................... JA2479

1837 Md. Acts 108 (Ex. 94) ....................................................... JA2481

1868 Oh. Supp. Rev. Stat 13 (Ex. 95) ........................................ JA2484

1872 Wisc. Rev. Stat 1960 (Ex. 96) ........................................... JA2486

1872 Conn. Acts 108 (Ex. 97) .................................................... JA2489

1872 Or. Acts 26 (Ex. 98).......................................................... JA2491

1873 S.C. Rev. Stat. 404 (Ex. 99).............................................. JA2493

1887 W.Va. Code, ch. 148, § 7 (Ex. 100) .................................. JA2495

Declaration of Angela Cai and Exhibits Volume III (ECF 90) ........................ JA2499

1881 Kan. Sess. Laws 92, § 23 (Ex. 101)................................... JA2512

1875 Ark. Acts 156 (Ex. 102)..................................................... JA2514

1847 Va. Laws 129 (Ex. 103)..................................................... JA2516

1868 W. Va. Code 153 (Ex. 104) ............................................................ JA2523

1872 Portland Ord. No. 1108 (Ex. 105) .................................................. JA2526

1813 Ky. Acts 10 (Ex. 106) ...................................................................... JA2528

1813 La. Acts 172 (Ex. 107) .................................................................... JA2532

1819 Ind. Acts 39 (Ex. 108) .................................................................... JA2536

1838 Va. Acts 76 (Ex. 109) ...................................................................... JA2538

1859 Ohio Acts 56 (Ex. 110) .................................................................... JA2541

1861 Ga. Laws 859 (Ex. 111) .................................................................. JA2544

1835 Mass. Rev. Stat., ch. 134, § 16 (Ex. 112) ...................................... JA2546

1838 Terr. of Wis. Stat. § 16 (Ex. 113) .................................................. JA2548

Me. Rev. Stat., ch. 169, § 16 (1840) (Ex. 114) ...................................... JA2550

Mich. Rev. Stat., ch. 162, § 16 (1846) (Ex. 115) .................................... JA2552

Excerpts from M. Dalton, The Country Justice (1690) (Ex. 116) .............. JA2554

Terr. of Minn. Rev. Stat., ch. 112, § 18 (Ex. 117) .................................... JA2560

1854 Ore. Stat. ch. 16, § 17 (Ex. 118) .................................................... JA2562

1857 D.C. Rev. Code ch. 141, § 16 (Ex. 119) ........................................ JA2564

1860 Pa. Laws p. 432, § 6; § 8 (Ex. 120) .............................................. JA2566

1844 Miss. Law p. 182, Art. 16, § 1, in Anderson Hutchinson, Code
    of Mississippi, from 1798 to 1848, 182 (1848) (Ex. 121) .................... JA2568

1856-1857 N.C. Sess. Laws 34, Pub. Laws, An Act Entitled
    "Revenue," ch. 34, § 23, pt. 4 (Ex. 122) ............................................ JA2570

1866 Ga. Laws p. 27-28, Title VI, No. 41 (Ex. 123) ................................ JA2572

Rev. Code of Alabama, p. 169, ch. 3, § 10 (1867) (Ex. 124) .................... JA2575

1867 Miss. Laws 327-28, An Act To Tax Guns And Pistols in The County Of Washington, ch. 249, § 1 (Ex. 125)...................................... JA2577

George W. Hess, Revised Ordinances of the City of Evanston, 131-132 (1893) (Ex. 126) ........................................................... JA2580

1895 Neb. Laws 210, Laws of Nebraska Relating to the City of Lincoln, Art. XVI, § 6 (Ex. 127) ........................................................... JA2582

1902-04 Va. Acts 155-157, An Act to Raise Revenue for Support of the Government and Public Free Schools, sched. B, § 6, Tangible Personal Property, Eighteenth (Ex. 128).............................. JA2584

Orville Park, Park's Annotated Code of the State of Georgia 1914, Penal Code, Article 3, Carrying pistols without license, § 348(a)-(d) (Ex. 129)........................................................... JA2587

Ohio Law, p. 633, §§ 24-25 (1884) (Ex. 130)........................................... JA2590

Mass. Law, p. 479-484, ch. 22, §§ 1-10 (1776) (Ex. 131) ........................ JA2592

1777 Pa. Laws 110-113 (Ex. 132) ............................................................. JA2598

Va. Act of May 5, 1777, ch. 3 (Ex. 133) ................................................... JA2604

Excerpt from Bernard Schwartz, The Bill of Rights: A Documentary History, Vol, 2, at 662 (1971) (Ex. 134) ...................... JA2608

Excerpt from Debates & Proc. in the Convention of the Commonwealth of Mass. Held in the Year 1788 (1856) (Ex. 135)................................................................................................... JA2616

Charles C. Branas, SeungHoon Han, and Douglas J. Wiebe, Alcohol Use and Firearm Violence, 38 Epidemiologic Rev. 32, 40-43 (2016) (Ex. 136) .................................................................................... JA2618

Jonathan Jay, Alcohol Outlets and Firearm Violence: a Place-Based Case–Control Study Using Satellite Imagery and Machine Learning, Inj. Prev. 61, 64 (2019) (Ex. 137)....................................... JA2632

Pamela J. Trangenstein et al., Outlet Type, Access to Alcohol, and Violent Crime, 42 Alcohol Clin. Exp. Re. 2234, 2241 (2018) (Ex. 138) ................................................................................................ JA2638

Matthew Miller et al., 'Road rage' in Arizona: Armed and
   Dangerous, 34 Accident Analysis and Prevention, 807, 811
   (2002) (Ex. 139) ................................................................... JA2650

Arlin J. Benjamin Jr., Sven Kepes, & Brad. J. Bushman, Effects of
   Weapons on Aggressive Thoughts, Angry Feelings, Hostile
   Appraisals, and Aggressive Behavior: A Meta-Analytic Review
   of the Weapons Effect Literature, 22 Personality & Social
   Psych. R. 347, 359 (2018) (Ex. 140) ..................................... JA2658

David Hemenway, Chloe Shawah, & Elizabeth Lites, Defensive
   gun use: What can we learn from news reports?, 9 Injury
   Epidemiology 19, 27 (2022) (Ex. 141)................................... JA2689

David Hemenway, Deborah Azrael, & Matthew Miller, Whose guns
   are stolen? The epidemiology of Gun theft victims, 4 Injury
   Epidemiology 11, 14 (2017) (Ex. 142)................................... JA2699

## VOLUME VIII

John J. Donohue et al., More guns, more unintended consequences:
   the effects of right-to-carry on criminal behavior and policing in
   U.S. cities, Nat'l Bureau of Econ. Research, Working Paper
   Series, Working Paper 30190, at 29,
   http://www.nber.org/papers/w30190 (Ex. 143)..................................... JA2704

D. Hemenway & S.J. Solnick, The epidemiology of self-defense
   gun use: Evidence from the National Crime Victimization
   Surveys 2007–2011, 79 Preventative Medicine 22, 27 (2015)
   (Ex. 144) ............................................................................ JA2740

John J. Donohue, Abhay Aneja, & Kyle D. Weber, Right-to-Carry
   Laws and Violent Crime: A Comprehensive Assessment Using
   Panel Data and a State-Level Synthetic Control Analysis, 16 J.
   Empirical L. Studies 198, 240 (April 2019) (Ex. 145)........................ JA2746

Michael Siegel et al., Easiness of Legal Access to Concealed
   Firearm Permits and Homicide Rates in the United States, 107
   AJPH Research 1923, 1929 (2017) (Ex. 146) ...................................... JA2796

1875 Wyoming Terr. Acts ch.52, §1 (Ex. 147) ......................................... JA2803

Code of City of Lynchburg, Va. Ch. XIX, § 20 (1887) (Ex. 148) ............. JA2806

1869 N.M. Gen Laws ch.32, at 313 (Ex. 149)................................... JA2809

A. Holgersson & U. Bjornstig, Mass-casualty attacks on public
    transportation, J Transp. Security 7:1–16 (2014) (Ex. 150)................ JA2812

1795 Mass Gen Law ch.26, § 2 (Ex. 151) ....................................... JA2828

1686 N.J. Laws, ch. 9, in The Grants, Concessions, and Original
    Constitution of the Province of New Jersey, at 289–90 (2d ed.
    1881) (Ex. 152).................................................................... JA2830

Second Supplemental Declaration of Jason Cook (ECF 98)........................... JA2834

Supplemental Declaration of Nicole Cuozzo (ECF 99) ................................ JA2837

Declaration of Ronald D'Angelo (ECF 100).......................................... JA2839

David Jensen Affidavit (ECF 103) .................................................... JA2841

1777 N.J. Laws 26-36, ch. XX (Ex. 1) ........................................ JA2843

1780 N.J. Laws 39-54, ch. XIII (Ex. 2) ....................................... JA2855

1798 N.J. Laws 609-28, ch. DCCCXXII (Ex. 3)................................ JA2872

1806 N.J. Laws 771-83, ch. CLVI (Ex. 4).................................... JA2893

1829 N.J. Laws 109-33, An Act for the punishment of crimes (Ex.
    5) .............................................................................. JA2907

Act of May 28, 1746, ch. X, Acts and Laws of Massachusetts Bay
    207-08 (Ex. 6)................................................................ JA2933

19 Colonial Records of the State of Georgia: Part I, Statutes,
    Colonial and Revolutionary 137-40 (Ex. 7) ............................... JA2935

Digest of the Laws of Georgia 157-58 (1800) (Ex. 8) ............................ JA2940

1812 Del. Laws 522-24, ch. CXCV (Ex. 9) .................................... JA2943

1818 Vermont Acts & Resolves 22-65, ch. II (Ex. 10) ........................... JA2947

1823 N.H. Laws 72-75, ch. XXXIV (Ex. 11)............................... JA2992

1885 N.J. Laws 52, ch. XLIV (Ex. 12)........................................................ JA2997

1799 N.J. Laws 561-63, ch. DCCCVI (Ex. 13)............................................ JA2999

1811 N.J. Laws 300 (Ex. 14) ....................................................................... JA3003

Public Laws of South Carolina 275-76 (1790) (Ex. 15)............................. JA3005

Acts and Laws of the State of Connecticut 36-37 (1784) (Ex. 16) ............ JA3008

Manual of the Laws of North Carolina 234-36 (1814) (Ex. 17) ................ JA3011

Digest of the Laws of Georgia 428 (1800) (Ex. 18)................................... JA3015

Public Laws of Rhode-Island and Providence Plantations 568
    (1798) (Ex. 19) ...................................................................................... JA3017

1812 Del. Laws 522-24, ch. CXCV (Ex. 20) ............................................. JA3019

5 Laws of the Colony of New York 11-13, ch. 1410 (1894) (Ex. 21) ....... JA3023

## VOLUME IX

Letter from Defendants (ECF 104) .................................................................. JA3027

Letter from Defendants (ECF 105) .................................................................. JA3029

    Supplemental Certification of Director Rebuck (Ex. 1)............................. JA3031

Letter from Defendants (ECF 107) .................................................................. JA3034

Letter from *Siegel* Plaintiffs Regarding Standing (ECF 114).......................... JA3035

    Declaration of Kenneth Armellino (Ex. 1) ................................................ JA3038

    Declaration of Daniel L. Schmutter (Ex. 2)............................................... JA3048

Third Supplemental Declaration of Jason Cook (ECF 115)............................. JA3091

*Siegel* Plaintiffs' Emergency Motion for Leave to File Supplemental
    Papers Containing Newly Obtained Information on Issues of
    Standing (ECF 116) ..................................................................................... JA3093

Transcript of Hearing on Motion for a Preliminary Injunction (ECF
    118) .............................................................................................................. JA3095

Letter from Defendants enclosing electronic copies of exhibits
    submitted to the court at motion hearing (ECF 119) .................................. JA3263

    Timothy Cunningham, 1 A New and Complete Law Dictionary
        (1771) (Tab 1) ..................................................................................... JA3265

    Samuel Johnson, Dictionary of the English Language (1773)
        (Tab 2) ................................................................................................. JA3270

    T. Sheridan, A Complete Dictionary of the English Language
        (1797) (Tab 3) ..................................................................................... JA3277

    N. Bailey, Dictionarium Britannicum (1736) (Tab 4) .............................. JA3282

    S. Colt, Revolving gun, patented Feb. 25, 1836 (from Rutgers
        University Libraries) (Tab 5) .............................................................. JA3286

    James Robinson Planché, 1 A Cyclopædia of Costume or
        Dictionary of Dress (1876) (Tab 6) .................................................... JA3289

Order administratively terminating actions pending appeal (ECF 130) ........... JA3297

March 3, 2023

The Honorable Renée Marie Bumb, U.S.D.J.
United States District Court for the District of New Jersey
Mitchell H. Cohen Building & U.S. Courthouse
4th & Cooper Streets
Camden, NJ 08101

    Re:   *Siegel v. Platkin*, 22-cv-7463
            *Koons v. Platkin*, 22-cv-7464

Dear Chief Judge Bumb,

      Defendants write to inquire into the remaining timeline for the currently-pending preliminary injunction motions, consistent with this Court's preference for a unitary process to "resolve the litigation all together," including any appeals process. Oral Arg. Tr. (1/26/23), at 83. Mindful of this Court's preference, the State has not yet filed an appeal, and has instead briefed all the issues in the motions for preliminary injunction in both above-captioned matters. Because those motions have been pending since February 24, 2023, this State is now respectfully requesting further information regarding the timeline for decision (and any oral argument).

      That timeline relates to the forthcoming appeals process. Defendants intend to file a notice of appeal on or before March 8, 2023, from the TRO orders dated January 9, 2023 (*Koons*, Dkt. 35) and January 30, 2023 (*Siegel*, Dkt. 52). Although this Court is likely aware that TROs are not ordinarily appealable, a TRO functionally becomes a PI and therefore becomes appealable after sufficient passage of time. In assessing whether a TRO has gone "beyond preservation of the status quo and mandates affirmative relief" and becomes "immediately appealable under § 1292(a)(1)," courts

JA3027

"must look past labels to consider functional effects." *Hope v. Warden York Cnty. Prison*, 956 F.3d 156, 160-61 (3d Cir. 2020); *see also Nutrasweet Co. v. Vit-Mar Enterprises, Inc.*, 112 F.3d 689, 692 (3d Cir. 1997). Federal Rule of Civil Procedure 65(b) provides that TROs expire after 14 days unless the court "extends it for a like period"—in other words, 28 days. Wright & Miller provides the same: "The text of Rule 65(b) seems to exclude any possibility that a TRO can remain in force beyond 28 days." 11A Wright & Miller, Fed. Prac. & Proc. Civ. § 2953 (3d ed.). In this case, 28 days elapsed from the *Koons* TRO on February 6, 2023. The deadline to file a notice of appeal from that injunction is 30 days later, on March 8, 2023. *See* Fed. R. App. P. 4.

Mindful of this Court's suggestion that a single orderly process would be more efficient, including for eventual presentation on appeal, the State has not yet pursued emergency relief at the Third Circuit. But given the continued passage of time, a protective notice of appeal is now necessary to allow Defendants to seek a stay pending appeal from the Third Circuit if this Court's decision on the pending motions for preliminary injunction is not immediately forthcoming. Conversely, if this Court issues an intervening decision on preliminary injunction (or lifts the TROs), Defendants would of course withdraw the appeal and any pending motions. In light of the impacts of an injunction of its law that has now lasted almost two months, the State greatly appreciates this Court's consideration.

Respectfully submitted,

MATTHEW J. PLATKIN
ATTORNEY GENERAL OF NEW JERSEY

By:  /s/  Angela Cai
      Angela Cai
      Deputy Solicitor General

cc:    Daniel L. Schmutter, Esq.
       David Jensen, Esq.
       Leon Sokol, Esq.
       Edward Kologi, Esq.

March 6, 2023

The Honorable Renée Marie Bumb, U.S.D.J.
United States District Court for the District of New Jersey
Mitchell H. Cohen Building & U.S. Courthouse
4th & Cooper Streets
Camden, NJ 08101

    Re:    *Siegel v. Platkin*, 22-cv-7463
              *Koons v. Platkin*, 22-cv-7464

Dear Chief Judge Bumb,

In *Siegel* Plaintiffs' reply brief in support of their motion for preliminary injunction, they claim that although record evidence shows all casinos in New Jersey have chosen to "'exercise their rights, as private property owners, to prohibit carrying of firearms on their premises' . . . nothing in the record indicates that all nine Atlantic City casinos have actually done so." (Dkt. 97, at 21).

In response, the State submits the attached supplemental certification of the Division of Gaming Enforcement Director into the record to reflect the current status of firearms prohibitions at casinos and racetracks in New Jersey.

                Respectfully submitted,

                MATTHEW J. PLATKIN
                ATTORNEY GENERAL OF NEW JERSEY

        By:   /s/  Angela Cai

JA3029

Angela Cai
Deputy Solicitor General


cc:     Daniel L. Schmutter, Esq.
         David Jensen, Esq.
         Leon Sokol, Esq.
         Edward Kologi, Esq.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE

Date Filed: 07/21/2023      Page: 28      Document: 29      Case: 23-2043

| | |
|---|---|
| AARON SIEGEL, JASON COOK, JOSEPH DELUCA, NICOLE CUOZZO, TIMOTHY VARGA, CHRISTOPHER STAMOS, KIM HENRY, AND ASSOCIATION OF NEW JERSEY RIFLE AND PISTOL CLUBS, INC., | No. 22-CV-7463 (RMB) (AMD) |

Plaintiffs,

v.

MATTHEW J. PLATKIN, in his official capacity as Attorney General of the State of New Jersey; and PATRICK CALLAHAN, in his official capacity as Superintendent of the New Jersey State Police,

Defendants.

| | |
|---|---|
| RONALD KOONS; NICHOLAS GAUDIO; JEFFREY M. MULLER; SECOND AMENDMENT FOUNDATION; FIREARMS POLICY COALITION, INC.; COALITION OF NEW JERSEY FIREARM OWNERS; and NEW JERSEY SECOND AMENDMENT SOCIETY, | No. 22-CV-7463 (RMB) (AMD) |

*Plaintiffs,*
v.
WILLIAM REYNOLDS in his official capacity as the Prosecutor of Atlantic County, New Jersey; GRACE C.

JA3031

Date Filed: 07/21/2023     Page: 29     Document: 29     Case: 23-2043

MACAULAY in her official capacity as the Prosecutor of Camden County, New Jersey; ANNEMARIE TAGGART in her official capacity as the Prosecutor of Sussex County, New Jersey; MATTHEW J. PLATKIN, in his official capacity as Attorney General of the State of New Jersey; and PATRICK CALLAHAN, in his official capacity as Superintendent of the New Jersey State Police,
*Defendants.*

## SUPPLEMENTAL CERTIFICATION OF DAVID L. REBUCK

David L. Rebuck, of full age, upon his oath certifies and says:

1.    I am the Director of the Division of Gaming Enforcement ("DGE" or "Division"), the casino regulatory agency within the Department of Law and Public Safety.

2.    As the Director, I am responsible for, inter alia, overseeing enforcement of the Casino Control Act, N.J.S.A. 5:12-1 *et seq.,* the review and audit of casino-hotel operations, and the investigation and prosecution of all casino-related crimes.

3.    As the Director of DGE, I have personal knowledge of the material facts of this Certification.

4.    As of March 3, 2023, each of the nine casino hotels in Atlantic City have posted signage prohibiting firearms on their premises.

JA3032

5.      As of March 3, 2023, each of the three race tracks in New Jersey have posted signage prohibiting firearms on their premises.

The foregoing statements are true to the best of my knowledge, information, and belief.  I am aware that, if any of the statements are willfully false, I may be subject to punishment.

DAVID L. REBUCK
Director, Division of Gaming Enforcement
State of New Jersey
Department of Law and Public Safety

Dated: March 3, 2023

JA3033

March 8, 2023

The Honorable Renée Marie Bumb, U.S.D.J.
United States District Court for the District of New Jersey
Mitchell H. Cohen Building & U.S. Courthouse
4th & Cooper Streets
Camden, NJ 08101

    Re:   *Siegel v. Platkin*, 22-cv-7463
            *Koons v. Platkin*, 22-cv-7464

Dear Chief Judge Bumb,

       The State appreciates the Court's setting an argument date of March 17 for the pending motions for preliminary injunction. (Dkt. 106). In light of that order, the State will not file a notice of appeal at this time.

                           Respectfully submitted,

                           MATTHEW J. PLATKIN
                           ATTORNEY GENERAL OF NEW JERSEY

                      By:  /s/ Angela Cai
                           Angela Cai
                           Deputy Solicitor General

cc:   Daniel L. Schmutter, Esq.
      David Jensen, Esq.
      Leon Sokol, Esq.
      Edward Kologi, Esq.

LAW OFFICES
# HARTMAN & WINNICKI, P.C.

Dariusz M. Winnicki *°
Richard L. Ravin *°□
Daniel L. Schmutter*
Andrew T. Wolfe*

74 PASSAIC STREET
RIDGEWOOD, NEW JERSEY 07450

* * *

Phone: (201) 967-8040
Fax:   (201) 967-0590

_____

* New York and New Jersey Bars
* Florida Bar
□ Washington, D.C. Bar
◊ New Jersey Bar

WEBSITE
www.hartmanwinnicki.com

_____

Porter E. Hartman (1920-2009)
Charles R. Buhrman (1938-1994)
William T. Marsden (1943-1993)
Cyrus D. Samuelson (1911-1998)

March 16, 2023

**VIA ECF**
The Honorable Renee M. Bumb
U.S. District Court for the District of New Jersey
Mitchell H. Cohen Building
& U.S. Courthouse
4th & Cooper Streets
Camden, New Jersey 08101

Re:   **Koons, et al. v. Reynolds, et al. - No.: 1:22-cv-07464**
      **Siegel, et al. v. Platkin, et al. - No.: 1:22-cv-07463**

## SIEGEL PLAINTIFFS' SECOND SUPPLEMENTAL LETTER BRIEF IN FURTHER SUPPORT OF THEIR MOTION FOR A PRELIMINARY INJUNCTION

Dear Judge Bumb:

We represent the Siegel Plaintiffs in the above referenced matter. Please accept this second supplemental letter brief in further opposition to Defendants' position on standing to challenge the handgun prohibitions in casinos.

Siegel Plaintiffs' are seeking leave to file the following documents:

(1) Declaration of Kenneth Armellino. The Armellino Dec. attaches the results of his Open Public Records Act ("OPRA") request to the Division of Gaming Enforcement ("Division"), which includes revealing email communications between the Division and the casinos.

1

JA3035

(2) Supplemental Declaration of Daniel Schmutter. The Supplemental Schmutter Declaration attaches various publicly available documents and webpages which demonstrate the extremely close relationship between the Division and the casinos.

The emails attached to the Armellino Dec show that Division Director David Rebuck was in direct communication with Casino Association of New Jersey ("CANJ") attorney Joseph Dougherty regarding both the language to be used with and the timing of the as-of-then not yet released CANJ statement on the so-called "independent" prohibition on handgun carry by the casinos.

Further, the documents attached to the Supplemental Schmutter Dec show that CANJ attorney Dougherty and his family are also long time business owners in Atlantic City, including owing a restaurant within the Resorts Casino Hotel which is run my CEO Mark Giannantonio, who is also President of the Casino Association of New Jersey ("CANJ") and the same individual who signed the statement of the CANJ regarding the carry of guns in casinos.

Notably, Exhibit B to the Supplemental Schmutter Dec is a cover letter from Dougherty to the Casino Reinvestment Development Authority ("CRDA") seeking site plan approval for a local Dougherty family business, Docks Oyster House. The Board of Directors of CRDA includes Defendant Attorney General Platkin, Gaming Enforcement Director David Rebuck, James Plousis, Chairman of the Casino Control Commission, and Lt. Governor Sheila Oliver.

Thus, the businesses of casino attorney Dougherty and his family require approvals from the very agency run by Attorney General Platkin, Gaming Enforcement Director David Rebuck, James Plousis, Chairman of the Casino Control Commission, and Lt. Governor Sheila Oliver.

JA3036

Taken together, these documents show a shockingly close relationship between State officials and the casinos. This further draws into serious question the idea that the casinos have "independently" banned handguns from their premises.

Rather, this, along with Siegel Plaintiffs' previous submission regarding the casino bailouts by the State, fundamental undermines Defendants' position on traceability and redressability. The argument that there is an "independent" carry prohibition by the casinos cannot be taken seriously.

Respectfully submitted,

s/ Daniel L. Schmutter
Daniel L. Schmutter
Hartman & Winnicki, P.C.
74 Passaic Street
Ridgewood, New Jersey 07450
(201) 967-8040
(201) 967-0590 (fax)
dschmutter@hartmanwinnicki.com

cc:   Angela Cai, Esq.
      Leon Sokol, Esq.
      Edward Kologi, Esq.
      Howard Goldberg, Esq.
      David Jensen, Esq.

JA3037

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| RONALD KOONS, *et al.* ) | Civil Action No. 1:22-cv-07464-RMB-AMD |
| )
| *Plaintiffs* ) | |
| ) | |
| v. ) | **CIVIL ACTION** |
| ) | |
| WILLIAM REYNOLDS, *et al.* ) | **(ELECTRONICALLY FILED)** |
| ) | |
| *Defendants* ) | |
| ) | |
| --------------------------------------------- ) | **CONSOLIDATED ACTIONS** |
| ) | |
| AARON SIEGEL, *et al.* ) | |
| ) | |
| *Plaintiffs,* ) | |
| ) | |
| v. ) | |
| ) | |
| MATTHEW PLATKIN, *et al.* ) | |
| ) | |
| *Defendants.* ) | |

**DECLARATION OF KENNETH ARMELLINO IN SUPPORT OF SIEGEL PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**

1.      I, Kenneth Armellino, am a member of Plaintiff Association of New Jersey Rifle & Pistol Clubs, Inc.   I am over the age of 18, have personal knowledge of the facts and events referred to in this Declaration, and am competent to testify to the matters stated below.

JA3038

2.      Attached hereto as **Exhibit A** is the response to a request I filed pursuant to the Open Public Records Act on February 16, 2023 to the New Jersey Division of Gaming Enforcement.  The request sought:

> All correspondence between the Division of Gaming Enforcement, the Governor's Office, and Attorney General's Office and the NJ Casino Association regarding the policy of allowing firearms on casino properties dated January 1, 2023 to February 15, 2023.

3.      Attached hereto as **Exhibit B** is an e-mail thread between David Rebuck and attorney Joseph R. Dougherty.

4.      Attached hereto as **Exhibit C** is an e-mail thread between Nicholas Moles, General Counsel of Resorts Casino Hotel, and Kerry Langan with a copy to David Rebuck.

I declare under penalty of perjury that the foregoing is true and correct. Executed within the United States.

_____
Kenneth Armellino

3/16/2023
_____
Date

JA3039

# EXHIBIT A

February 28, 2023   07:06 PM

State of New Jersey

Government Records Request

Receipt

Page: 1 of 2

| Requestor Information | |
|---|---|
| | **Request Number:** W197314 |
| Kenneth Armellino | **Request Status:** Filled Closed |
| | **Ready Date:** |
| 60 Dance Blvd | Custodian Contact Information |
| Dumont, NJ 07628 | Division of Gaming Enforcement |
| | Records Custodian |
| kennethpe@yahoo.com | PO Box 047 |
| 516-220-9333 | 140 E Front Street |
| | Trenton, NJ 08625-0047 |
| Request Date: February 16, 2023 | records.dge@njdge.org |
| | 609-633-7158 |
| Maximum Authorized Cost:    $50.00 | By  *Jordan Hollander* |
| Email | |

| Status of Your Request | Cost Information |
|---|---|
| Your request for government records (# W197314) from the Division of Gaming Enforcement has been reviewed and has been Filled Closed.  Detailed information as to the availability of the documents you requested appear below and on following pages as necessary. | **Total Cost:** $0.00 |
| | **Deposit:** $0.00 |
| The cost and any balance due for this request is shown to the right.  Any balance due must be paid in full prior to the release / mailing of the documents. | **Total Amount Paid:** $0.00 |
| | **Balance Due:** $0.00 |
| If you have any questions related to the disposition of this request please contact the Custodian of Records for the Division of Gaming Enforcement.  The contact information is in the column to the right.  Please reference your request number in any contact or correspondence. | |

Document Detail

| Div | Doc # | Doc Name | Redaction Req | Pages | Legal Size | Electronic Media | Other Cost |
|---|---|---|---|---|---|---|---|
| GE | 0001 | All correspondence between the Division of Gaming Enforcement, the Governor's Office, and Attorney General's Office and the NJ Casino Association regarding the policy of allowing firearms on casino properties dated January 1, 2023 to February 15, 2023. | N | 3 | N | Y | |
| | | Granted, in part, and Denial, in part: 01. Not Made, Maintained, or Received by Division; 02. Inter/Intra-Agency Advisory, Consultative or Deliberative Material; 15. Attorney Client Privilege; and 16. Other Claimed Privilege --- Attorney Work Product | | | | | |

JA3041

February 28, 2023   07:06 PM

State of New Jersey

Page: 2 of 2

Government Records Request

Receipt

On February 17, 2023, you filed OPRA request #W197388 with the Department of Law and Public Safety, Division of Gaming Enforcement (DGE) seeking "[a]ll correspondence between the Division of Gaming Enforcement, the Governor's Office, and Attorney General's Office and the NJ Casino Association regarding the policy of allowing firearms on casino properties" dated January 1, 2023 to February 15, 2023.

The DGE has reviewed your request and provides the following records in response:

- Email chain between DGE Director David Rebuck and Joseph R. Dougherty, Esq. dated February 5, 2023 - 1 page.
- Email from Nick Moles, Esq., to DGE PIO Kerry Langan and DGE Director David Rebuck dated February 7, 2023 - 2 pages.

To the extent your request seeks records between the DGE and the Attorney General's Office these records are exempt pursuant to N.J.S.A. 47:1A-1.1 which exempts from disclosure under OPRA inter-agency or intra-agency advisory, consultative or deliberative material, as well as any record within the attorney-client privilege. Additionally, these records are exempt as attorney-work product, pursuant to N.J.S.A. 47:1A-9 which provides that OPRA does not abrogate or erode any privileges recognized by court rule or judicial case law. Finally, to the extent your request seeks records between DGE and the Governor's Office, there are no responsive records.

Sincerely,

Jordan Hollander
DGE Records Custodian

Your request for government records (# W197314) is as follows:

All correspondence between the Division of Gaming Enforcement, the Governor's Office, and Attorney General's Office and the NJ Casino Association regarding the policy of allowing firearms on casino properties. Correspondence dated 1/1/2023 - 2/15/2023 only.

JA3042

# EXHIBIT B

**Jordan Hollander**
_____

| | |
|---|---|
| **From:** | jdougherty jdnjlaw.com <jdougherty@jdnjlaw.com> |
| **Sent:** | Sunday, February 5, 2023 12:29 PM |
| **To:** | David Rebuck |
| **Subject:** | [EXTERNAL] |

Yes. The approved statement is below.  We're having it pushed out starting tomorrow.

Thanks again.

**"The safety and well-being of our customers and employees is our top priority. Considering the Court Order temporarily restraining enforcement of the State law prohibiting the carrying of firearms,  all of the Atlantic City casinos are exercising their rights, as private property owners, to prohibit the carrying of firearms on their premises."**

Joseph R. Dougherty, Esq.
Jdougherty@jdnjlaw.com
609-431-0490

_____

**From:** David Rebuck <David.Rebuck@njdge.org>
**Sent:** Sunday, February 5, 2023 11:52 AM
**To:** jdougherty jdnjlaw.com <jdougherty@jdnjlaw.com>
**Subject:**

Any update on possible CANJ press release?

Sent via the Samsung Galaxy S20 FE 5G, an AT&T 5G smartphone
Get Outlook for Android

CONFIDENTIALITY NOTICE The information contained in this communication from the Office of the New Jersey Attorney General is privileged and confidential and is intended for the sole use of the persons or entities who are the addressees. If you are not an intended recipient of this e-mail, the dissemination, distribution, copying or use of the information it contains is strictly prohibited. If you have received this communication in error, please immediately contact the Office of the Attorney General at (609) 292-4925 to arrange for the return of this information.

JA3044

Case 1:22-cv-04563-AMD Document 29-11 Page #42 Date Filed 07/21/2023 PageID: 3575

# EXHIBIT C

**Jordan Hollander**

| | |
|---|---|
| **From:** | Nick Mole  <NMole @re ort ac.com> |
| **Sent:** | Tue day, February , 2023 3:2  PM |
| **To:** |  erry Langan |
|  **c:** | David Rebuck |
| **Subject:** | [EXTERNAL]  a ino A ociation o  New er ey Statement |

Good afternoon,  erry. These articles showed up in our clippings and I thought I would pass them on to  you for your information. Stay well. Nick.

<u>AC CASINO CONCEAL CARRY  AN</u>

**Casino Association of New Jersey Statement**
February  , 2023
<u>Insider NJ</u>
**Casino Association of New Jersey Statement**

**Atlantic City, NJ**   Mark Giannantonio, president of the Casino Association of New Jersey (CANJ), issued the following statement on behalf of the Atlantic City casino industry:

*"The safety and well-being of our guests and employees is a top priority for the Atlantic City casino industry. Considering the Court Order temporarily restraining enforcement of the State law prohibiting the carrying of concealed firearms in public places, including casinos, all of the Atlantic City casinos are exercising their rights, as private property owners, to prohibit the carrying of firearms on their premises."*

**About the Casino Association of New Jersey**

The Casino Association of New Jersey (CANJ) is a trade organi ation that provides a collective voice for the Atlantic City casino industry by facilitating the exchange of information and ideas between our industry, small businesses, Atlantic City stakeholders and the general public. The CANJ consistently advocates for legislation and initiatives that support the ongoing revitali ation of Atlantic City into a world-class destination resort. A thriving casino industry drives economic growth, job creation, increased tax revenue for state and local budgets, and prosperity for city residents, hardworking families and businesses which rely on the casinos for their livelihood. Our goals are simple: protect and grow the tens of thousands of jobs the casino industry supports across New Jersey and continue Atlantic City s transformation into a world-class destination resort. For additional information, please visit <u>www.casinosnj.org</u>.

**Atlantic City casinos ban guns as legal battle over new carrying law continues**
February  , 2023
David Wildstein
<u>New Jersey Globe</u>
Guns will be banned in New Jersey casinos despite a temporary restraining order blocking the enforcement of a portion of a new state law that limits firearms in public places, Mark Giannantonio, the president of the Casino Association of New Jersey, said on Monday.

 The safety and well-being of our guests and employees is a top priority for the Atlantic City casino industry, Giannantonio said.   All of the Atlantic City casinos are exercising their rights, as private property owners, to prohibit the carrying of firearms on their premises.

JA3046

 .S. District Court Chief Judge Ren  e Marie   umb ordered the restraints last month after a gun rights group challenged the constitutionality of the new law signed by Gov.   hil Murphy in December.

 umb s ruling fro  e a section of the law that limits guns in  sensitive places, including schools and restaurants.

Last week, another  .S. District Judge,  iden appointee  ahid   uraishi, also issued a temporary restraining order blocking a section of the law that allows the state to sue the gun industry.

**Atlantic City casinos will not allow concealed carry**
February 6, 2023
Daniel   an
 OLITICO   ro

Atlantic City casinos will prohibit the concealed carry of guns on their premises, the state s casino trade group announced Monday afternoon.

The announcement from the Casino Association of New Jersey, which represents Atlantic City s nine casinos, comes after a federal judge last month blocked parts of the state s newly enacted concealed carry law, which includes broad prohibitions on where guns can be carried.

One of the law s provisions   which was blocked   includes a blanket ban on carrying guns in casinos.   rivate property owners can still prohibit guns from being carried on their premises.

 Considering the Court Order temporarily restraining enforcement of the State law prohibiting the carrying of concealed firearms in public places, including casinos, all of the Atlantic City casinos are exercising their rights, as private property owners, to prohibit the carrying of firearms on their premises,  association president Mark Giannantonio said in a statement.

Gun rights groups immediately filed legal challenges to the gun law after Gov.   hil Murphy signed it in December. So far, several of the  sensitive places  where guns are prohibited from being carried have been blocked by the courts, including places that serve alcohol, public libraries or museums and entertainment facilities.

The state has previously suggested to private property owners they can prohibit guns on their property despite the court orders. Ahead of a highly-anticipated   hiladelphia Eagles-New York Giants NFL playoff game, Attorney General Matt   latkin reminded bars and restaurants that serve alcohol that they still had the right to bar guns from being carried on their premises.

Nicholas F. Moles
Vice President & General Counsel
Resorts Casino Hotel
1133 Boardwalk
Atlantic City, NJ 08401
Phone: 609-340-7955
Fax: 609-340-6547
Email: nmoles@resortsac.com

CONFIDENTIALITY NOTICE: The information contained in this email and any document attached hereto is intended only for the named recipient(s). If you are not the intended recipient, nor the employee or agent responsible for delivering this message in confidence to the intended recipient(s), you are hereby notified that you have received this transmittal in error, and any review, dissemination, distribution or copying of this transmittal or its attachments is strictly prohibited. If you have received this transmittal and  or attachments in error, please notify me immediately by reply e-mail and then delete this message, including any attachments.

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

RONALD KOONS, *et al.*    )
           )  Civil Action No. 1:22-cv-07464-
    *Plaintiffs*   )     RMB-AMD
           )
v.          )  __CIVIL ACTION__
           )
WILLIAM REYNOLDS, *et al.*   )  **(ELECTRONICALLY FILED)**
           )
    *Defendants*  )
           )
---------------------------------------------)  **CONSOLIDATED ACTIONS**
           )
AARON SIEGEL, *et al.*    )
           )
    *Plaintiffs,*   )
           )
v.          )
           )
MATTHEW PLATKIN, *et al.*   )
           )
    *Defendants.*  )

**SUPPLEMENTAL DECLARATION OF DANIEL L. SCHMUTTER IN FURTHER SUPPORT OF SIEGEL PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**

1.  I, Daniel L. Schmutter, am an attorney at the law firm of Hartman & Winnicki, P.C., attorneys of record for Plaintiffs in the above-titled action. I am licensed to practice law before the United States District Court for the District of New Jersey. I have personal knowledge of the facts set forth herein and, if called and sworn as a witness, could and would testify competently thereto.

2.     Attached hereto as **Exhibit A** is a screen shot of a page on the website of The Chamber of Commerce of Southern New Jersey showing that Joseph Dougherty is attorney for the Casino Association of New Jersey. https://business.chambersnj.com/directory/Details/casino-association-of-new-jersey-891105 (last visited March 16, 2023).

3.     Attached hereto as **Exhibit B** is a letter from attorney Joseph Dougherty to the Casino Reinvestment Development Authority ("CRDA") seeking site plan approval for a local Dougherty family business, Docks Oyster House. https://njcrda.com/wp-content/uploads/documents/2021/08/Submission-Cover-Letter-dated-3-29-21.pdf (last visited March 16, 2023).

4.     Attached hereto as **Exhibit C** is a screen shot of the page of the CRDA's website identifying the members of the Board of Directors, which include Defendant Attorney General Platkin, Gaming Enforcement Director David Rebuck, James Plousis, Chairman of the Casino Control Commission, and Lt. Governor Sheila Oliver. https://njcrda.com/board-of-directors/ (last visited March 16, 2023).

5.     Attached hereto as **Exhibit D** is an April 24, 2017 news article from Atlantic City Weekly identifying the owners of Docks Oyster House as "Joe and Frank Dougherty." https://atlanticcityweekly.com/families-in-business/the-dougherty-family-has-offered-the-best-in-seafood-and-service-at-docks-oyster-

house/article_ce50169c-d038-5a4e-bbcc-e6f3c3bed476.html6 (last visited March 16, 2023).

6. Attached hereto as **Exhibit E** is a June 29, 2021 news article from Shore Local News announcing the opening of Dougherty's Steakhouse and Raw Bar in the Resorts Casino Hotel. The Article quotes Resorts Casino Hotel CEO Mark Giannantonio, who is also President of the Casino Association of New Jersey ("CANJ") and the individual who signed the statement of the CANJ regarding the carry of guns in casinos. https://shorelocalnews.com/the-dougherty-family-opens-steakhouse-and-raw-bar-in-resorts-casino-atlantic-city/ (last visited March 16, 2023).

I declare under penalty of perjury that the foregoing is true and correct. Executed within the United States.

    /s/ Daniel L. Schmutter          3/16/2023

    Daniel L. Schmutter             Date

# EXHIBIT A

Case 1:22-cv-03409-AMD Document 20-1 Page 49 of 93 Date Filed 07/21/2023 PageID: 3582



MEMBER LOGIN (https://business.chambersnj.com/a/MIC/Login)     CONTACT US (http://business.chambersnj.com/contact-us)

WEBSITE VIDEO TUTORIALS (https://www.youtube.com/playlist?list=PL09BVxYloPlZCLWjFsYQBkQpkFOHB9Dta)

f (https://www.facebook.com/ChamberofCommerceSouthernNewJersey)   🐦 (https://twitter.com/CCSNJ)   in (https://www.linkedin.com/company/chamber-of-commerce-southern-new-jersey/?trk=company_name)   📷 (https://www.instagram.com/ccsnj/)

CHAMBER OF COMMERCE
SOUTHERN NEW JERSEY
*Connecting the region since 1873*

(/)



# Casino Association of New Jersey

Back to Search (https://business.chambersnj.com/directory)

*Associations, Business & Trade Organizations*



📍
c/o                , Atlantic, NJ, 08401 (https://www.google.com/maps/place/c%2fo+Caesars          tlantic+City+NJ)
Caesars  City
Atlantic
City,
2100
Pacific
Avenue



📞 (609) 449-5500 (tel:6094495500)

## Additional Info

Minority-owned business : No

Women-owned business : No

Veteran-owned business : No

## 📰 Member News

Casino Association of New Jersey
Names Giannantonio President
(https://business.chambersnj.com/m
ember-news/Details/casino-
association-of-new-jersey-names-
giannantonio-president-124365)

## Contacts

| PRIMARY | |
|---|---|
| | |
| **Joseph Dougherty** | **Steve Callender** |
| Attorney | President |

JA3052

# EXHIBIT B

JA3053

## JOSEPH R. DOUGHERTY
*ATTORNEY AT LAW*
5409 WINCHESTER AVENUE
VENTNOR, NEW JERSEY 08401
TELEPHONE (609)431-0490

EMAIL: jdougherty@jdnjlaw.com

March 29, 2021

Rob Reid, AICP, PP
Land Use Regulation Enforcement Officer
Casino Reinvestment Development Authority
C/O Rob Reid
PO Box 1774
Absecon, NJ 08201

Re: Dock's Oyster House, Inc.
Application for Amendment of prior
Site Plan Approval (App#2015-06-1550)
Restaurant parking lot expansion project
Block 279, Lots 40, 44, 45, 46 & 48-52

Dear Rob:

Enclosed is one original and one copy of an application for approval of an Amendment to the above referenced prior Site Plan approval. Included in this transmittal are:

1. two electronic copies of the Site Plan prepared by Arthur W. Ponzio and Associates and all of the documents comprising this application.
2. two checks, one in the amount of $550.00 for application fees and one in the amount of $4,200.00 for the escrow deposit;
3. tax certifications from the Atlantic City Tax Collector showing that the taxes on all properties involved in the Project are current;
4. A copy of a deed dated 2018 describing the easement area that is located within the proposed parking lot expansion area;
5. a copy of the 200 foot list; and
6. a proposed form of advertisement of the application to be published after a hearing date is provided;

As we discussed, this application seeks approval for the expansion of the existing parking lot area at Dock's Oyster House to include two small adjacent properties that were acquired after the original approvals were granted. The expansion would add nine valet parking spots and still preserve the access easement that passes between the two new lots. The application also requests approval for the construction of a 6' by 27' refrigeration unit at the rear of the existing building.

Although I know you are familiar with the property - just by way of background - Dock's is

JA3054

– 2 –

Atlantic City's oldest restaurant and was originally opened in 1897, in or about the same year as Steel Pier, the Atlantic City Country Club and the Atlantic City Hospital, by Harry Dougherty, great grandfather of the current principals. It moved from its original location at 1817 Atlantic Avenue to its current location at 2405 Atlantic Avenue when the Convention Hall was under construction in or about 1929 and it has expanded twice and been renovated several times in that location since that move. The most recent expansion, of course, was that approved under the Site Plan approval that we are now looking to amend.

I am also mailing copies of the full paper application packet (and emailing electronic copies) to the following CRDA professionals:

Kathryn Cornforth, PE, CME
ARH Associates
215 Bellevue Avenue
PO Box 579
Hammonton, NJ 08037
gisinfo@arh-us.com

Christine A. Nazzaro-Cofone, AICP/PP
Cofone Consulting Group, LLC
125 Half Mile Road - Suite 200
Red Bank, NJ 07701
ccofone@cofoneconsulting.com

Scott G. Collins Esq.
Riker Danzig Scherer Hyland & Perretti LLP
Headquarters Plaza
One Speedwell Avenue
Morristown, NJ 07962-1981
SCOLLINS@RIKER.com

As always, I look forward to working with you and your staff on this Project. Of course, should you have any questions or require any further information, please do not hesitate to call.

Very truly yours,

Joseph R. Dougherty

EXHIBIT C



Governor Phil Murphy • Lt. Governor Sheila Oliver



ABOUT US ⌄    CONNECT AC ⌄    ENGAGE AC    PROCUREMENT    PUBLIC INFORMATION ⌄

PUBLIC HEARINGS & NOTICES    TOURISM DISTRICT ⌄    PRESS ROOM ⌄

Search …    [ Submit ]

# Board of Directors

JA3057



**Modia Butler**

**Board Chairman**

Mo Butler is a highly respected public affairs expert with extensive experience in government relations, political campaigns, and strategic communications in New Jersey and Washington,...

Read More >



## Lt. Governor Sheila Y. Oliver

### Commissioner, Department of Community Affairs

Lieutenant Governor Oliver is a self-described "Jersey Girl," born and raised in an ethnically diverse Newark neighborhood. Lieutenant Governor Oliver was inspired as a young...

**Read More >**

JA3060



**Elizabeth Muoio**

**State Treasurer**

Elizabeth Maher Muoio was officially sworn in as State Treasurer on April 17, 2018 after being confirmed by the State Senate. She had been serving...

**Read More >**



**Matthew J. Platkin**

**Attorney General**

JA3062

Matthew J. Platkin was nominated by Governor Phil Murphy to serve as the state's 62nd Attorney General on February 3, 2022, and confirmed to that...

**Read More >**



**James T. Plousis**

**Chairman, Casino Control Commission**

JA3063

Chairman Plousis is a veteran public service and law enforcement professional well known for his leadership skills. He was sworn in as the eighth chairman...

**Read More >**



**Marty Small, Sr.**

**Mayor, City of Atlantic City**

Marty Small was born in Atlantic City, New Jersey on March 25, 1974 to the late Ms. Annette Ann Small. Marty is a lifelong resident...

**Read More >**

JA3065



JA3066

## Paulina Banasiak

Paulina Banasiak is a democratic political operative with years of experience in the executive and legislative branch. She is a Vice President at The Zita...

**Read More ›**



**Mike Beson**

Mike Beson is a small business owner in Monmouth County. His company, Guide Publications, specializes in online recruitment tools that have matched thousands of job...

**Read More >**



**Daniel Cosner**

Daniel Cosner, is the Business Manager and Financial Secretary of Electrical Workers Local Union 351, a labor union which represents over 2,600 members. Mr. Cosner…

**Read More ›**



**Edward H. Gant**

**Read More ›**



## Michael I. Hanley

Michael I. Hanley is a Principal at NW Financial Holdings, Inc. The company owns a number of companies including NW Financial Group, LLC and NW...

**Read More >**

JA3071



JA3072

## Michael Laughlin III

Michael is currently President of the Atlantic and Cape May County Building Trades Council and Assistant Business Manager with International Union of Painters and Allied...

**Read More >**



**Brett Matik**

JA3074

Brett Matik, 48, is President of Harrison Beverage Company, a Southern New Jersey based business that for over 65 years has been distributing alcoholic and...

**Read More >**



**William T. Mullen**

JA3075

William T. Mullen is the President of the New Jersey State Building & Construction Trades Council. As President of the Building Trades Council, Mr. Mullen...

**Read More >**



**David Rebuck**

**Director Division of Gaming Enforcement**

David Rebuck serves on the CRDA Board of Directors as a designee of the Attorney General of New Jersey. David L. Rebuck was named by...

**Read More >**



**William C. Sproule**

JA3078

William Sproule is the Executive Secretary-Treasurer of the Eastern Atlantic States Regional Council of Carpenters (EASRCC). EASRCC represents more than 41,000 members in Delaware, District...

**Read More ›**

JA3079



**Karen Worman**

JA3080

Karen Worman was born in Atlantic City and raised in Ventnor. Karen has been employed by Caesars Entertainment since 1992 starting her casino career at...

**Read More >**

# CONTACT US

Click here to fill out a form and send a message to the Board of Directors at CRDA.

SEND MESSAGE

# MEETING INFORMATION

Board Agendas and Meeting Minutes

VIEW ALL

# BOARD STRUCTURE

A board of 17 voting members governs the Authority as follows:

- Six public members appointed by the Governor with the advice and consent of the State Senate for four-year terms.
- Two members appointed by the Governor upon the recommendation of the President of the State Senate for a four-year term.
- Two members appointed by the Governor upon the recommendation of the Speaker of the General Assembly for a four-year term.
- Two casino representatives appointed by the Governor for two-year terms.
- One member of the Casino Control Commission appointed by the Governor.
- The Mayor of Atlantic City.
- The State Treasurer.
- The State Attorney General.
- One member appointed by the Governor, who shall be either the Commissioner of the Department of Commerce and Economic Development or the Department of Community Affairs, or the Governor may appoint, in lieu thereof, an additional member of the Casino Control Commission as a voting member.

JA3081

3/16/23, 9:36 AM                                        Board of Directors

Case 1:22-cv-03043-RDB   Document 29-1   Filed 03/22/24   Page 73 of 23
Case 1:22-cv-03043-AMD   Document 191-1   Filed 07/21/23   PageID: 3612

YOU ARE HERE: Home » **Board of Directors**



## Casino Reinvestment Development Authority

15 South Pennsylvania Avenue
Atlantic City, NJ 08401

**609-347-0500**

Twitter    Facebook    Email

## PRESS & MEDIA

Press Room & Media

Press Releases

News Articles

## RESOURCES

Public Notices

Applications

Master Plan

Land Use Hearings

Connect AC

Engage AC

CRDA 501(c3) Foundation

## CONTACT US

Contact CRDA

Contact Board of Directors

Employment

## LOOKING FOR SOMETHING?

| Search … | Submit |

Privacy Policy

Copyright © 2023 – NJ CRDA

Case 1:22-cv-01343-AMD Document 29-4 Filed 03/23/23 Page 1 of 3 PageID: 3614

# EXHIBIT D

JA3084

https://atlanticcityweekly.com/families-in-business/the-dougherty-family-has-offered-the-best-in-seafood-and-service-at-docks-oyster-house/article_ce50169c-d038-5a4e-bbcc-e6f3c3bed476.html

# The Dougherty family has offered the best in seafood and service at Dock's Oyster House, Harry's Oyster Bar and the Knife & Fork Inn

Apr 24, 2017

A restaurant surviving for over 100 years is a remarkable feat in itself. A restaurant owned and operated by the same family for over 100 years is a true rarity, and Dock's Oyster House is just that. Dock's was opened by Harry "call-me-Dock" Dougherty in 1897 and quickly became a favorite of locals and tourists.  Lines would form out the door on Atlantic Avenue (and at the back door for those in the know) with guests waiting to dine on the freshest seafood in town.

Harry's vision has since been carried on by four generations of Doughertys, who share his commitment to quality and service. The fourth-generation owners, brothers Joe and Frank Dougherty, got an early start in the restaurant standing on milk crates to wash dishes when they were 8 and 6, and went on to learn every aspect of the business from their parents Joe and Arleen. They also learned the more subtle qualities necessary to run a successful family business — mutual respect, hard work, dedication and a willingness to do whatever it is that needs to get done.

The family business now includes the Knife & Fork Inn and Harry's Oyster Bar in addition to the recently renovated and expanded Dock's. Frank and his wife Maureen run the restaurants full time with Joe and his wife Bernadette, who have careers outside the business, assisting frequently.  The fifth generation — Madison, Harry, Katherine, Megan and Lila — are already getting involved. It is too early to know who will take over, but we are certain that the business will thrive and welcome the sixth generation of Doughertys.

Dock's Oyster House, 2405 Atlantic Ave., **DocksOysterHouse.com**; Harry's Oyster Bar, 1900 Pacific Ave., **HarrysOysterBar.com**; Knife & Fork Inn, 3600 Atlantic Ave., **KnifeAndForkInn.com**; all in Atlantic City.

Case 1:22-cv-01643-AMD Document 114 Page Filed 07/21/2023

# EXHIBIT E

Thursday, March 16, 2023  2:33:27 PM          Recent News        Daylight saving time 101: The where, when, whys and what

  




F

INSTAGRAM

TWITTER

YOUTUBE

You are here ▸ Home ▸ Food & Beverage ▸

The Dougherty Family Opens Dougherty's Steakhouse and Raw Bar in Resorts Casino Atlantic City.

## The Dougherty Family Opens Dougherty's Steakhouse and Raw Bar in Resorts Casino Atlantic City.

📅 June 29, 2021        👤 Cindy Fertsch





Dougherty's Steakhouse is now Open in Resorts Casino Atlantic City

### Latest Issue





Shore Local's Marc Berman met up with Frank Dougherty, owner of the newest dining option in Resorts Casino Atlantic City Dougherty's Steakhouse and Raw Bar at the Dougherty's

JA3087

Steakhouse ribbon cutting in Resorts for a short interview.

The Doughtery Family are the owners of the Knife and Fork, Doc's Oyster House and Harry's in Atlantic City and the Linwood Country Club.

Frank, can you give us a little insight into what you've created here at Dougherty's Steakhouse and Raw Bar?

"Resorts was looking for another steakhouse and they came to us and we said this is such a beautiful space, it was hard to pass up.

This was the old Le Palais and the Gold Room, just a great historic kind of a place for us to be and I like old things."

"The outside space that was Gallagher's Burger Bar we said we could easily convert into a spectacular raw bar."

And Doughtery's Steakhouse and Raw Bar is Born in Resorts Casino Atlantic City.

  
  
  

Dougherty's Steakhouse Photos By: Marc Berman

Earlier Resort put out a statement about the new partnership and you can read that below.

"Resorts Casino Hotel is pleased to announce Dougherty's Steakhouse and Raw Bar is officially open! The new restaurant is owned and operated by Atlantic City restaurateurs, the Dougherty family, a staple in the local restaurant industry for over 120 years. The Dougherty family has become synonymous with fine dining in Atlantic City. In 1987, Harry "Call Me Dock" Dougherty opened Dock's Oyster House with a vision of a fine neighborhood restaurant and a commitment to quality and service. That vision and commitment has allowed four generations of Doughertys to flourish in the restaurant industry, growing the brand to include the iconic Knife & Fork Inn, Harry's Oyster Bar and Linwood Country Club.

"Resorts Casino Hotel is delighted to be in this partnership with the Dougherty family, and to celebrate the opening of Dougherty's Steakhouse and Raw Bar," said Mark Giannantonio, President and CEO of Resorts Casino Hotel. "As two historic Atlantic City staples with decades of fine dining experience come together, we are excited to offer our guests a new dining concept that includes an enticing menu and energizing live entertainment. Dougherty's Steakhouse and Raw Bar is a perfect complement to our other award-winning fine dining offerings."

"We are excited to announce the opening of Dougherty's Steakhouse and Raw Bar in the historic Resorts Casino Hotel," said Frank Dougherty. "The space has been beautifully renovated in classic steakhouse style with modern touches and the new menu allows steaks


Your liquor, delivered.
ORDER NOW AT PASSIONVINES.COM
PassionVines
SOMERS POINT & EGG HARBOR TOWNSHIP
DOWNLOAD OUR APP
App Store  Google Play
FOLLOW US: @PassionVines



## Here Comes The Bride


Here Comes The Bride 2023

## Join Our Newsletter

Sign up for our Newsletter to get great information from Shore Local in your Inbox!

Email (required) *

JA3088

and chops to share the spotlight with an expansive raw bar and carefully curated wine list. We are happy to be included in the amenities Resorts offers to its guests and the dining public, especially as COVID restrictions begin to ease, and we look forward to an amazing summer."

In addition to the variety of delicious seafood options the Doughertys' restaurants are known for, the menu at Dougherty's Steakhouse and Raw Bar includes filet mignon, NY strip, porterhouse and other select cuts of steak. The menu will also include veal Milanese, lamb chops and prime rib. Guests can top off their favorite steaks and chops with options like a delicious crab Oscar, foie gras butter and black truffle butter. While guests can currently access all of Dougherty's Steakhouse and Raw Bar's mouthwatering menu items in one space, a separate raw bar will officially open right across from the steakhouse in June 2021. The raw bar will exclusively offer seafood items, along with a casual lunch menu that includes sandwiches, burgers and salads.

Dougherty's Steakhouse and Raw Bar is located on the dining level of Resorts Casino Hotel. Hours of operation are 4:00pm to 9:00pm on Sunday through Thursday and 4:00pm to 9:30pm on Friday and Saturday. Guests can book reservations via Resy.com, via doughertyssteak.com or by calling 609-340-6555.

🗀 Atlantic City Casinos, Food & Beverage   🏷 doughertys steakhouse, shore local news


« 
Fourth of July Events in Ocean City


»
The Mighty Middle: Creating A Culture of Connection with Christian Correa

## Related posts


📅 March 14, 2023   👤 Cindy Fertsch   💬 0

### Borgata Hotel Casino & Spa Announces $55 Million Tower Remodel

The Water Club to be Rebranded the MGM Tower...

Atlantic City

Atlantic City Casinos

Atlantic County    South Jersey


📅 March 8, 2023   👤 Cindy Fertsch   💬 0

### Atlantic Cape's Culinary Arts Students Gain Real-World Mobile Food Truck Operations Experience in Cape May County

MAYS LANDING — Students from Atlantic Cape Community College's...


📅 March 8, 2023   👤 Cindy Fertsch   💬 0

### Hard Rock Hotel & Casino Atlantic City's Women in Leadership Celebrate International Women's Day at MudGirls Studios

Atlantic City, NJ (March 8, 2023) — Dorrie Papademetriou...

JA3089

3/16/2X Case 1:22-cv... Document 29-1 Page... Date Filed 07/21/2023 PageID: 3620

Atlantic County      Business          Atlantic City

Cape May County      Features          Atlantic City Casinos

Food & Beverage      Mays Landing      Atlantic County      Entertainment

South Jersey                           Features      South Jersey

## Recent Comments

Cindy Fertsch on Ideal Institute of Technology Breaks Ground on Washington Avenue Facility with $4 Million Expansion

Bruce on Ideal Institute of Technology Breaks Ground on Washington Avenue Facility with $4 Million Expansion

A man on Tuffy the Lion and the Wildwood Wall of Death

Bill on Orsted acquires Ocean Wind 1, sparking community concerns

DDT on Mayor Small Promises a Noticeable Atlantic City Transformation in 2023 During His 'State of the City' Address

## Advertising



ROBERT SHAMBERG
Owner/VP Sales
609-652-6690 x 217
609-335-5711 Cell

COMMISSIONS 2% As Low As

Why Pay More for the Same Service?
RobShamberg@comcast.net
www.bhhsdiversified.com

BERKSHIRE HATHAWAY HomeServices
Diversified Realty
www.bhhsdiversified.com

Are you READY TO BUY? Are you READY TO SELL?
Top 1% Producer
FullTime 24 Hours/7 days
Multi Million Dollar Club


Privacy Policy

AcmeThemes © 2022

Proudly powered by WordPress | Theme: SuperMagPro by Acme Themes


https://shorelocalnews.com/the-dougherty-family-opens-doughertys-steakhouse-and-raw-bar-in-resorts-casino-atlantic-city/

JA3090

4/4


## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| RONALD KOONS, *et al.* ) | Civil Action No. 1:22-cv-07464-RMB-AMD |
| *Plaintiffs* ) | |
| v. ) | **CIVIL ACTION** |
| WILLIAM REYNOLDS, *et al.* ) | **(ELECTRONICALLY FILED)** |
| *Defendants* ) | |
| ----------------------------------------------- ) | **CONSOLIDATED ACTIONS** |
| AARON SIEGEL, *et al.* ) | |
| *Plaintiffs*, ) | |
| v. ) | |
| MATTHEW PLATKIN, *et al.* ) | |
| *Defendants*. ) | |

## THIRD SUPPLEMENTAL DECLARATION OF JASON COOK IN FURTHER SUPPORT OF SIEGEL PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

1.      I, Jason Cook, am a plaintiff in the above-titled action. I am over the age of 18, have personal knowledge of the facts and events referred to in this Declaration, and am competent to testify to the matters stated below.

2.      This past Saturday, March 11, 2023, I was with my family at the Monmouth Mall in Middletown, New Jersey. I was lawfully carrying my handgun.

JA3091

3.     As we were walking through the mall, I suddenly saw a film set. I immediately turned around and left the mall as I did not want to be in violation of Chapter 131 Section 7(a)(23).

4.     But for fear of arrest and prosecution under Chapter 131, I would have approached the film set while lawfully carrying my handgun to see what they were filming and to speak with some of the film crew if the opportunity presented itself.

5.     I later learned that the film crew was filming an episode of The Walking Dead.

I declare under penalty of perjury that the foregoing is true and correct. Executed within the United States.

_____          3/16/2023_____
Jason Cook                                      Date

JA3092

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

RONALD KOONS, *et al.*

         *Plaintiffs*

   v.

WILLIAM REYNOLDS, *et al.*

         *Defendants*

-----------------------------------------------

AARON SIEGEL, *et al.*

         *Plaintiffs,*

   v.

MATTHEW PLATKIN, *et al.*

         *Defendants.*

Civil Action No. 1:22-cv-07464-RMB-AMD

## CIVIL ACTION

## (ELECTRONICALLY FILED)

### CONSOLIDATED ACTIONS

**NOTICE OF MOTION OF SIEGEL PLAINTIFFS FOR LEAVE TO FILE ADDITIONAL SUPPLEMENTAL PAPERS IN FURTHER SUPPORT OF THEIR MOTION FOR PRELIMINARY INJUNCTION**

TO:    ANGELA CAI, ESQ.
        OFFICE OF THE ATTORNEY GENERAL
        DEPARTMENT OF LAW AND PUBLIC SAFETY
        DIVISION OF LAW
        25 MARKET STREET
        TRENTON, NJ 08625

        DAVID JENSEN
        DAVID JENSEN PLLC
        33 HENRY STREET SUITE 420
        BEACON, NY 12508

        LEON JOSEPH SOKOL
        CULLEN AND DYKMAN, LLP
        433 HACKENSACK AVE.
        HACKENSACK, NJ 07601

EDWARD J. KOLOGI
KOLOGI SIMITZ
COUNSELLORS AT LAW
923 NORTH WOOD AVENUE
LINDEN, NJ 07036

**PLEASE TAKE NOTICE**, that on a date to be determined by the Court, the *Siegel* plaintiffs, shall move before the Honorable Renee M. Bumb, U.S.D.J., at the United States Courthouse, Mitchell H. Cohen Building & U.S. Courthouse 4th & Cooper Streets, Camden, NJ 08101, for an Order granting *Siegel* Plaintiffs leave to file additional supplemental papers in further support of their motion for preliminary injunction.

**PLEASE TAKE FURTHER NOTICE** that in support of the within motion, Plaintiffs shall rely upon the Declaration of Daniel L. Schmutter.

**PLEASE TAKE FURTHER NOTICE** that a proposed form of order is submitted herewith.


Dated: March 16, 2023                    Respectfully submitted,

                                         s/ Daniel L. Schmutter
                                         Daniel L. Schmutter
                                         HARTMAN & WINNICKI, P.C.
                                         74 Passaic Street
                                         Ridgewood, New Jersey 07450
                                         (201) 967-8040
                                         (201) 967-0590 (fax)
                                         dschmutter@hartmanwinnicki.com
                                         *Attorney for Siegel Plaintiffs*

```
                    UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF NEW JERSEY
```

————————————————————————————

| | | |
|---|---|---|
| RONALD KOONS, et al. | ) | CIVIL ACTION NUMBER: |
| *Plaintiffs,* | ) | |
| vs. | ) | 1:22-cv-07464-RMB-AMD |
| | ) | |
| WILLIAM REYNOLDS, in his official | ) | |
| capacity as the Prosecutor of | ) | |
| Atlantic County New Jersey, et al., | ) | |
| *Defendants.* | ) | |
| and | ) | |
| | ) | |
| NICHOLAS P. SCUTARI, President of | ) | ORAL ARGUMENT ON |
| The New Jersey Senate, and | ) | PLAINTIFFS' MOTIONS FOR |
| CRAIG J. COUGHLIN, Speaker of the | ) | PRELIMINARY INJUNCTION |
| New Jersey General Assembly, | ) | |
| *Intervenors-Applicants.* | ) | *CONSOLIDATED CASES* |

————————————————————————————

```
Mitchell H. Cohen Building & U.S. Courthouse
4th and Cooper Streets
Camden, New Jersey 08101
Friday, March 17, 2023
Commencing at 10:09 a.m.
```

**B E F O R E:**      THE HONORABLE RENÉE MARIE BUMB,
                      CHIEF UNITED STATES DISTRICT JUDGE

**A P P E A R A N C E S:**

DAVID JENSEN PLLC
BY:  DAVID D. JENSEN, ESQUIRE
33 Henry Street
Beacon, New York 12508
For the Koons Plaintiffs

            John J. Kurz, Federal Official Court Reporter
                   John_Kurz@njd.uscourts.gov
                        (856)576-7094

    Proceedings recorded by mechanical stenography; transcript
            produced by computer-aided transcription.

*United States District Court*
*District of New Jersey*

JA3095

<pre>
 1                  UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF NEW JERSEY
 2    _____

 3   AARON SIEGEL; JAMES COOK;          )  CIVIL ACTION NUMBER:
     JOSEPH DELUCA; NICOLE CUOZZO;      )
 4   TIMOTHY VARGA; CHRISTOPHER         )  1:22-cv-07463-RMB-AMD
     STAMOS; KIM HENRY; and             )
 5   ASSOCIATION OF NEW JERSEY RIFLE &  )
     PISTOL CLUBS, INC.,                )
 6              Plaintiffs,             )
                                        )
 7   vs.                                )  *CONSOLIDATED CASES*
                                        )
 8   MATTHEW J. PLATKIN, in his official)
     capacity as Attorney General of    )
 9   New Jersey; and PATRICK J.         )
     CALLAHAN, in his official capacity )
10   as Superintendent of the New Jersey)
     Division of State Police,          )
11              Defendants.             )
     and                               )
12                                      )
     NICHOLAS P. SCUTARI, President of  )
13   the New Jersey Senate, and         )  ORAL ARGUMENT ON
     CRAIG J. COUGHLIN, Speaker of the  )  PLAINTIFFS' MOTIONS FOR
14   New Jersey General Assembly,       )  PRELIMINARY INJUNCTION
              Intervenors-Applicants.)
15    _____

16   A P P E A R A N C E S:  (Continued)

17   HARTMAN & WINNICKI, P.C.
     BY:  DANIEL L. SCHMUTTER, ESQUIRE
18   74 Passaic Street
     Ridgewood, New Jersey 07450
19   For the Siegel Plaintiffs

20   OFFICE OF THE NEW JERSEY ATTORNEY GENERAL
     BY:  ANGELA CAI, DEPUTY SOLICITOR GENERAL
21        JEAN REILLY, ASSISTANT ATTORNEY GENERAL
     R.J. Hughes Justice Complex
22   25 Market Street, P.O. Box 080
     Trenton, New Jersey 08625
23   For the Defendants Attorney General Platkin and Superintendent
     of NJ State Police Callahan

24

25
</pre>

1   **A P P E A R A N C E S:** **(Continued)**

2   KOLOGI SIMITZ
    BY:  EDWARD J. KOLOGI, ESQUIRE
3        MICHAEL SIMITZ, ESQUIRE
    500 North Wood Avenue
4   Linden, NJ 07036
    For the Intervenors Scutari and Coughlin
5

6   CULLEN and DYKMAN, LLP
    BY:  STEVEN SIEGEL, ESQUIRE
7   433 Hackensack Ave.
    Hackensack, New Jersey 07601
8   For the Intervenors Scutari and Coughlin

9

10  **A L S O   P R E S E N T:**

11  Arthur Roney, The Courtroom Deputy

12  Tate Wines, Judicial Law Clerk

13  Jordan Pino, Judicial Law Clerk

14  Michael O'Leary, Judicial Law Clerk

15

16

17

18

19

20

21

22

23

24

25

```
 1              (PROCEEDINGS held in open court before The Honorable
 2    Renée Marie Bumb, Chief United States District Judge, at
 3    10:09 a.m. as follows:)
 4              THE COURTROOM DEPUTY:  All rise.
 5              THE COURT:  Good morning.  Good morning.  Have a
 6    seat, you all.  Thank you.
 7              Okay.  So we're here for oral argument in the case,
 8    consolidated case Koons, et al., Siegel, et al., versus
 9    Reynolds.  The docket number is 22-7464.  So I'll start with
10    appearances, please.
11              MR. JENSEN:  Good morning, Your Honor.  David Jensen.
12    I am counsel for plaintiffs, the plaintiffs in Koons.
13              THE COURT:  Okay.  Good morning.
14              MR. SCHMUTTER:  Good morning, Your Honor.  Daniel
15    Schmutter from the firm of Hartman & Winniki for the Siegel
16    plaintiffs.
17              THE COURT:  Okay.  Good morning.
18              MS. CAI:  Good morning, Your Honor.  Angela Cai for
19    the State defendants.
20              THE COURT:  Good morning.
21              MS. REILLY:  Assistant Attorney General Jean Reilly
22    for the State, Your Honor.  Good morning.
23              THE COURT:  Good morning.
24              MR. KOLOGI:  Good morning, Your Honor.  Edward
25    J. Kologi, Kologi Simitz, on behalf of Senate President
```

*United States District Court*
*District of New Jersey*

JA3098

1   Nicholas Scutari and Speaker Craig Coughlin.

2         THE COURT:  Good morning.

3         MR. SIEGEL:  Good morning, Your Honor.  Steven Siegel

4   with the firm of Cullen and Dykman.  We're co-counsel for the

5   Senate President and the Assembly Speaker.

6         THE COURT:  All right.  Good morning.

7         MR. SIEGEL:  Good morning.

8         THE COURT:  So we'll start with, as I said, this is

9   oral argument on the motions for preliminary injunction.  I

10   have been advised by all parties that there is no intent on the

11   part of either side to present testimony.

12         So, Mr. Jensen, Mr. Schmutter, have you collaborated

13   with each other to figure out division of labor, or how do you

14   wish?

15         MR. SCHMUTTER:  No, Judge.  But certainly, since

16   Koons is the lead case, I have no problem if Mr. Jensen begins.

17         THE COURT:  All right.  I'll hear from you,

18   Mr. Jensen.  And my practice is to interrupt when I have

19   questions, if you don't mind.

20         MR. JENSEN:  Okay.  That sounds good.

21         THE COURT:  Okay.  Thank you.

22         MR. JENSEN:  Okay.  Well, good morning, Your Honor.

23   It was about two and a half months ago when I first appeared

24   before you in this case, and we had a discussion about the

25   governing law and went through the historical analogs that the

*United States District Court*
*District of New Jersey*

JA3099

1    State had provided in support of these sensitive place

2    restrictions or denominated sensitive place restrictions.  And

3    I think what we would submit at this juncture is not that much

4    has actually changed since the hearing we had at the beginning

5    of January.

6         Certainly a number of briefs have been submitted and

7    there has been some points made.  There's some things I'd like

8    to clarify; I'm sure Dan would as well.  But overall, the

9    big-picture question, which is have we shown the existence of

10   an enduring American tradition that upholds these types of

11   regulations, I think the question [sic] is no.

12        One other big-picture issue we have is, which I think

13   has been alluded to some in the briefing, but is this question

14   of on standing, the issue of standing, which was somewhat

15   significant to some of the claims, not so much the claims that

16   were in our original case, although potentially one or two of

17   the claims that have been added to that case, and the question

18   of does the requirement of standing change when the posture

19   moves from a temporary restraining order to a preliminary

20   injunction?  And I would submit that it does on the rationale

21   that a temporary restraining order is looking to address an

22   exigency that is going to arise between the time that the

23   application for relief is being filed and the time that the

24   Court is actually ruling on the merits of the motion, whether

25   it's a preliminary injunction or a final injunction.

1          In the context we're at now, you know, ostensibly

2     this is a preliminary injunction.  I don't think it's really

3     much of a secret that there's going to be at least one notice

4     of appeal filed following this hearing and that from here, to a

5     large extent, this controversy is going to move up to the

6     Circuit.

7          THE COURT:  But I wanted to back up, what do you mean

8     by the requirement of standing?  You're not saying that

9     standing is not necessary.

10          MR. JENSEN:  No.  But I'm saying that the window of

11     when injury is likely to be imminent opens up more when the

12     context is a preliminary or, for that matter, a permanent

13     injunction as opposed to a temporary restraining order.

14          So one thing I would point to you specifically is one

15     issue that came up, and now I'm kind of stepping on Dan's toes

16     here, but one issue that came up in the Court's decision on the

17     Siegel motion in the context of airports was, well, is this

18     actually imminent?  Does anyone have any plans of going to the

19     airport in a way that's going to be jeopardized or impacted by

20     these restrictions between now and when the Court is going to

21     be addressing things more at length?

22          Now, as an aside, I'm not -- you know, one of the

23     things that actually came up when we were putting in our

24     affidavits on that point, you know, Gil Tal is actually a pilot

25     with a plane at a small airport.  Nick Gaudio, one of our

 1    plaintiffs, I didn't even know this at the time we were putting

 2    our papers together, but was actually taking a trip with his

 3    family over Christmas and routed the flight through

 4    Philadelphia in part to avoid the risk of arrest at the Camden

 5    airport.

 6         So the point being that it's not always that easy to

 7    say that something -- that an injury isn't necessarily imminent

 8    in no small measure because our lives are not always that

 9    planned out in such methodical detail.

10         THE COURT:  I think what you're saying is that at the

11    time of a TRO inquiry, it's whether or not the injury is

12    imminent.  At the time of a permanent injunction, it is less

13    so.  I think that's what you're saying.

14         MR. JENSEN:  Or -- that's what I'm saying.  I think

15    an alternative way of saying it would be that the proximity

16    needed for an injury to be imminent is probably longer in the

17    context of a preliminary injunction than a temporary

18    restraining order, although that may be six of one and half

19    dozen of the other.

20         Definitely one of the big-picture issues that emerges

21    in the briefs, and in particular, in reading over the Court's

22    decision in the Siegel matter, I saw this as something that the

23    Court seemed to really be reaching out for -- and to be fair, I

24    think if I was in the context of being the judge or a law clerk

25    for the Court, I would be having similar questions -- is this

1    idea of, you know, in *Bruen*'s discussion of sensitive places,

2    we have basically two sets of data points, and the Court

3    doesn't really tell us how we get from one to the other.  But

4    we start out saying -- and where am I looking at here?

5         We start out talking -- so pages 21, 33 to 34 of the

6    decision, but the section that's discussing sensitive place

7    restrictions, let me just read to you from sort of the key part

8    of the decision.

9         "Although the historical record yields relatively few

10   18th- and 19th-Century 'sensitive places' where weapons were

11   altogether prohibited -- for example, legislative assemblies,

12   polling places, and courthouses -- we are also aware of no

13   disputes regarding the lawfulness of such prohibitions."

14   Following that, there's a citation to an article by David Kopel

15   and Joseph Greenlee called the "Sensitive Places Doctrine," as

16   well as a reference to one of the amicus briefs that was

17   submitted in the case.  "We therefore can assume it settled

18   that these locations were 'sensitive places' where arms

19   carrying could be prohibited consistent with the Second

20   Amendment."  And then it goes on to talk about how well, you

21   know, in both *Heller* and *McDonald* we said, we don't mean to

22   cast doubt on longstanding prohibitions on the carry of

23   firearms in schools and government buildings.

24        Now, I mean, the issue or at least one of the issues

25   that comes up here is when you actually look up, in particular,

1 this article by David Kopel and Joseph Greenlee, what you see

2 that their conclusion is, is that as far as this idea of

3 prohibiting firearms from schools and, for that matter,

4 probably a generalized interest in prohibiting firearms from

5 government buildings, you don't actually really see any direct

6 historical analog, and that's true whether we're citing the

7 focus of inquiry at 1791 or 1868.

8    THE COURT:  I think that's -- and you are correct,

9 that the article discusses that there are, in fact, no

10 historical analogs to support that conclusion.

11    But I think it's fair to say that the Supreme Court

12 was, in essence, saying it's just not fairly debatable, but

13 that there should be no guns in schools.  Isn't that what the

14 Supreme Court was really saying?

15    MR. JENSEN:  Well, I think at the end of the day,

16 it's kind of hard to get around that, because it -- you know,

17 *Heller*, *McDonald*, and *Bruen* all refer to restrictions on

18 carrying guns in government buildings and schools as being

19 presumptively lawful.  And certainly at least prior to *Bruen*

20 coming down, there was a significant amount of debate in the

21 federal courts about exactly what that presumptively lawful

22 language meant.  You know, at one extreme it means that these

23 are categorically lawful, discussion over.  And at the other

24 extreme it means that the Court has to apply scrutiny, but it

25 looks like presumptively these pass.

1          I'm going to suggest that, particularly given that

2     the statements are dicta, it's probably better to look at the

3     presumptively lawful examples as things that are presumptively

4     lawful, meaning they pass scrutiny.  But in the big picture, I

5     think it would be a little bit daft to say that the Court isn't

6     communicating in pretty clear terms that they think that

7     restrictions on schools and government buildings as a general

8     proposition are going to be held up, right?

9          So the two data points we have are -- we've got three

10    examples that were provided: legislative assemblies, polling

11    places, and courthouses.  And we've got an end result that says

12    government buildings and schools.  And as a side note, simply

13    by virtue of the categories we've been naming, I'm not sure

14    that any building that is simply owned by the government is

15    going to qualify as a government building because if it did,

16    for one thing, you wouldn't need to list schools.  Schools are

17    normally owned by the government.

18         How do we bridge the gap these between those two

19    points?  And normally when we're talking about rules of law,

20    we're using deductive reasoning.  Negligence is the failure to

21    observe reasonable care.  What is reasonable care?  We take

22    general principles, we apply those to specific facts, we come

23    to a result.

24         THE COURT:  Can I interrupt you, Mr. Jensen?

25         MR. JENSEN:  Of course.

*United States District Court*
*District of New Jersey*

JA3105

       1          THE COURT:  I'm not quite sure I'm following exactly
       2   where you are going.  Are you suggesting that what the Supreme
       3   Court ruled, which you say in dicta, is an exception to the
       4   *Bruen* ruling or a part of the *Bruen* ruling?  What exactly are
       5   you saying?
       6          MR. JENSEN:  I think we have to take it as an
       7   application of the *Bruen* ruling or an application of *Heller*,
       8   *McDonald*, and *Bruen* that hasn't come before the Court yet.  If
       9   we accept it as a general proposition that the Court is going
      10   to wind up upholding schools and government buildings and that
      11   the historical record in terms of a tradition of regulation
      12   supports legislative assemblies, polling places, and
      13   courthouses --
      14          THE COURT:  Which those are the government buildings.
      15   Because you've said government buildings much more broadly.
      16   But *Bruen* discusses government buildings in terms of
      17   legislative assemblies, courthouses, and polling places.
      18          MR. JENSEN:  Well*, Bruen* discusses legislative
      19   assemblies, polling places, and courthouses as the examples
      20   that can be found in the historical record showing traditions,
      21   which is also my takeaway of what the Kopel and the Greenlee
      22   article says.  But the Kopel and the Greenlee article also
      23   says, well, this doesn't really get you to schools.
      24          So how do we take --
      25          THE COURT:  No.  But are you reading "government

```
 1   buildings" more expansively than legislative assemblies,

 2   polling places, and courthouses?

 3            MR. JENSEN:  Well, I think inferentially government

 4   buildings can't mean simply any building that's owned by the

 5   government, because otherwise there would be no reason to

 6   specify courthouses and legislative bodies.  Polling places are

 7   a little bit different because a lot of times those are

 8   privately owned.

 9            THE COURT:  No.  I just wanted to understand what

10   your argument was, because you keep saying "government

11   buildings," and I didn't know if you were expanding that beyond

12   legislative assemblies and courthouses.  And you are or you

13   aren't?

14            MR. JENSEN:  I am and I'm not.  Sorry.  I realize

15   that's not a really square answer.  But normally we're using

16   deductive reasoning.  Here we need to use inductive reasoning.

17   What are the common threads that run between legislative

18   assemblies, polling places, and courthouses that would get us

19   to an end result that includes schools?

20            And I think the answer to that is all of these are

21   places that have a certain level of security attached to them,

22   right?

23            THE COURT:  Tell me why you're making this argument.

24   What sensitive place restrictions is it going to in this

25   legislation, so I can follow your argument?
```

 1          MR. JENSEN:  Well, I think, frankly, it goes to all

 2    of them, because what we're talking about is what's the actual

 3    analytic model that we're going to use to address whether these

 4    pass muster.  And in particular, do they line up with the

 5    historical tradition?

 6          THE COURT:  Okay.

 7          MR. JENSEN:  So what we can take as more or less a

 8    given is the Supreme Court saying legislative chambers, polling

 9    places, and courthouses, there's a historical tradition for

10    those.  The Supreme Court is also saying we can use analogy to

11    build out other acceptable sensitive place restrictions, and

12    it's basically offering up we think "schools" passes muster.

13          So if you're looking at it from that perspective,

14    which I think is a good perspective to be looking at it from,

15    the question becomes:  What are the defining characteristics of

16    those three historical categories, legislative assemblies,

17    polling places, and courthouses?

18          And what I would suggest to you is the defining

19    characteristic in all of those places is there is some level of

20    security present and a restriction on entry.  And one thing

21    that's significant to note about that, and in particular, when

22    we're looking at the lack of support for schools and any

23    relevant time period is that the nature of schools has very

24    likely changed in the time period from 1791 or even 1868 to the

25    present.

```
 1              Now, if you go to a school, a school normally has a
 2     controlled perimeter.  You have to get buzzed through via a
 3     security camera.  That would also be true of places like the
 4     secured portion of an airport.  Because the big-picture idea
 5     here is that --
 6              THE COURT:  And a stadium.
 7              MR. JENSEN:  I suppose it depends on exactly what the
 8     nature of the stadium is.  I mean, is it -- again, taking
 9     that -- taking the approach I just offered up as an example,
10     you'd have to say that a pretty significant question would be
11     what's the level of security that's present there?
12              Maybe an alternative way of framing it is saying
13     that, well, people always have a constitutional interest in
14     being able to protect themselves.  Is there something about
15     this particular place where we can say that someone isn't
16     really giving that up by walking in there without a defensive
17     weapon.
18              Certainly, again, if we're talking about places like
19     courthouses, legislative assemblies and, to some extent,
20     polling places, depending on exactly how the polling place is
21     being run, that would be true.
22              The one other example we have, and it's not clear --
23     the one other clear historical example we have and the only
24     thing that's a little up in the air is exactly how much weight
25     do we give to this, but we have the Statute of Northampton and
```

1    derivatives of it that were enacted in various colonial states.

2    And, you know, the Supreme Court discussed the Statute of

3    Northampton at some length in *Bruen*.  Most of that discussion

4    focused on the -- here, let's actually start out -- well, not

5    start out, let's take a look just briefly at what the Statute

6    of Northampton said.

7         "No person shall come before the King's justices, or

8    other of the King's ministers doing their office, with force

9    and arms, nor bring no force in affray of the peace, nor go nor

10   ride armed by night nor by day, in fairs, markets, nor in the

11   presence of the justices or other ministers, nor in no part

12   elsewhere, upon pain to forfeit their armor to the King and

13   their bodies to prison at the King's pleasure."

14        So a significant amount of the Court's discussion is

15   addressing this language about fairs and markets and to the

16   terror of the people.  But what's also not really being

17   discussed too much is that this also prohibits coming before

18   the King's justices or the King's ministers doing their offices

19   with arms.  The King's ministers doing their offices has the

20   qualification of with force, which means that it may not be an

21   absolute prohibition, but certainly I think it's fair to say

22   that a takeaway from here is that, as a matter of English law

23   in existence at the time of the Declaration of Independence, it

24   would be fair to say that there was a tradition of restricting

25   the ability to bring arms in front of the King's justices,

1    which basically amounts to courthouses.

2            THE COURT:  I want to make sure I'm understanding

3    what you're saying to me.  Because for a moment I thought you

4    might have been undercutting Mr. Schmutter's position.  I

5    thought that what you were saying to me is that if we look at

6    to what the Supreme Court's underlying reasoning might be as to

7    why the historical analogs support such restrictions, one of

8    the characteristics that you focused on is that these were

9    places where typically there's some level of security and

10   there's a restrictive entry.

11           That characteristic applies in stadiums, airports,

12   casinos, whatever.  And we can debate that in a moment.  Is

13   that what you're saying?  Or are you adding to that

14   characteristic but it must be in advance of a government

15   function?

16           And what do you say the Supreme Court said?  Because

17   if it's only the characteristic of, well, if there's some level

18   of security there, then I don't think that's the position your

19   co-counsel takes.

20           MR. JENSEN:  Well, no, I don't think that some level

21   of security on its own is enough.  And in particular, when

22   we're talking about stadiums and casinos, because while there

23   may be some level of security, this isn't a situation where

24   people are going through metal detectors and there's armed

25   security present or very readily available.

1       With regard to an airport, the secure part of it,

2  yeah, that would definitely be the case.  But I thought we had

3  made it pretty clear, we weren't trying to challenge

4  restrictions on carrying within the secure area of an airport.

5  We're talking about both the ability to access a private plane

6  as well as the ability to check baggage.

7       THE COURT:  No; with respect to airports.

8       But I just thought you were taking somewhat of a

9  detour by making the argument that what was really most present

10  in the mind of the Supreme Court was, well, if there's

11  traditionally a level of security at the establishment,

12  whatever that is, then the restriction would be acceptable.

13  I'm just -- are you qualifying that or is that your position?

14  Because I don't think that's Mr. Schmutter's position.

15       MR. JENSEN:  Well, I think it has to be a fairly high

16  level of security.  If -- if -- preliminarily, if a property

17  isn't being used in the actual administration of government,

18  it's a little difficult to see how this would be anything other

19  than an application of private property owner rights in the

20  first place, meaning that I think it's implicit that if we're

21  talking about security restrictions, well, starting out with

22  the first three, legislative assemblies, polling places and

23  courthouses, by definition, these are government buildings

24  carrying out government functions.

25       I have trouble actually coming up with a really

```
 1    direct -- a really good analogy that wouldn't involve

 2    governmental functions.  Although perhaps a couple that would

 3    be good would be the ones you just offered up, would be

 4    stadiums and casinos where there may be some level of entrance

 5    restriction, but this isn't a level of entrance restriction

 6    that it's that easy to analogize to a court or to a legislative

 7    assembly, right?

 8            THE COURT:  Well, talk to me about -- and the State

 9    makes much of this -- talk to me about, for example, the PNC

10    Center.  It's government owned, right?

11            MR. JENSEN:  It -- it's government owned.  It could

12    be privately owned, which is significant.  It's significant

13    because -- why should the level of restriction depend on who

14    the owner of the property is when we're not talking about

15    something that is a governmental function?

16            THE COURT:  Well, that's my question to you.  Are you

17    limiting -- we seem to be going around in circles.  But are you

18    limiting -- are you saying to me that if there is a presence of

19    security present, that there are measures in place to restrict

20    entry, that in addition to those characteristics there must be

21    a governmental function and those are the types of places the

22    Supreme Court has said in *Bruen* are proper to restrict guns.

23    Is that what you're saying?  Is it those two characteristics?

24            MR. JENSEN:  Well, okay.  It --

25            THE COURT:  Because as I sit here and listen to you
```

```
 1    now, Mr. Jensen, it seems to me that you're almost advocating
 2    that the restriction to the PNC Center is proper under Bruen.
 3    What am I missing?
 4              MR. JENSEN:  Okay.  So, first of all, this has to be
 5    something that we can analogize to those three restrictions
 6    that have already been offered up as historically valid
 7    examples.
 8              THE COURT:  Right.  And I thought that you had made
 9    the State's case for them on the PNC Center by your arguments.
10    I just want to make sure I'm understanding you correctly.
11              MR. JENSEN:  Okay.  So the fact that something is a
12    government building standing alone doesn't make it analogous to
13    those three categories.
14              THE COURT:  Okay.  Because?
15              MR. JENSEN:  Well, first of all, because all three of
16    those categories are carrying on government functions.
17              What I don't want to foreclose is the possibility
18    that sensitive place restrictions can validly apply in places
19    that are owned by private parties.
20              The starting premise is we have those examples, the
21    three, you know, legislative assemblies, polling places,
22    courthouses.
23              THE COURT:  So it's critical to your argument that
24    there be a government function?
25              MR. JENSEN:  I wouldn't necessarily say it's
```

 1   critical, but I think that's a pretty key component of it.

 2           THE COURT:  Okay.

 3           MR. JENSEN:  And let me give you a good -- what I

 4   think is a good example.

 5           What if an airport is privately owned and they have a

 6   TSA-controlled security perimeter?  An airport is not really

 7   performing a government function, and here it's not owned by

 8   the government, but it's much easier, at least for me, to

 9   analogize between those three examples and the example of the

10   secure area inside an airport.

11           If we're talking about stadiums in general, this

12   sounds a lot more like fairs and markets where the simple fact

13   that you have a number of people assembled together is

14   historically not a valid reason for the regulation.

15           So I appreciate the back-and-forth because I think we

16   actually did dress up the nuances here some.  But what I would

17   say is that the fact of governmental function is not an

18   absolute requirement, but certainly, certainly that is a common

19   theme that runs between those three examples the Supreme Court

20   gave.

21           Another common theme as stated is this notion of

22   security.  I think it might be a little bit much to read that

23   as saying that a sensitive place restriction would never be

24   valid anywhere that was not a government building carrying on a

25   government function.

```
 1              THE COURT:  Okay.  Fair enough.
 2              And if it were the government providing the security,
 3    what would you say to that?
 4              MR. JENSEN:  I think it's going to be the same thing
 5    about whether or not it needs to be a government building
 6    performing a government function.  That would certainly be a
 7    factor that would weigh somewhat strongly in favor of saying
 8    it's easier to analogize this to the historical examples we
 9    have.  But if you're looking at something like a school, it may
10    not be the government that's providing the security.  It
11    could -- it could -- you could have police officers providing
12    security at the school.  You could have private officers,
13    private security companies providing security at the school.  I
14    don't know that you can attach dispositive significance to
15    that.  But I think it would be a very strong factor.
16              Okay.  Honestly, there's probably a long list of
17    things I could potentially go into, but one of the points that
18    I don't think really came out that well in the briefing but I
19    think needs to be observed, and this is going in a somewhat
20    different direction than we've been talking about, but one of
21    the sensitive place restrictions at issue here is the
22    restriction on restaurants and bars that serve alcohol.  And
23    one of the points that's been made is, well, can we limit this
24    as being valid just in the context of bars?
25              And so the first -- I mean, one question of course
```

 1   is, would the restriction be valid in bars?  But stepping back

 2   from that, there's a somewhat more basic issue here, which is

 3   that if you look through the actual liquor laws of New Jersey,

 4   we really don't have a license classification that applies to

 5   bars per se.  We've got a whole bunch of licenses that allow

 6   for on premises alcohol sales, but it's not like you can say

 7   someone who has this license or that license is running a bar

 8   versus someone who has that license or this license is running

 9   a restaurant.

10          The Legislature didn't provide a definition for the

11   term "bar."  And while I think most of us can come up with a

12   rough definition of bar or maybe what we think a bar looks

13   like, that does really make some problems of application in

14   terms of how you would even be able to limit that order because

15   how would you provide any sort of bright line rule saying so

16   this is where the restriction is valid and this is where it

17   isn't?

18          Beyond that, unless you have anything further, it

19   might be a good time to turn this over to Mr. Schmutter.

20          THE COURT:  Mr. Schmutter.  Thank you, Mr. Jensen.

21          MR. JENSEN:  Thank you.

22          THE COURT:  Good morning.

23          MR. SCHMUTTER:  Thank you, Your Honor.  You know, I

24   think I'll go first to the security sensitive places thing that

25   Your Honor was just discussing with Mr. Jensen.

*United States District Court*
*District of New Jersey*

JA3117

```
 1           THE COURT:  And I know you will talk very slowly,
 2   Mr. Schmutter.
 3           MR. SCHMUTTER:  Very slowly, Your Honor.
 4           THE COURT:  Because if I don't ask you, Mr. Kurz
 5   will.
 6           MR. SCHMUTTER:  By the way, I think Your Honor's
 7   approach last time was actually extremely helpful, not that
 8   it's your responsibility to do that, but thank you for doing
 9   that.
10           We don't think security gets you there.
11           THE COURT:  Okay.
12           MR. SCHMUTTER:  As Your Honor is aware, we so far
13   have only seen one thing that gets you a sensitive place.
14   That's "governance."  And it's actually narrower than
15   government functions, because as Your Honor knows, the State
16   claims that libraries and museums and all that stuff is
17   government functions.  It's the function of governance.
18   Legislatures, courthouses, polling places, those are the three
19   Bruen sensitive places.
20           The thing they have in common is they are all
21   governance activities.  The Legislature governs.  The courts
22   are part of government governance.  Voting is part of that
23   whole process.  There is nothing else in the record that shows
24   any kind of historical tradition.  And I want to make an
25   important point.  I think we make this in our brief, but it
```

```
 1   bears emphasizing.
 2           When you read Bruen carefully and you read the
 3   "sensitive place" section carefully, and I think we talked
 4   about this at the TRO stage, there is a difference between
 5   Bruen's discussion of the Heller dicta, schools and government
 6   buildings, and the following sentence in which they actually
 7   identify actual historical sensitive places: legislatures,
 8   courthouses, and polling places.
 9           I think Your Honor pointed out something very
10   important in the colloquy with Mr. Jensen.  The Heller dicta is
11   just that.  It's dicta.  When the Court throws out government
12   buildings, sensitive places and government buildings were not
13   an issue in Heller.  That's, as we all know, now that Justice
14   Stevens has retired, we all know where all that dicta came
15   from.  There's a whole bunch of dicta in Heller that's very
16   frustrating because it has nothing to do with the case.  We now
17   know that that was basically to get Justice Kennedy's vote.
18   That's what Justice Stevens told us in his book.
19           So the Court goes there, but Bruen does not adopt --
20   the Court in Bruen did not adopt that.  It mentions the dicta.
21   It then goes on to do its own analysis for the sensitive places
22   which is just the three governance functions, because --
23           THE COURT:  Are you deviating from Mr. Jensen or are
24   you expanding upon what he said?  This is where I'm having
25   somewhat of -- I want to make sure I'm not misunderstanding.
```

1    And I think Mr. Jensen has sort of steered me clear in my

2    thinking.

3            I thought at one point Mr. Jensen was saying that

4    what was critical in the *Bruen* decision is that there must be

5    some element of security.  It wasn't an essential -- it wasn't

6    the ingredient, but it was a key component.  Do you agree with

7    that or don't agree with that?

8            MR. SCHMUTTER:  We agree that the three *Bruen*

9    examples all exhibit security.  Security by itself doesn't get

10   you there.

11           THE COURT:  Okay.

12           MR. SCHMUTTER:  Which is why the PNC Bank Center,

13   which is why stadiums, which is why other plainly not

14   historical locations don't get to be sensitive places because

15   they have security.  That's not -- that's not the historical

16   tradition.  Remember, it's about historical tradition.  And

17   when you look at Kopel and Greenlee, it's about governance.

18   And the reason is because it is historically critical that the

19   governance function not be subject to violent coercion.  You

20   don't want legislatures to fear violent coercion in the

21   Legislature.  Judges --

22           THE COURT:  Do you agree -- I am digressing, but I am

23   curious since you have discussed your position about dicta in

24   *Heller*, do you find that this is dicta in *Bruen*?

25           MR. SCHMUTTER:  No.  Because sensitive places was a

1    position that New York took in *Bruen*.  So New York said oh,

2    yeah, it's really crowded, so it's all sensitive, these are all

3    sensitive places.  So they actually argued that.  So it did --

4    it was -- it did matter to the outcome of the case, they talked

5    about sensitive places, not so in *Heller*.  That was thrown in

6    there for the benefit of getting that vote which, you know,

7    happens.  It's a shame, but it happens.  It's just one of those

8    things, I guess, you do on a -- at the Supreme Court.  But

9    *Bruen*, it was an actual issue, so it's not dicta in *Bruen*.

10         But importantly, you know, we -- it's critical to

11   distinguish between the previous sentence that talks about the

12   *Heller* dicta and *Bruen*'s actual holding, which is that there

13   are three sensitive places that they're aware of:

14   Legislatures, courthouses, polling places.  And that remains

15   true.  There's nothing in this record that expands beyond those

16   sensitive places.  And we've talked about this a lot.  We

17   talked about it at the TRO.  We talked about it again because

18   of the Patrick Charles affidavit, which, as Your Honor knows,

19   we think it's improper; but nevertheless, let's talk about what

20   Charles said.  His opening line practically is this concept of

21   macro-level historical analysis.

22         Macro-level historical analysis is just the same

23   let's aggregate, let's make these arbitrary aggregations

24   because we know that we don't have enough historical citations

25   to justify any of these sensitive places.  So Charles goes into

```
 1    the same analysis that we argued was improper at the TRO stage.
 2    It's just as improper now.  You don't get to aggregate just
 3    because you know that you only have one or two or three
 4    citations to rely on, because we know that one or two or three
 5    are not good enough.  The Court told us that in Bruen.
 6           So as we stand here, there's still nothing in the
 7    record to support anything other than legislatures,
 8    courthouses, and polling places.
 9           You know, I think, as Mr. Jensen said, the record
10    hasn't improved since the TRO stage.  They've tried and they've
11    dressed it up.  I mean, my God, the Rivas declaration
12    literally, I mean Your Honor saw it in our brief.  We have this
13    giant string cite in which we show how in Bruen the Court
14    disapproved of every single one of her citations, but
15    they're -- you know, this is --
16           THE COURT:  I didn't hear you.  Disapprove what?
17           MR. SCHMUTTER:  Disapproved of every single one of
18    Rivas's citations, is literally rejected in Bruen.  Your Honor
19    saw that giant string cite that we had basically, like here's a
20    citation, here's the citation to Bruen.  Here's another one of
21    her citations, here's the citation to Bruen, one after the next
22    after the next after the next.
23           The State's position is fundamentally we don't like
24    Bruen.  That's what it's been from the beginning.  It's what it
25    remains today.  All they're doing is they're saying we don't
```

1  like *Bruen*.  It's what all this interest balancing stuff is.

2          You know, we've got all these government officials

3  submitting declarations about how terrible guns are.  That's

4  interest balancing.  Yeah, I get it, the State of New Jersey

5  doesn't like people -- doesn't want people carrying guns, but

6  the Supreme Court says you can't do that.  People have a right

7  to exercise the right to keep and bear arms.

8          So, you know, we are here today with basically the

9  same record that they tried to produce at the TRO stage.  They

10 haven't made it any better.

11         Now, one thing that has improved, and Your Honor

12 alluded to this as well in the colloquy with Mr. Jensen, is

13 standing.  So we agree that it is much easier to show standing

14 at the PI stage than at the TRO stage, because as Your Honor

15 observed in the ruling, the TRO ruling in Siegel, Your Honor

16 held that some of the sensitive place challenges, there was not

17 a reasonable prospect that the injury would occur during the

18 TRO phase, which is typically a couple weeks.  In this case

19 it's a couple months.  But the PI extends out to the end of the

20 case.  So the PI time frame is really literally years.

21         And so, you know, look, Your Honor, we -- our

22 contention is and has been from the beginning that we've pled

23 and shown plenty of standing facts from the beginning that

24 satisfy standing in every one of the claims.  However, because

25 the State, I mean the State has focused on standing so much,

```
 1   Your Honor may recall the question to counsel, don't you
 2   want -- don't you want an up or down ruling on the merits?
 3   Don't you want to know if your statute is constitutional or
 4   not?  The answer is obviously no, they don't.  They don't want
 5   a ruling on the merits.  I think they recognize how vulnerable
 6   the statute is from a constitutional perspective, so they're
 7   doing everything they possibly can to bring these standing
 8   arguments.  So we, in our supplemental submissions, both our
 9   initial supplemental submissions at the beginning of the PI
10   briefing and then subsequently as well in our reply papers, we
11   went belt and suspenders and another belt and another pair of
12   suspenders with standing facts.  Our people have actual
13   doctor's appointments.  Our people have checked and they're
14   allowed to carry.  Aaron Siegel is allowed to carry at his
15   urgent care center where he works.  We have people who actually
16   are going to the zoos Memorial Day weekend and things like
17   that.  So we have, you know, like -- I don't think it was
18   necessary.  I think we made an adequate record before, for the
19   PI phase.
20         But nevertheless, we really -- we just wanted to just
21   load the record up as much as we possibly could because this
22   case should not be decided on standing.  It should be decided
23   on the merits.
24         THE COURT:  Let me ask you about standing with
25   respect to the permit process.
```

```
 1              MR. SCHMUTTER:  Yes.

 2              THE COURT:  All of your plaintiffs already have their

 3   permits, other than from my reading, other than Cuozzo; am I

 4   right?

 5              MR. SCHMUTTER:  No.  Kim Henry.  Kim Henry has none

 6   of the permits.  She is a single mom who's hiding from her

 7   violent ex-boyfriend.  She's not currently working because

 8   she's in danger from her boyfriend and so she's very low

 9   income.  She's on assistance essentially, lives with her

10   mother.  She hasn't applied for any of that stuff because she

11   can't afford it.  So she is one of the key --

12              THE COURT:  What steps has she taken?

13              MR. SCHMUTTER:  She hasn't done anything yet.

14              THE COURT:  Okay.  And what about Cuozzo?  What steps

15   has she taken?

16              MR. SCHMUTTER:  Cuozzo, I don't recall.  I think she

17   has applied -- I'm not sure.  I have to go back and look at the

18   record, Your Honor.  I don't recall what Cuozzo has done.

19              THE COURT:  Because isn't the concern there is that

20   if -- let's use Cuozzo, for example, applies and is granted a

21   permit, where's the issue?

22              MR. SCHMUTTER:  Cuozzo or Henry?  I'm not following.

23              THE COURT:  Well, Cuozzo hasn't finished her permit

24   process, has she?

25              MR. SCHMUTTER:  I believe that's correct.
```

```
 1              THE COURT:  Okay.  If she's granted a permit, where
 2   is there a standing issue?
 3              MR. SCHMUTTER:  As to which claim?  I'm sorry, I'm
 4   not following.
 5              THE COURT:  As to the -- well, you've challenged the
 6   issue with respect to the permit process.
 7              MR. SCHMUTTER:  Oh, oh.  I'm sorry.  Everybody has to
 8   renew every two years.  Everybody is going to have to renew
 9   within the reasonable time frame of a preliminary injunction.
10              THE COURT:  But the law says that if you have to
11   reapply -- or you have to renew in two years, the law on its
12   face says what is applicable two years from now are the same
13   standards that were in place when you applied.  And for I don't
14   know how many of the plaintiffs, most of them, the law doesn't
15   apply by the plain terms of the legislation.  Do you agree with
16   that?
17              MR. SCHMUTTER:  No.  I'm not following.  Is Your
18   Honor saying that if I got a permit before December 22nd, the
19   new standards never apply to me?
20              THE COURT:  That's how I read the legislation.
21              MR. SCHMUTTER:  I don't believe that's what the
22   statute says.  If I --
23              THE COURT:  Well, let's have a look at it.
24              MR. SCHMUTTER:  I'm pretty sure when you renew,
25   you're subject to the new standards, the new fees, the new
```

1    standards, everything.  I don't think you're forever governed

2    by the old standard.

3              THE COURT:  Well, let's take a look.

4              MR. SCHMUTTER:  I don't have the statute in front of

5    me, Judge.  It's the first I've --

6              THE COURT:  You don't have it memorized?

7              MR. SCHMUTTER:  Almost.  98 percent memorized, Judge.

8    But I've not heard this argument before.  So I didn't look at

9    it from that perspective, but I'm almost positive that's not

10   correct.

11             THE COURT:  "And they thereafter be renewed every two

12   years, in the same manner and subject to the same conditions as

13   in any case of original applications."

14             Seems pretty clear to me.

15             MR. SCHMUTTER:  Is that the old law or is that the

16   new statute?  Because that --

17             THE COURT:  That is the new statute, Mr. Schmutter.

18             MR. SCHMUTTER:  Judge, I'm sorry.  I apologize.  I'm

19   going to have to look at the context.  This is the first time

20   I'm hearing about this.

21             THE COURT:  Okay.  Well, it just seems to me that --

22   and maybe it's a legislative oversight, but, you know, it's not

23   for this Court to rewrite legislation.  But it seems to me that

24   the Legislature contemplated that if you got your application

25   to carry before the law was enacted, that the standards that

1   were in place before the legislation, pardon the pun, carry

2   with you.

3           MR. SCHMUTTER:  Well, on behalf of all the people who

4   already had their permits, I certainly -- I'm sure they would

5   love that to be the case.  I don't think it's the case.

6           THE COURT:  Well, it seems to me to be pretty plain

7   on its face unless someone tells me that I'm interpreting it

8   incorrectly.  "In the same manner and subject to the same

9   conditions as in the case of original application."  Seems

10  pretty clear to me.

11          MR. SCHMUTTER:  And so Your Honor's thought is that

12  applies to fees as well; is that right?

13          THE COURT:  It's not My Honor's thought.  This is

14  what the Legislature ruled.

15          MR. SCHMUTTER:  No.  Judge, look, I apologize.  It's

16  literally the first time I --

17          THE COURT:  And perhaps some of you might say this is

18  because it was rushed to legislation, perhaps.  But it's not

19  for this Court to rewrite legislation.

20          MR. SCHMUTTER:  Well, certainly then Nicole Cuozzo

21  and Kim Henry have standing.

22          THE COURT:  That's why I'm raising the question.

23          MR. SCHMUTTER:  Well, certainly they have standing

24  then, because if they don't have their permits yet, they're

25  subject to the new rules.

 1          THE COURT:  But my question is, is that who's to say
 2    they won't get their permits?
 3          MR. SCHMUTTER:  But then --
 4          THE COURT:  And then let me follow this through with
 5    you.
 6          MR. SCHMUTTER:  Sure.
 7          THE COURT:  And then the question becomes, assuming
 8    you're correct and I agree with you, your argument will then
 9    be, but two years down the road, Judge, they'll have to go
10    through this process again.  Let's just play it out.
11          And my question for you then, is that, you know, that
12    seems to me to be more of a permanent injunction as opposed to
13    a preliminary injunction issue because two years down the road
14    is two years down the road.
15          MR. SCHMUTTER:  So two thoughts on that.  So to the
16    extent that Cuozzo and Henry do not yet have their permits,
17    they currently have standing to object to the procedures.  It's
18    not a matter of not getting the permits.  This isn't a permit
19    denial concept.  This is it's unconstitutional to require them
20    to do the things that the statute requires.  So it's
21    unconstitutional to make them go through the procedures that
22    we're objecting to, and it's unconstitutional to subject them
23    to the standards we're objecting to, and it's unconstitutional
24    to subject them to the fees that we're objecting to.
25          So to the extent that neither Cuozzo nor Henry

1   currently have a permit, they have standing right now to object

2   to that right now.

3           THE COURT:  Okay.

4           MR. SCHMUTTER:  Now, the second argument is, I do

5   think actually two years is within the preliminary injunction

6   time frame.

7           THE COURT:  Preliminary or permanent?

8           MR. SCHMUTTER:  Preliminary.

9           THE COURT:  Well, why?

10          MR. SCHMUTTER:  Because preliminary goes out till the

11  end of the case.  We don't know when this case is going to end.

12  As Your Honor knows, cases last years.  We shouldn't -- I don't

13  think for standing purposes we can prejudge when the end of the

14  case is going to be.

15          THE COURT:  But why can't I just revisit it at a

16  later date?  Why do I have to visit now in a preliminary

17  injunction if it's not even pending for two more years?  That

18  doesn't seem correct to me.

19          MR. SCHMUTTER:  Because I don't -- I'm not aware --

20          THE COURT:  Because what I would say to you is,

21  Mr. Schmutter, let's revisit this issue in a more timely

22  fashion two years from now or a year and a half from now,

23  but --

24          MR. SCHMUTTER:  Yeah.  I think we have the right to

25  seek preliminarily injunctive relief for injury at any time

```
 1   during the relevant time frame.  Unlike a TRO, which is
 2   emergency, you know, hair-on-fire stuff, preliminary injunction
 3   is not.  Preliminary injunction is simply what should the
 4   conditions be while the case is being litigated.  And it's
 5   generally dealt with at the beginning of the case.  I'm not
 6   aware that --
 7            THE COURT:  And if I decline to issue it now and say
 8   I'll decide it down when it becomes more quote-unquote ripe,
 9   would you fault me?
10            MR. SCHMUTTER:  I think so, yeah.  I think that's
11   wrong, Judge.  I think that's not the correct approach.
12            THE COURT:  Okay.
13            MR. SCHMUTTER:  I mean, I hear Your Honor and I hear
14   the point Your Honor is making.  I don't think that's the
15   correct way for preliminary injunctions to happen.
16            I think preliminary injunctions, a litigant is
17   entitled to a preliminary injunction if they satisfy the
18   requirements at the time that the motion is made.
19            THE COURT:  Okay.
20            MR. SCHMUTTER:  And it applies through the time frame
21   of the preliminary injunction, which is the entire case.
22            THE COURT:  Fair enough.
23            So assume you're correct and all of the factors for
24   the issuance of a preliminary injunction are met, irreparable
25   injury, balancing of the equities, et cetera, et cetera, you
```

*United States District Court*
*District of New Jersey*

JA3131

```
 1   have some facial attacks on some of this legislation.  Why do I
 2   have to decide those now?  Because where's the irreparable
 3   injury?
 4         Let me start with the one that comes to my mind is
 5   your challenge, your equal protection challenge as to the
 6   provision that exempts judges and others.  Why do I have to
 7   decide that now?
 8         MR. SCHMUTTER:  Because all of the plaintiffs suffer
 9   that injury now.
10         THE COURT:  How are they being injured by the fact
11   that someone else might be getting a carry permit when they
12   themselves have one?
13         MR. SCHMUTTER:  Because they can't carry in places --
14         THE COURT:  After all, I mean, you are promoting the
15   right to carry a firearm.  So how can you argue that your
16   plaintiffs are being irreparably injured when someone else also
17   has the right to carry a firearm?  What am I missing?
18         MR. SCHMUTTER:  Because right now -- I'm sorry,
19   Judge.  I interrupted you.
20         THE COURT:  What am I missing?
21         MR. SCHMUTTER:  Right now today the constitutional
22   injury is that they can't carry in the sensitive places that
23   judges, prosecutors, and attorneys general can.
24         THE COURT:  But if I say they can?
25         MR. SCHMUTTER:  I'm sorry?
```

1          THE COURT:  If I say they can, what's the irreparable

2      injury?  If I say, if this Court rules that your clients can,

3      what is the irreparable injury now with respect to your

4      challenge, the equal protection challenge?

5          MR. SCHMUTTER:  Because they're all -- there's still

6      restrictions.  We haven't challenged everything in the statute.

7      We've sought relief on some things.  But there are all sorts of

8      things we haven't challenged that judges, prosecutors, and

9      attorneys general have the right to do that we don't.  For

10     example, judges can carry in schools.  Attorneys general that

11     work for the Attorney General's Office can --

12         THE COURT:  But you don't want to -- okay.

13         MR. SCHMUTTER:  -- can carry in schools.  I mean --

14         THE COURT:  You don't want to carry in schools, so

15     I -- can you focus --

16         MR. SCHMUTTER:  You can carry in -- I mean, we can

17     pick a -- I'm sorry, Judge.  I interrupted you.

18         THE COURT:  I want you to focus on the irreparable

19     injury part of the aspect.  Because if I don't have to decide

20     the equal protection challenge with respect to that provision,

21     I don't want to.

22         And so you would have to persuade me, and the

23     reason -- the way I get there is I find no irreparable injury.

24     So you will have to -- and maybe I'll order further briefing on

25     it -- you'd have to show me how your plaintiffs are being

*United States District Court*
*District of New Jersey*

```
 1   irreparably injured.  Here's the example that we just
 2   discussed.  You say, well, judges can carry in schools, but
 3   your plaintiffs don't seek to carry in schools.  So that's not
 4   irreparable injury, right?
 5           MR. SCHMUTTER:  Well --
 6           THE COURT:  What I'm saying is, you have to at least
 7   address the irreparable injury stage to persuade me why I need
 8   to rule now.  That's all I'm saying.  And I don't know that
 9   you've done that.  Have you?
10           MR. SCHMUTTER:  Yes.  So let me answer in two ways,
11   Judge, because there's actually more to it than I think is
12   clear.
13           The exemption that we're challenging doesn't just
14   allow judges, prosecutors, attorneys general to carry in the
15   sensitive places.  They're exempt from all of the restrictions
16   in 2C:39-5.  That means that Your Honor could walk into a
17   school with a machine gun.  I mean, that is -- this exemption
18   is really, really broad.  And so there's a whole swath of
19   things that my clients can't do that the exempt individuals
20   can, including carrying in schools or carrying in other places
21   that we haven't challenged.
22           THE COURT:  That's a statement that you've made.  But
23   now let's deal in reality.  What is it that your plaintiffs
24   want to do that you say these other individuals can do?  And by
25   the way, what's your classification on your equal protection
```

*United States District Court*
*District of New Jersey*

JA3134

1   challenge?

2           MR. SCHMUTTER:  I'm sorry?

3           THE COURT:  What is the classification?

4           MR. SCHMUTTER:  Classification is -- is the exercise

5   of a constitutional right.  So you can't discriminate -- under

6   the equal protection clause, you can't discriminate on the

7   exercise of a constitutional right.  So our people want to

8   exercise their Second Amendment rights.  They're being

9   discriminated against in the exercise of their constitutional

10  right because they don't fall into the classification of

11  judges, prosecutors, and attorneys general.

12          THE COURT:  Okay.  And so now let's flesh that

13  further out.  Where?

14          MR. SCHMUTTER:  Everywhere they want to.  Our people,

15  my plaintiffs, the allegations regarding the suspect

16  classification is about they would carry anywhere.  They would

17  carry everywhere.  But they're not asserting that they have a

18  Second Amendment right to carry in the nonchallenged locations.

19  They're asserting that they should be able to carry where these

20  other people should be able to carry, and that's an equal

21  protection claim.

22          And I guess I don't know if Your Honor is looking for

23  an allegation in the complaint that says -- where Aaron Siegel

24  says I would carry in schools if only I were a judge or a

25  prosecutor.  That's not in the record.

         1          THE COURT:  No.  It's not only if I were a judge.

         2    But why can a judge carry in a school and I can't carry in a

         3    school?  But your clients are not looking to carry in schools.

         4          MR. SCHMUTTER:  That's not true.

         5          THE COURT:  They are?

         6          MR. SCHMUTTER:  They would carry anywhere they were

         7    allowed to carry.  What these plaintiffs have made clear is

         8    that they carry for personal defense, they carry for defense of

         9    themselves, their families and the people around them.

        10          All you have to do is look at Varga and Cuozzo, the

        11    church plaintiffs.  They're not just protecting themselves.

        12    They're protecting the church community.  That's what this is

        13    all about for them.  So these plaintiffs would carry anywhere

        14    they could carry.  I think the record reflects that -- for

        15    example, let's look at Varga.  They have the 14-acre campus and

        16    they lease one of their buildings to a school.  I think it's

        17    absolutely clear that Tim Varga would carry in that school if

        18    he could.  I think that if he -- if there were a way for him to

        19    carry in the school constitutionally and lawfully, I think he

        20    absolutely would carry in the school if he walked into that

        21    building.  He's on the security committee.

        22          THE COURT:  If the classification is one that's

        23    professional-based, then it's a rational basis test, correct?

        24          MR. SCHMUTTER:  I'm sorry?

        25          THE COURT:  It's a rational basis test, correct?

                          *United States District Court*
                            *District of New Jersey*

                                                            JA3136

1              MR. SCHMUTTER:  No.  It's strict scrutiny.

2              THE COURT:  If it's professional-based?

3              MR. SCHMUTTER:  It's still strict scrutiny because it

4    implicates -- it impairs the exercise of a constitutional

5    right.  It's only rational basis if there's no constitutional

6    right involved, right?

7              So if I said --

8              THE COURT:  But how is that a suspect class?

9              MR. SCHMUTTER:  I mean, the cases that we cite make

10   that clear.  If I said, oh, judges are allowed to buy 50-ounce

11   Slurpees and I'm not, that's rational basis because there's no

12   suspect class.  There's no impairment of a constitutional

13   right.  I don't know if you have a constitutional right to --

14   maybe you do actually because the New York case, it was

15   stricken.  But if we're talking about Slurpees, that's probably

16   rational basis.  If we're talking about a right to keep and

17   bear arms, that's strict scrutiny.  That's a pretty bright

18   line.

19             If you're being discriminated against in the exercise

20   of a constitutional right, you get strict scrutiny.  I think

21   the law is -- I think the citations support that really pretty

22   plainly, Judge.

23             THE COURT:  Okay.

24             MR. SCHMUTTER:  Did I answer all Your Honor's

25   questions on those?  I hope I did.

1          Okay.  I want to talk a little bit more about

2    irreparable harm because -- and there's a few cases that I want

3    to cite to the Court that were not in the briefs.  I circulated

4    them to counsel on Monday so they know that I'm going to be

5    talking about some of these cases.

6          I guess I want to talk about -- because the State has

7    argued that the economic harms like the fees and the insurance

8    are not irreparable.  And that really -- that takes an

9    incorrectly non-nuanced approach to what economic harm is.

10          Of course, the general rule is that when you have

11    money damages, you don't have irreparable harm.  But the first

12    thing you have to do, first of all, is look at things like

13    sovereign immunity, right?  I have no idea how we would recover

14    the cost of insurance from the State.  I don't know if the

15    State is going to waive sovereign immunity.  I tend to doubt

16    it.  But, I mean, you look at cases like *Baker Electric*

17    *Cooperative vs. Chaske*.  By the way, I have copies for the

18    Court.  Did Your Honor want me to --

19          THE COURT:  Just give me the citations, please.

20          MR. SCHMUTTER:  Okay.  So *Baker Electric Cooperative*

21    *vs. Chaske,* it's 28 F.3d 1466.  That's an Eighth Circuit case.

22    That stands for the basic principal that just because there's

23    economic harm, if there's a sovereign immunity problem, you

24    can't recover.  That's irreparable harm.  So that's just one of

25    the classic examples.

1      Another example is where you can't be reasonably
2   certain about damages.
3      THE COURT:  But there's no sovereign immunity against
4   the individual who's collecting on behalf of the State.  So I
5   don't think that the plaintiffs need to be concerned there.  I
6   don't know that we need to get too bogged down in this
7   analysis, Mr. Schmutter.
8      MR. SCHMUTTER:  That's fine, Judge.  Let me just --
9   if I could just throw a couple citations out real quick.  I
10  just want to make sure it's in the record.
11      THE COURT:  All right.  Go ahead.
12      MR. SCHMUTTER:  I know, Your Honor.  I understand.  I
13  hear Your Honor.
14      *Husky Ventures vs. B55 Investments*, that's a
15  Tenth Circuit case, 911 F.3d 1000, that talks about, you know,
16  you have to have a reasonable certainty about the damages to
17  recover, and if you don't, it's irreparable.
18      One thing I do want to talk about though and
19  emphasize is I want to go back to Kim Henry.  Because it is
20  incorrect for the State to say if it's just about money, pay up
21  and then maybe at the end of the case you can recover the fees.
22  That is not the case with people who are indigent and poor and
23  can't afford the fees.
24      Now, this is what Kim Henry has to do when she wants
25  to protect herself from her violent ex-boyfriend.  So she needs

| 1 | a permit to purchase a handgun. That fee went from $2 to $25. |
| 2 | She has to get an FID card, Firearms Purchaser Identification |
| 3 | card. That fee went from $5 to $50, $75. Then she has to do |
| 4 | her $200 carry permit fee. So $275 just to exercise the right |
| 5 | to keep arms and the right to bear arms, but she also has to |
| 6 | buy a firearm. She has to buy ammunition. She has to buy |
| 7 | training. And every dollar that she has to expend, which she |
| 8 | doesn't have for the $275 in fees, is money that she cannot |
| 9 | spend on the actual exercise of her right. |
| 10 | And actually, there's an unreported decision out of |
| 11 | Illinois, I know it's not authoritative, but just conceptually |
| 12 | I think it's relevant to discuss. It's ACLU of Illinois |
| 13 | versus -- I forgot who the defendant is. But it's a district |
| 14 | court case in Illinois, and that's a case where there was -- |
| 15 | they had a $1,000 lobbying fee. Couldn't lobby without paying |
| 16 | the $1,000 fee, and the Court struck it down and issued a |
| 17 | preliminary injunction and said every dollar that ACLU of |
| 18 | Illinois has to spend on their lobbying fee is a dollar they |
| 19 | can't spend on their First Amendment activities, so it's |
| 20 | irreparable and we can enjoin them. |
| 21 | That's exactly Kim Henry and everybody like her who |
| 22 | for every dollar they to spend on these exorbitant fees -- and |
| 23 | Your Honor will recall exorbitant fees is right out of |
| 24 | footnote 9 in *Bruen* -- is money that they can't be spending on |
| 25 | what they need to be purchasing, such as their firearm, their |

1    ammunition, their training.

2            THE COURT:  And how do you suggest the Court go about

3    resolving the issue you have raised?  Is it an individualized

4    inquiry as to whether or not someone's Second Amendment right

5    is being infringed because of the nature of the fee?  Because

6    $25 to one individual may not be the same as to another

7    individual.  And so how do you suggest that this Court go about

8    determining it, the issue you've raised?

9            MR. SCHMUTTER:  We think it's a facial challenge,

10   Judge.

11           THE COURT:  It's a facial challenge?

12           MR. SCHMUTTER:  Correct.  We think that all you need

13   is some people for whom it is a hardship and demonstrates the

14   footnote 9 problem of an exorbitant fee.  And of course as Your

15   Honor knows from the papers, there's all kinds of other

16   problems with the fees.  There's the *Cox* problem.  There's the

17   *Bruen* problem.  You know, there's all sorts of issues.

18           THE COURT:  So am I to just look at the record as a

19   whole?  Just help me understand your argument.  Am I to look at

20   the record as a whole and say well, every other plaintiff who

21   is part of this record has been able to afford the fee but one

22   and therefore the Court concludes?  Or am I to say because one

23   of all of the plaintiffs cannot afford to pay the fee, the

24   Court concludes?  Which is it that I'm to do?

25           MR. SCHMUTTER:  The second.  It's a facial challenge,

*United States District Court*
*District of New Jersey*

JA3141

```
 1   Judge.
 2           THE COURT:  Okay.
 3           MR. SCHMUTTER:  By the way, it's not just Kim Henry.
 4   Because don't forget --
 5           THE COURT:  How do you get around the Second Circuit
 6   upholding a fee of $300?  You just say they're wrong, right?
 7           MR. SCHMUTTER:  I'm sorry?
 8           THE COURT:  The Second Circuit upheld a fee of $300.
 9   Do you say the Second Circuit got it wrong?  Is that what you
10   say?
11           MR. SCHMUTTER:  Is Your Honor talking about *Kwong*?
12           THE COURT:  Yes.
13           MR. SCHMUTTER:  Well, first of all, *Kwong* is
14   pre-*Bruen*.  But, yes, the Second Circuit got it wrong in *Kwong*,
15   and here's why.  And this goes to *Cox*, because *Kwong* is a
16   *Cox* case.  So -- and actually I was a little surprised.  The
17   State has not tried to defend the fees under *Cox* at all.  The
18   *Cox* analysis is twofold.  *Cox* tells us that the fee connected
19   to the exercise of a constitutional right is invalid if it does
20   not directly cover the costs of regulation.
21           So already the victims-of-compensation-fund stuff,
22   that is unlawful.  We know that immediately, and each of the
23   fees has a victims-of-compensation-fund component.  That goes
24   away, right away.  That's easy.  They didn't even try to defend
25   it.  But there's more to *Cox*, right.  But -- and this is in our
```

1    brief and Your Honor read this, but before you even get to does

2    the fee -- is the fee directly related to covering the cost of

3    regulation, the activities that give rise to the cost have to

4    have the *Bruen* justification.

5         So, for example, the State of New Jersey could pass a

6    statute that says we are going to evaluate an application --

7              (Pause.)   (Microphone feedback.)

8         The State of New Jersey could pass a law that says we

9    think it's so important that people be vetted properly before

10   they get a carry permit, we're going to have seven different

11   police officers do seven independent investigations just to

12   make sure we get it right, and that's going to cost $1,500 or

13   $2,000.

14        If you take the *Kwong* approach, all you're doing is

15   you're comparing the cost of seven investigations versus the

16   actual fee.  If it matches, boom, it's constitutional.  That

17   misses the point.

18        You first have to ensure that the process itself is

19   constitutional before you even figure out what the cost is.  So

20   the seven investigations would be subject to a *Bruen* analysis.

21   Is there a historical tradition that supports this process?

22   And that's the argument we made, and they didn't even try to

23   justify it.

24        So they don't even get to *Cox*.  They can't justify

25   their process.  And they don't even argue that the numbers are

*United States District Court*
*District of New Jersey*

JA3143

```
 1   consistent with the costs.  They don't even go to Cox, which I
 2   don't understand.  Well, I'm not going to say another -- but I
 3   was surprised not to see that.  So there are so many things,
 4   they lose on the fees for so many independent reasons we think
 5   that's absolutely critical.
 6          Now, there's another aspect of irreparable harm.  I
 7   know Your Honor didn't want to talk so much about irreparable
 8   harm, but I'll throw one thing out.  Lingle vs. Chevron, which
 9   is nominally a takings case, but what Lingle says -- and I'll
10   give Your Honor the citation, 125 Supreme Court 2074.  It's a
11   2005 Supreme Court case.  It is ostensibly a takings case.  And
12   it's a case in which the Supreme Court rejects what had
13   theretofore been a basis to find a taking.  And the Supreme
14   Court said you know what, this is not a valid taking theory.
15   So they rejected that case.
16          But there's something else implicit in what they say,
17   which is actually really important.  So what they say is this
18   might or might not be a taking, but it's also an argument for
19   due process violation.  It demonstrates that violations can be
20   dual violations.
21          The fees, for example, are not just monetary actions.
22   They're not just monetary penalties.  They're also themselves
23   constitutional violations, that is, they have a separate status
24   as a Second Amendment violation.  So making someone pay the fee
25   is not simply taking money out of their pocket.  It's violating
```

```
 1   their Second Amendment right.  That's an irreparable harm that

 2   getting your fee back at the end of the case somehow doesn't --

 3   doesn't compensate for.  So you don't have compensation for the

 4   constitutional harm itself.  That's an independent basis for

 5   irreparable harm.  So we're going to ask the Court to think

 6   about it from that perspective because that's sort of implicit

 7   in what *Lingle* is talking about by showing the dual nature of

 8   the taking allegation.

 9            THE COURT:  What do you think the fee should be?

10            MR. SCHMUTTER:  Well, I mean, as a standard today, I

11   think the fee should be what it was before.  Now, are those

12   constitutionally justifiable?  I don't know.  We're not

13   challenging the old fees.  The old fees may be challengeable as

14   well.

15            THE COURT:  Well, let me press you.  You don't have a

16   position as to whether or not the old fee was unconstitutional?

17            MR. SCHMUTTER:  We don't.  We're not taking a

18   position on that, Judge.  We really haven't -- we haven't

19   thought about the analysis of that.

20            I will say I'm not aware of any historical tradition

21   for these kinds of fees.

22            THE COURT:  So then why wouldn't you be challenging

23   it?

24            MR. SCHMUTTER:  I mean, Judge, we have to make

25   decisions when we litigate.  There's other stuff we're not
```

 1  challenging as well that we probably could.

 2          THE COURT:  Okay.

 3          MR. SCHMUTTER:  By the way, honestly, Judge, there's

 4  other stuff in the statute we probably could be challenging,

 5  but we're not.  And that doesn't mean we won't one day

 6  challenge them.  But importantly, we think going from 2 to 25

 7  and going from 5 to 50 and going from 50 to 200 is plainly

 8  unconstitutional.  And if we're back before Your Honor some day

 9  saying the old fees are unconstitutional, too, there's nothing

10  wrong with that, you know, we have to decide which claims we're

11  going to bring when we're going to bring them.

12          Judge, I'm not going to talk about traceability or

13  redressability.  We've briefed that.  The briefs are very

14  clear.

15          I do want to point out one thing, though.  And it's

16  in our brief, but I do want to emphasize it.  When we were here

17  on the TRO, the Court did a very helpful analysis with my

18  friend on the other side about the breadth and scope of

19  schools, the school's provision, and the breadth and scope of

20  multi-use property problem.  And in the Opinion, the Court, as

21  I read it, and I just want to make sure I'm not

22  misunderstanding it, the Court basically said the State

23  conceded these issues and therefore we don't have to go there.

24  That's kind of how I read the Opinion, and that was very

25  helpful.

*United States District Court*
*District of New Jersey*

JA3146

```
 1              Here's the problem we face:  I'm not sure that people
 2    like my clients and others, members of ANJRPC or anybody in New
 3    Jersey who wants to exercise their Second Amendment rights, I'm
 4    not sure they can rely on a concession of counsel during oral
 5    argument.  I believe we need a finding or a holding or a
 6    construction of those statutes as the State has conceded.
 7              In other words, I think we need, in the PI phase, the
 8    Court to actually find that those statutes mean that.
 9              THE COURT:  It will be an order embodying the
10    concession.  That's your finding.  That's the Court's finding.
11              MR. SCHMUTTER:  As long as the order says that.
12              THE COURT:  Okay.
13              MR. SCHMUTTER:  I don't think the previous order said
14    that.  I don't think the previous Opinion went that far.  So
15    that's what we're asking for.  We're asking for the Court to
16    take it to the level that is actually enforceable, because I
17    worry that -- I worry that the record in the TRO phase is a
18    little bit unclear that -- I'm not 100 percent sure that if a
19    police officer arrested someone in the parking lot of a
20    multi-use property, I'm not 100 percent sure that that person
21    can completely rely on the record in the TRO.  So we're just
22    asking for something more enforceable.  That's all.
23              THE COURT:  I will take it under advisement.  But
24    thank you.
25              MR. SCHMUTTER:  Thank you, Judge.
```

1    I want to actually point out something really

2  interesting.

3    We received an email from counsel the other day.  I'm

4  reluctant to cite --

5    THE COURT:  From Ms. Cai?

6    MR. SCHMUTTER:  Yes.  I'm reluctant to cite cases

7  that the other side says they want to cite, but it's such a

8  good case for us I can't help it.  So the email said oh, we may

9  cite *NRA* vs. *Bondi*, Eleventh Circuit case.

10    This case to me is the absolute best example of why

11  1791 is the time frame and not 1868.  So *Bondi* just came out, I

12  guess, last week.  *Bondi* is a challenge to Florida's law

13  prohibiting the acquisition -- or I'm sorry, the purchase of

14  firearms for adults age 18 to 20.  So no purchases.  Not just

15  handguns, because many states in many jurisdictions --

16    THE COURT:  I thought it was a Ninth Circuit case.

17  Am I wrong?

18    MR. SCHMUTTER:  Eleventh Circuit case.  It's Florida.

19  It's Florida law.

20    THE COURT:  Okay.

21    MR. SCHMUTTER:  And so the Court -- what the Court

22  says is they come straight out and say it's

23  Fourteenth Amendment, that means it's 1868, not 1791.  And the

24  reason *Bondi* is such a great case is that the Court makes it

25  absolutely clear there are no historical citations from the

```
 1   Founding, none, that support the law.

 2           So we have this great binary situation.  No citations

 3   from 1791 and then a bunch of citations the courts rely on from

 4   Civil War and construction time frame.  And they say it's 1868,

 5   therefore, the law is valid.

 6           Now, what does this illustrate?  It illustrates why

 7   that can't possibly be right.  As the Supreme Court said in

 8   Bruen, there is only one version of the right.  First

 9   Amendment, the Second Amendment, the Fourth Amendment, they

10   mean the same thing as to the federal government as to state

11   government.  There aren't two different versions of it.  What

12   does that mean?

13           Under the Bondi reasoning of the Eleventh Circuit, if

14   Congress enacted the exact same law, because 18 U.S.C. 922

15   works differently.  But if 18 U.S.C. 922 were amended to

16   provide the exact same restriction as the Florida law,

17   according to the way the Eleventh Circuit looks at it, the

18   federal statute would be invalid because the

19   Fourteenth Amendment has nothing to do with federal law, right?

20   The federal government is governed by 1791 because that's the

21   time frame, but the state law is governed by 1868, the result

22   would be different.

23           The federal law would be unconstitutional under the

24   Second Amendment but the state law would be constitutional.

25   The Supreme Court is 100 percent clear that that's not how it
```

 1    works.  You can't have a provision of the Constitution that

 2    applies differently to state law and federal law.  So *Bondi* is

 3    a magnificent illustration on why the time frame has to be

 4    1791.

 5           The only other thing I think that I'll point out,

 6    Your Honor saw our briefing on playgrounds and youth sports.

 7    We think there's a very good bright-line rule that the Court

 8    can apply, school ones and nonschool ones, and we think that's

 9    what the Court should do.

10           I guess the last thing I'll say is simply that it's

11    in our briefs, but we want to emphasize because the State

12    hasn't really responded to this at any point, *Bruen* doesn't --

13    you don't automatically go to analogies in *Bruen*.  You only get

14    analogies -- get to analogize under three circumstances, right?

15    It's unprecedented societal concerns.

16               THE COURT REPORTER:  I'm sorry?

17               (Clarified the record.)

18               MR. SCHMUTTER:  Unprecedented societal concerns,

19    which we know doesn't apply here because the concerns here are

20    exactly the same as in *Heller*, *McDonald*, and *Bruen*, handgun

21    violence, right?  They didn't parse technology.  They didn't

22    parse modern versus historic.  It's just handgun violence,

23    okay.  So that's the -- so they don't get to analogize on

24    ground one.

25           Ground two is, you know, massive changes in

```
 1   technology.  Again, that doesn't apply here because the

 2   technology of handguns is not what counts.  Again, Heller,

 3   McDonald, Bruen, a technology didn't fall into it.  So, again,

 4   it's handguns and handgun violence.

 5          And the third one is regulations that could not have

 6   been imagined at the time of the Founding.  They don't have any

 7   of that either.  So they don't get to analogize.  They actually

 8   have to provide the specific things.  There were museums back

 9   then.  There were libraries back then.  There were

10   entertainment venues back then.  It doesn't matter that PNC

11   Bank Art Center looks different than a theater in Boston in the

12   18th century.  None of the cases differentiate between what the

13   modern look is and what the historical look is.  That's not a

14   thing.  So they actually don't get to analogize.  They actually

15   have to bring specific examples of the same thing.

16          Now --

17          THE COURT:  How do you get to --

18          MR. SCHMUTTER:  -- their analogies don't work anyway.

19          THE COURT:  Well, okay.  I was going to ask you about

20   airports, how you get there.

21          MR. SCHMUTTER:  Well, you get to airports because all

22   airports really is are crowded places.

23          THE COURT:  Are what?

24          MR. SCHMUTTER:  All airports really are are crowded

25   places.  There's nothing about dropping, you know, there's
```

*United States District Court*
*District of New Jersey*

JA3151

```
 1    nothing about checking in at the counter or curbside check-in
 2    or going to have a bite to eat at McDonald's that's outside the
 3    TSA area, there's nothing different about those things.  The
 4    fact that there are airplanes on the tarmac, that has nothing
 5    to do with security because you're not bringing guns onto the
 6    airplane.  So what they care about with airplanes and
 7    transportation terminals is just a place where people gather.
 8    There's nothing modern about that condition, right?  If we were
 9    saying, Judge, we should be allowed to carry guns on airplanes,
10    okay, that's a totally different thing, right?  Airplanes have
11    their own special concerns, right?  They're pressurized.  They
12    get hijacked.  We're not arguing that.
13         The thing that they say they're protecting against is
14    an ordinary condition of people just milling about in crowds.
15    There's nothing modern about that.  That is the same thing that
16    we've seen before, and we know that crowds don't work.  *Bruen*
17    was 100 percent clear that simply because something is crowded,
18    that is not a proper sensitive place.
19         If Your Honor doesn't have any more questions, I'll
20    sit down.  I don't know if Your Honor has any questions for me.
21         THE COURT:  Thank you.
22         MR. SCHMUTTER:  Thank you, Judge.
23         THE COURT:  We'll take a five-minute break.  And,
24    Ms. Cai, I'll hear from you.
25         THE COURTROOM DEPUTY:  All rise.
```

```
 1              (Recess was taken from 11:25 a.m. to 11:31 a.m.)

 2              THE COURTROOM DEPUTY:  All rise.

 3              THE COURT:  Okay.  You can have a seat.  Thank you.

 4         Mr. Schmutter, you wanted to say a few more things?

 5              MR. SCHMUTTER:  Yes, Judge.

 6              THE COURT:  Okay.

 7              MR. SCHMUTTER:  So since we took a break, we have two

 8    clarifying helpful things hopefully.

 9              THE COURT:  Okay.

10              MR. SCHMUTTER:  On the issue of renewal.

11              THE COURT:  Yeah.

12              MR. SCHMUTTER:  So we looked at the language.  We

13    think that the language that says "and they may thereafter be

14    renewed every two years in the same manner and subject to the

15    same conditions as in the case of original applications," the

16    plural we think makes it clear that they're not saying that

17    individual person's original application, but renewals work the

18    same way as original applications in the general sense.

19              So when you renew --

20              THE COURT:  Okay.  You lost me.

21              MR. SCHMUTTER:  Okay.

22              THE COURT:  Why are you making the State's case for

23    them?

24              MR. SCHMUTTER:  Well, we're not making the State's

25    case for them.  We just want to make sure -- I mean I
```

1    understand that for people who --

2            THE COURT:  Why are you quarreling with the Court's

3    interpretation?

4            MR. SCHMUTTER:  Because some people benefit from that

5    interpretation but some people don't.

6            THE COURT:  Right.  That's true.  And I have no idea

7    in the case of Muller, for example, who got an application

8    based upon justifiable need, which is now unconstitutional, and

9    in two years from now when he goes forward and tries to show a

10   justifiable need which is now unconstitutional, I have no idea

11   what happens.  But it seems to me that this is indicative of

12   legislation that was not clearly thought out.

13           MR. SCHMUTTER:  Well, we agree that there's plenty in

14   here that was not thought out, Judge.

15           THE COURT:  Okay.  So I don't understand why you're

16   making the State's case.

17           MR. SCHMUTTER:  I'm not sure that I'm making the

18   State's case.  Well, we're making a record, Judge.

19           THE COURT:  Okay.

20           MR. SCHMUTTER:  And --

21           THE COURT:  So how could this Court be faulted if, in

22   the same manner and subject to the same conditions as in the

23   case of original applications, this Court rules that with

24   respect to all of the plaintiffs who have carry permits, they

25   are subject to the same conditions before?  I have no idea in

*United States District Court*
*District of New Jersey*

JA3154

 1    Mr. Muller's case what happens.  But is it the Court's problem
 2    or is it the Legislature's problem?  It seems to me the latter.
 3            MR. SCHMUTTER:  Certainly when the Legislature does
 4    ridiculous stuff, it is their problem, and I totally
 5    understand.
 6            THE COURT:  Okay.  And so if this Court interprets it
 7    that way and part of it as a result is unconstitutional because
 8    Mr. Muller cannot be forced to reapply showing justifiable
 9    need, I don't know the answer.  But my guess is neither does
10    the State.
11            MR. SCHMUTTER:  Thank you, Judge.
12            I guess the bottom line is, I wouldn't want to have
13    an adverse standing ruling turn on that, I guess.
14            To the extent -- and I don't know what the Court is
15    going to rule, and I don't know exactly how that plays out.  My
16    point is simply that I'm hoping that there's no adverse
17    standing ruling that turns on this interpretation.  That's all,
18    Judge.
19            THE COURT:  Okay.  So let me assume you're playing
20    devil's advocate.  Try it again.
21            MR. SCHMUTTER:  The analysis?  Oh.
22            The statute can be read and perhaps should be read
23    when the Legislature refers to "the same manner and subject to
24    the same conditions as in the case of original applications,"
25    plural, they're simply referring to a comparison of the two

 1   processes generally, not the process that a particular

 2   applicant undertook the first time versus the second time.

 3            So if you want to know how to renew, you look to the

 4   requirements when you first apply, the original application.

 5   So you go to the part of the statute that says how to apply for

 6   the first time.  That's how you know the things you have to do

 7   on renewal.  That's the interpretation that I was just

 8   ascribing.

 9            THE COURT:  That's a stretch.

10            MR. SCHMUTTER:  Thank you, Your Honor.

11            THE COURT:  This is the same language that applied in

12   the former law.  You would not be making that argument to me, I

13   suspect, under the former law.

14            MR. SCHMUTTER:  Well, we're not under the former law,

15   I guess, Judge, so I'm not sure.  But I understand the Court's

16   thought process.

17            THE COURT:  Yeah.  Okay.

18            MR. SCHMUTTER:  Thank you.

19            THE COURT:  Okay.

20            MR. SCHMUTTER:  And just a quick citation.  We talked

21   a lot about equal protection as to the suspect classification.

22   I just want to go over one more citation, *Illinois State Board*

23   *of Elections,* 440 U.S. 173.  That's a strict scrutiny case.

24   Well, the Court does strict scrutiny but doesn't call it strict

25   scrutiny.  But Justice Blackmun in concurrence makes it clear

1    that he understands that it's strict scrutiny -- they're

2    talking about strict scrutiny.  When you look at the case,

3    they're clearly talking about strict scrutiny.  So that's just

4    an additional citation that the Court can rely on.

5           I do apologize.  Can I make one more point?  I know I

6    sat down and I know Your Honor wants to hear from Ms. Cai.

7           THE COURT:  Go ahead.

8           MR. SCHMUTTER:  So I forgot to get to this.  This is

9    something -- I think this is actually very important.  It

10   applies to the challenged standards, the new standards.

11          The amended standard under 2C:58-3(c)(5), the public

12   health, safety and welfare, the new version of that, and also

13   this new sort of general language known in the community, Your

14   Honor is aware of the couple of challenges we're making.

15          Just to clarify what the actual challenge is, there

16   are -- there is no historical traditions, and this is a

17   straight-up *Bruen* analysis, there is no historical tradition

18   for a freestanding ad hoc dangerousness assessment.  Every

19   historical citation in any case, *Range*, *Rahimi*, any of these

20   cases that deal with individuals and who they are, they're

21   always citing to categorical disqualifiers, legislative

22   categorial disqualifiers.  There is no precedent *and no Bruen*

23   history that justifies these ad hoc determinations, and that's

24   why these approaches are problematic.  Because what they do is

25   they basically vest in an individual the discretion to decide

```
 1   on their own I think that guy's facts are problematic, and

 2   therefore, I'm going to say he's divested of his right to keep

 3   and bear arms.  It's an enormous difference to have vested that

 4   kind of discretion in a public official and basically say, ah,

 5   you don't like it, tell it to the judge.  You know, these

 6   constitutional rights don't work under a "tell it to the judge"

 7   approach.  That's very important.  And Range hasn't been

 8   cited --

 9              THE COURT:  Would you ever draft or be in favor of

10   legislation that does give some flexibility to an approving

11   official if there are red flags that are going off in his or

12   her mind?

13              MR. SCHMUTTER:  No.  I think what we need is the

14   Legislature has to say what counts.  That's what matters.

15              And the Legislature can say whatever they want and

16   then we get to test that ex ante against the historical

17   tradition.  That's why it's so -- that's what the big

18   difference is.

19              THE COURT:  But the legislation here refers to acts

20   or statements, for example.  You're not suggesting that the

21   legislation has to lay out with specificity what those acts or

22   statements might be that cause a police chief to say this

23   person really should not be carrying a firearm?

24              MR. SCHMUTTER:  There needs to be enough that the

25   applicant knows in advance what's going to get him in trouble.
```

*United States District Court*
*District of New Jersey*

JA3158

1  You need to know.  That's why --

2          THE COURT:  Getting him in trouble or prevent him

3  from carrying a firearm?

4          MR. SCHMUTTER:  That's what I meant.  In other words,

5  that's going to prevent him -- divest him of his constitutional

6  right.  If you look at how --

7          THE COURT:  But there's a give-and-take.  There's a

8  back-and-forth in this legislation.  There's an appeal process;

9  you agree with that?

10          MR. SCHMUTTER:  There is an appeal process.

11          THE COURT:  Okay.

12          MR. SCHMUTTER:  That's the "tell it to the judge"

13  approach.

14          THE COURT:  But are the plaintiffs really suggesting

15  to this Court that there should not be some sort of gatekeeping

16  function on the part of the police chief?

17          MR. SCHMUTTER:  Correct.  The gatekeeping function is

18  the Legislature.  The Legislature's job is to do that.  And the

19  historical tradition shows that.  It's always categorical.

20  There's never been in the relevant history this ad hoc ability

21  to divest people of the constitutional right to keep and bear

22  arms.

23          THE COURT:  And so help me understand that.  So

24  according to you, the Legislature should be prescient and list

25  out every conceivable scenario, act, or statement that might

1    cause a police chief concern to say to himself or herself:

2    This person should not carry a handgun.  Is that your position?

3            MR. SCHMUTTER:  Our position is that the Legislature

4    needs to spell out enough specificity that a person can know in

5    advance which behaviors and which conduct and which facts will

6    prevent them from exercising their right.  And, in fact, Judge,

7    that's how most of the country works.  Most statutes, most

8    statutes dealing with the right to carry or the right to

9    possession have only enumerated categories.  It's very unusual

10   to do it this way.

11           THE COURT:  So is it a void-for-vagueness challenge

12   that you're bringing?

13           MR. SCHMUTTER:  We're bringing both.  We are bringing

14   a void-for-vagueness challenge.  It's in the case because

15   vagueness, you get both a notice problem and an arbitrary --

16   you know, an unbridled discretion problem.  There's two pieces,

17   two different components.

18           THE COURT:  But if there's a give-and-take and

19   there's an appeal process and the process is taken out of the

20   hands of the police chief and into the hands of a court, what

21   do you say about that?

22           MR. SCHMUTTER:  That doesn't solve the problem,

23   because you still have the notice issue, right?  So once you

24   are litigating whether your denial was valid, it's too late,

25   right?  So you don't have the notice issue of what kinds of

|    |
|----|
| 1  | behaviors actually will divest you.  Because when you look at |
| 2  | legislatures, you look at Congress, right?  You look at |
| 3  | 18 U.S.C. 922(b) and (g), you look at legislatures all over the |
| 4  | country, they take an enumerated approach in almost every |
| 5  | instance.  It's only in sort of the quote-unquote anti-gun |
| 6  | states, like New Jersey, New York and a couple others, that |
| 7  | have these sort of ad hoc, this reservation of an ad hoc |
| 8  | process.  And it's not satisfactory to deprive someone a |
| 9  | constitutional right by simply saying, oh, you can always go to |
| 10 | court, because it's a deterrent -- it is a problem -- |
| 11 |         THE COURT:  But it seems to me that you're asking for |
| 12 | too much, Mr. Schmutter.  It seems to me that you're asking for |
| 13 | a laundry list of disqualifiers so that someone who wants to |
| 14 | carry a handgun knows whether or not he or she should even |
| 15 | bother. |
| 16 |         MR. SCHMUTTER:  That's how it's done almost |
| 17 | everywhere in the country, Judge. |
| 18 |         THE COURT:  A laundry list? |
| 19 |         MR. SCHMUTTER:  Yeah.  Yeah.  Literally in the |
| 20 | statute A, B, C, D.  That's how it's done.  In fact, it's done |
| 21 | in New Jersey, too.  New Jersey has its list of disqualifiers |
| 22 | and then it has these ad hoc additional catch-all categories. |
| 23 | It's the ad hoc additional catch-all categories that are the |
| 24 | problem. |
| 25 |         THE COURT:  All right.  I want further briefing on |

*United States District Court*
*District of New Jersey*

JA3161

 1   that issue.

 2          MR. SCHMUTTER:  Thank you, Judge.

 3          MR. JENSEN:  Can I just finish very briefly?  I

 4   promise I'll be quick.  It was just one point.  With both

 5   Mr. Schmutter and I, there was a great deal of discussion about

 6   sensitive places and the historical analogies, government

 7   functions, security.

 8          What I want to just throw out there was this:  I

 9   think Mr. Schmutter and I, our approaches here are pretty

10   consistent.  There's one distinction here where things are a

11   little bit different.  The statement that we don't intend to

12   cast doubt on longstanding restrictions on carrying firearms in

13   government -- sensitive places such as government buildings and

14   schools.  We're both in agreement that's dicta.  I think the

15   difference is I'm reading that dicta a little stronger than

16   Mr. Schmutter is.  And what I'm reading it is to say that, you

17   know, it may be dicta, but this is dicta the Supreme Court said

18   three times in 14 years, it seems like they're going to get to

19   that end result.  If we --

20          THE COURT:  But the dicta that you're reading is two

21   key components.  One is security is in place.  The second is

22   that there is a governmental/governance issue at play.

23          MR. JENSEN:  Well, how do we get to an end result

24   that says that a restriction in schools is valid if the only

25   factor is whether there is a government function at play?  At

*United States District Court*
*District of New Jersey*

1    least under San Antonio Independent School District, there's no

2    fundamental right to education.  That's not, I don't think,

3    fairly stated to be a governmental function.  So if

4    governmental function was the only criteria, a restriction in

5    schools would not be valid.  And at least, to an extent, I'd

6    say the Supreme Court has indicated pretty clearly, yeah, we're

7    going to uphold a restriction in schools.  So --

8           THE COURT:  I think it's not even debatable.  And how

9    the Supreme Court got there, one can debate.

10          MR. JENSEN:  Well, that's the whole issue though,

11   isn't it?

12          THE COURT:  Well, perhaps it is.  Perhaps it isn't.

13   But I think the Supreme Court was very clear, no guns in

14   schools, period, full stop.  And we can have this academic

15   exercise about whether or not that was right, that was wrong.

16   It's an academic exercise.  The Supreme Court ruled no guns in

17   schools, full stop.  Right?

18          MR. JENSEN:  I'll be sure not to take my gun to a

19   school.

20          THE COURT:  I hope not.

21          MR. JENSEN:  But --

22          THE COURT:  I mean, it's not -- it's not even

23   debatable.

24          MR. JENSEN:  But if it's not even --

25          THE COURT:  Nor should it be.

*United States District Court*
*District of New Jersey*

JA3163

```
 1          MR. JENSEN:  If it's not even debatable, how do we
 2    get from those three historical examples to schools?  And it
 3    has to be more than just governmental function.
 4          THE COURT:  Well, you'll all find out once I get this
 5    off my plate, okay?
 6          MR. JENSEN:  Fair enough.
 7          The other thing that goes along with that is the fact
 8    that children are present, which I took to be a key part of the
 9    Court's prior ruling, doesn't really factor into this because
10    however you were drawing these analogistic lines, I don't see
11    how the presence of children bears on this.
12          THE COURT:  Well, I think that it's a fair -- I think
13    that is a question that has been raised by any academicians as
14    well as others.  Was that in the mind of the Supreme Court?
15    There have been many who have written of it.  It's a question.
16    It's a question that the Supreme Court will have to answer.  We
17    all recognize that.
18          MR. JENSEN:  Yeah.
19          THE COURT:  We all recognize that Bruen has left open
20    some issues.  It is for the lower courts to figure them out as
21    best we can.  But I think we can all agree, we are waiting for
22    the Supreme Court.
23          MR. JENSEN:  We're waiting for the Supreme Court, but
24    we need to do our best job of using predictive judgment to try
25    to get the right result.
```

*United States District Court*
*District of New Jersey*

JA3164

```
 1              THE COURT:  100 percent.
 2              MR. JENSEN:  And that's why I'm trying to nurse this
 3    discussion in the direction of we've got three examples, we've
 4    got two inconclusions.  How do we get from those examples to
 5    those conclusions?  And that's it.  Thank you for indulging the
 6    additional time.
 7              THE COURT:  Ms. Cai, you've waited very patiently.
 8    So I would like you to respond to anything that you have heard
 9    here today and then I do have, as I promised, a series of
10    questions for you.
11              MS. CAI:  Of course, Your Honor.  And let me just set
12    the stage organizationally.
13              THE COURT:  Yes.
14              MS. CAI:  I think there will be a pretty clean
15    division between me and Ms. Reilly as well as Mr. Kologi.  So I
16    am going to speak on the challenges to the place-based
17    restrictions, so basically parts 1 and 2 of our brief, and
18    those arguments raised today as well as in the reply briefs.
19              Ms. Reilly will address the vagueness challenges, the
20    insurance challenges, permitting challenges, and the equal
21    protection exemption challenges.
22              THE COURT:  Okay.
23              MS. CAI:  So those other sections, and Mr. Kologi of
24    course will speak for the Legislature.
25              If Your Honor wants to go in a certain order, I'm
```

*United States District Court*
*District of New Jersey*

JA3165

 1   happy to do that.  And what I did want to do today is, you

 2   know, there's already been a lot of discussion, what I want to

 3   do is focus on the merits.  And I want to focus on new points

 4   either raised today or in the reply briefs because of course

 5   Your Honor already has our submissions.

 6          And this is the order I want to go in, but I'm happy

 7   to change that order.  The first is just, you know, what does

 8   *Bruen* direct us to do, some big-picture observations, which

 9   both Mr. Jensen and Mr. Schmutter spent a lot of time on, I

10   want to respond to that.

11          Two, I want to highlight a few provisions,

12   place-specific provisions.  I'm happy to talk about any

13   provision that Your Honor wants to talk about, but I did want

14   to highlight public assemblies, parks and zoos, hospitals and

15   casinos.

16          THE COURT:  Transportation hubs; we'll get to that.

17          MS. CAI:  All right.  I'll add that to the list.

18          And that will relate to the third thing I want to

19   talk about which didn't -- well, it came up a little bit today,

20   but we did want to respond to their arguments about the

21   government-as-proprietor or government-as-market-participant

22   doctrines.  I did want to talk a little bit about the private

23   property rule, but mostly so that I can get some documentary

24   responsive evidence into the record.

25          Finally, a quick response on the objection to the use

 1   of experts, and maybe a word or two on the scope of any

 2   injunction.  That's what I plan to do today.  And I'm happy to

 3   answer Your Honor's questions as they come or, you know, at the

 4   end or whatever it is.  And of course then Ms. Reilly will

 5   present on the other issues, and Mr. Kologi will speak on

 6   behalf of the presiding officers.

 7          All right.  So let's get to it.  On the merits, I

 8   want to make a couple of points that we want to highlight for

 9   the Court's consideration.  For what is *Bruen* asking for?  It's

10   asking for historical evidence of what the people understood

11   the Second Amendment allowed.  That's the point of the

12   historical analogy.  And that's what all of the cases that have

13   taken *Bruen*, including the Eleventh Circuit case *NRA vs. Bondi*

14   is trying to do.  And I think on that we do agree.  But how to

15   do that analysis I think is an important one.

16          And I want to start with something that plaintiffs

17   talk about in their brief but don't talk about today, which is

18   what to do with the absence of analogs at a particular point in

19   time when there is the existence of analogs at other points in

20   time.

21          And so generally speaking, this is really just about

22   burden of proof and what's enough to evaluate that under the

23   *Bruen* test.

24          So I want to highlight what *Bruen* actually said.  It

25   said that what matters for adjudicating Second Amendment cases

```
 1   is, as in all cases, party burdens.  In footnote 6 of the
 2   majority opinion, the Court said:  "Courts are thus entitled to
 3   decide a case based on the historical record compiled by the
 4   parties."
 5           Here, the State has compiled a large historical
 6   record in support of its position.  We've amply met, I think,
 7   the burden of production with respect to historical documents
 8   and expert declarations that provide historical contextual
 9   facts.  Against this, the plaintiffs haven't offered
10   counteracting historical evidence.  They do nitpick at specific
11   pieces of evidence, but they haven't come up with here's an
12   example of a similar restriction that either the populous
13   thought was unconstitutional, that the courts held were
14   unconstitutional, or was very quickly abrogated by a later
15   Legislature either on the basis that it was unconstitutional or
16   invalid in some way.  And so --
17           THE COURT:  That's because they can't find
18   restrictions.
19           MS. CAI:  Right.  But I think that's key because why
20   at any given point in time restrictions may be lacking is not
21   necessarily constitutional evidence.  So let me give you an
22   example.
23           I am unaware of -- and perhaps there is and we just
24   haven't found it yet -- historical evidence of New Jersey
25   banning firearms specifically at ballrooms.  That is true.  We
```

 1    have evidence of other states or other jurisdictions doing so

 2    but not New Jersey.  But what does that mean, right?

 3              I think if you think about what everyone agrees on is

 4    in 1791 through 1868, the Second Amendment did not apply to New

 5    Jersey.  It only applied against the federal government.  There

 6    is no New Jersey constitutional provision on an individual

 7    right to bear arms at the time.  And so the State's lack of

 8    restriction on firearms is almost certainly not because it was

 9    concerned about the Second Amendment because that didn't even

10    exist.  The lack of an analog is most likely the product of

11    policy.  So the State doesn't regulate any number of things

12    because it doesn't see a policy problem, perhaps because it

13    doesn't notice the policy problem.  That is true sometimes.  Or

14    because people have not behaved in such a manner to create a

15    policy problem.  So the absence of analogs at any given point

16    in time by itself is not counterfactual or countervailing

17    evidence against what we presented.

18              And so at no point does the plaintiffs -- do the

19    plaintiffs bring what the *Bruen* Court had, which is New York

20    provided historical evidence and the Court said actually courts

21    interpreting that evidence at the time did not think that that

22    regulation was actually constitutional, or it did not believe

23    that that regulation actually covered what you think it covers.

24    That is lacking here in most respects.  And I think that's

25    really important in terms of what *Bruen* says the burdens of the

*United States District Court*
*District of New Jersey*

JA3169

```
 1    parties have to be.  And it's not different than in any other,

 2    you know, litigation where you provide fact evidence.

 3              THE COURT:  So you make some fair points.  But it

 4    seems to me that you're sort of sweeping over the principle

 5    that the lack of evidence itself can stand for the proposition

 6    that the restriction is unconstitutional.

 7              MS. CAI:  So I think it depends, Your Honor.  So if

 8    there is a lack of evidence because the location -- we're

 9    talking about locations here, not types of guns.  If the

10    location simply didn't exist until the 20th century, there

11    couldn't possibly be that kind of exact kind of analogy.

12              The other thing is if the location technically

13    existed but the way in which people interacted at that location

14    was so different, right?  So we give the example of mental

15    health and addiction treatment centers.  Historically they were

16    more in the form of incarceration than voluntary treatment, and

17    so there's no such analog, even though the place literally did

18    exist in the exact same way.  Ben Franklin's library did exist,

19    but it's not a place where general members of the public and

20    children went to spend time to learn, right?  And so that's the

21    kind of analysis and nuance that we need.

22              And the second is, I think it's one thing if there

23    were no examples whatsoever.  That might be, you know, one of

24    the things a court would want to consider.  What we have here

25    certainly for at least several of the provisions, and I think,
```

```
 1    you know, almost all of them, is more nearly identical
 2    historical regulations that were then upheld by the state
 3    courts evaluating them at the relevant time -- and I'll talk
 4    about that in a second -- as well as historical evidence from
 5    other contexts, such as legal commentators and treatises,
 6    historical newspapers, discussing them as entirely valid and
 7    uncontroversial.  So I think we have to take all of that into
 8    context.  And so that was point one.
 9            Point two is what is the kind of analogizing the
10    level of specificity that we're doing here?  I think it's
11    interesting because what I heard from the plaintiffs are a
12    couple of things and I just want to state the State's position
13    on them.  The first is the line about government and schools
14    being presumptively constitutional regulations, just dicta or
15    not.  I'm actually not sure who thinks it's dicta and who
16    doesn't.  It's not dicta, and I think Mr. Schmutter said in
17    Bruen it wasn't dicta.  But whatever the analysis is, it was
18    repeated three times, right.  It started in Heller, which
19    evaluated the historical tradition.  It was repeated in
20    McDonald in a very specific manner.  At page 786 of McDonald --
21            THE COURT:  Are we talking about guns in schools?
22            MS. CAI:  This is government buildings and schools,
23    that line in general.
24            THE COURT:  Okay.
25            MS. CAI:  And so in McDonald, the Court said we are
```

1    reassuring the states that just because we're now recognizing

2    the incorporation of the Second Amendment against states, we're

3    not -- that does not disturb what we said in *Heller*, which is

4    that regulations at government buildings and schools are

5    presumptively constitutional, and then it was said again in

6    *Bruen*.

7              So I think it's one thing if it's a stray line in one

8    decision, right?  But the Court's commitment to that makes it

9    much less -- much stronger than mere dicta.  And I think even

10   if you agree with Mr. Jensen that the Court was just looking at

11   the historical record on an issue that wasn't squarely before

12   it yet, I think what you would still have to look at is how the

13   Court would be applying its own stated test for how to do

14   historical analysis.  And from there, there are a few

15   observations that I think are worth making.

16             The first is that there is now I think no dispute

17   that the record that the Supreme Court was looking at was not

18   terribly fleshed out.  It was two sources.  It was an amicus

19   brief and the Kopel and Greenlee article.  And I don't think

20   there's any difference in terms of what they presented.  And

21   the Kopel and Greenlee article we don't think is a

22   comprehensive view of what is out there certainly on all

23   sensitive places.  But I don't know if we've come up with any

24   other legislative assemblies, for example, that ban firearms

25   than the two that Kopel and Greenlee identify.

1          On that specific record the Court specifically cited,

2     it could draw the conclusion definitively three times that

3     legislative assemblies are presumptively constitutional.  And

4     it is true that Kopel and Greenlee didn't find any historical

5     evidence on schools.  I think there actually are some, but

6     that's of course not before this Court.  Nonetheless that's not

7     the point.  The point is, what is the Court doing when it does

8     the historical analogy test?  And I think it does what it said

9     it did.  You're looking for evidence of a historical tradition

10    at the relevant time that was longstanding and unchallenged,

11    and that's exactly what we presented to this Court.

12          Now, I do want to make an observation about how --

13    what I think is a contradiction in what the plaintiffs have

14    been saying but it became crystallized today, and that is what

15    level of abrogation you can do.

16          So Mr. Jensen has always said that their position is

17    that if there is high levels of security at a particular

18    location, and he pointed to this courtroom as an example, and

19    perhaps there were others, that is one basis for which you can

20    analogize.  And so if you had, you know, a ton of security at

21    schools -- I think he alluded to that.  I don't actually think

22    most schools have that level of security -- but if you did,

23    then perhaps that would go in favor of that justification.

24          We don't agree with that as the actual justification,

25    but just running with that idea for a second, that's an

 1    aggregation, right?  That is taking something that may or may

 2    not have existed in the historical record based on a principle

 3    and applying it analogically to other locations.  And so I

 4    think that is what *Bruen* is asking for.  And I agree with the

 5    more philosophical or the underlying methodology that

 6    Mr. Jensen was pointing out there.  But I think what's

 7    interesting is how they pick and choose what they want to

 8    analogize and what they don't.

 9            So, for example, Mr. Jensen read to you the Statute

10    of Northampton, specifically the provision -- and I may not

11    have every single word here.  I was just writing it down, but

12    that a person cannot go ride armed by day -- by night or day in

13    fairs, markets, nor in the presence of justices and ministers.

14    He highlights how the last part about justices and ministers is

15    the basis for restriction -- sensitive places restriction at

16    courthouses.  Perhaps that's so.  We're fine with that.  That

17    may be so, and there may be other justifications.  That

18    challenge is not before us.

19            But what he wants to read out of that very sentence

20    is where it also says one cannot go ride by night or day in

21    fairs and markets.  And so you can't have it both ways.  You

22    can't rely on the Statute of Northampton for the provision of

23    courthouses but then you read out the fairs and markets

24    language.

25            THE COURT:  Well, but in fairness, I think the State

1    is guilty of the same sin, if you will, because the State seems

2    to ignore the "in terrorem" language.

3           MS. CAI:  We can discuss what that means.  I think

4    the State's position is that additional historical evidence

5    that the *Bruen* court did not consider demonstrates that the

6    words "in terrorem," in terrorem of the people or in terrorem

7    of the county, is not a qualifier on the way in which a person

8    is behaving, but rather the act of carrying in those places

9    would be in terrorem of the county.

10          Now, that's an open debate, right?  I agree with Your

11   Honor that that is something that you'd have to look at the

12   history and interpret what that means, and that's very

13   important.  That's just our position on that.  But I don't

14   think there's a way to read "in the presence of justices and

15   ministers" as applying legitimately to restrictions at

16   courthouses and reading out of the very same statute fairs and

17   markets which all were collected together.

18          All right.  So one last question, and I don't think

19   the Court needs to resolve this question, but the plaintiffs

20   talk about it a lot so I do want to address it and put a couple

21   points into the record is the time frame analysis.

22          I find it interesting that Mr. Schmutter cites

23   *NRA vs. Bondi* for the opposite conclusion that the Eleventh

24   Circuit made, but I'll put that aside for one second, which is

25   it would be one thing if there was countervailing evidence that

1   the Founding generation saw certain sensitive place

2   restrictions as unconstitutional and then that changed in 1868.

3   Then you would have a conflict between those two

4   interpretations and then the question would be which

5   interpretation matters.  I agree with that.  That's not what we

6   have here.  You have -- we say -- I mean, we do have evidence,

7   and I understand that Your Honor is not necessarily persuaded,

8   but, you know, we think it's persuasive, that the English

9   common law tradition had been incorporated into certainly the

10  common law of states as well as the statutes of states in terms

11  of the Statute of Northampton and what it prohibited even at

12  the Founding era.  Certainly on the private property rule,

13  there were specific statutes, and I'll get to that later.

14          But even if Your Honor did not agree, all there would

15  be would be the absence of analogs at the Founding and then the

16  presence of many analogs in the Reconstruction period beginning

17  in the 1860s.  And, in fact, what you saw was like a -- I want

18  to say resurgence, but that's not the quite right word -- a

19  move to adopt more sensitive place restrictions precisely at

20  the moment when the states ratify the Fourteenth Amendment.

21  And so it would be very strange, I think, for states to

22  understand this is now incorporated against us, which cases

23  like *English versus Texas* do recognize, and now we're adopting

24  additional regulations and we're interpreting them to be

25  constitutional, if that was all incorrect.

*United States District Court*
*District of New Jersey*

JA3176

1        But I think one thing that plaintiffs cite that I

2    think actually makes this point very well is the *Gamble* case,

3    which the Koons plaintiffs cite.  And there, you know, it's a

4    case -- the case is about double jeopardy, but the key is that

5    the Court declined to overrule the longstanding dual

6    sovereignty doctrine in interpreting the double jeopardy

7    clause, but it interpreted 19th century evidence.  Why did it

8    do that?

9        Justice Thomas pointed out in his concurrence that

10    the reason there were few Founding era examples of dual

11    sovereignty prosecutions is not because it was believed to be

12    unconstitutional, rather he said:  "The Founding generation saw

13    very limited potential for overlapping prosecutions by the

14    states and the federal governments.  Thus, the founders,

15    therefore, had no reason to address the double jeopardy

16    question that the court resolves today."

17        I submit to you this is the exact same situation

18    we're in, especially as to places like airports, train

19    stations, public libraries, zoos, recreational parks, casinos,

20    hospitals.  And I think that's important for how to resolve a

21    situation like today.  You would look at the methodology that

22    the *Gamble* Court used, which is to look at cases on the double

23    jeopardy clause from 1847, 1850, 1852, and then 1922 as

24    "cementing the foundation laid by those prior 19th century

25    cases."

*United States District Court*
*District of New Jersey*

1    If this Court sees a conflict between actual evidence

2    at the Founding and evidence at Reconstruction, I want to make

3    one clarification.  We don't think and we couldn't think that

4    the Second Amendment means different things against the federal

5    or state government.  That is foreclosed by Supreme Court

6    precedent.  But our argument is not that.  Our argument, which

7    is also the same position advanced by many leading

8    constitutional scholars, the only ones that the *Bruen* court

9    cited is when states adopted or ratified the

10   Fourteenth Amendment so that the Second Amendment incorporated

11   against them.  The Second Amendment took on the meaning and

12   took on the meaning that the states understood at the time such

13   that whatever conflict there was with the 1791 meaning had

14   changed, and so the same meaning now applies against everybody,

15   the states and the federal government.

16   And as the *Bondi* Court explained, the opposite rule

17   would be illogical.  And what the Court said, it said it makes

18   no sense to suggest that the states would have bound themselves

19   to an understanding of the Bill of Rights that they did not

20   share when they ratified the Fourteenth Amendment.

21   And I'll give you an example outside of the Second

22   Amendment context that I think makes this fairly clear.  And

23   this is from the Amar book that we cite in our brief, although

24   in a slightly different section.  I can send Your Honor the

25   pages.  The right to petition government under the First

1    Amendment obviously existed since the Founding, but it was

2    thought of as a political right of people who held the right to

3    vote and, you know, the participated democracy at that time.

4            By 1866, however, the right was seen to cover more

5    than just those individuals, white male voters.  It was seen to

6    cover the right of nonvoters, specifically women, to petition

7    the government for representation.

8            Obviously today, we don't look to the right to

9    petition as defined by the 1791 meaning.  We look to it as

10   found by the 1860 meaning, to encompass those who do not have a

11   right to vote.  That's just another -- I mean, there are other

12   examples like that, but that one I think is relatively

13   uncontroversial.

14           And so if it's the case that the Founding generation

15   saw sensitive place restrictions at public assemblies as

16   unconstitutional and then in 1868 and onwards the state saw it

17   as constitutional, you wouldn't be going into this analysis.

18   We don't have that here.  Instead what you have is a

19   longstanding tradition beginning with really British common law

20   but certainly lasting through and invigorated by the states

21   during the critical Reconstruction period when, you know, the

22   relationship between states and federal governments changed in

23   a way that still exists today.

24           Okay.  So that's the three big-picture observations I

25   had about *Bruen*.  And now I just want to discuss the specific

1    provisions.  And since we are on the topic of public

2    assemblies, I'll start there.

3         What's very interesting from what Mr. Jensen talked

4    about is, in addition to security, one of the other things that

5    Your Honor and Mr. Jensen were talking about is whether or not

6    a place-based restriction would be constitutional if the place

7    was used for governance.  And it's not clear to me there's

8    anything in the historical record supporting that governance as

9    the rationale, but there is historical evidence for supporting

10   the idea of exercising other constitutional rights as a

11   rationale for why a place-based restriction would occur.

12        And so that comes from some of the cases that we've

13   cited to this Court, including cases like *Andrews*, the

14   *Tennessee* case, and the *Shelby* case.  But backing up for a

15   second, in terms of what we've actually provided to this Court,

16   we've cited examples of eight different jurisdictions that

17   enacted firearms restrictions specifically on public assemblies

18   and gatherings.  Some of these are one-for-one analogs.  They

19   literally say public gatherings or public assemblies in the

20   same way.

21        And as we noted in our brief, these restrictions are

22   nothing new because English common law and statutes prohibited

23   armed assemblies as well, and this is well supported by the

24   historical evidence in the Charles declaration.  And what's

25   telling about these statutory restrictions is that as soon as

*United States District Court*
*District of New Jersey*

JA3180

 1    the laws were enacted, the courts uniformly upheld them.  And

 2    that is precisely the kind of evidence that the *Bruen* Court

 3    says is particularly helpful.

 4            THE COURT:  Along those lines, the State cites laws,

 5    ordinances, primarily from southern states, some Midwest

 6    states.  Is it your position that that is representative of the

 7    nation?

 8            MS. CAI:  It is, Your Honor.  And I have two points

 9    to make on that.  The fact that some states in a geographic

10    region tended to see a policy problem arise such that they

11    wanted to respond to it is a matter of policy, right?  I don't

12    think there's any understanding that northern states and

13    southern states understood the right to bear arms differently,

14    especially for the ones that had similar state constitutions.

15    And I don't think there's any reason to discount analogs,

16    especially when they were -- it would be one thing if you

17    thought that the analogs were justified or sorry, were

18    motivated by some kind of animus or tradition that we didn't

19    believe anymore.  That's an open question of whether or not

20    those analogs are equally applicable.

21            The analogs that we're citing from the Reconstruction

22    period, as the Rivas declaration makes very clear -- and she is

23    an expert on Reconstruction Texas firearm law, so it's really

24    hard to get any better than that -- is that this was the

25    response of radical Reconstruction Republican government trying

```
 1    to provide safety for freed people exercising their right to
 2    just be around the world.  And so that's why they started
 3    enacting these restrictions.  And perhaps those were
 4    controversial as a policy matter at the time, but they were
 5    certainly held to be constitutional.  And even when the
 6    Republicans left office in Texas, those laws remained on the
 7    books.
 8              And so I heard -- I don't remember which brief it
 9    was, but one of the reply briefs made the argument that because
10    Texas and Missouri were western states, that we should discount
11    those.  I mean, I haven't -- I'm not an expert in history, but
12    this is sort of a high school level understanding, Missouri's
13    joining of the union and Texas's joining of the union were
14    pivotal moments in understanding why we fought the Civil War,
15    why all of this happened in the first place.  So I don't think
16    you can discount them just because they were to the west of
17    some other states and in the south.
18              And it would be one thing if the territorial laws, of
19    which we cite very few, were the only evidence, right?  I would
20    understand if, you know, the Yukon -- or not Yukon territory,
21    because that's not in the United States, but some territory at
22    one time had a statute that no other state adopted, that would
23    be shaky evidence; not dispositive, but shaky.  We don't have
24    that here.
25              When we cite territorial laws, those are just
```

 1  demonstrating the breadth of the tradition; that it began in
 2  states and other places that wanted to become states, were
 3  about to become states, also adopted the same regulations.

 4        And so I think the final thing I wanted to note is
 5  that even the security rationale I think would justify banning
 6  guns at public assemblies and demonstrations because we only
 7  restrict firearms carry when they're permitted public
 8  assemblies and demonstrations, right?  It's things that the
 9  government has advanced notice of.  The whole point of the
10  permit process is so the government can manage the security
11  around a big rally or a big protest.  And so I think that is a
12  very direct example of why the security justification would
13  also apply to this situation.

14        And so to the extent the State is providing security
15  of the people gathered there to exercise one of their most
16  fundamental rights to public assembly and public speech, I
17  think that very well is the same kind of rationale that
18  Mr. Jensen is using to justify or to say that the Supreme
19  Court's decisions in *Heller, McDonald*, and *Bruen*, when it said
20  that constitutional restrictions on government buildings are
21  constitutional.  So that's public assemblies.

22        The next I wanted to talk about is parks and zoos.
23  And the analytical link there is the earliest relevant versions
24  of historical zoos were all in parks.  And, in fact, the
25  earliest zoos were in the earliest recreational parks, so the

```
 1    historical evidence is the same.
 2              THE COURT:  Can I back up for a second?  So what's
 3    your position on public gatherings outdoors where there's no
 4    metal detectors?
 5              MS. CAI:  Yeah, I don't think you need metal
 6    detectors, right?  So security is not -- I don't think the
 7    founders had metal detectors when they enacted some of those
 8    restrictions at public assemblies in Maryland, for example.
 9    That's not quite the same.
10              THE COURT:  But how do I get there with this
11    legislation, because it restricts public assemblies?  It
12    doesn't say public assemblies where the government is providing
13    security.  It doesn't say -- none of these restrictions say
14    "where the State is providing security."  So help me understand
15    how I get there.
16              MS. CAI:  Your Honor, the permitting process, right,
17    puts the government on notice that a gathering of some size is
18    happening.
19              THE COURT:  Okay.
20              MS. CAI:  And the point of that is to respond to
21    security concerns at those gatherings.  And so it may not be
22    possible --
23              THE COURT:  But you're not standing here before me
24    saying -- I don't think you are -- that once there is a
25    gathering for which a permit is required, that the State will
```

```
 1    guarantee that it will secure the gathering?

 2              MS. CAI:  Of course not.  But the State is now on

 3    notice that a gathering is occurring.  And depending on the

 4    number of people and the kind of gathering it is will calibrate

 5    how much security and law enforcement to be there as a backup

 6    for if anything happens.

 7              And so I don't know if there's any support in the

 8    record that the level of security provided at legislative

 9    assemblies, polling places, or courthouses is what the

10    historical analysis turned on.  There's no --

11              THE COURT:  No.  But I think you've got a *Bruen*

12    problem, because that's exactly what the Court talked about;

13    that the State can't get up and say -- because they gave the

14    example of Manhattan, you got police everywhere.

15              MS. CAI:  Of course.

16              THE COURT:  And so if you're going to have a

17    gathering at Times Square and the State is going to take the

18    position, well, you got police everywhere, they're on the

19    lookout, I think *Bruen* squarely rejected that.

20              MS. CAI:  And we're not saying --

21              THE COURT:  How do you get around that?

22              MS. CAI:  We're not saying that all of Jersey City,

23    all of Camden is a sensitive place.  That's not what we're

24    saying at all.  But of course, *Bruen* recognized that some

25    government-provided security specifically for that location --
```

*United States District Court*
*District of New Jersey*

JA3185

1 and I don't mean all police officers in Camden protect Camden.

2 I mean for the very location and the very activity that's going

3 on there --

4        THE COURT:  I.e., the polling place and the

5 courthouse?

6        MS. CAI:  You know, Your Honor, polling places

7 actually, you know, there's no armed security at polling places

8 by law in New Jersey and many other states.  So I don't think

9 it turns -- I don't think it turns on that.  And so we're

10 talking about something that I think is not really the

11 justification.  It's just an alternative argument.

12        THE COURT:  No.  But I think --

13        MS. CAI:  But I think it's interesting because I

14 think it may help some places that don't have other

15 justifications that are analogically relevant, right?

16        So I suppose one could argue that if the security

17 provided is analogous to what the historical level of security

18 was provided at legislative assemblies, polling places, again,

19 that would be a very deep historical analysis that I

20 acknowledge no party has submitted to the Court on what level

21 of security was provided at these locations.  That's why I

22 don't think that's actually the justification.  It has to be

23 what I think comes from the language of the statutes that we're

24 citing, right?  What they're concerned about is both places

25 where volatile conditions could occur, because the statutes

*United States District Court*
*District of New Jersey*

JA3186

 1    from Texas and Missouri and Tennessee, they all looked at
 2    places where people are gathered socially and/or in some kind
 3    of assembly in that meaning.
 4            And also they were especially concerned about places
 5    where those gatherings were for all purposes but also
 6    especially for educational, literary, and scientific purposes
 7    and social purposes.
 8            So you can think and draw some lines for why those
 9    things were singled out as especially important.  But we would
10    submit to you that the thing that matters for drawing the
11    analogy in this case is the exercise of constitutional rights.
12    And so just as it is so important that when people go to vote,
13    they are not intimidated by the presence of guns.  When they go
14    to participate in petitioning the government and to seek
15    redress for grievances at the courthouses, that the same is
16    true.  When they go and participate in democracy by attending
17    legislative assemblies, that is the same rationale that applies
18    to when people go and protest or gather to express their
19    freedom of speech.
20            All right.  So parks and zoos.  All I want to say
21    here is that the level of even if we were going with a
22    numerosity standard, which we don't agree is what *Bruen* calls
23    for, the State has provided nearly 30 state and local firearms
24    prohibitions.  I actually have now become aware of more.  But I
25    don't think the difference is going to turn on 30 versus 40.

*United States District Court*
*District of New Jersey*

 1    So we can submit that to the Court if Your Honor wants, but

 2    that's kind of not the point, right?

 3            The point is that the most prominent recreational

 4    parks in America at the time and today, Central Park and

 5    Fairmount Park, when they opened, prohibited firearms

 6    immediately, and other parks followed thereafter.  When

 7    national parks first became a thing in the late 19th and early

 8    20th century, they did the same.  And that spans big cities as

 9    Your Honor noted in your TRO Opinion and also smaller towns

10    like Springfield, Massachusetts and some of the other towns

11    that we've cited.  And plaintiffs have nothing to refute this

12    evidence.

13            Instead, they cite to laws regulating firearm

14    discharge at public squares and commons in the Colonial era.

15    So it's not clear to me why more restrictions or other

16    restrictions at other places somehow discount restrictions that

17    were also adopted at other places.  That doesn't really

18    logically make sense to me.  But I think what's also key is

19    that the very language of the 18th century statutes they cite

20    don't say "parks."  Instead they group things like "greens"

21    with streets, alleys or lanes.

22            And so under the doctrine -- I can never pronounce

23    this right -- noscitur a sociis, or something like that, things

24    generally take on the meaning of the list that they're a part

25    of, these statutes clearly indicate that there's a difference

 1    between recreational parks and the proverbial Boston common

 2    town square that you would stroll through on your way to

 3    something else.

 4              And that's true in Mr. Jensen's Exhibit 19.  The 1789

 5    Rhode Island statute that says no shooting guns in or across

 6    any road, street, square or lane.  I don't think that means

 7    that historically firearm restrictions at large parks would be

 8    prohibited just because they only restricted discharge in the

 9    lane that you -- or the square on the lane that you're walking

10    through.  And our evidence shows the concept of a park was

11    defined to be different from a town square.  That was the whole

12    point that parks became a thing in the 19th century.  And so

13    Exhibit 50 has the progenitor of Central Park and Prospect Park

14    and many other parks, Frederick Law Olmsted explaining that

15    parks were created to be a contrast to the town square.

16              THE COURT:  You can have firearms in national parks

17    now, can't you?

18              MS. CAI:  Your Honor, I don't know the answer to

19    that.

20              THE COURT:  I think you can.

21              MS. CAI:  And it may depend on the location and the

22    specifics, but that's also what Chapter 131 does.  It provides

23    for the specific regulator of the park to set rules for what

24    parks are off limits and what are not.

25              Let me just remind myself of where else I'm going

1    next.  Hospitals.  Okay.

2              THE COURT:  I think the law is, is that it depends if

3    the national park is located in a state which allows firearms,

4    then you can.  And you don't -- well, okay.

5              MS. CAI:  Right.  But I guess, Your Honor, to that,

6    we don't look to the current policy decisions, right, and that

7    there could be policy decisions there.  What matters is when

8    they were created, and we have an exhibit showing the policies

9    at that time.

10             THE COURT:  Yes.

11             MS. CAI:  Okay.  Hospitals, I did want to get to

12   because there is a difference in terms of what has been alleged

13   before and now at least in terms of standing.

14             THE COURT:  I think we can pass by hospitals.

15             MS. CAI:  Okay, Your Honor.  I just -- okay.

16             So casinos, I don't actually want to spend too much

17   time on this, except Mr. Jensen -- or Mr. Schmutter filed a

18   number of items on the docket last night that I do want to --

19             THE COURT:  So here's my question on casinos.

20             MS. CAI:  Yes.

21             THE COURT:  If an individual, if a plaintiff with a

22   concealed carry permit walks into the Tropicana, is the State

23   going to prosecute him for trespassing or for a violation of

24   A18?

25             MS. CAI:  Currently, Your Honor, because of your

*United States District Court*
*District of New Jersey*

JA3190

```
 1  injunction, trespassing.

 2           THE COURT:  Okay.  And if the injunction does not

 3  issue?

 4           MS. CAI:  I think it -- well, if the injunction does

 5  not issue but the casino also maintains its current rules, I

 6  think you could do either.

 7           THE COURT:  Okay.

 8           MS. CAI:  Now let me give you another example that

 9  may be clarifying.  If the injunction is in place --

10           THE COURT:  Yes.

11           MS. CAI:  -- and the Tropicana says actually we are

12  not prohibiting firearms, the State would not be prosecuting

13  just the presence of firearms at the Tropicana.

14           THE COURT:  Try that again.

15           MS. CAI:  So if Your Honor's injunction stands, and

16  let's say the Tropicana -- I'm not saying they will, but, you

17  know, if they decide we changed our mind, we're changing our

18  policy to say firearms allowed, the State would not be

19  prosecuting someone from carrying a handgun into the Tropicana

20  in that instance.  Because the injunction on Chapter 131 would

21  be in place so there is no --

22           THE COURT:  No.  I want you to assume this Court has

23  had no involvement in this case.

24           MS. CAI:  Okay.

25           THE COURT:  A18 is on the books.
```

*United States District Court*
*District of New Jersey*

JA3191

1          MS. CAI:  Okay.  So first, the DGE regulations that

2    have existed since 1970 already prohibited this.  So whether

3    it's that or A18, that would be the thing.

4          THE COURT:  Is the State going to prosecute on the

5    A18?  If Mr. Koons walks into the Tropicana with a firearm, is

6    he getting prosecuted under A18?

7          MS. CAI:  Let me ask you a question about what the

8    other relevant fact, which is has the Tropicana in your

9    hypothetical, Your Honor, also prohibited firearms?

10          THE COURT:  Let's answer that -- how about I answer

11    that with a question or answer it with let's assume -- let's

12    take it one by one.  The Tropicana doesn't take a position.

13    A18 is on the books, okay, and Mr. Koons walks in with his

14    firearm, is the State prosecuting him?

15          MS. CAI:  Yes.

16          THE COURT:  Okay.

17          MS. CAI:  Unless he's a law enforcement officer or

18    other exemption carrier.

19          THE COURT:  The Tropicana says no firearms allowed,

20    A18 is on the books.  When Mr. Koons walks into the casino, is

21    he getting prosecuted for trespassing or A18?

22          MS. CAI:  It could be either, Your Honor.

23          THE COURT:  Okay.  And then I guess the third

24    scenario is -- I'll leave it at that.

25          MS. CAI:  Okay.  So what I wanted to make clear on

```
 1    the record is that Mr. Schmutter appears to acknowledge that

 2    the casino's independent choice in February to ban firearms

 3    dooms their application for a PI.  Instead, he files --

 4             THE COURT:  Well, no, I don't think so.  I think he

 5    basically has said that the individual casino owners are in

 6    cahoots with the State.

 7             MS. CAI:  Right.  But that's why he's trying to say

 8    that.  And I'm just trying to clarify to Your Honor that that

 9    is absolutely not true.

10             THE COURT:  Okay.

11             MS. CAI:  So number one, the DGE director never

12    directed the casinos to ban firearms in any way, shape or form.

13    And I say that as an officer of the court.  No evidence

14    suggests that.

15             THE COURT:  Well, they certainly were communicating

16    with each other; we can agree on that.

17             MS. CAI:  What the evidence shows, yes, is that there

18    was communication.

19             THE COURT:  And the State was certainly very curious

20    what the casinos were doing.

21             MS. CAI:  Yes.  And that's very important.  And

22    that's what I wanted to address.

23             The DGE director inquired as to what decisions the

24    casinos had made and what the association was going to announce

25    and when it was going to announce it.  That's highly relevant
```

 1   to the law enforcement's ability to enforce security

 2   appropriately and to understand the security posture at the

 3   casinos.

 4           There are a lot of -- there are a lot of

 5   responsibilities at the casinos from law enforcement that's

 6   divided up between different branches of the Attorney General's

 7   Office as well as local law enforcement in Atlantic City, and

 8   they need to know whether firearms are going to be allowed

 9   inside casinos or not so that if there is an incident, they

10   know how to respond.  And that's especially true in February

11   when Super Bowl weekend was coming up and there's more

12   activity.  I don't have anything to show for that.  But I think

13   it's a commonly known fact that sports wagering goes up in the

14   casinos around that time.

15           And the timing of the casinos' decisions,

16   Mr. Schmutter was trying to cast aspersions on that.  It's

17   obviously because they needed to make a decision in response to

18   this Court's January 30th injunction which for the first time

19   in about 50 years restricted firearms at casinos -- or lifted

20   the restrictions on firearms at casinos.  And so the fact that

21   they made the decision in that time period is an obvious

22   reaction to the reality they're facing.

23           And what the documents that Mr. Schmutter submitted

24   shows is that after the casinos had already made that decision,

25   the casino association, which is just a trade association that

 1    the DGE does not regulate, told the DGE that it was going to

 2    publicize that information, and the email shows the director

 3    was asking whether that has happened yet, the publicization.

 4    And he was sent just a final copy of the press release.  That's

 5    all.  And so --

 6              THE COURT:  I don't think we really need to belabor

 7    the record.  I don't know that it's really relevant.  I think

 8    that Mr. Schmutter raises an interesting issue as to really the

 9    back-and-forth between the casino commission and the State.

10    It's an interesting issue.  It's not one I don't think that

11    this Court needs to resolve once I have now understood that the

12    State retains the discretion whether to prosecute under

13    trespassing or A18.  I think it really -- that resolves the

14    issue of standing, so I think we can move on.

15              MS. CAI:  If I may say one more point on that

16    particular point.

17              THE COURT:  Yes.

18              MS. CAI:  I don't think plaintiffs have alleged that

19    they would be going to the casino with a firearm if they were

20    only going to be facing criminal trespass penalties, but they

21    wouldn't be going if they were facing Chapter 131 penalties.

22              THE COURT:  Well, but I think the issue is that I

23    don't know at what point will the casinos change their mind.  I

24    don't know.

25              MS. CAI:  That's true.

```
 1          THE COURT:  And so none of us do.  I mean, the
 2   casinos may change their mind tomorrow, just like any private
 3   property owner might change his mind or her mind tomorrow.  So
 4   I don't think that the State can stand before me and say
 5   there's no standing because the private property owner has a no
 6   guns sign.  I think we have to presume that that is fluid.
 7          MS. CAI:  Respectfully, Your Honor, I disagree.
 8   Article III requires there to be a present case for
 9   controversy, and right now there is not.  And what it also
10   requires is that even cases that plaintiff cites makes clear
11   that it has to be the cause of the -- or rather, if they
12   received a favorable court ruling, it could then do the thing
13   that they want to do.  And that is clearly not the case
14   presently.  A favorable court ruling which Your Honor had
15   already issued in the TRO, but if it were to reissue it, would
16   not allow plaintiffs to carry firearms in a casino.
17          And so under their own language, they cite --
18          THE COURT:  But that's a but-for causation, which the
19   Third Circuit doesn't require.
20          MS. CAI:  So, Your Honor, I'm quoting from Sherwin
21   Williams, which is a 2020 decision written by Judge Hardiman,
22   which makes clear that the operative fact in the case that
23   plaintiffs cite, Khodara, was, quote, "it was undisputed," in
24   that case, "if the plaintiff received a favorable ruling, it
25   would develop the landfill," which is the remedy he was
```

 1     seeking.  So that's just not true in our case.

 2          And so if we prevail on -- they're not saying, you

 3     know, if I prevail on Chapter 131, I am walking into the casino

 4     with a firearm.  They can't say that.

 5          THE COURT:  All right.

 6          MS. CAI:  Okay.  So finally, Your Honor wanted to

 7     talk about transit hubs.  You know, the beginning of my

 8     analysis on transit hubs actually begins with the

 9     government-as-proprietor doctrine, but I can skip over that

10     part and just talk about --

11          THE COURT:  I want you to -- yeah.

12          MS. CAI:  -- historical evidence.

13          THE COURT:  I want you to tell me, what is a public

14     transportation hub?  There is no definition in the legislation.

15     Could you help me understand what that is?  And then I'm going

16     to give you some examples and you tell me whether or not that

17     is a public transportation hub.

18          MS. CAI:  Sure, Your Honor.

19          THE COURT:  Because if I don't know, I'm not so sure

20     the plaintiffs know.

21          MS. CAI:  Okay.  Your Honor, I think, and I don't

22     have the specific cite right in front of me, I think there are

23     state either statutes, regulations, or other understandings and

24     in the transportation context that transportation hubs are

25     places where multiple modes of transportation intersect.  And

```
 1    it doesn't have to be modes as in trains and buses.

 2              THE COURT:  Okay.

 3              MS. CAI:  But, for example, Trenton Transit Center is

 4    certainly a transit hub because both Amtrak and New Jersey

 5    Transit and the -- and the SEPTA, for example, those modes of

 6    transit all intersect there.

 7              THE COURT:  So where modes of transportation, are you

 8    giving me -- is there a definition somewhere that I should be

 9    looking to?  Or are you just going from case law?  Tell me what

10    you're doing.

11              MS. CAI:  My understanding is that that's certainly

12    the Port Authority's understanding.  Now, obviously that's a

13    different agency than the State.

14              THE COURT:  Yes.

15              MS. CAI:  And I'm sorry, Your Honor.  I don't have

16    that specific citation, but we can provide that to the Court.

17              THE COURT:  Well, let me ask you some questions.  Is

18    a bus stop at Exit 3 of the turnpike a --

19              MS. CAI:  No, no, it is not.

20              THE COURT:  Okay.  But that's where cars and trucks

21    and, I don't know, horses intersect.

22              MS. CAI:  I think the fact that the bus stop happens

23    to be on another road, I mean it's the same road that carries

24    both buses and -- well, I guess that's not really the

25    distinction.
```

 1            That's just not a hub in any way, right?  That's just

 2    one station where you're only going to that station for the

 3    purpose of getting on one mode of transportation, which is the

 4    bus.  You're not going to the bus stop to get in a car or a

 5    truck or a train or anything like that.

 6            THE COURT:  So tell me -- okay.  Well, let's

 7    continue.  So is a marina a transportation hub?

 8            MS. CAI:  I don't think so, Your Honor, because my

 9    understanding is only boats are there.

10            THE COURT:  Okay.

11            MS. CAI:  I confess, I don't know enough about

12    marinas to have an understanding of that.

13            THE COURT:  But that's my point, Ms. Cai.  And I

14    don't -- if you don't know what a transportation hub is, how

15    would these plaintiffs?

16            MS. CAI:  Well, Your Honor, I don't think a

17    void-for-vagueness -- and Ms. Reilly is going to address this

18    in a bit, but I can preview, which is that a void-for-vagueness

19    analysis, which I don't think plaintiffs have even brought

20    against transportation hubs, doesn't turn on whether or not any

21    particular person, including a particular lawyer, has questions

22    on the edge cases or certain applications thereof.  They're

23    trying to invalidate the statute, period.  And so there are

24    definitely places that I think everyone agrees are obviously

25    transportation hubs.

1      THE COURT:  But before -- they're asking this Court

2  to invalidate a restriction.  I have to know what restriction

3  it is that they're asking me to invalidate.  So would it be

4  error for me to sua sponte raise the question of what a

5  transportation hub is?  Because I certainly don't want to go

6  there.

7      MS. CAI:  I do think that a plaintiff would have to

8  demonstrate that they -- well, if they have not pled or nor has

9  anyone averred that they are confused by what a transit hub is,

10  and so there is no constitutional injury in that sense.

11      THE COURT:  I'm not so sure that's fair.  I think

12  they have submitted several declarations where they have talked

13  about driving through or near or by the Newark Airport or by

14  the -- one of the -- I don't remember now.

15      And that raises, I think, very fair points, which is,

16  is someone who is on the turnpike in the perimeter of the

17  Newark Airport violating this restriction?

18      MS. CAI:  No, Your Honor.  It has to be the airport

19  itself.  And of course there's also the exception for -- and

20  this is in Section 7(d) on accessing the roads at a public

21  right-of-way where you're not restricted.  And so if you're

22  driving on the pickup lane of Newark Airport, that's not a

23  violation to have -- well, you would have to abide by the

24  vehicle restrictions, but that's not a violation of Section

25  A20.

```
 1          THE COURT:  Okay.  You can understand my concern.
 2   And one of the plaintiffs has a boat at one of the marinas, I
 3   think by Atlantic City.  So your view is that's not considered
 4   a transportation hub or it would not -- it certainly isn't an
 5   airport.  We can all agree on that.
 6          What about privately owned airports?
 7          MS. CAI:  Your Honor, I think they are airports.  The
 8   definition of airport is -- I mean, they have "airport" in the
 9   name, and so it doesn't matter if they're privately owned or
10   publicly owned.
11          I will note, however, that it's not clear to me that
12   plaintiffs have demonstrated that there is a self-defense right
13   to have a handgun when they're on an airplane, which is what
14   they're trying to do, right?  They're trying to bring the
15   handgun on to their private aircraft when they fly.  It's not
16   clear to me what kind of right, Second Amendment right would be
17   vindicated by that kind of activity.  It's a very unusual set
18   of circumstances.  I clearly have not thought about private
19   planes.
20          But I don't think that the prohibition -- rather I do
21   think that the prohibition on airports does apply generally to
22   airports even if they're privately owned.
23          THE COURT:  Okay.  And then they've made the argument
24   about like a restaurant or a store on that property.  Is that
25   considered a transportation hub?
```

         1          MS. CAI:  No, Your Honor.  I mean, the restaurant

         2    that they've pointed to, we've gathered from the, you know,

         3    reporting on what the restaurant is, it's just a stand-alone

         4    building that serves food.  It's not an airport at all.

         5          Now, it's one thing if it's the McDonald's inside the

         6    Newark Airport Terminal B, right?  That's a very different

         7    situation because you're in the airport in order to be in the

         8    restaurant.

         9          THE COURT:  Yeah.  That's a different situation.

        10          And what about what many of the plaintiffs -- well,

        11    not many, I think a couple, talk about dropping off family and

        12    friends at the airport.  Are they in violation of this

        13    provision?

        14          MS. CAI:  No, Your Honor.

        15          THE COURT:  Why?

        16          MS. CAI:  Because they are -- well, so this is the

        17    provision in Section 7(d) where it says the holder of a validly

        18    and lawfully issued permit shall not be in violation of

        19    subsection (a) -- which is where all the places are

        20    enumerated -- while the holder is traveling along a public

        21    right-of-way that touches or crosses any of the places

        22    enumerated in section (a) of this section.

        23          THE COURT:  Where are you?

        24          MS. CAI:  This is subsection 7(d).

        25          THE COURT:  All right.  I'll find it.

                              *United States District Court*
                                *District of New Jersey*

                                                              JA3202

```
 1            MS. CAI:  Yes, Your Honor.
 2            I will note that I think in one of the supplemental
 3   declarations, and I apologize, I don't remember the name of the
 4   plaintiff, I think he noted that he may want to go into the
 5   airport terminal with the firearm.
 6            THE COURT:  Yeah.
 7            MS. CAI:  On picking up and dropping, that is
 8   prohibited, right.  The rule says, the whole point is, you
 9   know, even outside of the TSA area but in the airport itself
10   you can't be carrying a handgun on your hip in those areas.
11            THE COURT:  Yeah.  So what about one of the
12   plaintiffs who I think he travels to New Hampshire and so he
13   avoids -- and he's permitted to take his firearm to New
14   Hampshire, but he has to fly out of another airport?  He
15   disassembles the firearm, he takes it to that other airport,
16   and he travels to New Hampshire.  Can he -- he can't -- there's
17   no way under this legislation that he can disassemble his
18   firearm and take it, fly on a plane out of Newark to New
19   Hampshire?
20            MS. CAI:  So certainly he couldn't take it as
21   carry-on luggage.  That's already prohibited by TSA rules.  As
22   to checked luggage, I think it depends on the facts of the
23   case, how long he's lingering in the pre-TSA area.  If he's
24   just dropping off the luggage, and I think there's actually
25   when you go to the airport, they're actually outside, luggage
```

 1    drop-off areas, I would think that would have to be at least

 2    just a de minimis, if any, violation at all of the statute.

 3              THE COURT:  So where is that?  Is that the 7(d) you

 4    just cited to me?

 5              MS. CAI:  The de minimis is in Section 7(a).  We've

 6    discussed this before.

 7              THE COURT:  We talked about that the last time.

 8              MS. CAI:  Exactly, we did.

 9              THE COURT:  So the State would take the position that

10    you can take your firearm to the airport as long as you're just

11    dropping off your checked luggage, and so he could fly from

12    Newark to New Hampshire?

13              MS. CAI:  If that's all he is doing.

14              THE COURT:  What do you mean all he is doing?

15              MS. CAI:  Some people are doing other things with the

16    firearm.  They're going into --

17              THE COURT:  He's having a cup of coffee on the

18    sidewalk; you'd have a problem with that?

19              MS. CAI:  Correct.  If he's having a cup of coffee in

20    the Starbucks before the TSA check area, before he drops off

21    his bag, if he's going to be sitting there for hours and hours,

22    I think that would be a problem.  Because what we're concerned

23    about or what the state -- the legislation is concerned about

24    is gun events at airports, which is a place that did not exist

25    at the Founding.  And in light of 9/11 and many other

```
 1   incidents, having a gun in any way, shape or form in that area
 2   is a huge security concern not just for the State, but for Port
 3   Authority, national security, et cetera.
 4           THE COURT:  Yeah.  And we talked about this before,
 5   and I don't want to digress, but the de minimis, so even though
 6   it is de minimis, the problem with the argument, the de minimis
 7   argument that the State has made -- and they've made it to me
 8   before -- is that it really by then, the plaintiff is already
 9   charged and the plaintiff then bears the burden under the
10   statute, as I recall it, to check -- to persuade the Court that
11   it was de minimis.
12           But in any event, I don't want to get too bogged down
13   in that.  Your next point, please.
14           MS. CAI:  Those are all the places that we wanted to
15   cover.
16           THE COURT:  Okay.
17           MS. CAI:  But if you wanted to talk about more on
18   transit, I'm happy to answer any other questions from the
19   Court.
20           THE COURT:  I think I'm good.
21           MS. CAI:  Okay.  So I did, and this part does relate
22   to public transit as well.  The government-as-proprietor and
23   government-as-market-participant doctrines, those are related
24   but different doctrines.  I think the bottom line is that the
25   plaintiffs have not really responded to the core constitutional
```

1    principles here.

2              And what the two doctrines say is the following:

3    When the government is operating a premise like a library, a

4    hospital, a jail, a stadium, whatever it is, and it sets

5    building rules or premises rules, it is operating as the

6    proprietor of the premises and not as a sovereign regulator of

7    the people.  I think Mr. Jensen basically acknowledged this in

8    his argument earlier.

9              We're not talking about highways, the streets, the

10   town square.  We're talking about places where it is obvious

11   from the kind of regulation and what the government is doing

12   that it is taking the place of the owner as the owner of the

13   building or the land just as a private individual who happens

14   to own that would.

15             THE COURT:  Yeah.  And I don't really understand this

16   argument.  I think it's -- I mean, if the State is the

17   proprietor like any other private business owner, it can post a

18   sign "no guns."  We all agree on that.  It's not acting as a

19   sovereign, it's acting as a proprietor, right?

20             MS. CAI:  I agree with that, Your Honor.  But I don't

21   think plaintiffs agree with that.

22             THE COURT:  Well, what they say, and this is what I

23   would like you to address is, so you don't need -- this

24   legislation -- this legislation is dealing with the state as a

25   sovereign, not the state as a proprietor.  Because there is

```
 1    nothing preventing the state as a proprietor.  If it owns

 2    the -- if it owns the car vehicle, then it doesn't want guns in

 3    its vehicle.  They're not quarreling with that, at least I

 4    don't think they are.  But when you are acting as a sovereign

 5    is where they quarrel.

 6              MS. CAI:  I guess I'm a little confused, Your Honor,

 7    because I think this is the State's way of saying in one fell

 8    swoop, these are the places where we act as proprietor --

 9              THE COURT:  Well, you can't pretend to act as a

10    proprietor.  You either own it or you don't, right?

11              MS. CAI:  Yes, Your Honor.  And to be clear, this

12    argument only applies to the state-owned libraries, hospitals,

13    jails.  So I understand that there are other parts of the

14    statute that this government-as-proprietor doctrine would not

15    apply to.  And so let's take the section on zoos, for example,

16    right?

17              THE COURT:  Yeah.

18              MS. CAI:  So plaintiffs say some zoos are private,

19    some zoos are public.  This justification, this constitutional

20    justification I've offered to the Court admittedly would not

21    apply to -- I don't remember which zoo was privately owned, but

22    whatever the privately owned zoo was, but it would apply to the

23    publicly owned zoo.  And so that's why we're making this

24    distinction.

25              When the State is acting as the owner of the zoo, it
```

```
 1   is not restricted from being able to restrict firearms and
 2   restrict a number of other activity in order to protect its
 3   status as the owner of that property.
 4           THE COURT:  So I think it's somewhat of a
 5   disingenuous argument in this regard, and you tell me, you
 6   persuade me differently.  If the State owns the property, it
 7   has every right to say "no guns allowed."  And if someone comes
 8   in, the librarian says get out, you can't have a gun in here,
 9   then the remedy is trespass, right?  The State can prosecute
10   that person for trespass.
11           But here, what the State is doing is it's
12   criminalizing the behavior as a sovereign.  It's not simply
13   putting up a no trespassing or a no guns sign, it is acting as
14   a sovereign and criminalizing the behavior.
15           So what it seems to me the State is doing is saying,
16   oh, no, Judge, we're just simply acting as a proprietor.  But
17   you have that right.  Prosecute them for trespass.  You're
18   going further and you're criminalizing and making it a crime,
19   and that's acting as a sovereign.  Tell me where I'm wrong.
20           MS. CAI:  I don't think that the analysis turns on
21   whether or not the State's prohibition is on a sign or in a
22   statute.  I may be wrong, but I'm pretty sure that --
23           THE COURT:  But I think that's the distinction
24   between whether you are acting as a proprietor or a sovereign.
25           MS. CAI:  I just -- I would have to disagree with
```

 1   that, Your Honor.  I don't think that the State's only way of

 2   acting as proprietor is posting a sign on a door.  It has --

 3            THE COURT:  Okay.  Tell me -- let me ask the question

 4   this way:  What is the source of authority when the State

 5   criminalizes this behavior, is it an owner or is it a state?

 6            MS. CAI:  So it's a combination -- it has to be a

 7   combination.  Because when states criminalize trespass for

 8   anybody, it's also the State.

 9            THE COURT:  Bingo.

10            MS. CAI:  But, but, Your Honor, it also has the

11   ability to do so as an owner.  And so there's no distinction

12   between the State's ability to do both and when it's rolled up

13   into the same regulation, that doesn't mean that it's not

14   acting as an owner.  Sorry.  That's a lot.  Let me back up for

15   a second.

16            So let's start with *United States vs. Class.*  This is

17   the D.C. Circuit decision.  I also wanted to clarify that

18   plaintiffs are dead wrong to say that *Bruen* abrogated the

19   holding in *Class.*  What *Bruen* abrogated was *Class's* description

20   of the legal standard, the two-part legal standard, the second

21   part of which *Bruen* abrogated, the means-end test.  But *Class*

22   specifically said we are not doing that.  We are not going to

23   that second step.  We're only doing the first step, does the

24   activity constitute Second Amendment activity at all?

25            And I am pretty sure that the regulation at issue in

1   *Class* on the U.S. Capitol parking lot was a statute rather than
2   a sign at the parking lot.  It might have been both.  I'm not
3   aware of, you know, if there are facts on that.  But there was
4   a statute that was violated that regulated Capitol Grounds.

5           And so in the same way that the federal government
6   was using a statute, a criminal statute to regulate its
7   property, the Capitol Grounds, the same thing is true when the
8   State here in Chapter 131 is doing the same for public
9   libraries and museums.

10          THE COURT:  Yeah.  I think the problem you have with
11  that argument, Ms. Cai, is that that's the U.S. Capitol where
12  government function is at its apex.  And that's exactly what
13  *Bruen* talked about.

14          MS. CAI:  But the holding in *Class* was not about --
15  well, first of all, it was the parking lot which I guess -- I
16  don't know if the federal government would agree, but I don't
17  think the parking lot is where the actual activity is at its
18  apex, rather it's because the government owns that parking lot.
19  It's not different from when a parking lot owner -- I don't
20  know the names of any household names for parking lot owners,
21  but if someone else is doing that.  And I think that's also a
22  slightly different argument and an even stronger one when the
23  government is not just the owner of the property, but also a
24  participant in the marketplace.  And so that's a different line
25  of cases that come from the same genesis, and in the

     1    Commerce Clause context, in the preemption context.  So these
     2    are constitutional provisions that courts say we don't even do
     3    the preemption analysis or the very complicated "dormant"
     4    Commerce Clause analysis when you don't even reach that
     5    question because the government is not acting as a sovereign.
     6         All of plaintiffs' arguments are saying some version
     7    of, well, *Bruen* didn't talk about this in its historical test,
     8    that's true.  But *Bruen* wasn't concerned with this problem,
     9    right?
    10         Cases like *Pike vs. Bruce Church*, which lays out a
    11    very complex dormant Commerce Clause analysis, that doesn't
    12    talk about government as participant.  You don't do the *Pike*
    13    test if the government is a participant.  That's the whole
    14    point of this part of the analysis.
    15         Okay.  So on the private property role, I don't want
    16    to belabor the point.  We've had a lot of conversations about
    17    this, but I did want to respond to the brand new argument that
    18    Mr. Jensen raised in his reply brief, which is to say that the
    19    word "gun" in these historical statutes spanning from the
    20    18th century through the 19th century only meant long gun and
    21    not handguns.
    22         A few different levels of analysis.  And I'll start
    23    with the ones that don't require me to provide the Court with
    24    documents.  The first is that this argument obviously doesn't
    25    apply to the Texas, Louisiana, Oregon, or New York laws which

                        *United States District Court*
                        *District of New Jersey*

1    use the word "firearms."  And so even that alone, that would

2    establish the tradition that we're looking at here.

3          But even on the New Jersey, Massachusetts, and

4    Pennsylvania laws, I'll make this point:  Even if Mr. Jensen

5    were correct, they still regulated other kinds of guns.  *Bruen*

6    says you don't need an analog -- or you don't need a historical

7    twin, you need an analog.  Certainly people exercised their

8    Second Amendment right with long guns and they were still

9    restricted.  But the key point I want to make to Your Honor is

10   that their argument relies on a single dictionary definition

11   from 1828, the weight of the authority from the 18th century

12   period that is contemporaneous with the enactment of the 1722

13   and 1771 New Jersey statutes is otherwise.  So what we did is

14   we looked at dictionaries relied on by the Supreme Court in

15   *Heller*, and what they show was that the word "gun" was a broad

16   term for firearms, and that pistol was a type of gun and

17   handguns were a type of gun.

18         What I have for Your Honor, and plaintiffs already

19   have this because I've already sent it up to them last night,

20   is a binder.  If I may approach, Your Honor.

21         THE COURT:  Yes.  Thank you.

22         MS. CAI:  I have a nonbinder version for the clerks,

23   if they need it, I have that here.

24         (Handing documents to the Court.)

25         THE COURT:  Yeah.  Thank you.

         MS. CAI:  So tab 1 is this Sheridan dictionary from
1796, which was cited in *Heller*.  You can access it on the
U Penn library website, but it's easier to print it out.  And
there, and I know it's hard to read the historical documents.
I'll try to point the Court geographically on the page.  On the
second, the right-hand column about halfway down the page,
under "gummy" it defines gun.  And it says it's the general
name for firearms, the instrument from which shot is discharged
by fire.

         And on the last page of that exhibit on the upper
left-hand corner, it defines pistol as a small handgun.

         Tab 2 is the Samuel Johnson dictionary from 1755,
which was cited by *Heller* and by another case that plaintiffs
cite, *Espinosa*, Justice Gorsuch's concurring opinion.

         There, on the third page of the exhibit, the
right-hand column halfway down the page, it defines gun again
as "the general name for firearm, the instrument from which
shot is discharged by fire."

         If you turn to the last page of that exhibit, on the
right-hand side halfway down the page, it defines pistol again
as a small handgun.

         The Cunningham dictionary is Exhibit 3.  This is
actually from 1771, which is the same year that the relevant
New Jersey statute was reenacted, cited in *Heller* and actually
described as important.  It has a very long entry for guns

1   starting on the second page, right-hand column about three

2   quarters of the way down the page.

3           And what it does is it describes a number of laws or

4   cases that used the word "gun," and in the very first entry it

5   talks about a handgun.  Second entry does the same.  And then

6   on the following page, about halfway down the page, it talks

7   about an execution of a sheriff's office to carry such a

8   handgun, that it was lawful and that a dag was a handgun within

9   the statute.  *Bruen*, on page 2140, describes "dag" as a

10  handgun.  I did not know that.  You learn something new every

11  day.

12          Outside of *Heller*, another dictionary that was cited

13  by another case that plaintiffs cite to, *Gamble*, is Exhibit 4,

14  the Dictionarium Britannicum from 1722, which is very relevant

15  because that's very close in time to when the New Jersey

16  statute was first enacted.  It describes -- or it defines gun

17  on the second page, upper left-hand side, as warlike machine

18  used before the invention of guns, or a firearm or weapon of

19  several sorts and sizes.

20          On the next page, upper left-hand side, it defines

21  pistol as a short, small gun or firearms worn on the saddle

22  bow, the girdle, or in the pocket.  And 19th century evidence

23  also confirms this.  So Exhibit 5 is Samuel Colt's 1836 patent

24  for the revolver, which, as the Rivas declaration explains, is

25  what led to the popularization of handguns in general.  It

1    literally describes his invention as a revolving gun.

2         Exhibit 6 is a dictionary or a cyclopedia of costume

3    or dress from 17 -- or sorry, 1876.  Now, I note this is a

4    British dictionary, but to the extent that we're looking at the

5    English language, it's at least somewhat relevant, although I

6    agree it's less relevant than the others.  It goes through and

7    describes in detail all kinds of guns and pistols.  And on page

8    234 it talks about the etymology of the word "gun."  It says

9    the word gun, although still retained in the language, was

10    henceforth -- thenceforth used in a general sense only.  The

11    constant improvements in hand firearms during the 16th and

12    17th centuries giving rise to various other names.

13         And so I think all of this demonstrates that the one

14    dictionary definition that plaintiffs rely on was not

15    indicative and is not evidence supporting the idea that the New

16    Jersey statute which lasted two centuries and using the word

17    "gun" meant to say, well, you can just carry a handgun on to

18    other's property without their consent in contravention of the

19    word.  And some of the statutory context evidence that

20    plaintiffs cite actually disprove their point.

21         And so, for example, Exhibit 9 to Mr. Jensen's

22    declaration is an 1812 Delaware law that prohibited the

23    discharge of "any gun, musket or pistol."

24         Mr. Jensen's argument is that guns were long guns

25    like muskets, but if it's using the word gun, musket, pistol

1  disjunctively, that disproves his point, right.  Because if a

2  musket is a gun, then the use of the word gun doesn't exclude

3  musket any more than it excludes the word pistol.  And that's

4  true for several of the other statutes.  Exhibit 10, Vermont

5  law.  In Exhibit 11, a New Hampshire law, and so forth.

6      And I'll just note that even if sometimes we use

7  words colloquially to mean slightly different things, that

8  doesn't mean that the definitional use in the statute is the

9  same.  So let me give you an example.  A car, right?  Car is

10  anything that's got four wheels and drives like an automobile.

11  It includes SUVs in probably the legal definition.  So if you

12  had a statute that says all persons are prohibited from driving

13  any car onto another's private property without expressed

14  permission, we wouldn't say aha, that exempts SUVs even though

15  sometimes in colloquial language you may say oh, there's a

16  bunch of cars parked on the street and a bunch of SUVs, too,

17  right?  You wouldn't think of that as a reason to read the

18  statute as excluding SUVs.  So that's my bit on the private

19  property rule.  Obviously there's a lot more there on the

20  principle and all that, but I did want to get that into the

21  record.

22      THE COURT:  Okay.  I want to move things along, and I

23  don't want to deprive the others of their time.  Were you going

24  to speak on the default rule?

25      MS. CAI:  Oh.  That was what this was, yes.

```
 1              THE COURT:  Further on it with respect -- well,
 2    obviously.
 3              MS. CAI:  Only to the extent Your Honor has any
 4    questions.
 5              THE COURT:  I wanted to focus on the First Amendment,
 6    the compelled speech.
 7              MS. CAI:  Sure, Your Honor.
 8              THE COURT:  The State focuses on the framing of the
 9    Second Amendment right, but it doesn't do a means-end analysis.
10    So assume I disagree with your framing, what level of scrutiny
11    should I apply?
12              MS. CAI:  I think it would have to be rational basis
13    or intermediate perhaps.  I mean, the problem with the entire
14    First Amendment theory of the plaintiffs is that someone is
15    speaking about their property, no matter what.
16              THE COURT:  Right.
17              MS. CAI:  So under the rule that they want, the
18    person who doesn't want guns on their property has to speak.
19    It has to put up a no trespass sign, right.  That's speech.
20    They say that's -- they say their version in our world is
21    compelled speech, but that's not compelled speech.  I think
22    that's logically impossible.  In both cases, someone is putting
23    up a sign saying what their preference is.  But I don't
24    think -- the key to the analysis is that the fact that someone
25    has to express their preference to the outside world is not
```

```
 1   compelled speech.  So that's true in contracting.  That's true
 2   in wills.  Now, the point is not what the dead person, their
 3   rights, it's what they have to say before they're dead to
 4   communicate their rights.
 5          There is a -- by definition there has to be a default
 6   rule, right, to set aside what it is the rights and
 7   responsibilities are of people vis-a-vis the thing we're
 8   talking about, be it a will, a property, whatever it is.  And
 9   so it logically cannot --
10          THE COURT:  But what's the governmental interest?
11          MS. CAI:  I'm saying, Your Honor, that there is no
12   speech infringement at all.  When the principle is you have to
13   speak to express your preference, that's not a regulation of
14   your speech.
15          THE COURT:  Okay.
16          MS. CAI:  But if there was a government interest at
17   stake under that analysis, Your Honor, it would be this:
18   First, we have evidence in the record that at best,
19   New Jerseyans are confused about what they're supposed to say
20   and not say under the prior regime before Chapter 131.  So
21   Exhibit 21 is empirical report, empirical study by Ayres and
22   Jonnalagadda, which demonstrate --
23          THE COURT:  Yeah.  And you've been --
24          MS. CAI:  Yeah.  I know it's hard to read.  So we can
25   send you an electronic copy if you'd like.
```

1    THE COURT:  No.  It's been in the record.  I'm

2 familiar with it.

3    MS. CAI:  Your Honor, so I think the government's

4 compelling interest is making sure that private property owners

5 are accurately communicating what they actually believe.

6    THE COURT:  Right.  And we've discussed this a little

7 ad nauseam before.

8    MS. CAI:  Yes, Your Honor.

9    THE COURT:  And I've asked the question.  I've never

10 really quite gotten an answer to it, so run a radio campaign.

11    MS. CAI:  Your Honor, I don't even think that under

12 intermediate scrutiny the analysis is whether or not there are

13 other alternatives.  I'm not actually sure if that's more

14 restrictive of speech or less restrictive of speech.

15    I mean, it's a matter -- and it's the same that

16 people would have to post their information in a certain way

17 for the outside world to know it.  I don't even know if that's

18 a least restrictive means or just an alternative restrictive

19 means.

20    I think what's clear, though, is that there is no

21 compelled speech.  There is no content-based regulation.  It's

22 not based on what you -- you can say whatever you want about

23 your property.  The government is not telling you that you

24 can't or that you have to speak a certain message.  There's no

25 compelled speech.  And so I don't think there's a speech

```
 1   problem at all.

 2              To the extent it even touches on the First Amendment,

 3   it would be a lower tier of scrutiny.  And so the idea that

 4   there is other ways of accomplishing lesser goals, I would say

 5   that the radio announcement, probably not very effective, but

 6   I --

 7              THE COURT:  One last question, because it looks like

 8   you're sitting down, but what are you going to do about the

 9   citizens who they don't want guns on their property but they

10   don't want to broadcast it?  What's your response to that?

11              MS. CAI:  Well, they don't have to broadcast it at

12   all under Chapter 131.  And that's exactly what Chapter 131

13   allows.  So if you don't want guns on your property, you don't

14   have to say anything.

15              THE COURT:  But the --

16              MS. CAI:  The default rule under Chapter 131 is if

17   you don't say anything, guns are not allowed.

18              THE COURT:  But you have to -- okay.  Fair enough.

19   Okay.

20              MS. CAI:  I don't know if Your Honor had any

21   questions about the use of expert declarations.  I'll just note

22   that many post-*Bruen* courts have allowed them, have found them

23   useful.  The Seventh Circuit recently remanded to do that

24   precise analysis.

25              THE COURT:  Can I just go back for a second?  And
```

 1   maybe I didn't ask the question that I thought I asked.  Hang

 2   on a second.

 3          Oh, yeah.  The question I was asking is, what about

 4   those who they want -- they're fine with guns.

 5          MS. CAI:  Oh.

 6          THE COURT:  But they don't want to broadcast that,

 7   what do you say to them?  I think you misheard me.  Yeah.

 8   That's the -- well, in any event, that's my question.  What do

 9   you say to those who they want guns, they want the protection,

10   they whatever, but they don't want to broadcast it, what do you

11   say to those?

12          MS. CAI:  I don't think they have to broadcast it.

13   They can just communicate that to whoever they want to have

14   guns on their property, right?  They don't have to post a sign.

15   They can email, call, put it on their website, whatever other

16   means.

17          THE COURT:  Yeah.  And we talked about this before.

18   So if, you know, the local hardware store would prefer that

19   people come to its establishment with guns, but they certainly

20   don't want to post a sign, it's the State's position well, to

21   get in touch with your customers somehow and let them know, I

22   guess.

23          MS. CAI:  Yeah.  Or, you know, you could -- there are

24   probably other ways of doing that in advertising or other

25   things.  But the point, Your Honor, is that the hardware store

 1   that does want to prohibit guns, under plaintiffs' view of the

 2   world, would have to post a -- so it's the same problem to the

 3   extent it is a problem.

 4           Our position is that expressing your preference to

 5   people that is an accurate reflection of your preference is not

 6   a prohibition on speech or a restriction on speech.

 7           THE COURT:  Understood.  Thank you.

 8           MS. CAI:  Thank you, Your Honor.

 9           THE COURT:  Okay.  Ms. Reilly.  Thank you.

10           MS. REILLY:  Your Honor, could we have a brief

11   sustenance break, like five minutes?

12           THE COURT:  Five minutes.  And then I'm really hoping

13   to go maybe a half an hour more or so.

14           MS. REILLY:  Thank you.

15           THE COURT:  Because we've covered a lot of ground,

16   and I do want to give you all your due time, but I think we've

17   covered a lot of ground.  But, yes, five minutes, okay.  Thank

18   you.

19           MS. REILLY:  Thank you, Your Honor.

20           THE COURTROOM DEPUTY:  All rise.

21           (Recess was taken at 1:07 p.m. until 1:16 p.m.)

22           THE COURTROOM DEPUTY:  All rise.

23           THE COURT:  Okay.  You can all have a seat.  Thank

24   you.

25           Okay.  Ms. Cai, can I ask you just some follow-up

```
 1   questions?
 2              MS. CAI:  Sure.
 3              THE COURT:  I have some questions I want to focus on
 4   before I turn to Ms. Reilly.  And this really focuses on the
 5   equal protection challenge to the default rule.
 6              MS. CAI:  Okay.
 7              THE COURT:  I don't think you like it when I call it
 8   "default rule."
 9              MS. CAI:  Oh, I think it's fine.
10              THE COURT:  Okay.  Assume I think that the rule
11   implicates a fundamental right, what's your asserted
12   governmental interest?  And then how is it narrowly tailored to
13   achieve that interest?
14              MS. CAI:  So I think the interest would be the same,
15   it's the same interest analysis that we just talked about in
16   the First Amendment context.
17              THE WITNESS:  The right to know?
18              MS. CAI:  It's not the right to know.  It's the right
19   to have the accurate reflection of the private property owner's
20   belief.  So, for example, someone who lives in a house who
21   thinks that by being silent they're actually allowing the
22   plumber to come into their house with a handgun unknowingly or
23   thinks the opposite rule is in effect, so it's the same as
24   that.
25              THE COURT:  And so how is that narrowly tailored then
```

1    to achieve that interest?

2             MS. CAI:  Because there's only two defaults that the

3    government can set.  Default is either what plaintiffs want,

4    which is silence means come in with a gun or it means don't

5    come in with a gun, come in without a gun.  And so there's only

6    two options.  And so it's kind of strange to think about

7    tailoring as one or the other when that's the only way to

8    accomplish that objective.

9             A radio campaign does not -- it's not going to reach

10   everybody.  It's not -- there's no way for the government to

11   ensure that people actually understand that's what that means.

12   And so that's the interest there.

13            I will say that I don't know what fundamental right

14   would be implicated if the other flip side of that, right,

15   would be similarly restricted.  So the person who is -- so

16   you're comparing two groups of people, the person who wants to

17   restrict firearms and has to speak today and under Chapter 131

18   the person who doesn't and would have to speak.  So it's a very

19   strange equal protection theory that under either world, there

20   would be a classification on the exact same thing and a set of

21   rules and whatever analysis in terms of the interest would be

22   at play there.

23            THE COURT:  Well, I'm going to throw out two

24   possibilities.  One, there could be no default rule at all.  Or

25   two, it could apply only to private property and not property

```
 1   open to the public.  Do you agree with that?
 2              MS. CAI:  So I think there has to be a default rule,
 3   because if the rule is no restriction, that's actually a
 4   default rule in the other direction.  So that's one.  And as to
 5   a default rule that's only on I think Your Honor said
 6   commercial property, or am I getting it backwards?
 7              THE COURT:  Private property open to the public.
 8              MS. CAI:  Open to the public.  So that would just be
 9   setting a default rule for those.
10              THE COURT:  Because this is all private property.
11              MS. CAI:  Correct, correct, correct.  I just wanted
12   to make sure I was getting the analysis as Your Honor had
13   stated it.
14              So all that would mean is that there's a different
15   default rule for homes or businesses that are not open to the
16   public and places that are open to the public.  It would be two
17   different default rules for those types of locations.  So I
18   think the analysis is still the same.
19              THE COURT:  Okay.
20              MS. CAI:  Thank you, Your Honor.
21              THE COURT:  All right.  Thank you.  Ms. Reilly.
22              Take your time.
23              MS. REILLY:  Your Honor, I would like to start with
24   the, just because I think it's easiest, with the equal
25   protection challenge to the judges, the prosecutors, and the
```

```
 1    deputy attorney generals.

 2              THE COURT:  Okay.

 3              MS. REILLY:  First of all, the exemption for

 4    prosecutors has existed since 1937.  And that's

 5    N.J.S. 2:176.43, and that goes for assistant prosecutors as

 6    well.

 7              The exemption for a deputy attorney general has

 8    existed since at least 1983.  And that's L1983, Chapter 552.

 9    So it's unclear why there's a, you know, sudden rush for a

10    preliminary injunction now of, you know, exemptions that have

11    existed for decades.

12              THE COURT:  Yeah.  And that's the question I was

13    asking earlier.  What is the -- yeah.  Okay.  Go ahead.

14              MS. REILLY:  And as for judges, there was an

15    exemption for court attendance dating back to 1937.  And the

16    Court has -- the Legislature has now just expanded that to

17    include judges because of, you know, current events that have

18    happened.  And that's the same statute that also addressed

19    prosecutors and assistant prosecutors.

20              With regard to plaintiff said that strict scrutiny

21    applies to this equal protection challenge.  And at least four

22    circuits, and that would be the First, Second, Fifth, and

23    Ninth, have said that if a Second Amendment challenge fails,

24    the equal protection claim is subject to rational basis, not

25    strict scrutiny.  And that's because no fundamental right is
```

1    involved.

2            So plaintiffs are already challenging the sensitive

3    places on Second Amendment grounds.  If they prevail, then the

4    equal protection claim is moot.  If they don't prevail, then

5    that's because there's no fundamental right, so rational basis

6    applies.

7            And here, there's definitely rational basis.  The

8    exempt categories, professional categories, they're simply not

9    similarly situated.  And the State has listed all of this in

10   its brief.  They've been vetted.  They're subject to oaths and

11   codes of conduct.  But most importantly, given the nature of

12   their jobs, they're subject to a heightened risk of danger and

13   a heightened need for self-protection.  And so that's certainly

14   a rational basis.  And they're also subject to more stringent

15   requirements regarding how they qualify.  They must qualify

16   annually in the use of a handgun.

17           To turn now to what Your Honor mentioned before with

18   regard to permitting.  So Your Honor was pointing to Section 3A

19   and raised the question of when somebody who currently has a

20   permit is seeking to renew, sort of what sets of rules apply.

21   And here, the State agrees completely with the plaintiffs, that

22   that language, for many reasons -- first of which is syntax and

23   then I'll get into other reasons -- means that the person who

24   seeks to renew is subject to whatever rule is currently in

25   place for original applications.

1           And you see that I believe as plaintiffs were also

2      pointing to in the syntax, it doesn't say as in the case of

3      their original application.  It says, you know, as happens to

4      be the case of original applications at the time.  But beyond

5      the syntax argument, there are other arguments, Your Honor.

6           First is, as the Legislature said in Section 1A of

7      Chapter 131, they specifically addressed *Bruen*.  And they

8      specifically said in light of *Bruen*, we are getting rid of this

9      justifiable need requirement.  That would be nonsensical for

10     them to have said that if this was going to -- if 3A was like

11     oh, but that doesn't apply to folks who already have permits.

12          Another reason why it just doesn't make sense is it's

13     simply the way the statute has always operated.  So the

14     disqualifiers are in section 2C:5.  And the Legislature keeps

15     adding to them.  So you see 2C:9, like oh, my goodness, we need

16     to add the terrorist watch list.  And then you see the next one

17     they add, C:10, the Extreme Risk Protective Order Act, the Red

18     Flag Law that Your Honor was saying.

19          Under no circumstance did someone say, oh, okay,

20     you're renewing your permit and now we have the terrorist watch

21     list or the Red Flag Law, but we didn't have it then so we

22     won't bother applying those to you.  The history of how this

23     law has been applied is whatever the current regulations are,

24     those are the ones that apply to your renewal.

25          And another reason is that there are, you know,

*United States District Court*
*District of New Jersey*

JA3228

 1  different requirements.  This 3A must be read in the context of

 2  the entire act, which also says, you know, section 4, you need

 3  liability insurance and then training requirements and fees,

 4  and oh, yeah, we haven't raised the fees in 50 years, but

 5  you're sort of grandfathered if you already have a permit.

 6  These other sections don't make sense unless this means that

 7  you're subject to whatever, at renewal, whatever the current

 8  requirements are.

 9          And I think that if there's an interpretation of this

10  provision that makes the statute constitutional, as we are

11  asserting there is, then the Court should take that

12  interpretation rather than one which renders it

13  unconstitutional by keeping in place the very justifiable need

14  standard that the Legislature said it was getting rid of.  So

15  that was that point.

16          With regard to the fee increases themselves, just a

17  couple of quick points.  One, it's plaintiffs' burden to prove

18  under the Third Circuit Boyd case, it's plaintiffs' burden --

19          THE COURT:  Ms. Reilly, can you push the mic away

20  from you?  I'm getting feedback.

21          MS. REILLY:  Sorry.

22          THE COURT:  Try it again, yeah.

23          (Discussion was held off the record in open court.)

24          THE COURT:  Okay.  Good.  Thank you.

25          MS. REILLY:  So plaintiffs have -- it's plaintiffs'

 1   burden under the Third Circuit, the Boyd case, their burden to

 2   prove the first step of the *Bruen* analysis, which is that the

 3   regulation falls within the scope of the Second Amendment to

 4   begin with, and they have not proven that at all.  They don't

 5   seem to be implying, although maybe they are today, but they

 6   don't seem to be -- they never raised an objection to permit

 7   fees as a whole.  They just seem to be objecting to oh, well,

 8   you know, $25 is not okay, but a lesser amount is okay.  And

 9   it's not unusual at all for there to be sort of fees charged

10   for folks.

11          So in a prosecutorial context, right, everybody has a

12   right to go in and defend themselves in court and to get an

13   appeal and there are fees attached to that, and that's exactly

14   what we have here.  So that mere charging of a fee does not

15   fall within that first step of *Bruen*.  And we see that also in

16   Justice Kavanaugh and Justice Alito's concurrences where

17   they're like oh, yeah, permitting processes and background

18   checks and all that, you know, that's fine, we're not doing

19   anything to tinker with that.

20          Second...

21          (Pause.) (Microphone feedback.)

22          Second, you know, these are -- *Bruen* said something

23   about, well, maybe if the fees are exorbitant.  But they're not

24   exorbitant here.  They're very modest.  They haven't been

25   raised in 50 years.  The Legislature in section 1(i) lists out,

 1    well, we're doing this because of inflation and because the

 2    cost of background checks and sort of new technology upgrades

 3    that were needed.

 4            And Your Honor asked the question before, well, like

 5    what about the one plaintiff, Plaintiff Henry, I guess, who's

 6    saying like, you know, I can't really afford that.  Because

 7    there's one person saying that they can't afford it, that

 8    doesn't mean, under a facial challenge, which plainly has a

 9    legitimate sweep, you knock out the entire statute.  If

10    Plaintiff Henry wanted to bring an as-applied challenge and

11    like, listen, I feel as if I can afford the guns but I can't

12    afford the permit and she were to document that, you know, then

13    that's a different story.  The State, you know, would also be

14    willing to say, as to that one plaintiff, if she wanted somehow

15    to ask the Court to put the money in escrows to be sure she

16    gets it back or whatever, you know, we're willing to -- to

17    stipulate to that.

18            THE COURT:  What about the argument that having part

19    of the money go into the victim compensation fund is illegal?

20    Can you talk to me quickly about that?

21            MS. REILLY:  Absolutely, Your Honor.  And that,

22    frankly, is an appropriations clause issue under the state

23    constitution and actually has nothing to do with this.  So I

24    think it's important first to look at the exact language

25    instead of just sort of the sweeping generalizations plaintiffs

 1   make.

 2        So the victims compensation fund for all the permits

 3   to purchase and the identification cards that the

 4   superintendent issued, so state employee issued, go into the

 5   victims compensation fund, which is the state fund.

 6        Just because, no offense to the legislative

 7   intervenors, but just because this Legislature said they're

 8   going to the victims compensation fund, 100 percent of them,

 9   does not mean that, you know, the Legislature that enacts the

10   next budget in July, on July 1st, has to abide by that.  They

11   could be like no, actually, we're going to use the money for

12   this other thing.  They can sweep that money there.

13        THE COURT:  But I thought the legislation talks about

14   defraying the cost of investigations; no?

15        MS. REILLY:  Yes.  So then, right.  But, yes, it

16   adjusts for inflation.  It defrays the cost of investigations.

17   It does the whole well, we needed a technology upgrade.  So it

18   has legitimate purpose and meets those needs.  But what the

19   State then does with that money, that's irrelevant to a Second

20   Amendment analysis.

21        The Legislature three years down the road isn't bound

22   by what this Legislature said.  Oh, this Legislature expressed

23   a wish to go to the victims compensation fund.  Three years

24   down the road we could be in the middle of another pandemic and

25   the Legislature could be like no, we want to use the money for

     1    that.  So where the money ultimately ends up in the state

     2    treasury, irrelevant.  And as --

     3            THE COURT:  But do the plaintiffs have a remedy to --

     4    let's say I agree with the plaintiffs, is it irreparable?  Is

     5    there a means for them to get the money back?

     6            MS. REILLY:  Your Honor, the question of -- first of

     7    all, I think there's a predicate question here, an open

     8    question of whether they can even seek damages for this type of

     9    harm.  And you see that plaintiffs had sort of their new cases.

    10    You see that in the *Freedom* case, which is 408 F.3d 112, where

    11    it said the cost of ordinary compliance, even if it can't

    12    receive compensation later, is not irreparable harm.

    13            THE COURT:  But is this a fee to exercise a Second

    14    Amendment right?

    15            MS. REILLY:  No.  It's entirely outside of the Second

    16    Amendment context, as I said before, because it fails -- it

    17    fails step one.  And there are fees, and I mentioned the right

    18    of the person to come to court and their charged fees.  And I

    19    recognize, it is not a perfect analogy because --

    20            THE COURT:  Do you also recognize that they can't

    21    have their Second Amendment right until they pay the fee?  Do

    22    you concede that?

    23            MS. REILLY:  But it's the fee itself, which they

    24    don't seem to challenge the fact of the fee; they seem to

    25    challenge the exorbitance, as they phrase it, of it.  It's not

*United States District Court*
*District of New Jersey*

JA3233

1   directly regulating the right to bear arms any more than in,

2   and this is what I was saying doesn't quite fit, in the First

3   Amendment context, you know, you have to pay for a permit in

4   order to do that.  It's irrelevant to the right.

5          There's a legitimate cost associated with issuing

6   permits, and issuing permits goes to core state interest.  Like

7   we really can't have people who are a danger to themselves or

8   others, you know, possessing, carrying handguns.  And so this

9   is -- and, Your Honor, dating back to -- the State cites nine

10  historical analogs where historically fees were imposed.

11             THE COURT:  Okay.

12             MS. REILLY:  That's it there.

13             With regard to the --

14             THE COURT:  Insurance?

15             MS. REILLY:  -- insurance.

16             THE COURT:  Okay.  If you don't have anything other

17  than what's in your brief, I do -- do you?

18             MS. REILLY:  I have -- I have, I think, some.

19             THE COURT:  Okay.  I'll hear you.

20             MS. REILLY:  Okay.  So, first of all, with regard to

21  insurance, I wanted to focus on the practicalities for a moment

22  of the situation.  The record shows now that there are four

23  types of policies available.  There's the homeowner's policy.

24  You can get a personal liability policy that covers all the

25  same risk.  You can get an umbrella policy, or now you can get

```
 1   a stand-alone firearm policy.  Prime Insurance is offering
 2   this, and they are licensed to do business in New Jersey.
 3          With regard to the cost, the State has demonstrated
 4   that, you know, a lot of folks are already covered by virtue of
 5   their homeowner's policy, and --
 6          THE COURT:  Do you know the answer to this question?
 7   I was surprised to learn it, that...
 8          (Feedback.)
 9          THE COURT:  It's that I'm permitting remote access,
10   and I think it's through the remote access.  So it's coming
11   from those listening in.
12          I was surprised to learn this, that some homeowner's
13   policies have exclusions -- or maybe they all do, I don't
14   know -- for willful conduct.  And there is state law that says
15   that willful conduct includes the exercise of self-defense.
16   That was surprising for me to learn.  Do you know what New
17   Jersey law says?
18          MS. REILLY:  I am not familiar with that law, Your
19   Honor.  And if you --
20          THE COURT:  It would change your analysis; would it
21   not?
22          MS. REILLY:  That it says self -- so what I think is
23   at issue here is what the policies cover and what the liability
24   insurance provision is intended to cover is accidental
25   discharges, not intentional conduct, whether that conduct --
```

1          THE COURT:  But the core of the -- I don't -- well...

2          MS. REILLY:  So when you're exercising your right to

3   self-defense, you are intentionally engaging in conduct.

4   Whether or not that's justified, that's another issue.  But

5   what the liability provision is designed to do is to cover

6   accidental discharges of weapons.

7          THE COURT:  Okay.

8          MS. REILLY:  And we see that in the Kochenburger

9   certification where he defines an occurrence as a defined term

10  which requires it to be an accident.

11         I think the idea is that you don't want to encourage

12  the intentional discharge of a gun at another person by giving

13  the person like oh, well, I shot him.  Like, say it's not

14  self-defense.  Yeah, well, I shot him, but all my costs are

15  going to be covered here.  I think that's what it's trying to

16  get at by focusing only on the accidental because the

17  incentive --

18         THE COURT:  Right.  But I still think you -- and I

19  really don't want to dwell on it, but I think you have a real

20  problem if in the act of self-defense a bystander is harmed.

21         MS. REILLY:  Then that's different.

22         THE COURT:  That would be accidental.  You're

23  exercising your Second Amendment right to self-defense.  And so

24  I can see a parade of horribles.

25         MS. REILLY:  And absolutely.  There's a -- and that

1    would be a case-by-case determination of intentionality.  And

2    you see that the New Jersey Supreme Court actually addressed

3    this issue.  So kids were like firing a BB gun at a car and

4    they intentionally were firing that gun, but like, oh, my

5    goodness, the gun, it hit the car and ricocheted into the

6    driver's eye, blinding them.  And the question was, you know,

7    was that covered?  And the Supreme Court was like no, he

8    never -- they never intended to injure the driver, and they

9    deemed that it was covered under the insurance policy.  But

10   questions like that are insurance determinations, you know,

11   they're not Second Amendment determinations.

12         And then, again, with regard to the plain text

13   argument, the first prong of *Bruen* there, we would again say

14   that the plaintiffs have not met their burden of proving that,

15   you know, merely having insurance falls within the scope of the

16   Second Amendment.  There -- you know, it's part of the way of

17   making sure like background checks are of, you know, promoting

18   safe carry.

19         And then as the *Sebelius* case stated, the compelled

20   purchase of the first isn't a regulation of the second.  And

21   they were saying that in regard to the health insurance

22   context, but the same principle applies here.

23         And I would just like to point out with regard to the

24   surety laws.  You know, as the Rivas declaration says, it was

25   the common law during Colonial times to have such surety

 1    statutes.  Later on, ten jurisdictions actually codified them.

 2    Of those ten, two of them, Virginia and West Virginia, didn't

 3    require any sort of accusation to be made against the person.

 4              And as for the others, they're actually...

 5              (Feedback.)

 6              They're actually very close to what the State's doing

 7    with liability insurance and have the same why and how metrics.

 8    So the others, Massachusetts being an example, say on complaint

 9    of any person having reason to fear injury or breach of the

10    peace.

11              So what's happening here is under a reasonable person

12    standard saying there's a cause to fear injury from accidental

13    discharge of firearms.  And what the insurance companies do is

14    they calibrate it to the level of risk for each person.

15              So the why, why are we doing this, are the same in

16    both instances.  Why?  We're shifting the cost of any

17    accidental damage away from the victim to the owner, and we're

18    also incentivizing safe carry.  And how are we doing it?  We're

19    doing it by putting -- by putting -- because of the fear of

20    injury of accidental injury.

21              And I won't go into what the State has already

22    addressed --

23              THE COURT:  In your submissions, yes.

24              MS. REILLY:  -- strict liability.  And I would just

25    like to address the criminal penalty if I could for a moment.

```
 1          So I think a useful analogy here is with the -- the
 2   National Firearms Act, it causes -- it requires the makers,
 3   importers and transferors of firearms to have to pay a
 4   registration fee.  And if you don't -- if you're found to have
 5   violated that, then you have a $10,000 fine or you face
 6   imprisonment for ten years.
 7          And so courts addressed that, like is that a burden
 8   there?  And they said under federal law on the Second Amendment
 9   and said no, because the burden imposed on the National
10   Firearms Act is the tack -- or is the fee...
11          (Feedback.)
12          The burden imposed by the National Firearms Act is
13   the fee itself, not the penalty that the Legislature chooses.
14   The Legislature retains plenary discretion to decide how they
15   want to make the penalty by the degree of enforcement that they
16   want to have.
17          Does Your Honor have any specific questions?
18          THE COURT:  I don't.  Thank you.
19          MS. REILLY:  Okay.  Any questions on the permit
20   disqualifiers or the dangerous standard or the First Amendment
21   claims that plaintiffs raise?
22          THE COURT:  I don't have any further -- I have one
23   last question for you, Ms. Reilly.  Thank you.  How do you
24   define unjustifiable display?
25          MS. REILLY:  Yes, Your Honor.
```

*United States District Court*
*District of New Jersey*

```
1              THE COURT:  And who decides it?

2              MS. REILLY:  So, first of all, Your Honor, I'd like

3    to just start with the standard.  Under the vagueness standard,

4    if it's a facial challenge, as we have here, plaintiffs have to

5    prove that it's vague in all of its applications.  It's okay

6    it's imprecise, as long as it's comprehensible.  It just has

7    to --

8              THE COURT:  So let's just spend a minute on it.  What

9    is an unjustified display?

10             MS. REILLY:  Okay.  So --

11             THE COURT:  And can it be -- can one officer believe

12   that it's unjustified and another believe that it is?

13             MS. REILLY:  So, Your Honor, I'll give the simplified

14   answer first and then I'll be happy to go back and go into the

15   text to see how we got there.

16             So the simple answer is unjustified display is a

17   knowing display of a firearm outside of the holster for a

18   purpose other than self-defense.

19             THE COURT:  Is it a strict liability offense?

20             MS. REILLY:  It's a knowing display.

21             THE COURT:  Okay.  So it's not a strict liability?

22             MS. REILLY:  It is not.  And the way we get there

23   is -- so under the criminal code 2C:2-2(c)(3), if the mens rea

24   is not specified, then it's knowingly.  And then under the

25   criminal code 2C:2-2(b)(2), knowingly means either the person
```

*United States District Court*
*District of New Jersey*

JA3240

 1   is aware or they have -- that, you know, such circumstances

 2   exist or they're aware that there's a high probability of their

 3   existence.

 4        And then to look at the text of Chapter 131 itself,

 5   section 3(a) defines how you have to carry.  You have to carry

 6   in a holster.  And then section 3(h) gives the holster

 7   specifications.  It has to be a sheath that securely retains

 8   the handgun.  The main body of the firearm has to be concealed,

 9   and the trigger has to be covered and inaccessible.

10        And then section 3A again exempts sort of brief

11   incidental exposure.  So it expressly says like, okay, so your

12   clothing shifted while, you know, you were moving, that doesn't

13   count.  If it's a brief incidental exposure, does not count.

14   And then what is a justifiable purpose?  We know what a

15   justifiable purpose is from *Bruen* and *Heller* saying that the

16   core of the Second Amendment is your right to self-defense.  So

17   the simple definition again is a knowing display of a firearm

18   outside of the holster for a purpose other than self-defense.

19        And if it would be helpful for me to give a few

20   examples of sort of what's in and out there.

21        THE COURT:  Well, let me just ask:  Who decides

22   whether or not it was self-defense, the police officer or the

23   holder?

24        MS. REILLY:  And, again, on any individual challenge,

25   and there's always going to be some like hypotheticals, well,

```
 1    what about this, what about that, but under the facial

 2    challenge that they've brought, they have to show it's vague in

 3    all of its applications.  And I think we would all agree if

 4    someone, despite the holster carry requirements and despite the

 5    self-defense requirement, were to go into the parent-teacher

 6    meeting and unholster their gun and put it on the desk and say

 7    I would like to discuss with you my daughter's grade in

 8    history, is that used for self-defense?  No.

 9            What if a person were to be like, oh, my goodness,

10    this is so cool, I just got my new gun and they're outside with

11    their friend in public and they're spinning it on -- it's not

12    in the holster, they're spinning it on their finger or they're

13    like here, look at this, passing it around where it could drop,

14    things like that, I think we could all agree that that would be

15    an unjustified display of the handgun because it's not in the

16    holster and it's not for purposes of self-defense.

17            THE COURT:  Right.

18            MS. REILLY:  So I think the State has --

19            THE COURT:  I think what this illustrates though is I

20    think that there is some room for disagreement.  Can we agree

21    on that?

22            MS. REILLY:  And -- and that is fine under the

23    vagueness standard.  You know, even if there's a, you know, it

24    just has to give fair notice of...

25            (Feedback.)
```

```
 1              THE COURT:  Of what the legislation prohibits, yes.

 2              MS. REILLY:  Yeah.  And it's fine if it is imprecise.

 3    It's fine if it's imprecise but comprehensible enough.  And

 4    that's the Fullmer, Third Circuit.

 5              And as the U.S. Supreme Court said in Colten, like

 6    just because we have practical difficulties in sort of drafting

 7    a statute so it's not too general, but it's also not so

 8    specific that you don't get -- you know, capture all the

 9    conduct you want, that does not raise it into a constitutional

10    challenge.

11              So I think the State has proven all it needs to with

12    regard to vagueness.

13              THE COURT:  Okay.  Thank you, Ms. Reilly.  You may

14    step down.  Thank you.

15              Okay.  Mr. Kologi, if you could limit your comments,

16    please, to those that you have not already made in your briefs.

17              MR. KOLOGI:  Your Honor, I promise that I will not be

18    duplicative in any way, shape or form, to an extent I can.

19              THE COURT:  Okay.

20              MR. KOLOGI:  Judge, at the outset, I trust that in

21    Your Honor's career, you've dealt with many situations where

22    you're dealing with a challenge to a local piece of legislation

23    either at the ordinance level, the county level, regulations,

24    the state level, a statute, and very often they're drafted in a

25    very cursory, I'll say, you know, just not a really
```

 1 | well-drafted document, which makes it much harder for the Court

 2 | to answer a lot of questions and discern things it has to

 3 | discern.  That's not the case here.  We're here on behalf of

 4 | the Assembly Speaker and the Senate President.  And what I am

 5 | offering to the Court is on its face, this document, the bill

 6 | that we're talking about, goes light years ahead of where most

 7 | legislation goes in terms of its drafting.

 8 |      Section 1, this lengthy preamble, number one, it

 9 | recognizes *Bruen* is controlling.  Number two, it does away with

10 | justifiable need.  Number three, it recognizes the need to deal

11 | with historical analogs.  So on its face, this is a good, solid

12 | piece of legislation.  It's followed the protocols.  The issue

13 | is going to be, does the Court agree with the historical

14 | analogs.  At the end of the day, that's pretty much what it's

15 | going to --

16 |      THE COURT:  I do want to back up to the preamble

17 | though, Mr. Kologi, because I do think the legislation

18 | misrepresents the Johns Hopkins study.  I was disappointed to

19 | see that.  I think it misrepresents what the Johns Hopkins

20 | study said.  Because the analysis in the Johns Hopkins study

21 | dealt with going from a "shall" issue to a permitless state,

22 | and that's what the focus of that study was, which is not what

23 | we have here.

24 |      So I was disappointed to see that the Legislature

25 | would put in its legislation a study that really is not

```
 1    applicable to the legislation.  And the study is alarming, but
 2    it's not applicable here.
 3           I guess I say that as an observation.  But I think
 4    that if the State's going to rely upon the Johns Hopkins study,
 5    it should characterize it correctly, and I'll leave it at that.
 6           MR. KOLOGI:  Judge, I will certainly, you know,
 7    acknowledge that.  And without having the whole study in front
 8    of me, that, you know, there could be different
 9    interpretations.  I take Your Honor's point, and I will
10    certainly, you know, review that further.
11           As I said, at the end of the day, it's going to be up
12    to this Court to determine whether the historical analogs fit.
13    But the point is, the State has followed the process and has
14    basically agreed to the process that we're following, which is
15    probably a lot more than Your Honor gets in many other cases
16    involving legislation.
17           Now, Judge, I'd like to address something that really
18    is being addressed for the first time here today, and again,
19    keeping in mind, we're here today for the limited purpose of a
20    preliminary injunction.  We're not here to litigate the whole
21    case, although I've heard a lot of great stuff and there's a
22    lot of great stuff in the record.  But the limited purpose of
23    us here today is the preliminary injunction.  And under the
24    Riley case, obviously there's four prongs, and the plaintiffs
25    have to -- actually, the one plaintiff has to satisfy four of
```

1   them.

2          My understanding is that the Koons plaintiffs are not

3   seeking anything on the insurance issue, on 4A, only the Siegel

4   plaintiffs are.  And I believe I'm correct on that.  I think

5   the Koons plaintiffs submitted two certifications or

6   declarations which basically supported standing, but they are

7   not into the merits of it.

8          And if you look at the submissions, number one,

9   today, I heard nothing -- the silence was deafening -- I heard

10  nothing in the proffers by plaintiffs' attorney about the

11  insurance issue.

12         Number two, if you look at the submissions, the

13  totality of the --

14         THE COURT:  Well, I want to be fair to all of you.  I

15  did cut some of you off.  Some of you I told you I wasn't

16  interested in hearing.  So just because they didn't talk about

17  it doesn't mean they don't care about it.

18         MR. KOLOGI:  Okay.  Just pointing it out for the

19  record, Your Honor.

20         If Your Honor takes a look at the brief, and I

21  believe it's page 16 of the Siegel brief, it's less than a

22  page, it's like a half a page on one, another half a page on

23  the next one, maybe 16 and 17, and it basically just gives a

24  kind of conclusory net opinion argument that, well, the

25  insurance will be more expensive.  That is basically the

```
 1    totality, to my knowledge, of what has been submitted on this
 2    issue of insurance.  And I submit that, you know, obviously
 3    they have to prove a likelihood of success on the merits.
 4            Now, looking at what we have provided the Court with,
 5    number one, again, this is the first time it's being argued, so
 6    there's really not a lot here.  But if you compare it to the
 7    allegations in the complaint that the insurance would impose a
 8    crushing financial burden, there's a substantial financial
 9    burden, there are insurance requirements that have no precedent
10    in history.  And I've got all the pages and the cites, but
11    these are all in the Siegel complaint.
12            Our position is that the insurance requirement is no
13    different in terms of substance than any of the other minor or
14    significant requirements of licensure, firearms training
15    course, fingerprinting, background checks and all that other
16    type of thing.
17            And the plaintiffs who have the burden have not come
18    forward with anything to dispute that, which goes, again,
19    directly to the issue of their ability to carry this matter on
20    the merits.  The Kochenburger certification, and, Your Honor,
21    you brought --
22            (Feedback.)
23            THE COURT:  Go ahead.
24            MR. KOLOGI:  You brought up a great point which I'm
25    going to get to momentarily, but if I'm saying his name right,
```

1     the Kochenburger certification basically says that coverage for

2     accidental firearms injuries, deaths, et cetera, are under most

3     homeowner's insurance policies and that he is unaware of any

4     that had any exclusions.

5              Now, I understand Your Honor's comments earlier that

6     it had come to your attention.  That was the first I heard that

7     because I didn't see it in the paperwork.  But I know from

8     years of being a little bit of a PI lawyer that there's a whole

9     body of law on what is an intentional act in the context of did

10    you intend to do the act vis-a-vis intend to bring about the

11    result.  And I think the deputy attorney general, the BB gun

12    example was very illustrative of that fact.  You could shoot at

13    a car with a BB gun and it somehow ricochets and you hit the

14    guy in the eye.  So you intended to do the act but not the

15    result.  There's a whole body of case law on that.  And since I

16    just heard it for the first time, I'm not in a position to

17    argue it, but it certainly is an issue.

18             But the point is, in the papers that are before Your

19    Honor today, you know, there is nothing other than everything

20    that we've given and a net allegation by the other side that

21    it's going to be expensive.

22             And, again, we are viewing this.  Now, if Your Honor

23    somehow viewed this differently that this impacted -- we're

24    saying this does not impact on the Second Amendment.  This is

25    not something that goes -- you know, it's not an infringement

 1   on the Second Amendment.  It doesn't violate your ability to

 2   carry a gun, to transport a gun, to fire a gun, to do anything

 3   like that.  This is another paperwork type of requirement.  And

 4   that's all it is.  And to characterize it as anything else, you

 5   know, I think would be really taking it out of context.

 6            Now, if for whatever reason Your Honor found that it

 7   did impact on the Second Amendment, then Your Honor would have

 8   to get into the analogs and we have the surety analogs and we

 9   have all of that stuff, and I'm not going to beat the horse to

10   death on that now.  You've got thousands of pages, and

11   certainly it's all in there.  But I think when we look at the

12   big picture here, there is nothing to defeat allowing the

13   insurance requirement to continue.  And I would ask that you

14   allow that to continue and not issue any injunctive relief on

15   that.

16            My last point, Judge, and it's in point three of our

17   brief, two of the factors that are required under *Riley* is the

18   possibility of harm to other parties and the public interest.

19   I understand Your Honor is, you know -- and unfortunately, I

20   have it here in my notes, the Johns Hopkins study, and there's

21   another study.  But to the extent our position is that those

22   studies indicate, no matter how you read them, that the states

23   that have let's say lightened up on the requirements of gun

24   carrying have had an increase in gun-related incidents.  I

25   mean, I think it seems like a reasonable inference to be drawn.

1    You're not going to have less inference -- less of a problem.

2    The more guns out there, it shouldn't go down.  It should, you

3    know, likely go up.  And these two studies that are cited in

4    our brief support that proposition.

5           If that's the case, we're talking about -- I mean,

6    guns only have two functions -- to kill or to seriously injure.

7    So if you have a situation where the danger to the public --

8           THE COURT:  You forgot the right to self-defense.

9           MR. KOLOGI:  I'm sorry, Your Honor?

10          THE COURT:  You forgot about the right to

11   self-defense.  You said guns only have two functions -- to kill

12   or to seriously injure.  But you forgot about the right to

13   self-defense.

14          MR. KOLOGI:  Well, let me qualify it.  The gun

15   itself, the metal object that has the cylinders or that's the

16   automatic, there's only two things that that could do if it

17   makes contact with somebody.  It's either going to injure them

18   or kill them, okay.

19          THE COURT:  Or defend the --

20          MR. KOLOGI:  The purpose of using it --

21          THE COURT:  Excuse me.

22          MR. KOLOGI:  I'm sorry, Your Honor.

23          THE COURT:  Or to defend the person.

24          MR. KOLOGI:  Well, I would say that goes to the

25   purpose as opposed to the mechanics, but I defer to Your

*United States District Court*
*District of New Jersey*

JA3250

```
 1    Honor's -- I think we're saying the same thing.
 2            THE COURT:  Well, I hope we are.  But I think it's
 3    important to the conversation that we be careful with the words
 4    we use.
 5            Do guns kill?  Yes.  Do guns give someone the right
 6    to self-defense?  Yes.  So I think it's important that when we
 7    have this conversation, we have a fair one.  That's all I'm
 8    saying.
 9            MR. KOLOGI:  Judge, I certainly didn't mean to not be
10    fair.  But the point is, there's no coming back from it.  The
11    danger to the public and the danger to other people, whether
12    it's a death by a gun or a serious injury by a gun, right,
13    wrong or indifferent, at the end of the day there's no coming
14    back from that.  So that is the factor that we're saying how
15    can you possibly say that there's not a public interest in not
16    having gun-related deaths or gun-related injuries?
17            THE COURT:  I don't think anyone is saying that,
18    Mr. Kologi.  In fairness to the plaintiffs, I don't think these
19    plaintiffs are standing before this Court or any court and
20    saying that that's not a public interest.  I don't think that's
21    what they're saying.
22            MR. KOLOGI:  But to get a TRO, they would have to
23    demonstrate to Your Honor's satisfaction that there is no
24    adverse public interest to people carrying guns.
25            THE COURT:  Say it again.  Try it again.
```

```
 1              MR. KOLOGI:  I'm sorry.  I said TRO.  To get a
 2    preliminary injunction today to meet those other two prongs,
 3    would they not have to demonstrate that there is no significant
 4    adversity to the public interest or to the safety of others?  I
 5    think our conversation was just, I mean, it clearly is.
 6              THE COURT:  Well, I think the law requires a
 7    balancing of the interest.  It's not an either -- it's not a
 8    none or all.  It's a balancing of the interest.  And so clearly
 9    the State has, as it has argued, has a right to protect its
10    citizens.  And the plaintiffs have a right to self-defense
11    under the Second Amendment.  And so it's not an all-or-nothing.
12    You seem to be saying it's an all-or-nothing.  It isn't.  It's
13    a balancing of.  And that's what the law requires, the
14    balancing of the equities.
15              MR. KOLOGI:  Well, again, Judge, if we balance the
16    equities, I didn't really want to get into balancing, but if
17    we're going to do it, that's fine.
18              THE COURT:  But that's what the factor is, though,
19    yeah.
20              MR. KOLOGI:  Okay.  But the balancing on the side of
21    the gun owner is I'm not going to be able to carry my gun into
22    this particular place.  I can carry it.  I can carry it a lot
23    of places.  This particular place I can't carry it.  The
24    balance in terms of the injury to the other person is there's
25    either a death or a serious injury, or the significant
```

 1  potential for a death or a serious injury.  So when you weigh

 2  the two, I mean, I wouldn't use the word "inconvenience"

 3  because we're talking about a significant constitutional right,

 4  but just for the purposes of our argument with a small eye.

 5       THE COURT:  Okay.  So you seem to be saying -- and

 6  let me see if I can ask the question this way, because we're

 7  talking about the balancing of the equities -- you seem to be

 8  saying to me that there is no difference between a law-abiding

 9  citizen who fulfills the requirements that the legislation

10  requires to obtain a carry permit versus those who do not.

11  That's what you seem to be saying to me.  Who's more dangerous?

12       MR. KOLOGI:  Well, Judge, I mean, you've

13  characterized it in a broader sense than I think what we spoke

14  about.  I would just like to make it more limited, that when

15  we're talking about something where the possibility on one side

16  of the scale is a death or a serious injury, to me that is a

17  significant problem for the public safety and for affected

18  people.

19       When we're talking about the balancing on the other

20  side is I can't bring my gun into this particular place.  And

21  again, this isn't forever.  We're only here today on a

22  preliminary injunction.

23       THE COURT:  No, no.  But I really want to hold you to

24  it, because you don't seem to be making a distinction between

25  the types of plaintiffs here who have gone through these

*United States District Court*
*District of New Jersey*

 1   rigorous requirements and have obtained a carry permit to
 2   felons who haven't.  You just seem to be saying well, anyone
 3   who walks into a restaurant and there's a death versus a
 4   non-death, that's the analysis, but I don't think that's a fair
 5   analysis.  I don't think that's the fair analysis that this
 6   Court should be doing, unless you're going to tell me, maybe
 7   this is the better question, do you have evidence to support
 8   the position that there is an increased -- that there is
 9   increased violence by issuing more permits in the manner that
10   this legislation requires?  Do you have that evidence?

11          MR. KOLOGI:  Well, Judge, there will be no evidence,
12   and I think this was brought up earlier in either the paperwork
13   or a transcript, in New Jersey because this is a relatively new
14   statute.  And government being what it is, statistics wouldn't
15   be compiled.  So we have to look to extrinsic sources.  Of
16   course, one of the sources I was going to cite was the Johns
17   Hopkins study, and then there was a second study.

18          THE COURT:  Right.  Just to be clear, the reason I'm
19   taking you a little bit to task on the Johns Hopkins study is
20   that in that study, they analyzed going to a permitless
21   scenario.  We don't have that here.  This legislation requires
22   a very rigorous, extensive background permit process.

23          So I think it's unfair to say look at these studies
24   and look at the increase in shootings and officer involvement
25   when they don't apply to the facts of this case.  That's what I

```
 1    want you to focus on.

 2           MR. KOLOGI:  Well, Judge, if you're asking me to

 3    articulate what are the dangers to the public interest and to

 4    individuals, we thought that obviously injury or death by

 5    firearms are the most significant.  I don't have anything in

 6    front of me at the moment in addition to that.  But we think

 7    that that, you know, is the gravamen of the issue.  I'm sorry

 8    if I, respectfully, am not responding, or I'm not meaning to

 9    disagree with you.  I'm just saying that that's our viewpoint

10    of it.

11           THE COURT:  No.  I think that -- I guess to sum it

12    up, your viewpoint is that when there's more guns, there's more

13    violence, that's it.  In a nutshell, that's what you're saying,

14    regardless of how those guns are obtained, whether lawfully

15    through law-abiding citizens, such as the plaintiffs here, or

16    through felons, because there's more guns, there's more

17    violence.  And that's the analysis you want me to engage in,

18    right?

19           MR. KOLOGI:  Well, that's correct, Your Honor.

20           THE COURT:  But that's not the record before me.  The

21    record before me is I have to look at the evidence, it seems to

22    me, when I look at the balancing of the equities under the law,

23    is it has to be -- it has to deal with the evidence that

24    relates to law-abiding citizens who obtain carry permits.

25           MR. KOLOGI:  Well, Judge --
```

```
 1            THE COURT:  It just seems to me.  Maybe we're saying
 2    the same thing, and maybe we're going in circles.  I don't
 3    know.
 4            MR. KOLOGI:  I think we're pretty much -- I just need
 5    to get a little clarification from the Court, if I may.
 6            THE COURT:  Yeah.
 7            MR. KOLOGI:  They have the burden of proving prongs
 8    three and four, the public interest and the injury to other
 9    people.
10            THE COURT:  Yes.
11            MR. KOLOGI:  We just gave you what we believe are the
12    most compelling examples of that, death, serious injury.
13            I don't know if the Court's saying they don't have to
14    prove that now.  I'm just trying to understand Your Honor's
15    process.  I'm sorry.
16            THE COURT:  No.  But -- because I think that in your
17    comments, when you make those kinds of comments, you are asking
18    this Court to presume that those who have valid carry permits
19    will somehow engage in violence.  And I think that is a step
20    taken too far unless you can show me evidence of such.
21            MR. KOLOGI:  Judge, I will say that that is not what
22    I'm asking.  What I'm asking is the Court to rely on the
23    studies that were submitted because we don't have any actual
24    empirical data from New Jersey or statistics.  It's too soon.
25    I'm asking the Court to rely on the studies submitted for the
```

```
 1   general proposition that the more guns out there, the more gun

 2   incidents, the more likely there's going to be deaths or

 3   there's going to be injuries, that's it.

 4              THE COURT:  And that --

 5              MR. KOLOGI:  I'm not saying it's going to come from

 6   law-abiding citizens.  They could be law abiding 364 days a

 7   year and on that one day go awry, you know.

 8              THE COURT:  Okay.  And that helps clarify it.

 9              MR. KOLOGI:  I appreciate it, Judge.  Thank you.

10              THE COURT:  That is how I understood your argument.

11   Because in a nutshell, it is the State's position that there

12   should be no guns?

13              MR. KOLOGI:  I'm getting less articulate as I'm

14   getting older, but thank you for reaching out for it.

15              THE COURT:  Yes.  Okay.

16              MR. KOLOGI:  Judge, that's the essence of my

17   submission.  We're going to rely on everything -- I mean, the

18   Attorney General's Office and the Deputy Solicitor General did

19   a phenomenal job, I mean, pelting this Court.  At the TRO

20   stage, you had this much to work with.  I think you've got

21   quite a bit more now, which, in my mind, would enable the Court

22   to, you know, obviously potentially reach different conclusions

23   than at the TRO.

24              And with that, I will sit down unless you have any

25   other questions.
```

*United States District Court*
*District of New Jersey*

JA3257

```
1            THE COURT:  Thank you, Mr. Kologi.

2            MR. KOLOGI:  Thank you, Judge.  Nice to see you.

3            THE COURT:  Nice to see you.  Nice to see all of you.

4   We have gone very long.  It's now four hours.  I am very

5   appreciative of all of the hard work that you've all done and

6   the great advocacy that you have all done on behalf of your

7   clients.

8            I don't want to deprive the plaintiffs of their

9   responsibility to respond, but it is late.  We're all getting a

10  little tired.  Here's what I'm going to do:  I'm going to give

11  you an opportunity to give me a submission, no more than eight

12  pages per side, of anything you want to respond to that was

13  said here today, all right?  And by eight pages, I mean eight

14  pages, no exhibits, no -- okay.  Eight pages.

15           There were one or two areas where I thought I would

16  want further briefing, and I can't remember what they are.

17           Yes, Mr. Schmutter.

18           MR. SCHMUTTER:  Judge, I think you wanted additional

19  briefing on the enumeration of disqualifying categories versus

20  the ad hoc, right?

21           THE COURT:  Okay.  So I'll give you a couple more

22  pages on that, and a couple more pages on that, Ms. Cai, in

23  response.  But it's eight, and so if you add that, then I'll

24  make it ten and ten, okay?

25           MR. SCHMUTTER:  So, Judge, I have a question about
```

     1    the enumeration versus ad hoc.  What exactly does Your Honor
     2    want to know?  Our contention about what other states do and
     3    what New Jersey does or --
     4            THE COURT:  Well, as I recall, I was asking you
     5    questions about, well, what are you really expecting the State
     6    to do?  You don't like the language that's in the legislation,
     7    and your comments to me were, well, other states do it so why
     8    can't New Jersey?  I would be interested to see what it is that
     9    you are speaking of.
    10            MR. SCHMUTTER:  Okay.  Thank you, Judge.
    11            MS. CAI:  Okay.  Your Honor, two questions.  Ten
    12    pages, single- or double-spaced?  And what date would you like
    13    the submissions?  There's a huge difference in terms of how
    14    much you would have to read, Your Honor, so...
    15            THE COURT:  Double-spaced, please.  Ten days, a week.
    16    I don't -- most respectfully, I don't want the State telling me
    17    I'm taking too long.  So how much time do you want?
    18            (Laughter.)
    19            THE COURT:  Ms. Cai, I'll let you set the date.
    20            MS. CAI:  Sure, Your Honor.  How about -- we're happy
    21    to do it sooner rather than later.  So whatever date Your Honor
    22    wants.  Next Wednesday would be fine with us.
    23            THE COURT:  I won't get to it by Wednesday, so make
    24    it next Friday.
    25            MS. CAI:  Okay.  That's fine, Your Honor.

                         *United States District Court*
                           *District of New Jersey*

                                                            JA3259

```
 1                    THE COURT:  Next Friday, okay?  Yes?
 2                    MR. JENSEN:  All right.  Two things.  Could I maybe
 3       please ask for Monday because I was supposed to be on vacation
 4       all day next week?
 5                    THE COURT:  For what?
 6                    MS. CAI:  Of course.
 7                    THE COURT:  Ms. Cai said yes.  Thank you.
 8                    MR. JENSEN:  Second thing, we really need to do
 9       something to brief this gun definition issue a little more.
10       Could we also get --
11                    THE COURT:  I really don't think you do.
12                    MR. JENSEN:  You don't think so?
13                    THE COURT:  No.
14                    MR. JENSEN:  All right.
15                    MR. SCHMUTTER:  Judge, I'm sorry.  Are we
16       simultaneously submitting on Monday?
17                    THE COURT:  Yes.  Yeah.  I'm not going to have you
18       two going back and forth.  You folks can't hardly agree on
19       anything.
20                    (Laughter.)
21                    MR. KOLOGI:  Your Honor, will a text order follow
22       embodying what you want?
23                    THE COURT:  No; wasn't planning on it.
24                    MR. KOLOGI:  Or we're relying on our notes?
25                    THE COURT:  Yeah, you're relying on your notes.
```

```
 1              MR. KOLOGI:  Thank you.

 2              THE COURT:  And you'll have the transcript.  I

 3    presume you're ordering it.

 4              MR. SCHMUTTER:  And it's ten pages, not eight,

 5    correct?

 6              THE COURT:  I'm giving you ten if you're addressing

 7    this issue which I would like further briefing on, yeah.

 8              MR. SCHMUTTER:  Yes.  Okay.

 9              THE COURT:  Ms. Cai, you had said something in your

10    oral argument, and I think I may have intimated I wanted

11    further briefing on it, so when you review the transcript, look

12    and see.

13              MS. CAI:  Yes, Your Honor.

14              THE COURT:  Just try to include that, because it's

15    obviously something I would be interested in if I said that to

16    you, so...

17              Okay.  I thank you all.  It's great to see you all.

18    Okay.  I'll take it under advisement.  Thank you.

19              MR. JENSEN:  Thank you, Your Honor.

20              MR. SCHMUTTER:  Thank you, Judge.

21              THE COURTROOM DEPUTY:  All rise.

22              (Proceedings concluded at 2:15 p.m.)

23              - - - - - - - - - - - - - - - - - - - - - -
```

**FEDERAL OFFICIAL COURT REPORTER'S CERTIFICATE**

```
24              - - - - - - - - - - - - - - - - - - - - - -

25         I certify that the foregoing is a correct transcript
```

*United States District Court*
*District of New Jersey*

JA3261

 1   from the record of proceedings in the above-entitled matter.

 2

 3

 4   /S/John J. Kurz, RDR-RMR-CRR-CRC            March 18, 2023

 5   Court Reporter/Transcriber

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



*State of New Jersey*
OFFICE OF THE ATTORNEY GENERAL
DEPARTMENT OF LAW AND PUBLIC SAFETY
PO BOX 080
TRENTON, NJ 08625-0080

PHILIP D. MURPHY
*Governor*

SHEILA Y. OLIVER
*Lt. Governor*

MATTHEW J. PLATKIN
*Attorney General*

March 27, 2023

The Honorable Renée Marie Bumb, U.S.D.J.
United States District Court for the District of New Jersey
Mitchell H. Cohen Building & U.S. Courthouse
4th & Cooper Streets
Camden, NJ 08101

    Re:    *Siegel v. Platkin*, 22-cv-7463; *Koons v. Platkin*, 22-cv-7464

Dear Chief Judge Bumb,

      To ensure a complete electronic record, attached please find an electronic version of the exhibits contained in the binder that State Defendants submitted to the Court during the hearing on March 17, 2023 (date corrected on Index sheet).

                        Respectfully submitted,

                        MATTHEW J. PLATKIN
                        ATTORNEY GENERAL OF NEW JERSEY

              By:  /s/  Angela Cai
                    Angela Cai
                    Deputy Solicitor General

cc:    All counsel via ECF



UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE

| | |
|---|---|
| AARON SIEGEL ET AL. | Hon. Renée Marie Bumb, U.S.D.J. |
|    Plaintiffs, | Hon. Ann Marie Donio, U.S.M.J. |
| v. | |
| MATTHEW J. PLATKIN, ET AL., | Docket No. 22-CV-7463 |
|    Defendants. | |

| | |
|---|---|
| RONALD KOONS; ET AL., | Hon. Reéne Marie Bumb, U.S.D.J. |
| *Plaintiffs,* | Hon. Ann Marie Donio, U.S.M.J. |
| v. | |
| MATTHEW J. PLATKIN, ET AL. | Docket No. 22-CV-7464 |
| *Defendants.* | |

**INDEX OF EXHIBITS**
**MARCH 17, 2023**

1. Timothy Cunningham, 1 A New and Complete Law Dictionary (1771)

2. Samuel Johnson, Dictionary of the English Language (1773)

3. T. Sheridan, A Complete Dictionary of the English Language (1797)

4. N. Bailey, Dictionarium Britannicum (1736)

5. S. Colt, Revolving gun, patented Feb. 25, 1836 (from Rutgers University Libraries)

6. James Robinson Planché, 1 A Cyclopædia of Costume or Dictionary of Dress (1876)

JA3264

TAB 1

A

# New and Complete Law-Dictionary,

O R,

## GENERAL ABRIDGMENT of the LAW:

O N

A more Extensive Plan than any LAW-DICTIONARY hitherto published.

CONTAINING

Not only the EXPLANATION of the TERMS but also the LAW itself,
both with Regard to *Theory* and *Practice*.

ALSO THE

INTERPRETATIONS of the WORDS made use of in our Ancient CHARTERS,
CHRONICLES, HISTORIES, RECORDS, and REGISTERS.

TOGETHER WITH

Such Knowledge as is necessary to illustrate the Antiquity of the LAW and our Original
Government and Customs in former Times.

The whole collected and extracted from all the Abridgments, Commentaries, Histories, Institutes, Registers,
Reports, and Year-books published to this Time; and adapted to the Use of Barristers, Attornies, Solicitors,
Justices of the Peace, Members of Parliament, Clergymen, &c. &c.

By T. CUNNINGHAM, Esq.

Barrister at Law, and Fellow of the Society of Antiquaries, LONDON.

IN TWO VOLUMES.

THE THIRD EDITION.

Corrected, Augmented, and Improved, and the ACTS OF PARLIAMENT continued to the Session ended
in July, One Thousand Seven Hundred and Eighty-three, inclusive.

VOL. II.

" *In Books of the Terms of Law should be comprised, not only the Exposition of the Terms of Law, but*
" *the Words of all Ancient Records and Precedents.*"
LORD BACON.

L O N D O N,

Printed for J. F. and C. RIVINGTON, T. LONGMAN, S. CROWDER, G. ROBINSON, W. FLEXNEY,
R. BALDWIN, and W. FOX.

MDCCLXXXIII.

O
KD
313
C95
1783
oversize

c.2

JA3266

# GUI

# GUN

vicar-general doth for the time depute. 13 *Eliz. cap.* 12. And the guardian of the spiritualities hath all manner of ecclesiastical jurisdiction of the courts, power of granting licences and dispensations, probate of wills, &c. during the vacancy, and of admitting and instituting clerks presented; but such guardians cannot as such consecrate or ordain, or present to any benefice. *Wood's Inst.* 25, 27. See *Bishop.*

**Guernsey, Jersey, Alderney, and Sark.** Provisions relating to the exportation of wool from *Southampton* to those islands, 12 *Car.* 2. *c.* 32. *f.* 12, 13, 14. 1 *W. & M. sess.* 1. *c.* 32. *f.* 14.

Spirits brought from thence charged with the excise, 2 *W. & M. sess.* 2. *cap.* 9. *sect.* 12. 4 *Ann. cap.* 6. *sect.* 34.

Goods of their own growth may be imported duty free, 3 *Geo.* 1. *c.* 4. *f.* 5.

Salt imported from thence to pay as foreign, 5 *Geo.* 1. *c.* 18. *f.* 11.

Their vessels how made liable to the payment of six pence a month to *Greenwich* hospital, 2 *Geo.* 2. *c.* 7.

**Guest,** (Sax. *gest,* Fr. *gist,* a stage of rest in a journey,) A lodger or stranger in an inn, &c. A guest who hath a piece of plate set before him in an inn, may be guilty of felony in fraudulently taking away the same, 1 *Hawk. P. C.* 90. And a guest having taken off the sheets from the bed, with intent to steal them, carried them into another room, and was apprehended before he could get away; this was adjudged larceny. *Ibid.* 92. Action lies against an innkeeper, refusing a guest lodging, &c. See *Inn.*

**Guidage,** (*Guidagium,*) Is an old legal word, signifying that which is given for safe-conduct through a strange land, or unknown country. *Est guidagium quod datur alicui, ut tuto conducatur per terram alterius.* Consuetud. Burgund. p. 119. 2 *Inst.* 526.

**Guiders,** Are those who lead fish to the net. 1 *Jac.* 1. *c.* 23.

**Guild,** A fraternity or company, and comes from the *Saxon* word *gildan,* which is *to pay;* because every one was *gildare,* i. e. to pay something towards the charge and support of the company. And from thence come *Guild-halls,* that is, the halls of the society or fraternity, where they meet and make orders and laws among themselves. The original was thus, viz. It was a law among the *Saxons,* that every freeman of fourteen years old should find sureties to keep the peace, or be committed; whereupon certain neighbours entered into an association, and became bound for each other, to produce him who committed an offence, or to make satisfaction to the injured party; which that they might the better do, they raised a sum of money among themselves, which they put into a common stock; and when one of their pledges had committed an offence, and was fled, then they made satisfaction out of this stock, by the payment of money, according to the quality of the offence. And because this association consisted of ten families, it was called a *Decennary*: and from hence came our fraternities. But as to the direct time, when these *guilds* had their origin in *England,* there is nothing of certainty to be found, since they were in use long before any formal licences were granted to them for such meetings. *Edward* the Third, in the fourteenth year of his reign, granted licences to the men of *Coventry* to erect a *Merchants* guild, and a fraternity of brethren and sisters, with a master or warden, and that they might make chantries, bestow alms, do other works of piety, and constitute ordinances touching the same, &c. So *Henry* the Fourth, in the fourth year of his reign, granted licence to found a *gild* of the Holy Cross at *Stratford upon Avon.* See *Antiquities of Warwickshire, fol.* 119 & 522. Guild, gild or geld (according to *Camden*) signifies also a tribute or tax, and the statutes of 27 *Ed.* 3. *stat.* 2. *cap.* 13. and 11 *H.* 7. *c.* 9. used *gildable* in the same sense with *taxable.* Guild (according to *Crompton* in his *Jurisdictions, fol.* 191.) signifies an amercement, as *soot-geld*; and *fol.* 197. he interprets it to be a prestation within the forest in these words, *To be quit of all manner of guilds is to be discharged of all manner of prestations, to be made for gathering sheaves of corn, lamb,*

and wool, to the use of foresters. The word is also mentioned in the statute 15 *Hen.* 6. *c.* 6. and 15 *Car.* 2. *c.* 7. By stat. 1 *Ed.* 6. *c.* 14. *f.* 9, 10, 11. Guilds and fraternities are given to the King.

**Guildhalda Teutonicorum.** See *Gild.*

**Guild-hall,** The chief *hall* of the city of *London.* Gildarum nomine continentur non solum minores fraternitates & sodalitia, sed ipsæ etiam civitatum communitates, says the learned *Spelman.* See *Guild.*

**Guild-rents,** Are rents payable to the crown by any *guild* or fraternity, or such rents as formerly belonged to religious *guilds,* and came to the crown at the general dissolution, ordered for sale by the stat. 22 *Car.* 2. *c.* 6.

**Guinea company,** Traders therein not liable to bankruptcy, 13 & 14 *Car.* 2. *c.* 24. *f.* 3.

**Guinea-pepper,** otherwise called *Indian* pepper, Is mentioned among drugs and spices to be garbled, by 1 *Jac.* 1. *c.* 19.

**Guineas and half-guineas,** may be imported, 8 *W.* 3. *cap.* 1.

**Gule of August,** (*Gula Augusti. West.* 2. *cap.* 30. 27 *Ed.* 3. *cap. unico. F. N. B. fol.* 62. alias *goule de August.* And *Plowden, fol.* 316. case of *mines.*) Is the day of St. *Peter ad Vincula,* which was wont to be, and is still celebrated upon the first of *August,* and probably called the *gule of August,* from *gula,* a throat. The reason we have in *Durand's Rationale Divinorum, lib.* 7. *cap. De facto Sancti Petri ad Vincula,* where he saith, that one *Quirinus,* a tribune, having a daughter that had a disease in her throat, went to *Alexander,* then pope of *Rome,* the sixth from St. *Peter,* and desired of him to borrow or see the chains that St. *Peter* was chained with under *Nero*; which request obtained, his said daughter kissing the said chain was cured of her disease, and *Quirinus* with his family baptized. *Tunc dictus Alexander papa,* saith *Durand, hoc festum in calendis Augusti celebrandum instituit, & in honorem beati Petri ecclesiam in urbe fabricavit, ubi ipsa vincula reposuit & Ad Vincula nominavit, & calendis Augusti dedicavit. In qua festivitate populus ille ipsa vincula hodie osculatur.* So that this day, which before was only called the *calends of August,* was upon this occasion termed indifferently, either from the instrument that wrought the miracle, St. *Peter's day ad vincula*; or from that part of the maid whereon the miracle was wrought, the *Gule of August.* See *Hospinian de Origine Festorum, fol.* 85. *Averagium æstivalia fieri debet inter Hock-day & Gulam Augusti. Rentale Manerii Regalis de* Wye. *Cowell, edit.* 1727.

**Guldum,** Taxation, or pecuniary imposition. *Abbas & conventus sunt quieti de eschaptis latronum, bobus, de disseisina,* guldis, *theoloniis, &c.* Cartular. Glaston. MS. fol. 87. a. *Cowell, edit.* 1727.

**Guiltwit,** Is an amends for trespass, according to *Saxton,* in his *Description of England, cap.* 11. But we may suppose it mistaken for *gyltwit,* because no such word is found either in *Spelman's Glossary,* the *Saxon Dictionary,* or ancient records. *Cowell, edit.* 1727.

**Gum,** Is a clammy or tough liquor issuing out of trees, and hardened by the sun. There are divers sorts of it brought from beyond sea, that are drugs to be garbled, as appeareth by the statute 1 *Jac. c.* 19.

**Gumus, Gumphus,** The hook upon which the hinge turns. *Cowell, edit.* 1727.

**Gun.** Stat. 33 *Hen.* 8. *cap.* 6. *f.* 1. enacts, That none shall shoot in, or use to keep in his house a hand-gun, cross-bow, hagbut or demihake, unless his lands are of the value of 100 *l.* a year, on pain to forfeit 10 *l.* for every such offence.

*Sect.* 2, &c. Howbeit, the followers of lords spiritual or temporal, knights, esquires, gentlemen, and the inhabitants of cities, boroughs or market towns, may keep in their houses, and use to shoot (but at a dead mark only) with any hand gun of the length of one yard, or hagbut, or demihake of three quarters of a yard; so may the owner of a ship, for the defence of his ship, and also he that dwells two furlongs distant from a town, or within five miles from the sea-coast. And this last may shoot at any wild beast or fowl, save only deer, heron, shovelard, partridge, wild swan or wild elke.

*Sect.*

4

JA3267

## GUN

*Sect.* 5. None may licenfe his fervant to fhoot, except his game-keeper, on pain of 10 *l.*

*Sect.* 12, 13. Gunfmiths or merchants may keep guns by them, obferving the lengths abovefaid.

*Sect.* 14. Proclamation to iffue before an offender can be punifhed.

*Sect.* 15. Owner of the gun to forfeit, and not the mafter of the houfe.

*Sect.* 16. It fhall be lawful for any perfon to convey the perfon offending againft this act before the next Juftice of peace; who, upon due examination and proof, fhall have power to commit him to prifon, there to remain till he has fatisfied the penalty, which in this cafe fhall be divided between the King and the party that fo takes the offender.

*Sect.* 19. Juftices of peace in their feffions, and ftewards of leets, have power to hear and determine thefe offences.

*Sect.* 20. Penalty of 20 *s.* a-piece on juries concealing offenders.

*Sect.* 22. Forfeitures arifing by this act fhall be fued for within one year by the King, and within fix months by a common perfon, otherwife they fhall be loft.

*Sect.* 24. Saving for fervants carrying guns by their mafters orders.

*S.* was convicted of fhooting in a gun contrary to this ftatute, and committed to gaol; and upon *hab. corp.* exceptions were taken to the return. Firft, that the caption is taken before *J. S.* and *T. N. ad pacem confervandam*, without faying (Juftices), and fo by what appears they may be conftables. Secondly, that it appears to be a conviction by oath, where the ftatute fays, "proof and examination" which muft be intended by jury. Thirdly, that it does not appear, that it was before the next Juftices as it ought to be. Fourthly, nor that the ftatute had been proclaimed in the fame county, whereas there is an exprefs provifion in the ftatute, that none fhall be punifhed before it is proclaimed, which *Twifden* J. faid ought to appear in the return (though the ftatute perhaps was proclaimed one hundred years fince). 1 *Sid.* 419. No judgment. *Trin.* 21 *Car.* 2. *B. R. The King v. Saunders.* 1 *Saund.* 263. *S. C.* fays, that it was quafhed for the exception, that the conviction was faid to be *coram T. B. & G. B. ar. duobus Juftic. domini Regis ad pacem in com. prædicto confervand.* But that the word *affign* was omitted. For it ought to have been *confervand. affignatis.* And fo it does not appear, whether the faid Juftices were affigned to keep the peace or not. The reporter adds a *nota*, that the conviction was before two Juftices of peace, but the ftatute gives authority to one Juftice alone, being the next Juftice of the county where the offence is committed, to commit the offender for the forfeiture, but that here it does not appear whether either of the faid two Juftices was the next Juftice or not, which was another exception intended to be moved; but the conviction being quafhed for the exception aforefaid, this exception was not moved, and that he was of counfel with the defendant. *Vent.* 33. *Anon.* But *S. C.* reports, that as to the words " upon due examination and proof before a Juftice of peace", it was refolved, that that was not intended by a jury, but by witneffes, and that no writ of error lies upon fuch conviction: and that an exception was taken, becaufe it was *coram J. S.* Juftice of the peace, without adding *nec non ad diverfas felonias, tranfgreffiones, &c. audiend. affignat.* and that the court agreed it ought fo to be in returns upon *certioraries* to remove indictments taken at feffions, but otherwife of convictions of this nature; for it is known to the court, that the ftatute gives them authority in this cafe. *Vent.* 33. *Trin.* 21 *Car.* 2. *Anon.*

A perfon being brought before the next Juftice of peace in the county where, *&c.* for fhooting with hail fhot in a hand-gun, who, upon examination finding it true, made a record thereof, and committed the party to prifon, until he fhould pay 10 *l. viz.* 5 *l.* to the informer, and 5 *l.* to the King. This record being certified upon a *habeas corpus*, it was held by the whole court, that if the Juftice of peace does not obferve the form prefcribed

## GUN

by the ftatute, it is void, *& coram non judice*, and needs no writ of error; but if he acts according to the ftatute, then neither B. R. nor Juftices of peace, can redrefs it, or fet the party at large. *Jo.* 170. *Hill.* 3 *Car. B. R. Cole's cafe.*

The judgment on an indictment upon this ftatute, that the defendant *folvet dicto domino Regi, &c. decem librarum, &c.* where the words fhould have been *folvat* inftead of *folvet*, and *libras* inftead of *librarum*, and for thofe and other reafons the judgment was reverfed. *Raym.* 378. *Trin.* 32 *Car.* 2. *B. R. the King v. Affop.*

The conviction was for having a gun in his houfe, and this being excepted to, becaufe the ftatute is *ufe to keep in his or her houfe*, and perhaps it might be lent him, and the words of the ftatute ought to be purfued; fo the conviction was quafhed. 1 *Show.* 48. *Trin.* 1 *W. & M. the King v. Lewellin.*

The conviction was *non habuiffet* 100 *l.* per annum, and did not fay when; and this was excepted to, becaufe it may be that he had 100 *l.* a-year at the time when he kept a gun, but not when he was convicted; to which it was anfwered, that thofe words were as much as to fay, *nunquam habuit*, and the conclufion being *contra formam ftatuti*, muft explain fuch words which feem to be doubtful. But *per cur*,' This being a conviction before a Juftice of peace, the time when the offence was committed fhould be certainly alledged, *viz.* that the defendant *prædict' die & anno* had not 100 *l. per annum*, and for that reafon it was quafhed. 3 *Mod.* 280. *Pafch.* 2 *W. & M. the King v. Selcot.*

So where the indictment was *non habens terras, &c.* exception was taken, that it referred to the time of the indictment, and not to the fhooting; the judgment for that and other reafons was reverfed. *Raym.* 378. *Trin.* 32 *Car.* 2. *B. R. the King v. Affop. Vid.* 4 *Mod.* 51. in cafe of the *King v. Affop.*

*T. S.* being conftituted fpecial bailiff to ferve an execution in debt on a judgment, and fearing a refcous, carried with him a *dagg*; whereupon the defendant, being a Juftice of peace, made one of his fervants to go and fearch him, and finding him armed brought him before his mafter, being the next Juftice of peace, who by colour thereof committed him to gaol, till he paid 10 *l.* But on a *habeas corpus* it was held no offence for a fheriff or his minifters in execution of their office to carry fuch a hand-gun, and that it was lawful, and that a dagg was a hand-gun within this ftatute. *Cro. Eliz.* 821. *Gardener's cafe.* 5 *Rep.* 71. *b. Trin.* 34 *Eliz. St. John's cafe. alias Gardener v. St. John, S. C.*

The defendant not having 100 *l.* a year, did fhoot in a gun in *February*, and in *March* following was carried before a Juftice of peace, and by him convicted of this offence. It was moved to quafh this conviction, becaufe it was before a fingle Juftice, who had not power by the ftatute to proceed in a fummary way, unlefs the party is brought before him *inftanter*, upon view of the offence committed, which was not done in this cafe, and therefore was ordered to fhew caufe why it fhould not be quafhed. 4 *Mod.* 147, 148. *Trin.* 4 *W. & M. the King v. Bullock.* 1 *Show.* 367. *Trin.* 4 *W. & M. S. P. King v. Litten.*

An indictment will lie on this ftatute before the feffions, though this hath been formerly doubted; becaufe though the Juftices have power by the general words of their commiffion to punifh offences againft the peace, yet fhooting is not fuch an offence, for it is only a defect of the qualification of the perfon who fhoots in a gun. *Dalton's Juftice, cap.* 47. *page* 143.

**Gunpowder.** By ftat. 16 *Car.* 1. *c.* 21. All perfons may make and fell gunpowder, and bring into the kingdom falt-petre, brimftone, or any other materials for the making of it.

By ftat. 1 *Jac.* 2. *c.* 8. *f.* 3. it is enacted, that if any perfon fhall obtain a grant for the fole making or importing of gunpowder, he fhall incur a *præmunire.*

By ftat. 4 *Geo.* 2. *c.* 29. A bounty is granted on exporting *Britifh* gunpowder, but to be abated if duties on falt-petre ceafe.

U u                                                    Stat.

JA3268

Stat. 5 *Geo*. 1. *cap*. 26. *ſect*. 4. No perſon ſhall carry in the ſtreets of *London* or *Weſtminſter*, or the ſuburbs thereof, more than twenty hundred weight of gunpowder at one time ; and all gunpowder carried in the ſaid ſtreets in any carts or carriages, and the barrels cloſe jointed and hooped, and put into caſes of leather or canvas ; and gunpowder carried by a man or horſe ſhall be put in caſes of leather or canvas, and entirely covered therewith : and if any ſhall be carried otherwiſe, it ſhall be forfeited, and may be ſeized by any perſon to his own uſe, the offender being thereof convicted before two Juſtices.

Stat. 11 *G*. 1. *c*. 3. *ſ*. 3. If any perſon ſhall work with any iron hammer, or hammer plated with iron or ſteel, in any warehouſe or place while any gunpowder is there, he ſhall on conviction within one month, by the oath of one witneſs before one Juſtice, forfeit twenty ſhillings to the informer, to be levied by diſtreſs by warrant of ſuch Juſtice ; and for want of ſufficient diſtreſs, to be committed to the houſe of correction, to be kept to hard labour not exceeding one month, nor leſs than fourteen days.

Stat. 5 *Geo*. 2. *cap*. 20. *ſect*. 2. No maſter of any veſſel outward bound, ſhall receive on board any gunpowder, either as merchandize or ſtore for the voyage (except for his Majeſty's ſervice), on the *Thames* above *Blackwall*, upon pain of five pounds for every fifty pounds weight, and ſo in proportion.

*Sect*. 3. And the maſter of every veſſel coming into the *Thames*, ſhall land all the powder on board, either before arrival at *Blackwall*, or within twenty-four hours (if the weather will permit) after he comes to anchor there, or at the place of unloading, on pain of five pounds for every hundred weight.

*Sect*. 4. And if any officer of any ſhip (except the King's) ſhall, between *London Bridge* and *Blackwall*, keep any gun loaded with ball, or fire any gun on board above *Blackwall*, before ſun-riſing or after ſun-ſetting, he ſhall forfeit for ſuch gun loaded five ſhillings, and for ſuch gun fired ten ſhillings.

*Sect*. 5. And the corporation at *Trinity-houſe* at *Deptford Strand*, may appoint a perſon to inſpect veſſels ; and if any ſuch officer obſtruct him, he ſhall forfeit five pounds.

*Sect*. 6. And the ſaid penalties ſhall go to the poor of the corporation.

*Sect*. 7. And two Juſtices of *London*, or the reſpective counties where the offence ſhall be committed, ſhall on complaint in ten days ſummon the offender, or after oath made of the offence, may iſſue their warrant for apprehending him, and on appearance or contempt may convict him, either by oath of witneſſes or confeſſion, or his own view, and levy the penalty by diſtreſs, and if not redeemed in five days, by ſale ; for want of diſtreſs he ſhall be impriſoned for three months, or till paid ; and perſons aggrieved may appeal to the next ſeſſions.

Stat. 15 *Geo*. 2. *cap*. 32. *ſect*. 1. No perſon, not being a dealer in gunpowder, ſhall keep more than fifty pounds weight, or being a dealer, not more than two hundred pounds weight, longer than twenty-four hours at any time, in any houſe or place, or in houſes or places, either under the ſame roof, or by dividing the ſame, and diſpoſing thereof under different roofs, or in any yard or yards within *London* and *Weſtminſter*, or the ſuburbs thereof, or within three miles of the *Tower*, or of *St. James*'s, or on the *Thames*, except in veſſels paſſing or detained by tides or bad weather, except carts and other carriages loading or unloading, or paſſing on the highway, on pain of forfeiting the ſame, or the value thereof, with full coſts to him who ſhall ſue in any court of record at *Weſtminſter* in thirty days.

*Sect*. 2. Any Juſtice of the peace within the ſaid limits, on demand by any inhabitants ſhewing a reaſonable cauſe, may iſſue his warrant to ſearch in the day-time for dangerous quantities of gunpowder, and break open any place, if there be occaſion ; and the ſearchers may ſeize, and may remove the ſame in twelve hours out of the ſaid limits, and detain the ſame till it be determined in the courts, whether it be forfeited or not.

*Sect*. 3. And perſons permitting others to keep gunpowder in any places not belonging to the owners of ſuch gunpowder, ſhall forfeit one ſhilling a pound.

Stat. 22 *Geo*. 2. *cap*. 38. *ſect*. 1. No perſon ſhall keep gunpowder for more than twenty-four hours at any one time in greater quantity than four hundred pounds weight, in any houſe or other place, in any city, or the ſuburbs thereof, or in any market-town, or within one hundred yards thereof, or within two miles of any of the King's palaces, or one mile of any of the King's magazines ; nor ſhall keep for more than twenty-four hours, at any time, a greater quantity than three thouſand pounds weight in any houſe or other place.

*Sect*. 2. And any two Juſtices, on demand made, and a reaſonable cauſe aſſigned, by any pariſh officer, or two houſeholders inhabiting where it is kept, ſhall iſſue their warrant for ſearching in the day-time any houſe, ſhop, or other place, and breaking open the doors thereof ; and if upon ſearch more than four hundred pounds weight, or three thouſand pounds weight reſpectively, as above, ſhall be found, all exceeding the ſaid quantities ſhall be ſeized and detained, and forfeited to any perſon who ſhall ſue in three months in any court at *Weſtminſter* ; which court ſhall give judgment for recovery of the ſame, or the value thereof, with full coſts.

*Sect*. 3. No perſon ſhall convey at any one time, in any waggon or other carriage, a greater quantity than two thouſand five hundred pounds weight, or more than five thouſand pounds weight, in any open veſſel on any river, within one mile of any city or market-town ; and all ſuch gunpowder ſhall be carried in covered carts and carriages ; and the barrels ſhall be cloſe joined and hooped, and ſecured that no part thereof be ſcattered in the paſſage ; on pain of being ſeized and forfeited to the informer, on proof of the offence before two Juſtices.

*Sect*. 4. Every perſon employed in any ſtorehouſe where gunpowder is kept, or in carrying of gunpowder from one place to another, being convicted before any Juſtice of wilfully committing any act, whereby ſuch gunpowder may be in danger of taking fire, ſhall forfeit five pounds to the informer for every hundred pounds weight of gunpowder contained in ſuch ſtorehouſe, or which he ſhall be employed in conveying ; and on non-payment thereof ſhall be committed to the public gaol, without bail, not exceeding ſix months.

*Sect*. 5. But this act ſhall not extend to any magazine belonging to the Crown, or to hinder the trying of gunpowder by his Majeſty's officers, or to the carrying of gunpowder to and from the King's magazines, or with forces in their march, or to any mills already built and uſed for the making of gunpowder, or to any ſtorehouſes, warehouſes, or other offices near or adjoining to ſuch mills.

*Sect*. 6. The Juſtices in ſeſſions ſhall, on application to them made, appoint convenient plats of ground, two miles diſtant from any city or market-town, not exceeding two acres, with the uſe of convenient roads leading thereto, for erecting warehouſes for keeping gunpowder in any quantity, firſt agreeing with the proprietor ; and if they cannot agree, the ſaid Juſtices ſhall iſſue their warrant to the ſheriff to impanel and return a jury, who ſhall on oath (to be adminiſtered by the ſaid Juſtices) enquire into the value of the ground, with the uſe of convenient roads leading thereto ; and all ſuch verdicts and inquiſitions ſhall be kept with the records of the ſeſſions, and be concluſive to all parties ; and the ſaid Juſtices may ſend for perſons intereſted, and examine the parties and witneſſes on oath ; and the ſum to be aſſeſſed as aforeſaid, not exceeding thirty years purchaſe, ſhall be paid to the proprietor ; and on ſuch payment, or in caſe of refuſal to accept it, or leaving it with the ſaid Juſtices for the proprietor, the inheritance of the grounds, and uſe of the roads leading thereto, ſhall be veſted in the purchaſers and their aſſigns for the purpoſes aforeſaid, and not otherwiſe ; and the warehouſes to be built thereon ſhall be built in ſuch manner as will moſt effectually render them ſafe and ſecure.

Gunpowder, &c. ſhipped after prohibition, forfeited, 29 *Geo*. 2. *c*. 16. *ſ*. 2.

Allowance

JA3269

TAB 2

Case 1:22-Case 23-2043-AD Document 29-1 Page 268/2 Date Filed 07/21/2023 geID: 3808

A

# DICTIONARY

OF THE

# ENGLISH LANGUAGE:

IN WHICH

The WORDS are deduced from their ORIGINALS,

AND

ILLUSTRATED in their DIFFERENT SIGNIFICATIONS

BY

EXAMPLES from the best WRITERS.

TO WHICH ARE PREFIXED,

A HISTORY of the LANGUAGE,

AND

AN ENGLISH GRAMMAR.

By SAMUEL JOHNSON.

IN TWO VOLUMES.

VOL. I.

THE FOURTH EDITION, REVISED BY THE AUTHOR.

Cum tabulis animum cenforis fumet honefti :
Audebit quæcunque parum fplendoris habebunt,
Et fine pondere erunt, et honore indigna ferentur.
Verba movere loco; quamvis invita recedant,
Et verfentur adhuc intra penetralia Veftæ :
Obfcurata diu populo bonus eruet, atque
Proferet in lucem fpeciofa vocabula rerum,
Quæ prifcis memorata Catonibus atque Cethegis,
Nunc fitus informis premit et deferta vetuftas.          HOR.

LONDON,

Printed by W. STRAHAN,

For W. STRAHAN, J. & F. RIVINGTON, T. DAVIES, J. HINTON, L. DAVIS; HAWES, CLARKE & COLLINS;
W. JOHNSTON, W. OWEN, T. CASLON, S. CROWDER, T. LONGMAN, B. LAW, E. & C. DILLY, J. DODSLEY,
Z. STUART, BECKET & DE HONDT, J. KNOX, T. CADELL, WILSON & NICOLL, W. NICOLL, G. ROBINSON,
JO. JOHNSON, J. ROBSON, RICHARDSON & URQUHART, and M. HINGESTON.

MDCCLXXIII.

Generated on 2023-03-14 17:46 GMT / https://hdl.handle.net/2027/osu.32435030881114
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google

Digitized by Google

Original from
THE OHIO STATE UNIVERSITY

JA3271

Case 1:22-cv-03419-AMD Document 11 Page 269 Date Filed 07/21/2023 PageID: 3809

# D.

**D,** Is a consonant nearly approaching in found to T, but formed by a ſtronger appulſe of the tongue to the upper part of the mouth. The ſound of D in *Engliſh* is uniform, and it is never mute. *DA CAPO.* [Ital.] A term in muſick, which ſignifying from the head or the beginning, means that the firſt part of the tune ſhould be repeated at the concluſion.

*To* DAB. *v. a.* [*dauber*, Fr.] To ſtrike gently with ſomething ſoft or moiſt.

A ſore ſhould never be wiped by drawing a piece of tow or rag over it, but only by *dabbing* it with fine lint. *Sharp.*

*A* DAB. *n. ſ.* [from the verb.]
1. A ſmall lump of any thing.
2. A blow with ſomething moiſt or ſoft.
3. Something moiſt or ſlimy thrown upon one.
4. [In low language.] An artiſt ; a man expert at ſomething. This is not uſed in writing.
5. A kind of ſmall flat fiſh.

Of flat fiſh there are rays, flowks, *dabs,* plaice. *Carew.*

*DA'B-CHICK. n.ſ.* A ſmall water-fowl ; called likewiſe *Dob-chick,* and *Didapper,* and *Dipchick. Columbus, Ray.*

A *dab chick* waddles through the copſe,
On feet and wings, and flies, and wades, and hops. *Pope.*

*To* DA'BBLE. *v. a.* [*dabbelen,* Dutch.] To ſmear ; to daub ; to ſpatter ; to beſprinkle ; to wet.

A ſhadow like an angel, with bright hair
*Dabbled* in blood. *Shakeſpeare's Richard III.*

I ſcarified, and *dabbled* the wound with oil of turpentine. *Wiſeman's Surgery.*

Mean while the South, riſing with *dabbled* wings,
A ſable cloud athwart the welkin flings. *Swift.*

*To* DA'BBLE. *v. n.*
1. To play in water ; to move in water or mud. Neither will a ſpirit, that dwells with ſtars, *dabble* in this impurer mud. *Glanville's Apology.*

The little one complained of her legs, that the could neither ſwim nor dabble with them. *L'Eſtrange.*

But when he found the boys at play,
And ſaw them *dabbling* in their clay,
He ſtood behind a ſtall to lurk,
And mark the progreſs of their work. *Swift.*

2. To do any thing in a ſlight, ſuperficial, or ſhallow manner ; to tamper.

Shakeſpeare ſhall be put into your hands, as clear and as fair as it came out of them ; though you, I think, have been *dabbling* here and there with the text, I have had more reverence for the writer, and the printer, and left every thing ſtanding. *Atterbury to Pope.*

*DA'BBLER. n.ſ.* [from *dabble.*]
1. One that plays in water.
2. One that meddles without maſtery ; one that never goes to the bottom of an affair ; a ſuperficial meddler.

He dares not complain of the tooth-ach, leſt our *dabblers* in politicks ſhould be ready to ſwear againſt him for diſaffection. *Swift.*

*DACE. n.ſ.* [of uncertain derivation : in moſt provinces called *dare. Leuciſcus.*] A ſmall river fiſh, reſembling a roach, but leſs.

Let me live harmleſsly, and near the brink
Of Trent or Avon have a dwelling place ;
Where I may ſee my quill or cork down ſink,
With eager bite of pearch, or bleak, or *dace.* *Walton.*

*DA'CTYLE. n.ſ.* [δάκτυλος, a finger.] A poetical foot conſiſting of one long ſyllable and two ſhort, like the joints of a finger ; as *cóndícat.*

*DAD,* } *n.ſ.* [The child's way of expreſsing *father.* It is
*DA'DDY,* } remarkable, that, in all parts of the world, the word for father, as firſt taught to children, is compounded of *a* and *t,* or the kindred letter *d* differently placed ; as *tad,* Welſh ; *αττα,* Greek ; *atta,* Gothick ; *tata,* Latin.] Father.

I was never to bethump't with words,
Since firſt I call'd my brother's father *dad.* *Shakeſpeare.*

His loving mother left me to my care ;
Fine child, as like his *dad* as he could ſtare ! *Gay.*

*To* DADE. *v. a.* To hold up by a leading ſtring. The little children when they learn to go, By painful mothers *daded* to and fro. *Drayton.*

*DÆ'DAL. adj.* [*dædalus,* Latin.]
1. Various ; variegated.
2. Skilful : this is not the true meaning, nor ſhould be imitated.

Nor hath
The *dædal* hand of nature only pour'd
Her gifts of outward grace. *Philips.*

VOL. I.

*DA'FFODIL.* } *n.ſ.* [Suppoſed by *Skinner* to be cor-
*DAFFODI'LLY.* } rupted from *aſphodelus.*]
*DAFFODOWNDI'LLY.*

This plant hath a lily-flower, conſiſting of one leaf, which is bell-ſhaped, and cut into ſix ſegments, which incircle its middle like a crown ; but the emplacement, which commonly riſes out of a membranous vagina, turns to an oblong or roundiſh fruit, which is triangular, and gapes in three parts ; is divided into three cells, and full of roundiſh ſeeds. *Miller.*

Strew me the green ground with *daffadowndillies,*
And cowſlips, and kingcups, and loved lilies. *Spenſer.*

Bid Amaranthus all his beauty ſhed,
And *daffadillies* fill their cups with tears,
To ſtrew the laureat herſe where Lycid lies. *Milton.*

The daughters of the flood have ſearch'd the mead
For violets pale, and cropp'd the poppy's head :
The ſhort narciſſus, and fair *daffodil,*
Pancies to pleaſe the ſight, and caſſia ſweet to ſmell. *Dryden.*

*To* DAFT. *v. a.* [contracted from *do oft* ; that is, to *throw back,* to *throw off.*] To toſs aſide ; to put away with contempt ; to throw away ſlightly. Not now in uſe.

The nimble-footed mad-cap prince of Wales,
And his comrades, that *daft* the world aſide,
And bid it paſs. *Shakeſpeare's Henry IV.*

I would the haſt *beſtow'd* this dotage on me : I would have *daft* all other reſpects, and made her half myſelf. *Shakeſp.*

*DAG. n.ſ.* [*dague,* French.]
1. A dagger.
2. A handgun ; a piſtol : ſo called from ſerving the purpoſes of a dagger, being carried ſecretly, and doing miſchief ſuddenly. It is in neither ſenſe now uſed.

*To* DAG. *v. a.* [from *daggle.*] To daggle ; to bemire ; to let fall in the water : a low word.

*DA'GGER. n.ſ.* [*dague,* French.]
1. A ſhort ſword ; a poniard.

She ran to her ſon's *dagger,* and ſtruck herſelf a mortal wound. *Sidney.*

This ſword a *dagger* had his page,
That was but little for his age ;
And therefore waited on him ſo,
As dwarfs upon knights-errant do. *Hudibras.*

He ſtrikes himſelf with his *dagger* ; but being interrupted by one of his friends, he ſtabs him, and breaks the *dagger* on one of his ribs. *Addiſon.*

2. [In fencing ſchools.] A blunt blade of iron with a baſket hilt, uſed for defence.
3. [With printers.] The obelus ; a mark of reference in form of a dagger ; as [‡].

*DA'GGERSDRAWING. n.ſ.* [*dagger* and *draw.*] The act of drawing daggers ; approach to open violence.

They always are at *daggerſdrawing,*
And one another clapperclawing. *Hudibras.*

I have heard of a quarrel in a tavern, where all were at *daggerſdrawing,* 'till one deſired to know the ſubject of the quarrel. *Swift.*

*To* DA'GGLE. *v. a.* [from *dag,* dew ; a word, according to Mr. *Lye,* derived from the Daniſh ; according to *Skinner,* from *bag,* ſprinkled, or *beaxan,* to dip. They are probably all of the ſame root.] To dip negligently in mire or water ; to bemire ; to beſprinkle.

*To* DA'GGLE. *v. n.* To be in the mire ; to run through wet or dirt.

Nor like a puppy, *daggled* through the town,
To fetch and carry ſing long up and down. *Pope.*

*DA'GGLEDTAIL. n.ſ.* [*daggle* and *tail.*] Bemired ; dipped in the water or mud ; beſpattered.

The gentlemen of wit and pleaſure are apt to be choaked at the ſight of ſo many *daggleдtail* parſons, that happen to fall in their way. *Swift.*

*DA'ILY. adj.* [bæʒlic, Saxon.] Happening every day, or very frequently ; done every day ; quotidian.

Much are we bound to heaven
In *daily* thanks, that gave us ſuch a prince. *Shakeſpeare.*

Ceaſe, man of woman born ! to hope relief
From *daily* trouble, and continu'd grief. *Prior.*

*DA'ILY. adv.* Every day ; very often.

Let that man with better ſenſe adviſe,
That of the world leaſt part to us is read ;
And *daily* how through hardy enterprize,
Many great regions are diſcovered. *Fairy Queen.*

A man with whom I converſed almoſt *daily,* for years together. *Dryden.*

6 F        DA'INTILY.

Generated on 2023-03-14 18:10 GMT / https://hdl.handle.net/2027/osu.32435030881114 / http://www.hathitrust.org/access_use#pd-google

Public Domain, Google-digitized

Digitized by Google       Original from THE OHIO STATE UNIVERSITY

JA3272

Case 1:22-cv-02043-JMS-Documentn29 | Page 270 of 295 Date Filed: 07/21/2023 JND: 3510

mon recreation, do not think I have wit enough to lie ſtraight
in my bed.　*Shakeſpeare's Twelfth Night.*

Yet love theſe ſorc'ries did remove, and move
Thee to *gull* thine own mother for my love.　*Donne.*
He would have *gull'd* him with a trick,
But Mars was too too politick.　*Hudibras.*
They are not to be *gulled* twice with the ſame trick. *L'Eſtr.*
The Roman people were groſly *gulled* twice or thrice over,
and as often enſlaved in one century, and under the ſame pre-
tence of reformation.　*Dryden.*

By their deſigning leaders taught,
The vulgar, *gull'd* into rebellion, arm'd.　*Dryden.*
For this advantage age from youth has won,
As not to be out-ridden, though out-run ;
By fortune he was now to Venus trin'd,
And with ſtern Mars in Capricorn was join'd ;
Of him diſpoſing in his own abode,
He tooth'd the goddeſs, while he *gull'd* the god.　*Dryden.*

**GULL.** *n. ſ.* [from the verb.]
1. [*mergus.*] A ſea-bird.
2. A cheat ; a fraud ; a trick.
I ſhould think this a *gull,* but that the white-bearded fellow
ſpeaks it.　*Shakeſpeare's Much Ado.*
Either they have theſe excellencies they are praiſed for, or
they have not ; if they have not, 'tis an apparent cheat and
*gull.*　*Government of the Tongue.*
3. A ſtupid animal ; one eaſily cheated.
Being fed by us you us'd us ſo,
As that ungentle *gull,* the cuckow bird,
Uſeth the ſparrow.　*Shakeſp. Henry IV.*
Why have you ſuffer'd me to be impriſon'd,
Kept in a dark houſe, viſited by the prieſt,
And made the moſt notorious geck and *gull*
That e'er invention plaid on.　*Shakeſp. Twelfth Night.*
That paltry ſtory is untrue,
And forg'd to cheat ſuch *gulls* as you.　*Hudibras.*

**GU'LLCATCHER.** *n. ſ.* [*gull* and *catch.*] A cheat ; a man of
trick ; one who catches ſilly people.
Here comes my noble *gullcatcher.* *Shakeſp. Twelfth Night.*

**GU'LLER.** *n. ſ.* [from *gull.*] A cheat ; an impoſtor.
**GU'LLERY.** *n. ſ.* [from *gull.*] Cheat ; impoſture. *Ainſworth.*
**GU'LLET.** *n. ſ.* [*goulet,* French ; *gula,* Latin.]
1. The throat ; the paſſage through which the food paſſes ; the
meat-pipe ; the œſophagus.
It might be his doom.
One day to ſing
With *gullet* in ſitting.　*Denham.*
Many have the *gullet* or feeding channel which have no
lungs or windpipe ; as fiſhes which have gills, whereby the
heart is refrigerated ; for ſuch thereof as have lungs and re-
ſpiration are not without wizzon, as whales and cetaceous
animals.　*Brown's Vulgar Errours.*
2. A ſmall ſtream or lake. Not in uſe.
Nature has various tender muſcles plac'd,
By which the artful *gullet* is embrac'd.　*Blackmore.*
The liquor in the ſtomach is a compound of that which is
ſeparated from its inward coat, the ſpittle which is ſwallowed,
and the liquor which diſtils from the *gullet.*　*Arbuthnot.*
The Euxine ſea and the Mediterranean, ſmall *gullets,* if
compared with the ocean.　*Heylyn.*
*To* **GU'LLY.** *v. n.* [corrupted from *gurgle.*] To run with
noiſe.

**GU'LLYHOLE.** *n. ſ.* [from *gully* and *hole.*] The hole where the
gutters empty themſelves in the ſubterraneous ſewer.
**GULO'SITY.** *n. ſ.* [*gulofus,* Latin.] Greedineſs ; gluttony ;
voracity.
They are very temperate, ſeldom offending in ebriety, nor
erring in *gulofity,* or ſuperfluity of meats.　*Brown.*
*To* **GULP.** *v. a.* [*golpen,* Dutch.] To ſwallow eagerly ; to
ſuck down without intermiſſion.
He looſens the fiſh, *gulps* it down, and ſo ſoon as ever the
morſel was gone wipes his mouth.　*L'Eſtrange.*
I ſee the double flaggon charge their hand ;
See them puff off the froth, and *gulp* amain,
While with dry tongue I lick my lips in vain.　*Gay.*
**GULP.** *n. ſ.* [from the verb.] As much as can be ſwallowed
at once.
In deep ſuſpirations we take more large *gulps* of air to
cool our heart, overcharged with love and ſorrow.　*More.*
As oft as he can catch a *gulp* of air,
And peep above the ſeas, he names the fair. *Dryden's Fables.*
**GUM.** *n. ſ.* [*gummi,* Latin.]
1. A vegetable ſubſtance differing from a reſin, in being more
viſcid and leſs friable, and generally diſſolving in aqueous men-
ſtruums ; whereas reſins, being more ſulphureous, require a
ſpirituous diſſolvent.　*Quincy.*
One whoſe eyes,
Albeit unuſed to the melting mood,
Drop tears as faſt as the Arabian trees
Their medicinal gum.　*Shakeſpeare's Othello.*
He ripens ſpices, fruit, and precious *gum,*
Which from remoteſt regions hither come.　*Waller.*

---

Her maiden train,
Who bore the veſts that holy rites require,
Incenſe, and od'rous *gums,* and cover'd fire.　*Dryd. Fables.*
2. [Ioma, Saxon ; *gomme,* Dutch.] The fleſhy covering that
inveſts and contains the teeth.
The babe that milks me
I'd pluck my nipple from his boneleſs *gums.* *Shak. Macbeth.*
Sh' untwiſts a wire, and from her *gums*
A ſet of teeth completely comes.　*Swift.*
*To* **GUM.** *v. a.* [from the noun.] To cloſe with gum ; to
ſmear with gum.
The eyelids are apt to be *gummed* together with a viſcous
humour.　*Wiſeman's Surgery.*
**GU'MMINESS.** *n. ſ.* [from *gummy.*] The ſtate of being gum-
my ; accumulation of gum.
The tendons are involved with a great *gummineſs* and col-
lection of matter.　*Wiſeman's Surgery.*
**GUMMO'SITY.** *n. ſ.* [from *gummous.*] The nature of gum ;
gummineſs.
Sugar and honey make windy liquors, and the elaſtick fer-
menting particles are detained by their innate *gummoſity. Floyer.*
**GU'MMOUS.** *adj.* [from *gum.*] Of the nature of gum.
Obſervations concerning Engliſh amber, and relations about
the amber of Pruſſia, prove that amber is not a *gummous* or
reſinous ſubſtance drawn out of trees by the ſun's heat, but a
natural foſſil.　*Woodward's Natural Hiſtory.*
**GU'MMY.** *adj.* [from *gum.*]
1. Conſiſting of gum ; of the nature of gum.
From the utmoſt end of the head branches there iſſueth out
a *gummy* juice, which hangeth downward like a cord. *Raleigh.*
Nor all the *gummy* ſtores Arabia yields.　*Dryden's Virgil.*
How each ariſing alder now appears,
And o'er the Po diſtils her *gummy* tears.　*Dryden's Silenus.*
2. Productive of gum.
The clouds
Tine the ſlant light'ning ; whoſe thwart flame driv'n down,
Kindles the *gummy* bark of fir and pine.　*Milton.*
3. Overgrown with gum.
The yawning youth, ſcarce half awake, eſſays
His lazy limbs and dozy head to raiſe ;
Then rubs his *gummy* eyes, and ſcrubs his pate. *Dryden.*
**GUN.** *n. ſ.* [Of this word there is no ſatisfactory etymology.
Mr. *Lye* obſerves that *gun* in Iceland ſignifies *battle* ; but when
*guns* came into uſe we had no commerce with Iceland. May
not *gun* come by gradual corruption from *canne, canne, gunne ?*
*Canne* is the original of *cannon.*] The general name for fire-
arms ; the inſtrument from which ſhot is diſcharged by fire.
Theſe dread curfes, like the fun 'gainſt glaſs,
Or like an overcharged *gun,* recoil
And turn upon thyſelf.　*Shakeſpeare's Henry VI.*
The emperor, ſmiling, ſaid that never emperor was yet ſlain
with a *gun.*　*Knolles's Hiſtory.*
The bullet flying, makes the *gun* recoil.　*Cleaveland.*
In vain the dart or glitt'ring ſword we ſhun,
Condemn'd to periſh by the flaugh'ring *gun.　Granville.*
**GU'NNEL.** *n. ſ.* [corrupted for *gunwale.* See GUNWALE.]
**GU'NNER.** *n. ſ.* [from *gun.*] Cannonier ; he whoſe employ-
ment is to manage the artillery in a ſhip.
The nimble *gunner*
With lynſtock now the deviliſh cannon touches,
And down goes all before him.　*Shakeſpeare's Henry V.*
They ſlew the principal *gunners,* and carried away their ar-
tillery.　*Hayward.*
**GU'NNERY.** *n. ſ.* [from *gunner.*] The ſcience of artillery ;
the art of managing cannon.
**GU'NPOWDER.** *n. ſ.* [*gun* and *powder.*] The powder put into
guns to be fired. It conſiſts of about fifteen parts of nitre,
three parts of ſulphur, and two of charcoal. The propor-
tions are not exactly kept.
*Gunpowder* conſiſteth of three ingredients, falpetre, ſmall-
coal, and brimſtone.　*Brown's Vulgar Errours.*
Burning by *gunpowder* frequently happens at ſea. *Wiſeman.*
**GU'NSHOT.** *n. ſ.* [*gun* and *ſhot.*] The reach or range of a
gun ; the ſpace to which a ſhot can be thrown.
Thoſe who are come over to the royal party are ſuppoſed to
be out of *gunſhot.*　*Dryden.*
**GU'NSHOT.** *adj.* Made by the ſhot of a gun.
The ſymptoms I have tranſlated to *gunſhot* wounds. *Wiſem.*
**GU'NSMITH.** *n. ſ.* [*gun* and *ſmith.*] A man whoſe trade is to
make guns.
It is of particular eſteem with the *gunſmiths* for ſtocks. *Mort.*
**GU'NSTICK.** *n. ſ.* [*gun* and *ſtick.*] The rammer ; or ſtick with
which the charge is driven into a gun.
Ev'n a *gunſtick* flying into fame.　*Stewart.*
**GU'NSTOCK.** *n. ſ.* [*gun* and *ſtock.*] The wood to which the
barrel of the gun is fixed.
The timber is uſed for bows, pullies, ſcrews, mills, and
*gunſtocks.*　*Mortimer's Huſbandry.*
**GU'NSTONE.** *n. ſ.* [*gun* and *ſtone.*] The ſhot of cannon. They
uſed formerly to ſhoot ſtones from artillery.
Tell the pleaſant prince, this mock of his
Hath turn'd his ball to *gunſtones,* and his ſoul
Shall

Digitized by Google

JA3273

Generated on 2023-03-14 17:48 GMT / https://hdl.handle.net/2027/osu.32435030881114
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google

Case 1:22-cv-03423-AMD Document 29 Filed 07/21/23 Page 271 of 295 PageID #: 3811

from ruin, under the worst administration, what may not his subjects hope for when he changeth *hands*, and maketh use of the best? *Swift.*

38. Giver, and receiver.

This tradition is more like to be a notion bred in the mind of man, than transmitted from *hand* to *hand* through all generations. *Tillotson.*

39. An actor; a workman; a soldier.

Your wrongs are known: impose but your commands,
This hour shall bring you twenty thousand *hands*. *Dryden.*
Demetrius appointed the painter guards, pleased that he could preserve that *hand* from the barbarity and insolence of soldiers. *Dryden.*

A dictionary containing a natural history requires too many *hands*, as well as too much time, ever to be hoped for. *Locke.*

40. Catch or reach without choice.

The men of Israel smote as well the men of every city as the beast, and all that came to *hand*. *Judges.*

A sweaty reaper from his tillage brought
First fruits, the green ear, and the yellow sheaf,
Uncull'd as came to *hand*. *Milton.*

41. Form or cast of writing.

Here is th' indictment of the good Hastings,
Which in a set *hand* fairly is engross'd;
Eleven hours I've spent to write it over. *Shakespeare.*
Solyman shewed him his own letters intercepted, asking him if he knew not that *hand*, if he knew not that seal? *Knolles.*

Being discovered by their knowledge of Mr. Cowley's *hand*,
I happily escaped. *Denham.*

If my debtors do not keep their day
Deny their *hands*, and then refuse to pay,
I must attend. *Dryden.*
Whether men write court or Roman *hand*, or any other, there is something peculiar in every one's writing. *Cockburn.*
The way to teach to write, is to get a plate graved with the characters of such *hand* you like. *Locke.*
Constantia saw that the *hand* writing agreed with the contents of the letter. *Addison.*

I present these thoughts in an ill *hand*; but scholars are bad penmen: we seldom regard the mechanick part of writing.
*Felton on the Classicks.*

They were wrote on both sides, and in a small *hand*. *Arbuth.*

42. Hand *over* head. Negligently; rashly; without seeing what one does.

So many strokes of the alarum bell of fear and awaking to other nations, and the facility of the titles, which, *hand over head*, have served their turn, doth ring the peal so much the louder. *Bacon.*

A country fellow got an unlucky tumble from a tree: Thus 'tis, says a passenger, when people will be doing things *hand over head*, without either fear or wit. *L'Estrange.*

43. Hand to Hand. Close fight.

In single opposition, *hand to hand*,
He did confound the best part of an hour. *Shakespeare.*

He issues, ere the fight, his dread command,
That flames alay, and poniards *hand to hand*,
He banish'd from the field. *Dryden.*

44. Hand *in* Hand. In union; conjointly.

Had the sea been Marlborough's element, the war had been bestowed there, to the advantage of the country, which would then have gone *hand in hand* with his own. *Swift.*

45. Hand *in* Hand. Fit; pat.

As fair and as good, a kind of *hand* in hand comparison, had been something too fair and too good for any lady in Britany. *Shakespeare's Cymbeline.*

46. Hand *to* mouth. As want requires.

I can get bread from *hand* to mouth, and make even at the year's end. *L'Estrange.*

47. *To bear in* Hand. To keep in expectation; to elude.

A rascally yea forsooth knave, to *bear* in hand, and then stand upon security. *Shakespeare.*

48. *To be* Hand *and* Glove. To be intimate and familiar; to suit one another.

To Hand. *v. a.* [from the noun.]

1. To give or transmit with the hand.

Judas was not far off, not only because he dipped in the same dish, but because he was so near that our Saviour could *hand* the sop unto him. *Brown's Vulgar Errours.*

I have been shewn a written prophecy that is *handed* among them with great fervency. *Addison.*

2. To guide or lead by the hand.

Angels did *hand* her up, who next God dwell. *Donne.*

By safe and insensible degrees he will pass from a boy to a man, which is the most hazardous step in life: this therefore should be carefully watched, and a young man with great diligence *handed* over it. *Locke.*

3. To *seize*; to lay hands on.

Let him, that makes but trifles of his eyes,
First *hand* me: on mine own accord, I'll off. *Shakespeare.*

4. To manage; to move with the hand.

'Tis then that with delight I rove
Upon the boundless depth of love:
I bless my chains, I *hand* my oar,
Nor think on all I left on shoar. *Prior.*

5. To transmit in succession, with *down*; to deliver from one to another.

They had not only a tradition of it in general, but even of several the most remarkable particular accidents of it likewise, which they *handed* downwards to the succeeding ages. *Woodw.*

I know no other way of securing their monuments, and making them numerous enough to be *handed down* to future ages. *Addison.*

Arts and sciences consist of scattered theorems and practices, which are *handed* about amongst the masters, and only revealed to the *filii artis*, 'till some great genius appears, who collects these disjointed propositions, and reduces them into a regular system. *Arbuthnot.*

One would think a story so fit for age to talk of, and infancy to hear, were incapable of being *handed down* to us.
*Pope's Essay on Homer.*

Hand is much used in composition for that which is manageable by the hand, as a *handjaw*; or borne in the hand, as a *handbarrow*.

HA'NDBARROW. *n. f.* A frame on which any thing is carried by the hands of two men, without wheeling on the ground.

A *handbarrow*, wheelbarrow, shovel and spade. *Tusser.*
Set the board whereon the hive flandeth on a *hand barrow*, and carry them to the place you intend. *Mortimer.*

HAND BASKET. *n. f.* A portable basket.

You must have woollen yarn to tie grafts with, and a small *hand-basket* to carry them in. *Mortimer.*

HAND-BELL. *n. f.* A bell rung by the hand.

The strength of the percussion is a principal cause of the loudness or softness of sounds; as in ringing of a *hand-bell* harder or softer. *Bacon.*

HAND-BREADTH. *n. f.* A space equal to the breadth of the hand; a palm.

A border of an *hand-breadth* round about. *Exod. xxv. 25.*
The eastern people determined their *hand-breadth* by the breadth of barley-corns, six making a digit, and twenty-four a *hand's breadth*. *Arbuthnot.*

HA'NDED. *adj.* [from *hand.*]

1. Having the use of the hand left or right.

Many are right *handed*, whose livers are weakly constituted; and many use the left, in whom that part is strongest.
*Brown's Vulgar Errours.*

2. With hands joined.

Into their inmost bow'r
Handed they went. *Milton.*

HA'NDER. *n. f.* [from *hand.*] Transmitter; conveyor in succession.

They would assume, with wond'rous art,
Themselves to be the whole, who are but part,
Of that vast frame the church; yet grant they were
The *handers* down, can they from thence infer
A right t' interpret? Or would they alone,
Who brought the present, claim it for their own? *Dryden.*

HA'NDFAST. *n. f.* [*hand* and *fast.*] Hold; custody. Obsolete.

If that shepherd be not in *handfast*, let him fly. *Shakespeare.*

HA'NDFUL. *n. f.* [*hand* and *full.*]

1. As much as the hand can gripe or contain.

I saw a country gentleman at the side of Rosamond's pond, pulling a *handful* of oats out of his pocket, and gathering the ducks about him. *Addison. Freeholder.*

2. A palm; a hand's breadth; four inches.

Take one vessel of silver and another of wood, each full of water, and knap the tongs together about an *handful* from the bottom, and the found will be more resounding from the vessel of silver than that of wood. *Bacon.*

The peaceful scabbard where it dwelt,
The rancour of its edge had felt;
For of the lower end two *handful*
It had devour'd, it was so manful. *Hudibras.*

3. A small number or quantity.

He could not, with such a *handful* of men, and without cannon, propose reasonably to fight a battle. *Clarendon.*

4. As much as can be done.

Being in possession of the town, they had their *handful* to defend themselves from firing. *Raleigh.*

HAND-GALLOP. *n. f.* A slow easy gallop, in which the hand presses the bridle to hinder increase of speed.

Ovid, with all his sweetness, has as little variety of numbers and found as he: he is always upon a *hand-gallop*, and his verse runs upon carpet ground. *Dryden.*

HAND-GUN. *n. f.* A gun wielded by the hand.

Guns have names given them, some from serpents or ravenous birds, as culverines or colubrines; others in other respects, as cannons, demicannons, *hand-guns* and muskets.
*Camden.*

HA'NDICRAFT. *n. f.* [*hand* and *craft*]

1. Manual occupation; work performed by the hand.
Particular

Generated on 2023-03-14 17:49 GMT / https://hdl.handle.net/2027/osu.32435030881114
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google

I

Digitized by Google

Original from
THE OHIO STATE UNIVERSITY

JA3274

Case 1:22-Case23-2043-ANDocumentn29t 11Paged2723/2 Date Filed: 07/21/2023ageID: 3812

A

# DICTIONARY

OF THE

## ENGLISH LANGUAGE:

IN WHICH

The WORDS are deduced from their ORIGINALS,

AND

ILLUSTRATED in their DIFFERENT SIGNIFICATIONS

BY

EXAMPLES from the best WRITERS.

TO WHICH ARE PREFIXED,

A HISTORY of the LANGUAGE,

AND

AN ENGLISH GRAMMAR.

By SAMUEL JOHNSON.

IN TWO VOLUMES.

VOL. II.

THE FOURTH EDITION, REVISED BY THE AUTHOR.

Cum tabulis animum cenforis fumet honefti :
Audebit quæcunque parum fplendoris habebunt,
Et fine pondere erunt, et honore indigna ferentur.
Verba movere loco ; quamvis invita recedant,
Et verfentur adhuc intra penetralia Veftæ :
Obfcurata diu populo bonus eruet, atque
Proferet in lucem fpeciofa vocabula rerum,
Quæ prifcis memorata Catonibus atque Cethegis,
Nunc fitus informis premit et deferta vetuftas.      Hor.

LONDON,

Printed by W. STRAHAN,

For W. STRAHAN, J. & F. RIVINGTON, T. DAVIES, J. HINTON, L. DAVIS; HAWES, CLARKE & COLLINS;
W. JOHNSTON, W. OWEN, T. CASLON, S. CROWDER, T. LONGMAN, B. LAW, E. & C. DILLY, J. DODSLEY,
Z. STUART, BECKET & DE HONDT, J. KNOX, T. CADELL, WILSON & NICOLL, W. NICOLL, G. ROBINSON,
JO. JOHNSON, J. ROBSON, RICHARDSON & URQUHART, and M. HINGESTON.

MDCCLXXIII.

Digitized by Google

Original from
THE OHIO STATE UNIVERSITY

JA3275

Case 1:22-cv-02043-AMD Document 29-11 Filed 07/21/2023 PageID: 3813

# PIS

Though he have the *pique*, and long,
'Tis still for something in the wrong;
As women long, when they're with child,
For things extravagant and wild. *Hudibras.*

3. Point; nicety; punctilio.
Add long prescription of establish'd laws,
And *pique* of honour to maintain a cause,
And shame of change. *Dryden.*

To PIQUE. *v. a.* [*piquer*, Fr.]
1. To touch with envy or virulency; to put into fret, to kindle to emulation.
*Piqu'd* by Protogenes's fame,
From Co to Rhodes Apelles came
To see a rival and a friend,
Prepar'd to censure or commend. *Prior.*

2. To offend; to irritate.
Why *pique* all mortals, that affect a name?
A fool to pleasure, yet a slave to fame! *Pope.*
The lady was *piqued* by her indifference, and began to mention going away. *Female Quixote.*

3. [With the reciprocal pronoun.] To value; to fix reputation as on a point. [*se piquer*, French.]
Children, having made it easy to part with what they have, may *pique themselves* in being kind. *Locke.*
Men apply themselves to two or three foreign, dead, and which are called the learned, languages; and *pique themselves* upon their skill in them. *Locke on Education.*

To PIQUER. *v. a.* See PICKEER.

PIQUE'RER. *n. f.* A robber; a plunderer. Rather *pickeerer*.
When the guardian professed to engage in faction, the word was given, that the guardian would soon be seconded by some other *piqueerers* from the same camp. *Swift.*

PIQUE'T. *n. f.* [*picquet*, Fr.] A game at cards.
She commonly went up at ten,
Unless *piquet* was in the way. *Prior.*
Instead of entertaining themselves at ombre or *piquet*, they would wrestle and pitch the bar. *Spectator.*

PI'RACY. *n. f.* [πειρατεία; piratica, Lat. piraterie, Fr. from *pirate*.] The act or practice of robbing on the sea.
Our gallants, in their fresh gale of fortune, began to scum the seas with their *piracies*. *Carew's Survey of Cornwall.*
Now shall the ocean, as thy Thames, be free,
From both those fates of storms and *piracy*. *Waller.*
Fame swifter than your winged navy flies,
To all that *piracy* and rapine use.
His pretence for making war upon his neighbours was their *piracies*; though he practised the same trade. *Arbuthnot.*

PI'RATE. *n. f.* [πειρατής; pirata, Lat. pirate, Fr.]
1. A sea-robber.
*Pirates* all nations are to prosecute, not so much in the right of their own fears, as upon the band of human society. *Bacon.*
Relate, if business or the thirst of gain
Engage your journey o'er the pathless main,
Where savage *pirates* seek through seas unknown
The lives of others, vent'rous of their own. *Pope.*

2. Any robber; particularly a bookseller who seizes the copies of other men.

To PI'RATE. *v. n.* [from the noun.] To rob by sea.
When they were a little got out of their former condition, they robbed at land and *pirated* by sea. *Arbuthnot.*

To PI'RATE. *v. a.* [*pirater*, Fr.] To take by robbery.
They advertised, they would *pirate* his edition. *Pope.*

PIRA'TICAL. *adj.* [*piraticus*, Lat. from *pirate*.]
1. Predatory; robbing; consisting in robbery.
Having gotten together ships and barks, fell to a kind of *piratical* trade, robbing, spoiling and taking prisoners the ships of all nations. *Bacon's Henry VII.*

2. Practising robbery.
The errours of the press were multiplied by *piratical* printers; to not one of whom I ever gave any other encouragement, than that of not prosecuting them. *Pope.*

PISCA'TION. *n. f.* [*piscatio*, Lat.] The act or practice of fishing.
There are four books of cynegeticks, or venation; five of halieuticks, or *piscation*, commented by Ritterhusius. *Brown's Vulgar Errours.*

PI'SCARY. *n. f.* A privilege of fishing. *Dict.*

PI'SCATORY. *adj.* [*piscatorius*, Lat.] Relating to fishes.
On this monument is represented, in bas-relief, Neptune among the satyrs, to shew that this poet was the inventor of *piscatory* eclogues. *Addison's Remarks on Italy.*

PISCI'VOROUS. *adj.* [*piscis* and *voro.*] Fisheating; living on fish.
In birds that are not carnivorous, the meat is swallowed into the crop or into a kind of antestomach, observed in *piscivorous* birds, where it is moistened and mollified by some proper juice. *Ray on the Creation.*

PISH. *interj.* A contemptuous exclamation. This is sometimes spoken and written *pshaw*. I know not their etymology, and imagine them formed by chance.

# PIT

There was never yet philosopher
That could endure the toothach patiently;
However they have writ the stile of Gods,
And made a *pish* at chance or sufferance. *Shakespeare.*
She frowned and cried *pish*, when I said a thing that I stole. *Spectator.*

To PISH. *v. n.* [from the interjection.] To express contempt.
He turn'd over your Homer, shook his head, and *pish'd* at every line of it. *Spectator.*

PI'SMIRE. *n. f.* [mype, Sax. *pismiere*, Dutch.] An ant; an emmet.
His cloaths, as atoms might prevail,
Might fit a *pismire* or a whale. *Prior.*
Prejudicial to fruit are *pismires*, caterpillars and mice. *Mort.*

To PISS. *v. n.* [*pisser*, Fr. *pissen*, Dutch.] To make water.
I charge the *pissing* conduit run nothing but claret. *Shakesp.*
One als *pisses*, the rest piss for company. *L'Estrange.*
The wanton boys would *piss* upon your grave. *Dryden.*

PISS. *n. f.* [from the verb.] Urine; animal water.
My spleen is at the little rogues, it would vex one more to be knocked on the head with a *piss*-pot than a thunder bolt. *Pope to Swift.*

PI'SSABED. *n. f.* A yellow flower growing in the grass.

PI'SSBURNT. *adj.* Stained with urine.

PISTA'CHIO. *n. f.* [*pistache*, Fr. *pistacchi*, Italian; *pistachia*, Latin.]
The *pistachio* is of an oblong figure, pointed at both ends about half an inch in length, the kernel is of a green colour and a soft and unctuous substance, much like the pulp of an almond, of a pleasant taste: *pistachios* were known to the ancients, and the Arabians call them *pestuch* and *festuch*, and we sometimes call them *fistick* nuts. *Hill.*
*Pistachios*, so they be good, and not musty, joined with almonds, are an excellent nourisher. *Bacon's Nat. Hist.*

PI'STEL. *n. f.* [French.] The track or tread a horseman makes upon the ground he goes over.

PISTILLA'TION. *n. f.* [*pistillum*, Lat.] The act of pounding in a mortar.
The best diamonds we have are comminuble, and so far from breaking hammers, that they submit unto *pistilation*, and resist not an ordinary pestle. *Brown's Vulgar Errours.*

PI'STOL. *n. f.* [*pistole*, *pistolet*, Fr.] A small handgun.
Three watch the door with *pistols*, that none should issue out. *Shakespeare's Merry Wives of Windsor.*
The whole body of the horse passed within *pistol*-shot of the cottage. *Clarendon.*
Quicksilver discharged from a *pistol* will hardly pierce through a parchment. *Brown's Vulgar Errours.*
A woman had a tubercle in the great canthus of the eye, of the bigness of a *pistol*-buller. *Wiseman's Surgery.*
How Verres is less qualify'd to steal,
With sword and *pistol*, than with wax and seal. *Young.*

To PI'STOL. *v. a.* [*pistoler*, Fr.] To shoot with a pistol.

PISTO'LE. *n. f.* [*pistole*, Fr.] A coin of many countries and many degrees of value.
I shall disburden him of many hundred *pistoles*, to make him lighter for the journey. *Dryden's Spanish Fryar.*

PI'STOLET. *n. f.* [diminutive of *pistol.*] A little pistol.
Those unlickt rear-whelps, unfil'd *pistolets*
That, more than cannon shot, avails or lets. *Donne.*

PI'STON. *n. f.* [*piston*, Fr.] The moveable part in several machines; as in pumps and syringes, whereby the suction or attraction is caused; an embolus.

PIT. *n. f.* [pyt, Saxon.]
1. A hole in the ground.
Tumble me into some loathsome *pit*,
Where never man's eye may behold my body. *Shakesp.*
Our enemies have beat us to the *pit*:
It is more worthy to leap in ourselves,
Than tarry 'till they push us. *Shakesp. Julius Cæsar.*
*Pits* upon the sea-shore turn into fresh water, by percolation of the salt through the sand; but in some places of Africa, the water in such *pits* will become brackish again. *Bacon.*

2. Abyss; profundity.
Get you gone,
And from the *pit* of Acheron
Meet me i' th' morning.
Into what *pit* thou seest
From what height fallen. *Milton.*

3. The grave.
O Lord, think no scorn of me, lest I become like them that go down into the *pit*. *Psalm xxviii. 1.*

4. The area on which cocks fight; whence the phrase, to fly the *pit*.
Make him glad, at least, to quit
His victory, and fly the *pit*. *Hudibras.*
They managed the dispute as fiercely, as two game-cocks in the *pit*. *Locke on Education.*

5. The middle part of the theatre.
Let Cully, Cockwood, Fopling charm the *pit*,
And in their folly shew the writer's wit. *Dryden.*

6

Now

Generated on 2023-03-14 17:51 GMT / https://hdl.handle.net/2027/osu.32435030881106
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google

Digitized by Google

Original from
THE OHIO STATE UNIVERSITY

JA3276

TAB 3

2043-AMD Document 11 Page 275 of 295 Date Filed 07

# A COMPLETE DICTIONARY

## OF THE

# ENGLISH LANGUAGE,

Both with regard to SOUND and MEANING:

One main Object of which is, to establish a plain and permanent

## STANDARD of PRONUNCIATION.

TO WHICH IS PREFIXED

## A PROSODIAL GRAMMAR.

By THOMAS SHERIDAN, A.M.

QUO MINUS SUNT FERENDI QUI HANC ARTEM UT TENUEM AC JEJUNAM
CAVILLANTUR; QUÆ NISI ORATORI FUTURO FUNDAMENTA FIDELITER JE-
CERIT, QUICQUID SUPERSTRUXERIS, CORRUET. NECESSARIA PUERIS, JU-
CUNDA SENIBUS, DULCIS SECRETORUM COMES; ET QUÆ VEL SOLA, OMNI
STUDIORUM GENERE, PLUS HABET OPERIS, QUAM OSTENTATIONIS.

QUINCT. L. I. C. 4.

THE FOURTH EDITION,
REVISED, CORRECTED, and ENLARGED.

IN TWO VOLUMES.

VOL. I.

LONDON:

PRINTED FOR CHARLES DILLY;
B. LAW AND SON; W. RICHARDSON; J. SCATCHERD;
AND T. N. LONGMAN.
MDCCXCVII.

JA3278

Digitized by
INTERNET ARCHIVE

Original from
UNIVERSITY OF CALIFORNIA

Generated on 2023-03-14 14:53 GMT / http://hdl.handle.net/2027/uc1.b3386763/19?en
Public Domain / http://www.hathitrust.org/access_use#pd

GUILTILY, gìlt'-ì-lỳ. ad. Without innocence.

GUILTINESS, gìlt'-ì-nès. f. The state of being guilty, confciousnefs of crime.

GUILTLESS, gìlt'-lès. a. Innocent, free from crime.

GUILTLESSLY, gìlt'-lèf-lỳ. ad. Without guilt, innocently.

GUILTLESSNESS, gìlt'-lèf-nès. f. Innocence, freedom from crime.

GUILTY, gìlt'-tỳ. a. Juftly chargeable with a crime, not innocent; wicked, corrupt.

GUINEA, gìn'-nỳ. f. A gold coin valued at one and twenty fhillings.

GUINEADROPPER, gìn'-nỳ-dròp-pûr. f. One who cheats by dropping guineas.

GUINEAHEN, gìn'-nỳ-hèn. f. A fmall Indian hen.

GUINEAPEPPER, gìn'-nỳ-pèp-pûr. f. A plant.

GUINEAPIG, gìn'-nỳ-pìg. f. A fmall animal with a pig's fnout.

GUISE, gì'ze. f. Manner, mien, habit; practice, cuftom, property; external appearance, drefs.

GUITAR, gìt-tâ'r. f. A ftringed inftrument of mufick.

GULES, gù'lz. a. Red: a term ufed in heraldry.

GULF, gùlf'. f. A bay, an opening into land; an abyfs, an unmeafureable depth; a whirlpool, a fucking eddy; any thing infatiable.

GULFY, gùl'-fỳ. a. Full of gulfs or whirlpools.

To GULL, gùl'. v. a. To trick, to cheat; to defraud.

GULL, gùl'. f. A fea-bird; a cheat, a fraud, a trick; a ftupid animal, one eafily cheated.

GULLCATCHER, gùl'-kàtfh-ûr. f. A cheat.

GULLER, gùl'-lûr. f. A cheat, an impoftor.

GULLERY, gùl'-lûr-ỳ. f. Cheat, impofture.

GULLET, gùl'-lìt. f. The throat, the meatpipe.

To GULLY, gùl'-lỳ. v. n. To run with noife.

GULLYHOLE, gùl'-lỳ-hòle. f. The hole where the gutters empty themfelves in the fubterraneous fewer.

GULOSITY, gù-lòs'-ì-tỳ. f. Greedinefs, gluttony, voracity.

To GULP, gùlp'. v. a. To fwallow eagerly, to fuck down without intermiffion.

GULP, gùlp'. f. As much as can be fwallowed at once.

GUM, gùm'. f. A vegetable fubftance differing from a refin, in being more vifcid, and diffolving in aqueous menftruums; the flefhy covering that contains the teeth.

To GUM, gùm'. v. a. To clofe with gum; to fmear with gum.

GUMMINESS, gùm'-mỳ-nès. f. The ftate of being gummy.

GUMMOSITY, gùm-mòs'-sì-tỳ. f. The nature of gum, gumminefs.

GUMMOUS, gùm'-mùs. a. Of the nature of gum.

GUMMY, gùm'-mỳ. a. Confifting of gum, of the nature of gum; productive of gum; overgrown with gum.

GUN, gùn'. f. The general name for fire-arms, the inftrument from which fhot is difcharged by fire.

GUNNEL, gùn'-nìl. f. Corrupted from GUNWALE.

GUNNER, gùn'-nûr. f. A cannonier, he whofe employment is to manage the artillery in a fhip.

GUNNERY, gùn'-nûr-ỳ. f. The fcience of artillery.

GUNPOWDER, gùn'-pow-dûr. f. The powder put into guns to be fired.

GUNSHOT, gùn'-fhòt. f. The reach or range of a gun.

GUNSHOT, gùn'-fhòt. a. Made by the fhot of a gun.

GUNSMITH, gùn'-fmìth. f. A man whofe trade is to make guns.

GUNSTICK, gùn'-ftìk. f. The rammer.

GUNSTOCK, gùn'-ftòk. f. The wood to which the barrel of the gun is fixed.

GUNSTONE, gùn'-ftòne. f. The fhot of cannon.

GUNWALE or GUNNEL of a fhip, gùn'-nìl. f. That piece of timber which

JA3279

Digitized by
INTERNET ARCHIVE

Original from
UNIVERSITY OF CALIFORNIA

Case 2:043-AMD Document 11 Page 277 Date Filed 03/27/08

# A COMPLETE
# DICTIONARY

## OF THE

## ENGLISH LANGUAGE,

Both with regard to SOUND and MEANING:

One main Object of which is, to establish a plain and permanent

## STANDARD of PRONUNCIATION.

TO WHICH IS PREFIXED

## A PROSODIAL GRAMMAR.

### By THOMAS SHERIDAN, A.M.

QUO MINUS SUNT FERENDI QUI HANC ARTEM UT TENUEM AC JEJUNAM
AVILLANTUR; QUÆ NISI ORATORI FUTURO FUNDAMENTA FIDELITER JE-
ERIT, QUICQUID SUPERSTRUXERIS, CORRUET. NECESSARIA PUERIS, JU-
UNDA SENIBUS, DULCIS SECRETORUM COMES; ET QUÆ VEL SOLA, OMNE
RUDIORUM GENERE, PLUS HABET OPERIS, QUAM OSTENTATIONIS.
QUINCT. L. I. C. 4.

## THE FOURTH EDITION,
REVISED, CORRECTED, and ENLARGED.

IN TWO VOLUMES.
VOL. II.

## LONDON:

PRINTED FOR CHARLES DILLY;
E. LAW AND SON; W. RICHARDSON; J. SCATCHERD;
AND T. N. LONGMAN.
MDCCXCVII.

JA3280

Digitized by
INTERNET ARCHIVE

Original from
UNIVERSITY OF CALIFORNIA

-2043-AM Document 29t 11 Page File 2783/2 Date Filed 07

PISTILLATION, pis-til-lā´shŭn. f. The act of pounding in a mortar.

PISTOL, pis´-tŭl. f. A small hand gun.

To PISTOL, pis´-tŭl. v. a. To shoot with a pistol.

PISTOLE, pis-tō´le. f. A coin of many countries and many degrees of value.

PISTOLET, pis´-tŏ-lĕt. f. A little pistol.

PISTON, pis´-tŭn. f. The moveable part in several machines, as in pumps and syringes, whereby the suction or attraction is caused; an embolus.

PIT, pit´. f. A hole in the ground; abyss, profundity; the grave; the area on which cocks fight; the middle part of the theatre; any hollow of the body, as the Pit of the stomach, the arm-Pit; a dint made by the finger.

To PIT, pit´. v. a. To sink in hollows; to set on an area to fight.

PITAPAT, pit-à-pàt. f. A flutter, a palpitation; a light quick step.

PITCH, pitsh´. f. The resin of the pine extracted by fire and inspissated; any degree of elevation or height; state with respect to lowness or height; degree, rate.

To PITCH, pitsh´, v. a. To fix, to plant; to order regularly; to throw headlong; to cast forward; to smear with Pitch; to darken.

To PITCH, pitsh´. v. n. To light, to drop; to fall headlong; to fix choice; to fix a tent or temporary habitation.

PITCHER, pitsh´-ŭr. f. An earthen vessel, a water pot; an instrument to pierce the ground in which any thing is to be fixed.

PITCHFORK, pitsh´-fàrk. f. A fork used in husbandry.

PITCHINESS, pitsh´-y-nĕs. f. Blackness, darkness.

PITCHY, pitsh´- y. a. Smeared with pitch; having the qualities of pitch; black, dark, dismal.

PITCOAL, pit´-kōle. f. Fossile coal.

PITEOUS, pit´-yŭs. a. Sorrowful, mournful, exciting pity; compas-

sionate, tender; wretched, paltry, pitiful.

PITEOUSLY, pit´-yŭs-lý. ad. In a piteous manner.

PITEOUSNESS, pit´-yŭs-nĕs. f. Sorrowfulness, tenderness.

PITFALL, pit´-fàl. f. A pit dug and covered, into which a passenger falls unexpectedly.

PITH, pith´. f. The marrow of the plant, the soft part in the midst of the wood; marrow; strength, force; energy, cogency, fulness of sentiment, closeness and vigour of thought and style; weight, moment, principal part; the quintessence, the chief part.

PITHILY, pith´-il-ý. ad. With strength, with cogency.

PITHINESS, pith´-ý-nĕs. f. Energy, strength.

PITHLESS, pith´-lĕs. a. Wanting pith; wanting energy, wanting force.

PITHY, pith´-ý. a. Consisting of pith; strong, forcible, energetick.

PITIABLE, pit´-ý-àbl. a. Deserving pity.

PITIFUL, pit´-ý-fŭl. a. Melancholy, moving compassion; tender, compassionate; paltry, contemptible, despicable.

PITIFULLY, pit´-ý-fŭl-lý. ad. Mournfully, in a manner that moves compassion; contemptibly, despicably.

PITIFULNESS, pit´-ý-fŭl-nĕs. f. Tenderness, mercy, compassion; despicableness, contemptibleness.

PITILESLY, pit´-ý-lĕs-lý. ad. Without mercy.

PITILESNESS, pit´-ý-lĕs-nĕs. f. Unmercifulness.

PITILESS, pit´-ý-lĕs. a. Wanting pity, wanting compassion, merciless.

PITMAN, pit´-màn. f. He that in sawing timber works below in the pit.

PITSAW, pit´-sà. f. The large saw used by two men, of whom one is in the pit.

PITTANCE, pit´-tĕns. f. An allowance of meat in a monastery; a small portion.

PITUITE,

JA3281

Digitized by
INTERNET ARCHIVE

Original from
UNIVERSITY OF CALIFORNIA

TAB 4

Case 1:22-Case 22-2043-AMDocDocument 29t 11Paged 2803/27Date Flag 07/21/2023ageID: 3820

# DICTIONARIUM BRITANNICUM:

#### Or a more COMPLEAT

## UNIVERSAL ETYMOLOGICAL

# ENGLISH DICTIONARY

#### Than any EXTANT.

##### CONTAINING

Not only the Words and their Explication; but their Etymologies from the *Antient British, Teutonick, Dutch Low* and *High, Old Saxon, German, Danish, Swedish, Norman* and *Modern French, Italian, Spanish, Latin, Greek, Hebrew,* &c. each in its proper Character.

##### ALSO

Explaining hard and technical Words, or Terms of Art, in all the *ARTS, SCIENCES,* and *MYSTERIES* following. Together with *ACCENTS* directing to their proper Pronuntiation, shewing both the *Orthography,* and *Orthoepia* of the *English Tongue,*

##### VIZ. IN

AGRICULTURE, ALGEBRA, ANATOMY, ARCHITECTURE, ARITHMETICK, ASTROLOGY, ASTRONOMY, BOTANICKS, CATOPTRICKS, CHYMISTRY, CHIROMANCY, CHIRURGERY, CONFECTIONARY, COOKERY, COSMOGRAPHY, DIALLING, DIOPTRICKS, ETHICKS, FISHING, FORTIFICATION, FOWLING, GARDENING, GAUGING, GEOGRAPHY, GEOMETRY, GRAMMAR, GUNNERY, HANDICRAFTS, HAWKING, HERALDRY, HORSEMANSHIP, HUNTING, HUSBANDRY, HYDRAULICKS, HYDROGRAPHY, HYDROSTATICKS, LAW, LOGICK, MARITIME *and* MILITARY AFFAIRS, MATHEMATICKS, MECHANICKS, MERCHANDIZE, METAPHYSICKS, METEOROLOGY, NAVIGATION, OPTICKS, OTACOUSTICKS, PAINTING, PERSPECTIVE, PHARMACY, PHILOSOPHY, PHYSICK, PHYSIOGNOMY, PYROTECHNY, RHETORICK, SCULPTURE, STATICKS, STATUARY, SURVEYING, THEOLOGY, *and* TRIGONOMETRY.

Illustrated with near Five Hundred CUTS, for Giving a clear Idea of those Figures, not so well apprehended by verbal Description.

##### LIKEWISE

A Collection and Explanation of *English* PROVERBS; also of WORDS and PHRASES us'd in our ancient Charters, Statutes, Writs, Old Records and Processes at Law.

##### ALSO

The Iconology, Mythology, Theogony, and Theology of the *Egyptians, Greeks, Romans,* &c. being an Account of their Deities, Solemnities, either Religious or Civil, their Divinations, Auguries, Oracles, Hieroglyphicks, and many other curious Matters, necessary to be understood, especially by the Readers of *English* POETRY.

##### To which is added,

A Collection of Proper Names of Persons and Places in *Great-Britain,* &c. with their Etymologies and Explications.

The Whole digested into an Alphabetical Order, not only for the Information of the Ignorant, but the Entertainment of the Curious; and also the Benefit of Artificers, Tradesmen, Young Students and Foreigners.

*A WORK useful for such as would* UNDERSTAND *what they* READ *and* HEAR, SPEAK *what they* MEAN, *and* WRITE *true* ENGLISH.



The SECOND EDITION with numerous ADDITIONS and IMPROVEMENTS.

#### By N. BAILEY, φιλόλογ⊙.

Assisted in the Mathematical Part by *G. GORDON;* in the Botanical by *P. MILLER;* and in the Etymological, &c. by *T. LEDIARD,* Gent. Professor of the Modern Languages in *Lower Germany.*

### LONDON:

Printed for T. COX, at the *Lamb* under the *Royal-Exchange.*
M,DCC,XXXVI.

Digitized by Google  JA3283

Gum *Oppanax*, the Juice of the Herb or Root of *Panax Herculis*.

Gum *Sagapenum*, good for Pains in the Side.

Gum *Sarcocolla*, good for glewing Flesh together.

Gum *Tragacanth* [τράγος; and ἀκανθα, Gr.] i. e. Goat's Horn.

Gu'mmata [in *Medicine*] strumous Tumours.

Gu'mmated [*gummatus*, L.] done over with Gum.

Gu'mminess [of *gumminess*, L. *gommeux*, F. *gummi*, L. *gomme*, F.] gummy Nature or Quality.

Gu'mmose [*gummosus*, L.] that hath much Gum.

Gummo'sity, gummy Quality.

Gu'mmy [*gummosus*, L. *gommeux*, F.] full of Gum.

Gums [ꝥomaꞃ, *Sax.*] the Flesh that covers the Jaw-Bones, into which the Teeth are set.

Gun [*Somner* derives *Gun* of *Mangon*, a warlike Machine used before the Invention of Guns] a Fire-Arm or Weapon of several Sorts and Sizes.

Gun-Powder, a Composition of Salt-Petre, Sulphur, and Charcoal, mixed together, and usually granulated, which easily takes Fire, and rarifies or expands with great Vehemence, by means of its Elastick Force.

Gun-Powder *Treason*, a Festival Day observed on the Fifth of *November*, in Commemoration of the happy Deliverance of King *James* I. and the House of Lords and Commons, by the Discovery of the *Gun-Powder Plot*.

Gu'nnel [of a *Ship*] the Gun-Wale.

Gu'nnery, the Gunner's Art,

Gu'nster, Gunner, one who goes a shooting with a Gun or Fowling-Piece.

Gu'nter's *Line*, [so call'd of Mr. *Gunter*, formerly Geometry Professor of *Gresham* College,] call'd also the Line of Numbers, is the Logarithms laid off upon straight Lines ; the Use of which is for performing Arithmetical Operations, by means of a Pair of Compasses, or even without, by sliding two of these Lines of Numbers by each other.

Gu'nter's *Quadrant*, a Quadrant of *Wood, Brass,* &c. being partly of a Stereographical Projection upon the Plane of the Equinoctial, for Eye being in one of the Poles, where the Tropick, Ecliptick, and Horizon, are Arches of Circles : but the Hour Circles are all Curves, drawn by means of the several Altitudes of the Sun, for some particular Latitude, every Day in the Year. The Use of it is to find the Hour of the Day, Sun's Azimuth, *&c.*

Gu'nter's *Scale*, that which Sailors commonly call the *Gunter*, is a large plain Scale, with the Lines of artificial Sines and Tangents upon it, laid off by straight Lines, and so contriv'd to a Line of Numbers that is on it, that by the Help of this Scale, and a Pair of Compasses, all the Cases of Trigonometry, both plain and spherical, may, to a tolerable Exactness, be solv'd, and of consequence all Questions in *Navigation, Dialling,* &c. may be wrought by it.

Guns and Powder, were invented or found out by *Bartholdus Swartz*, a *Franciscan Friar*, about the Year 1380. *temp.* K. *Richard* II. by his mixing Salt-Petre and some other Ingredients in a Mortar, on which he had placed a Stone ; and having Occasion to light a Candle, in striking Fire a Spark fell into the Mortar, and the Composition blew up with great Violence and Noise. This gave a Handle for the Invention of Guns : and the first that used them were the *Venetians* against the Inhabitants of *Genoa*.

*Gun-Powder* was had from foreign Parts, and at dear Rates, till Queen *Elizabeth* order'd it to be made in *England*.

Gu'nwale [of a *Ship*] is that Piece of Timber, which on either Side reaches from the Half-Deck to the Fore-Castle ; also the lower Part of the Port, where any Ordnance are.

Gurge [*gurges*, L.] a Whirl-Pool.

Gu'rgians a Sort of coarse Meal.

Gu'rgeon } the Chaff of Wheat or Barley.
Gu'rgins }

Gurgling [of *Gurgulio*, L.] making a Noise, as Water pouring out of a Bottle, or in swallowing a Liquid.

Gurgy'pting [*Vje*, a *Falcon.*] a Term used when a Hawk is stiff-neck'd and cloak'd.

Gurgu'lio [with *Anat.*] the Cover of the Wind-pipe ; the same as *Cion* and *Epiglottis*.

Gu'rnard, a Fish.

To Gush [of Ꝺeoꞇan, *Sax.* goſſetten, *Du.*] to pour or run out suddenly, and with Force.

Gu'shing [of Ꝺeoꞇunᵹ, *Sax.*] pouring or running out suddenly, and with Force.

Gu'sset [*gousset*, F.] a triangular, small Piece of Cloth, used in Shirts, Smocks, *&c.*

Gusset [in *Heraldry*] is formed by a Line drawn either from the Dexter or Sinister Chief Points, and falling perpendicularly down to the extreme Base, as in the Escutcheon : Or thus, it proceeds from the Dexter or Sinister Angle of the Chief, descending diagonally to the Chief Point, and from thence another Line falls perpendicularly upon the Base.

---

Mr. *Guillim* calls it one of the whimsical Abatements of Honour, for a Person who is either Lascivious, Effeminate, or a Sot, or all of them.

Gust [ꝧyꞃꞇ, *Sax.*] a sudden Puff or Blast of Wind.

Gust [*gustus*, L. *goute*, F. *Gusto*, Ital.] the Taste.

Gust [*old Writ.*] a Stranger or Guest who lodges with a Person the second Night.

Gu'stable [*gustosa*, Ital. *gustabilis*, L.] that may be tasted ; agreeable to the Taste.

Gu'sto, a Relish, Savour, or Taste, *Ital.*

Guts [prob. of kutteln, or, according to *Casaubon*, of κοιλία, *Gr.*] a Canal or Pipe in the Abdomen, through which the Food passes to the Colon.

To Gut, to take out the Guts, to empty.

Gu'tling [of *Guts*] stuffing the Guts, eating much or often.

Gu'tta, a Drop of any Liquor.

Gutta *Gamandra*, a kind of Gum or hardened Juice brought from the *East-Indies*, L.

Gutta *Rosacea* [with *Physicians*] a Redness with Pimples in the Nose, Cheeks, or over the whole Face, as if they were sprinkled with Rose-coloured Drops.

Gutta *Serena* [with *Oculists*] a Disease in the Eye, consisting in an entire Prevention of Sight, without any apparent Defect of the Eyes ; excepting that the Pupil seems something larger and blacker than before.

Gu'ttal *Cartilage* [with *Anatomists*] is that which includes the third and fourth Gristle of the Larynx.

Gu'ttated [*guttatus*, L.] spotted with Spots or Speckles like Drops.

Gu'ttæ, Drops.

Gu'tte [in *Architecture*] are certain Parts in Figure like little Bells, in Number six, placed below the Triglyphs in an Architrave, of the Dorick Order. They are so called of *Gutta*, a Drop, from their Shape, resembling the Drops of Water that have run along the Triglyph, and still hang under the Closure betwixt the Pillars.

Gutte *de l' Eau*, a Drop of Water, *F.*

Gutte *de l' Eau* [in *Heral.*] are painted Argent or White, *F.*

Gutte *de Larmes* [in *Heraldry*] is where Drops of Tears are represented in a Coat of Arms of a blue Colour, *F.*

Gutte *de Sang* [in *Heraldry*] Drops of Blood, *F.*

Gutte *de l' Or*, [in *Heraldry*] Drops of melted Gold, borne in a Coat of Arms of *Or*, or of Gold-colour.

Gu'tter [*goutiere*, F.] a Canal or Spout for carrying off Water.

Gutter *Tile*, a three cornered Tile laid in Gutters.

To Gutter, to sweal or run as a Candle.

Gu'ttera [*old Rec.*] a Gutter or Spout to convey Water from Leads or Roofs of Buildings.

To Gu'ttle [of *gut*, F.] to eat much.

Gu'ttose [*guttosus*, L.] full of Drops.

Gu'ttural [*gutturalis*, L.] of or pertaining to the Throat.

Guttural *Letters*, such as are pronounced in the Throat.

Gu'tturalness [of *guttur*, L. the Throat] the being pronounced in the Throat ; spoken of Letters.

Gu'tturis *Os* [*Anatomy*] the same that is call'd *Hyoides Os*, L.

Gu'ttus [with *Antiquaries*] a Sort of Vase used in the *Romans* Sacrifices, to take Wine and sprinkle it *Guttatim*, i. e. Drop by Drop upon the Victim, *L.*

Gu'tty [in *Heraldry*] signifies Drops ; and they being represented in Coat Armour of several Colours, the Colour should be mentioned in Blazon.

Gu't-wort, an Herb.

Guve *de ronde* [in *Fortific.*] is the same as *single Tenaille*.

Guy *Rope* [in a *Ship*] a Rope made fast to the Fore-Mast at one End, and is received through a single Block tiezed to the Pennant of the winding Tackle, and then again reev'd through another, seiz'd to the Fore-Mast. The Use of which is to hale forward the Pennant of the winding Tackle.

Gu'zes [in *Heraldry*] with the *English*, are Roundles of a sanguine or murrey Colour ; but the *French* call them *Torteux*. Guzes being of a bloody Hue, are suppos'd by some to represent Wounds.

To Gu'zzle, to drink greedily or much ; to Tipple.

Gwabr *Merched* [among the *Welsh*] a Payment or Fine to the Lords of some Manors upon the Marriage of the Tenants Daughters, or upon the committing the Act of Incontinency.

Gwa'lstow [of ꝥæl, a Gallows, and ꞅꞇoꝥ, *Sax.* a Place] a Place for the Execution of Malefactors.

Gwayf, Goods that Felons, when pursued, throw down and left in the High-Way, which were forfeited to the K'ng or Lord of the Manor, unless lawfully claimed by the right Owner within a Year and a Day.

To Gybe, to joke upon, banter, jeer, flout, *&c.*

Gylt wite. See *Gultwit*.

Gylt-wite [ᵹylꞇ-ꝥiꞇe, *Sax.*] a Satisfaction or Amends for a Trespass.

4 L        Gym-

Digitized by Google    JA3284

# P I        P L

meaning is; that it is a folly to strive against impossibilities; by striving against the stream, a man not only wearies himself: but looses ground too. See *To kick against the Pricks.*

PISTA'CHIO [*pistacia,* L. *pistache,* F. *pistacchio,* It.] a nut growing in Egypt, &c. of an aromatick scent.

PI'STE [in the *Manage*] the track or tread which a horse makes upon the ground.

PISTI'LLUM, a pestle of a mortar, *L*

PISTI'LLUM [with *Botanists*] a pistil, that part of some plants, which in shape resembles a pestle.

PI'STOL [*pistolet,* F. *pistola,* It. and Port. *pistolete,* Sp.] a short small gun, or fire-arms, born on the saddle-bow, the girdle, or in the pocket.

PISTO'LE [*pistole,* F. *pistola,* Ital. a *French* or *Spanish* coin, in value about 17 *s.*

PISIOLOCHI'A [*πιριλοχία,* Gr.] a kind of hart-wort.

PI'STON, a part or member in several machines, as, pumps, syringes &c.

PIT [*pit, Sax.*] a hole in the earth.

PIT-A-PAT, a beating or throbbing like the heart.

*To* PIT, to sink in holes, as in the small pox.

PIT, a hole in which the *Sects* used to drown women thieves; hence the phrase *condemn'd to the Pit,* is the same as with us, *to say condemn'd to the Gallows.*

*The* PIT [or *parterre*] of the play house.

*The* PIT [or hollow] of the stomach.

PI'TANCE [*pitancia,* L.] a little repast or refection of fish or flesh more than the common allowance.

PITANCIARIUS [in the ancient *Monasteries*] an officer who provided and distributed the pitances of meat and herbs amongst the monks.

PITCH [pic, *Sax.* ppʒ, *C. Br.* pʒck, *Du.* and L. G. pʒch, H. G. pox, F. *pece* It. *pez,* Sp. *pix,* L.] an oily, bituminous, black substance; as it distills from the wood, it is called *Barras.* This makes two sorts, the finest and clearest being called *Galipot,* and the coarser *Marbled Barras.*

*The common* PITCH, is the liquid *Galipot,* reduced into the form and consistency we see it, by mixing it with tar with oil.

*Naval* PITCH, is that which is drawn from old pines, rang'd and burnt like charcoal, and used in pitching of vessels.

*The* PITCH or tar.

*The highest* PITCH [or *Top*] of any thing.

*To* PITCH upon, or choose a thing.

*To* PITCH [*applier,* Ital.] to fix in the ground; to fall or light upon.

*To* PITCH, to do over with pitch.

*To* PITCH upon or choose a thing.

*A* PITCH, an iron bar with a picked end, a crow.

PITCH [with *Architects*] the angle to which a gable-end, and of consequence the whole roof of a building is set.

*To* PITCH upon, to choose.

*To* PITCH [in *Sea Language*] a term used of a ship when the fails with her head too much into the sea, or bears against it so, as to endanger her top-masts, then the sailors say, *She will pitch her Mast by the Board.*

PIT-FALL [of pit and *peallan, Sax,* to fall] a trap for birds.

PITCHER [*picher,* O. F.] an earthen drink pot with a handle.

PITCHER *Bawd* [*with the Canting Crew*] the poor hack who runs of errands, to fetch wenches or liquor.

*The* PITCHER *goes so often to the well, that it comes broken home at last.*

It. *Tanto vala secchin'al pozzo, che vi lascia il manico.*

L. *Quem sæpe casus transit, aliquande invenit.* F. *Tant souvent va le pot à l'eau, que l' ance y demeure.*

PITCH FORK [pʒc forc, *C. Br.*] an instrument used in husbandry.

PITCHINESS [of *piceus,* L. and *ness*] pitchy quality, or condition.

PITCHING *Pence,* a duty paid for setting down every sack of corn, or of other merchandizes, in a fair or market.

PI'TCHY [*piceus,* of *pix* L.] dawbed with pitch, &c

PI'TEOUS [*piteux* F.] deserving pity. also poor, mean, sorry.

PI'TEOUSLY [*pitoyablement,* F.] after a piteous manner.

PITEOUSNESS [*piteux,* F. and *ness*] sorriness, meanness.

PITH [piʒð, *Sax.*] the marrow of an animal.

PY'THIAS } [with *Meteorologists*] the name of a comet. or
PITHI'TES } rather meteor, of the form of a tub; of which there are divers kinds, *viz.* some of an oval figure, others like a tun or barrel set perpendicular and some like one inclined or cut short; others having a hairy train or bush, &c.

PI'THY full of pith or marrow, substantial full of good matter.

PITHILY, strongly, vigorously, with an energy.

PITHLESS, dry, faint, insipid, having no pith.

PITHY, strong, forcible, energetical.

PI'THINESS, fulness of pith; also substantialness, fulness of good matter.

PI'TIABLE [*pitoyable,* F.] to be pitied.

PI'TIFUL [of *pitie,* F. and *full*] inclined to pity, tender-

---

hearted, compassionate, merciful; also that deserves pity, woful; also sorry, mean.

PI'TIFULLY [*pitoyablement,* F.] mournfully; meanly, &c.

PITIFULNESS [of *pitie,* F. and *fulness*] propenseness to pity; also meanness.

PI'TILESS [of *pitie,* F. and *less*] unmerciful.

PITTA'CIUM [*πιττάκιον,* Gr.] a small cloth spread with salve. to be laid on a part affected.

PI'TTANCE [*pietanza,* It.] properly a small portion of victuals allow'd to monks or others for a meal; short commons; also a small part of any thing.

PI'TU'ITA, phlegm or rheum, snivel, snot. It. is one of the four humours in the body of animals, on which their temperament is suppos'd to depend. It is the most viscid and glutinous part of the blood, separated in the largest glands, where the contorsions of the arteries are largest, and give the greater retardation to the velocity as in the glands about the mouth and heart.

PITUITA'RIA [with *Botanists*] the herb slaves acre, *L.*

PITU'ITARY *Gland* [*Anat.*] a gland in the brain, of the size of a large pea, in the *Sella* of the *Os Sphænoides.*

PITU'ITOUS [*pituitosa,* It. of *pituitosus,* L.] full of phlegm.

PITU'ITOUSNESS [of *pituituex,* F. *pituitosus,* L. and *ness*] phlegmatickness.

PI'TY [*pitie,* F. pietà, It. *piedad,* Sp.] compassion, concern.

*To* PITY, to take pity, or have compassion of.

*It is better to be envied than Pitied.*

F. *Il vaut mieux faire envie que pitié.* It. *E meglio far invidia che compassione.*

PI'TY [*an Allegorical Deity with the Heathens*] was by them represented in the form of a beautiful nymph of a fair complexion crown'd with olives stretching out her left arm, as being nearest her heart, to relieve an object of compassion lying at her feet. In her right hand a twig of cedar, and standing by her a crow.

PITYRI'ASIS [*πιτυρίασις,* Gr.] the falling of dandriff, or scurf from the head.

PITYRO'IDES [*πιτυροειδης,* Gr.] a kind of settlement in urine like bran.

PIVA, a heat-boy, *Ital.*

PI'VOT, a foot or shoe of iron, &c. usually made in a conical form, or terminating in a point, whereby a body intended to turn round, bears on another fixed at rest, and performs its circumvolutions, F.

PIU [in *Musick Books*] a little more, it increases the strength of the signification of the word to which it is joined with, *Ital*

PIU *Piano* [in *Musical Books*] signifies, play a little more gay and brisk, th'n *Allegro* it self requires.

PIU *Presto* [*Musick Books*] i. e. play quicker than *Presto* it self requires, *Ital.*

PIZZLE [prob. of *pijs* q. *pisse* or of *pese, Du.* a nerve, whence *pisark, Du.* a *pizzle:* unless you had rather from *pricz* H. G. a scourge, for which bulls pizzles were used] the gristly part of the *Penis* of an animal.

PLA'CABLE [Sp. *Placabile,* It. of *placabilis,* L.] easiness of being pacified or appeased.

PLACABI'LITY { [of *placabilis,* L. and *ness*] easiness to be
PLA'CABLENESS } appeased.

PLA'CARD } [plackarut, *Du. pla'art,* F. *placardo,* It.] a leaf
PLA'CART } or sheet of paper stretch'd, or apply'd upon a wall or post. in *Holland,* it is an edict or proclamation; also it is used for a writing of safe conduct: In *France,* it is a table wherein laws, orders, &c. are written and hung up In *France* the fore part of a woman's petticoat.

PLA'CARD [in *Architecture*] the decoration of the door of an apartment; consisting of a chambranle crowned with its frize or gorge, and its corniche sometimes supported with consoles.

PLA'CARD [in our *old Customs*] a licence whereby a person is permitted to shoot a gun, or to use unlawful games.

PLACE [place or place, *Sax.* plactʒe, *Du.* O. and L. G. platʒ, H. G. *place,* F. of *plaja,* Sp. *platea,* L. of *πλατεῖα,* Gr.] space or room, in which any thing is; also an office or employment; a passage of a book; a town or hold; also rank.

PLACE [in *Opticks*] is the point to which the eye refers an object.

PLACE [with *Naturalists*] is sometimes taken for that portion of infinite space which is possessed by and comprehended within the material world. and which is thereby distinguished from the rest of the expansion.

PLACE *of Radiation* [in *Opticks*] is the interval, or space of the medium, or transparent body, thro' which any visible object radiates.

PLACE [with *Philosophers*] that part of immoveable space which any body possesses.

*Absolute* PLACE [with *Philosophers*] is that part of infinite and immoveable space which a body possesses; called also *primary* Place.

*Relative* PLACE [in *Philos.*] is the space it possesses with regard to other adjacent objects, called also *secundary Place.*

PLACE *Geometrick,* is a certain extent wherein each point may

TAB 5



**RUcore: Rutgers University Community Repository**

---

# S. Colt revolving gun, patented Feb. 25, 1836



PDF

PDF-1  (62.70 MB)

Citation & Export

View Usage Statistics

Staff View

## Citation & Export    Hide

### Simple citation

**S. Colt revolving gun, patented Feb. 25, 1836.** Retrieved from https://doi.org/doi:10.7282/T3SN076C

### Export

- EndNote Desktop Client
- EndNoteWeb
- RefWorks
- RIS File Download

## Statistics    Hide

## Description

**Title** S. Colt revolving gun, patented Feb. 25, 1836

**Name** Patent Arms Manufacturing Company; Americana Archives Publishing

**Date Created** 1836

**Date Issued**

**Subject** Colt revolver, Revolvers--Patents

**Extent** 1 page(s)

**Description** A digital facsimile from the book Ten Great American Inventions of the original 1836 plan or diagram for the patent application for the first Colt revolver. "The Colt legend dates to 1836, when the United States Government issued Sam Colt a patent for the world's first commercially viable revolving cylinder firearm." (Colt Website, http://www.colt.com    ) The patent was issued to Samuel Colt's first corporation, the Patent Arms Manufacturing Company, Paterson, New Jersey, which was founded in 1836 and failed in 1842.

**Genre** diagrams, drawings

**Persistent URL** https://doi.org/doi:10.7282/T3SN076C

**Data Life Cycle Event(s)**
Type: Version creation
Label: Digital Source
Detail: The digital source file for this work is available in the New Jersey State Publications Digital Library, Digital Jerseyana Collection.
Collector: New Jersey State Library Information Center
Reference: http://hdl.handle.net/10929/32201

**Collection** New Jersey State Library

**Organization Name** New Jersey State Library

**Rights** This resource may be copyright protected. You may make use of this resource, with proper attribution, for educational and other non-commercial uses only. Contact the contributing organization to obtain permission for reproduction, publication, and commercial use.

---

S. COLT.

Revolving Gun.

Patented Feb. 25, 1836.



JA3288

TAB 6



A

# CYCLOPÆDIA OF COSTUME

OR

## DICTIONARY of DRESS,

### Including Notices of Contemporaneous Fashions on the Continent;

AND

*A General Chronological History of the Costumes of the principal Countries
of Europe, from the Commencement of the Christian Era
to the Accession of George the Third.*

By JAMES ROBINSON PLANCHÉ, ESQ.,

*SOMERSET HERALD.*



*IN TWO VOLUMES.*

VOL. I.—THE DICTIONARY.

## London:

CHATTO AND WINDUS, PICCADILLY.

1876.

[*All Rights reserved.*]

Hosted by Google    JA3290

Case 1:22-cv-07426-R043-AMDocuDocument 11Pagei2863/27Date Filed: 07/21/2023geID: 3828

having given their name to the guisarme as the Normans had previously given theirs of guisarme to the Saxon byl.

In the time of Charles VII. of France, it would appear that soldiers armed with voulges were called in that country "guisarmiers." (See VOULGE.) M. Viollet-le-Duc observes that the goad with which oxen are driven is called a *gise;* and though he makes no comment on the fact, it certainly offers us a new and more direct derivation than any yet suggested. The drover would be as likely to come armed with his goad as the thresher with his flail, the mower with his scythe, the haymaker with his fork, or the woodman with his bill-hook, and thus the *gise-*arm would be added to the other military weapons constructed from the peaceful implements of the field and the farm-yard. The absence of a representation of anything resembling the weapon now generally known as the guisarme, either in the Bayeux Tapestry or in any illuminations of the eleventh and twelfth centuries, is a fact however which calls for more consideration than has hitherto been bestowed on it. M. Demmin, who classes the "guisarme" with the scythe weapons, the glaive and the bill, suggests that its name was derived from the followers of the House of Guise, who were called *Guisards,* apparently unaware or forgetful that it occurs in the writings of Wace and Guiart, and several of the most early Anglo-Norman romances. Our example is from one in the Meyrick Collection. There are several in the Tower; but the exact date of any specimen is not ascertainable, as they were used to the end of the fifteenth century. Olivier de la Marche, a chronicler born in 1425, speaks of the great antiquity of the guisarme, and defines it as a combination of a dagger and a battle-axe.

*GUN.* Fortunately there is no occasion for me to plunge into the apparently interminable controversy respecting the introduction of cannon. I have to speak only of hand fire-arms, which were a later invention, and can be more easily traced to their origin : "An Italian writer, coeval with the discovery, having fortunately preserved a very minute detail of the fact." (Meyrick.)

Billius, or Billi, a learned Milanese nobleman, acquaints us that they were first employed at the siege of Lucca in the year 1430. He tells us that the Florentines were provided with artillery which, by the force of gunpowder, discharged large stones ; but the Lucquese, perceiving they did very little execution, came at last to despise them, and every day renewed their sallies, to the great slaughter of their enemies, by the help of small fire-arms, to which the Florentines were strangers, and which before this period were unknown in Italy. Still more distinctly he says : "*They invented a new kind of weapon.* In their hands they held a sort of club, about a cubit and a half in length, to which was affixed an iron tube, which, being filled with sulphur and nitre, by the force of fire emitted iron bullets. The blow, if it hit, was certain destruction ; neither armour nor shields were sufficient protection, for often men two or three deep, if fired upon, would be transpierced by a single bullet."

Juvenal des Ursins, however, mentions "canons à main" as being used at the siege of Arras, as early as 1414. Meyrick observes upon this, that Juvenal wrote between 1438 and 1468, and con-siders the minute description of a contemporary author more entitled to credit. Nevertheless, the late Emperor of the French has appended to the first volume of his 'Études sur l'Artillerie' an inventory of stores at Paris, in 1428, wherein are mentioned "xvii. canons à main dont les deux sont de cuivre et les xv. de fer sans chambre,"—this being two years earlier than the siege of Lucca. It is just possible, however, that the *invention* of the Lucquese might be the fixing of the iron tube on a stock, which was the first improvement of the hand-cannon, as it originally had no such convenient adjunct, and would have become too hot to hold after a few discharges. At all events, no mention of the hand-cannon has been found, as yet, earlier than the fifteenth century, towards the middle of which it was in use throughout Europe, and known in England as the hand-gun.

In one of the 'Paston Letters,' written from Norfolk *circa* 1459, it is said, "They have made wickets on every quarter of the house to shoot out of, both with bows and with hand-guns ; and the holes that be made for hand-guns, they be scarce knee high from the plancher."

In a MS. Brit. Mus., marked Royal, 15 E 4, there is the figure of a soldier firing a hand-gun of the earliest form, although the book is dedicated to Edward V., and must therefore have been com-

Hosted by Google JA3291

Case 1:22-Cυ-07423-2043-AMD-Document 29-11 Page 2893/2 Date Filed 07/21/2023 PageID: 3829

pleted in 1485. It is without a stock, and is fired by a match applied to the touch-hole, which is on the top of the piece. This was the sort of hand-gun in use during the first half of the fifteenth century. The first improvement appears to have been made in the reign of Henry VI., when the touch-hole was placed at the side, and beneath it a pan for holding priming powder. A hand-gun of this description, united with a battle-axe, all of iron, was in the Meyrick Collection, and is here copied from the engraving in Skelton, plate cxiv.



Hand-gun and Battle-axe.







Hand-gun. Royal MS. 15 E 4.

Pan of the above.

The next improvement was the addition, already mentioned, of the wooden stock, which, if the Milanese nobleman is to be believed, was used in 1430 at Lucca.

Two examples of the reign of Edward IV. are here appended from MSS., the first written *circa* 1470, and the other in 1473.





Hand-gun with stock. Royal MS., 18 E 5.

Hand-gun, 1468. Burney MSS. No. 169.

The third improvement consisted in adding a cover to the pan, to prevent the powder being blown away by the wind. A hand-gun of brass, in a painted wooden stock, with the arms of Austria

2 H

Hosted by Google    JA3292

Case 1:22-cv-07423-AMD Document 11 Filed 03/21/23 Page 290 of 295 PageID: 3830

on it, showing its German origin, was in the armoury at Goodrich Court, and, in addition to the cover of the pan, was provided with a perforated piece of brass near the breech, through which to look at the sight on the muzzle, so that the eye might not be diverted whilst the match was applied to the powder; a sliding cap in the butt also covered a recess to hold bullets. The date of the gun was about 1480. I append an engraving of it from Skelton.



Hand-gun of brass. *Circa* 1480.

The match-lock, invented towards the end of the century, having been suggested, it is said, by the trigger of the cross-bow, acquired for the hand-gun the name of arcabouza or arquebus, "a bow with a mouth," corrupted into harquebus (which see); and the word "gun," though still retained in the language, was thenceforth used in a general sense only; the constant improvements in hand-fire-arms during the sixteenth and seventeenth centuries giving rise to various other names, viz. caliver, carbine, dragon, esclopette, fusil, fowling-piece, musquet, rifle, snaphaunce, dag, pistol, and petronel. Descriptions of these will be found under their separate heads, or incidentally in the notices of the match-lock, wheel-lock, or other features by which they were distinguished. I shall, therefore, only give here two examples of guns of the seventeenth century, which most nearly approach those within the memory of this generation.

The first is a flint-lock, self-loading gun of the time of Charles I., and akin to the modern revolver, having a cylinder containing eight charges, movable by lifting up a little spring on the top of



Flint-lock Gun. *Temp.* Charles I.

the barrel, by which means a fresh touch-hole is brought under the hammer on removing its sliding cover. Seven out of the eight recesses in the cylinder always appear in sight just where it unites with the barrel, and, as the charges are previously put into these, a ramrod becomes unnecessary.

The next is a flint-lock, self-loading and priming gun of the time of Cromwell. There are two perforations in the butt, covered by a plate, which is represented lifted up in our woodcut. The upper



Flint-lock, self-loading and priming Gun. *Temp.* Cromwell.

one contains a pipe, into which was placed the fine powder for priming, which then ran down into a touch-box affixed to the side of the pan. The lower answered the purpose of a flask, to hold the coarse powder for charging. This gun has also a cylinder at the bottom of the barrel, placed with

Case 1:22-cv-07-cv-02043-AMDcumrent 29t 11 Pageid 2903/27 Dase Filed: 0J2/21/2023geID: 3831

its axis at right angles to it. In this cylinder is a recess, in which a bullet may be inserted, and by turning a lever this is brought into its proper place, a sufficient portion of charge and priming obtained, the pan shut, and the gun cocked ready for firing. Another, with revolving barrel and loaded at the breech, of the time of Charles II., was in the same collection.

Here, therefore, we have a breech-loader and a revolver; and the percussion gun is really the only important addition to fire-arms which the present century has to boast of.

*GUSSET.* (*Gousset*, French.) A piece of chain mail cut almost of a triangular or lozenge shape, which was fixed to the *haustement* or garment under the armour by means of arming points. There were commonly eight required for a suit—two to protect the arm-pits, two in the joints of the elbows, two in the joints of the knees, and two upon the insteps. (Meyrick.) The small plates of various shapes worn at the junction of the arms for the same purpose are called gussets by Mr. Hewitt, and pallets by Sir S. Meyrick. In the romance of 'Morte d'Arthure' the word is spelt *gowces;*

> " Umbegrippys a spere and to a gome [*i.e.* man] rynnys
> That bare of gowles fulle gaye with gowces of silvere."
> MS. Lincoln, f. 42, apud Halliwell *in voce.*

To me, however, the line appears to have an heraldic signification, and seems to imply that the man bore for his arms, gules charged with gowces (? *gouts*) of silver, or, as heralds would say, " guttée argent." Cotgrave has " Gousset, a gusset. The piece of armour or of a shirt whereby the armhole is covered."



Hosted by Google          JA3294

Case 1:22-cv-37423-2043-AMD Document 11 Page 2923/27 Date Filed 03/21/2023 PageID: 3832



AG, DAGG, TACK. A pistol so called, varying only from the ordinary firearm·in the shape of the·butt end, that of the latter terminating in a knob like the pommel of a sword-hilt, while the dag had a butt like that of a musquet. Such distinction is, however, unnoticed by Mr. Hewitt and M. Demmin, the latter not even naming the dag ; and Sir Samuel Meyrick, to whom it is due, does not quote any authority for his opinion, which may possibly have been founded simply on his own observation, not to be lightly disregarded.

The earliest mention I have found of it is in an inventory, taken in 1547, of stores in the different arsenals in England, wherein are the following curious entries:—"One dagge with two pieces in one stock. Two *tackes after the fashion of a dagger*, with *fier locks*, varnished, with redde stocks, shethes covered with black vellet (velvet), garnished with silver and guilt, with powder flaskes and touch boxes of black vellet, garnished with iron guilt. Two tackes *hafted like a knyff*, with *fier locks* and doble locks."



Wheel-lock Dag. *Temp.* Edward VI. Meyrick Collection.

That it was only another name for a pistol, howsoever derived, is evident from the many passages in old plays and entries in inventories in which it appears. In the Instructions of the Privy Council to the citizens of Norwich in 1584, it is suggested that the light horseman shall be furnished with "a case of pistols," which is subsequently called "a case of daggs." ('Norfolk Archæology,' vol. i.) In an inventory of the date of 1603 is an entry of "two little pocket dagges." (Gage's 'Antiquities of Hengrave,' p. 30.) The following quotations from old plays and works of the seventeenth century have been collected by Mr. Fairholt.

In the 'Spanish Tragedy,' 1603, one of the characters about to slay another "shoots the dag," and the watch enter, exclaiming, " Hark, gentlemen ! This is a pistol shot !"

> " He would show me how to hold the dagge,
> To draw the cock, to charge and set the flint."
>> *Jack Drum's Entertainment*, 1616.

> " My dagge was levelled at his heart."
>> *Arden of Faversham.*

" The Prince yet always bare himself so wisely that he could not without some stir be thrust down openly ; and riding on his journey, he was once shot with a dagge secretly." (Ascham's Works, by Bennet, p. 21.)

To these may be added one from ' Love's Cure, or the Martial Maid :'

> "What do you call this gun?—a dag ?
> CLARA. I'll give thee a French petronel."—Act ii. sc. 2.

Y

Hosted by Google JA3295

Case 1:22-c... Case 4:23-2043-AM... Document 11... Page 293/2... Date Filed: 07/21/2023... PageID: 3833

The Scotch called it a *tack.* The stocks of the Highland tacks were generally of iron or brass, sometimes inlaid with silver. In the Meyrick Collection there was a brace of Highland tacks, dated 1626, with slender barrels, which, as well as the stocks, were wholly of brass. (Skelton's engraved specimens.) The subjoined examples are also copied from Skelton, the first two being wheel-lock dags of the time of Elizabeth, and the third a Highland firelock tack of the time of George II., the stock of iron inlaid with silver. The little knob between the scroll ends of the butt is the head of a picker which screws into it.



1, 2. Wheel-lock Dags. *Temp.* Elizabeth.
3. Highland Firelock Tack. *Temp.* George II.

Sir Samuel Meyrick remarks on this subject : " Strange as it may seem that the word 'dag' should signify a firearm and not a dagger, like the French *dague,* yet in the Italian language *pistolese* implies a great dagger or wood-knife. See Florio, 1st and 2nd edition." ('Critical Inquiry into Antient Armour,' vol. iii. p. 6, note) ; and therein we undoubtedly find " Pistola, a dag or pistol ; " " Pistolese, a great dagger, a wood-knife." The fact is pregnant with interest to the etymologist as well as to the antiquary, taken in conjunction also with the entries in the inventory of 1547, " Two tacks after the fashion of a dagger," and " Two tacks hafted like a knife," which increase the complication. (See PISTOL.) Other derivations are suggested from the Hebrew *douack* (*acuere*), and from *dacia,* the latter extremely curious and well deserving attention.

*DAGGER.* (*Dague,* French ; *daga,* Italian and Spanish ; *duger* or *dage,* Teuton ; *dagh,* Welsh ; *dolch,* German.) M. Demmin derives this word from the Celtic *dag,* a point. ('Weapons of War.') The dagger is one of the earliest of all offensive weapons, by whatever name it might be known. Examples have been found of the flint and the bronze period. The parazonium of the Greeks and Romans ; the sica or hand-seax of the Anglo-Saxons ; the scramasax of the Germans ; the skeine of the ancient Irish ; the bidag or dirk of the Scotch Highlanders ; the dague, poignard, or miséricorde of the French ; the stiletto of the Italians—are all varieties of the same arm ; the war-knife or coutel of the common soldiery being the immediate predecessor of the dagger in England, or rather one and the same weapon under another name. Thus we find in a statute of William, King of Scotland (*circa* 1180), " Habeat equum, habergeon, capitium et ferro et *cultellum qui dicitur dagger ;*" and Thomas Walsingham, a historian of the fifteenth century, says (page 254), " Mox extracto *cultello quem dagger .vulgo dicitur,*" showing that, as late even as his day, the coutel and the dagger were identical. Henry Knighton also, commenting on the appearance of ladies at a tournament in very masculine attire, tells us they wore " *cultellos quos daggerios vulgariter dicunt,* in pouchiis desuper impositis." ('De eventibus Angliæ,' *sub anno* 1348.) Ducange (*in voce* DAGGER), quoting from an ancient Latin Chronicle, shows that it was considered identical with the sica : " Habens sicam vel daggam ut latus." " Dague de Praguerie " occurs in a French work also quoted by the same author ; but whether of Prague manufacture, or of a peculiar form, does not appear. It is in the fourteenth century that the dagger is first seen as a constant appendage to the belt of the knight, or the girdles of the civilians, the latter of whom generally wore it stuck in their purses or pouches—" in pouchiis impositis," as described by Knighton. Illustrations of this fashion are numerous in miniatures of the fifteenth century (see

Hosted by Google

JA3296

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY
### CAMDEN VICINAGE

| | |
|---|---|
| RONALD KOONS, *et al.*, | Civil No. 22-7464 (RMB/AMD) |
| Plaintiffs, | *Consolidated with* |
| v. | *Civil No. 22-7463 (RMB/AMD)* |
| MATTHEW PLATKIN,<br>in his official capacity as Attorney General of<br>the State of New Jersey, and<br>PATRICK CALLAHAN,<br>in his official capacity as Superintendent of the<br>New Jersey State Police, | **ORDER** |
| Defendants, | |
| and | |
| NICHOLAS SCUTARI,<br>President of the New Jersey Senate, and<br>CRAIG COUGHLIN,<br>Speaker of the New Jersey Assembly, | |
| Intervenors-Defendants. | |

**BUMB, Chief District Judge**

     **THIS MATTER** having come before the Court *sua sponte* in light of: (1) Defendants'

and the *Siegel* Plaintiffs' appeals of this Court's order granting-in-part, and

denying-in-part, Plaintiffs' motions for a preliminary injunction, (2) Defendants'

motion for a stay of that order in the United States Court of Appeals for the Third

Circuit, and (3) a Third Circuit panel's summary order granting-in-part, and

denying-in-part, Defendants' motion for a stay,

     **IT IS** on this **22nd** day of **June 2023**, hereby

JA3297

**ORDERED** that this Court will administratively terminate these actions (Civil Nos. 22-7464 and 22-7463) pending the ultimate resolution of the parties' appeals even though this Court's preliminary injunction decision left several matters unresolved pending discovery and additional briefing on, among other things, Chapter 131's new fees, Chapter 131's handgun ban at airports, transportation hubs, and the other sensitive place designations discussed in the Court's Opinion; and it is

**FURTHER ORDERED** that if any party opposes this Court's decision to administratively terminate these actions, that party must submit a letter to the Court within five days of this Order explaining why this Court should not administratively terminate these actions pending the outcome of the appeals; and it is

**FURTHER ORDERED** that following the final resolution of the parties' appeals, any party may move to reopen these matters by filing a letter with the Court requesting the matters be reopened so that discovery can proceed.

<u>**s/Renée Marie Bumb**</u>
RENÉE MARIE BUMB
Chief United States District Judge

JA3298