No. 23-2043

IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

RONALD KOONS, *et al.* v.
ATTORNEY GENERAL NEW JERSEY, *et al.*

On Appeal from the United States District Court
for the District of New Jersey
Case No. 22-7464
(Honorable Renée Marie Bumb)

BRIEF OF *AMICUS CURIAE*
BRADY IN SUPPORT OF DEFENDANTS-APPELLANTS

*Of Counsel:*

Douglas N. Letter
Shira Lauren Feldman
**BRADY CENTER TO PREVENT
GUN VIOLENCE**
840 First Street, NE Suite 400
Washington, DC 20002
(202) 370-8100
dletter@bradyunited.org
sfeldman@bradyunited.org

Suzan Charlton
Aroosa Khokher
Ryan A. Partelow
Elizabeth Upton
**COVINGTON & BURLING LLP**
One CityCenter

*Counsel for Amicus Curiae*:

David A. Luttinger, Jr. (DL3180)
**COVINGTON & BURLING LLP**
The New York Times Building
620 Eighth Avenue
New York, NY 10018-1405
Tel.: (212) 841-1134
dluttinger@cov.com

850 Tenth Street, NW
Washington, DC 20001-4956
Tel.: (202) 662-6000
scharlton@cov.com
akhokher@cov.com
rpartelow@cov.com
eupton@cov.com

## <u>CORPORATE DISCLOSURE STATEMENT</u>

In accordance with Federal Rule of Appellate Procedure 26.1 and Third Circuit Local Appellate Rule 26.1, *Amicus Curiae* Brady Center to Prevent Gun Violence states that it is a nonprofit organization.  It has no parent corporations.  It has no stock, and therefore no publicly held company owns 10% or more of its stock.

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ........................................................................ iii

INTEREST OF AMICUS CURIAE ........................................................... ix

SUMMARY OF ARGUMENT .................................................................... 1

ARGUMENT ................................................................................................ 3

I.    The District Court applied too restrictive a standard in assessing
      whether the Insurance Requirement is relevantly similar to historical
      regulations.................................................................................................. 3

      A.    The Insurance Requirement is a "modern regulation" that is
            "relevantly similar" to historical regulatory schemes. ........................ 4

            1.    The Insurance Requirement is relevantly similar to
                  historical firearms regulations, including surety laws. .............. 5

            2.    The Founders embraced responsible financial practices
                  and innovative financial regulations, including insurance,
                  to address societal problems. ...................................................... 6

            3.    The Insurance Requirement is consistent with historical
                  regulation of firearms to address threats to the orderly
                  functioning of society. ............................................................... 10

      B.    The District Court failed to acknowledge the origins of
            insurance in America's historical tort system. ................................... 14

      C.    The District Court disregarded that societal values have evolved
            regarding 18th Century restrictions on carrying firearms................. 20

II.   American courts have consistently recognized government-mandated
      liability insurance is constitutional. ........................................................ 25

CONCLUSION .......................................................................................... 27

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Bauer v. Becerra*,
   858 F.3d 1216 (9th Cir. 2017) ............................................................26

*Cole v. Fisher*,
   11 Mass. 137 (1814) ...........................................................................16

*District of Columbia v. Heller*,
   554 U.S. 570 (2008) ......................................................................... viii

*Friedman v. City of Highland Park, Illinois*,
   784 F.3d 406 (7th Cir. 2015) .............................................................22

*Guedes v. Bureau of Alcohol, Tobacco, Firearms & Explosives*,
   45 F.4th 306 (D.C. Cir. 2022) ......................................................... viii

*Kwong v. Bloomberg*,
   723 F.3d 160 (2d Cir. 2013) ..............................................................26

*McCulloch v. Maryland*,
   17 U.S. 316 (1819) .........................................................................5, 7

*Moody v. Ward*,
   13 Mass. 299 (1816) ...........................................................................16

*Morgan v. Cox*,
   22 Mo. 373 (1856) ...............................................................................16

*National Ass'n for Gun Rights, Inc. v. City of San Jose*,
   No. 22-CV-501-BLF, 2023 WL 4552284 (N.D. Cal., July 13,
   2023) ............................................................................................*passim*

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*,
   142 S. Ct. 2111 (2022) .................................................................*passim*

*Phoenix Ins. Co. v. Erie & W. Transp. Co.*,
   117 U.S. 312 (1886) ...........................................................................17

*Range v. Att'y Gen. United States of Am.*,
  69 F.4th 96 (3d Cir. 2023) ...............................................................10, 21

*State v. Shelby*,
  90 Mo. 302, 2 S.W. 468 (1886) ...............................................................12

*United States v. Coleman*,
  No. 3:22-CR-8-2, 2023 WL 122401 (N.D. W. Va. Jan. 6, 2023) ..............10, 11

*United States v. Jackson*,
  69 F.4th 495 (8th Cir. 2023) ...............................................................21

*Wrenn v. District of Columbia*,
  864 F.3d 650 (D.C. Cir. 2017)...............................................................13

**Statutes**

Act of June 19, 1801, ch. XX, 1801 Mass. Acts 507................................12

Act of Oct. 4, 1780, ch. V, 1780 Mass. Acts 326 ...................................12

Laws of the State of Texas, An Act Authorizing the Corporate
  Authorities of the Town of Dangerfield, Fairfield and Springfield,
  to tax ten pin alleys, billiard tables, and pistol galleries § 1 (1860)..................26

Mass. Decl. of Rights, art. 7..............................................................7, 8

N.J. Public Law 2022, Chapter 131, § 4 .................................................1

N.J. Public Law 2022, Chapter 131, § 1(c) ............................................22

Ordinances and Joint Resolutions of the City of San Francisco § 13
  (1854)..........................................................................................25

U.S. Const. art. I, § 8, cl. 1.................................................................8

U.S. Const. art. I, § 8, cl. 2.................................................................8

U.S. Const. art. I, § 8, cl. 3.................................................................8

U.S. Const. art. I, § 8, cl. 4.................................................................8

U.S. Const. art. I, § 8, cl. 5.................................................................8

U.S. Const. art. I, § 8, cl. 6 ............................................................ 8

U.S. Const. art. I, § 8, cl. 7 ............................................................ 8

U.S. Const. art. I, § 8, cl. 8 ............................................................ 8

U.S. Const. art. I, § 9, cl. 3 ............................................................ 8

U.S. Const. art. I, § 9, cl. 7 ............................................................ 8

U.S. Const. art. I, § 9, cl. 8 ............................................................ 8

U.S. Const. art. I, § 10, cl. 1 .......................................................... 8

U.S. Const., preamble ..................................................................... 7

1631 Va. Acts 173, Acts of February 24th, 1631, Act L ......................... 11

1844 Miss. Laws, Rates of Taxation § 1, Revenue, An Act to Amend
    and Reduce into one the several Acts in Relation to the Revenue of
    this State, and for other purposes (1844) ........................................ 25

1851 R.I. Pub. Laws 9 § 2 (1851) ................................................... 25

1856–1857 N.C. Sess. Laws 34, Pub. Laws, An Act Entitled
    "Revenue," ch. 34, § 23, pt. 4. (1856–1857) ................................ 25

1870 La. Acts 127, Persons, Trades, Professions and Occupations
    Subject to Taxation, § 3, pt. 6 (1870) ........................................... 26

**Other Authorities**

#NotAnAccident Index, Everytown for Gun Safety,
    https://everytownresearch.org/maps/notanaccident/ (last accessed
    July 18, 2023) ........................................................................ 23

Accident Insurance, 7 Am. L. Rev. 585, 585 (1873) ............................. 17

Alexander Hamilton, Final Version of an Opinion on the
    Constitutionality of an Act to Establish a Bank (Feb. 23, 1791),
    https://perma.cc/7XE7-N59E ..................................................... 7

Alex Napoliello, *N.J. Gun Permit Applications Are Spiking.  How Fear Brought Unprecedented Demand*, NJ.COM (Jan. 14, 2021), https://www.nj.com/news/2021/01/nj-gun-permit-applications-are-spiking-how-fear-brought-unprecedented-demand.html ...................................... 1

Allstate, *7 Easy Ways to Help Lower Your Car Insurance Premiums* (Sept. 2019), https://www.allstate.com/resources/car-insurance/how-to-lower-car-insurance-premiums ............................................. 19

Allstate, *Safe Driving Bonus*, https://www.allstate.com/auto-insurance/safe-driver-savings ................................................................. 19

Benjamin Franklin, *On Protection of Towns from Fire*, The Pennsylvania Gazette (Feb. 4, 1735), https://founders.archives.gov/documents/Franklin/01-02-02-0002 ................... 10

Cass R. Sunstein, *On Analogical Reasoning Commentary*, 106 Harv. L. Rev. 741, 773 (1993) ........................................................................... 4

Champe Barton & Tom Jackman, *Popular Handgun Fires Without Anyone Pulling the Trigger, Victims Say*, Wash. Post (Apr. 11, 2023) ............................................................................................ 24

Cornelius J. Peck, *Negligence and Liability Without Fault in Tort Law*, 46 Wash. L. Rev. 225, 227 (1971) .............................................. 16

Darrell A. H. Miller & Jennifer Tucker, *Common Use, Lineage, and Lethality*, 55 U.C. Davis L. Rev. 2495, 2509 (2022) ......................... 22

Erwin Chemerinsky, *Constitutional Law* 250 (5th Ed. 2015) ................................... 9

Federal Rule of Appellate Procedure 26.1 ................................................................. i

Fred E. Inbau, *Firearms and Legal Doctrine*, 7 Tul. L. Rev. 529, 549–50 (1932–33) ................................................................................. 16

*In America, Accidental Shootings Among Children Occur Nearly Every Other Day*, The Trace (June 1, 2023), https://www.thetrace.org/2023/06/children-gun-safety-accidental-shootings/ ..................................................................................... 24

James Fleming, Jr., *Accident Liability: Some Wartime Developments*, 55 Yale L.J. 365, 365 (1946) .............................................................. 18

Jennifer Mascia, *In America, Accidental Shootings Among Children Occur Nearly Every Other Day*, The Trace (June 1, 2023), https://www.thetrace.org/2023/06/children-gun-safety-accidental-shootings/ ................................................................................24

Jennifer Tucker, Opinion, *Now That Guns Can Kill Hundreds in Minutes, Supreme Court Should Rethink the Rights Question*, CNN (Oct. 20, 2021), https://www.cnn.com/2021/10/20/opinions/supreme-court-gun-rights-case-lethality-tucker/index.html ...............................................22

Jennifer B. Wriggins, *Mandates, Markets, and Risk: Auto Insurance and the Affordable Care Act*, 19 Conn. Ins. L.J. 275, 287, 291 (2013) .........................................................................................18, 20

John Fabian Witt, *Toward a New History of American Accident Law*, 114 Harv. L. Rev. 690, 694 (2001)......................................................16

Kenneth S. Abraham, *Liability Insurance and Accident Prevention: The Evolution of an Idea*, 64 Md. L. Rev. 573, 576 (2005) ..................16, 17, 18

Local Appellate Rule 26.1 ...........................................................................i

Mike Stobbe, *Gun Injuries in US Surged During Pandemic, CDC Study Shows*, Associated Press (Mar. 30, 2023) https://apnews.com/article/gun-injuries-violence-cdc-study-pandemic-308741db0a1130d79c601ec966ecf542 ...........................................22

Nicholas B. Wainwright, *Philadelphia's Eighteenth-Century Fire Insurance Companies*, 43 Transactions of Am. Philosophical Soc'y 247, 247–48 (1953).......................................................................9, 10

Occupational Safety and Health Administration, *Business Case for Safety and Health*, https://www.osha.gov/businesscase/benefits.......................19

Peter Kochenburger, *Liability Insurance and Gun Violence Symposium*, 46 Conn. L. Rev. 1265, 1295 (2014).................................18, 19, 20

*Preventable Tragedies: Unintentional Shootings by Children*, Everytown for Gun Safety (Apr. 26, 2023), https://everytownresearch.org/report/notanaccident/ .........................................23

Saul Cornell & Nathan DeDino, *A Well Regulated Right: The Early American Origins of Gun Control*, 73 Fordham L. Rev. 487, 511 (2004) ................................................................................12

Saul Cornell, *History and Tradition or Fantasy and Fiction: Which Version of the Past Will the Supreme Court Choose in NYSRPA v. Bruen?*, 49 Hastings Const. L.Q. 145, 154 (2022) ............................................25

State Farm, *Be Rewarded With Drive Safe & Save Discounts*, https://www.statefarm.com/insurance/auto/discounts/drive-safe-save; ................................................................................19

Stephen G. Gilles & Nelson Lund, *Mandatory Liability Insurance for Firearm Owners: Design Choices and Second Amendment Limits*, 14 Engage 18 (2013) ................................................................13

The Federalist No. 11 (Alexander Hamilton) ...........................................9

The Federalist No. 42 (James Madison) ..................................................9

Thomas E. Plank, *The Constitutional Limits of Bankruptcy*, 63 Tenn. L. Rev. 487, 499 (1996) ...........................................................9

Tom Baker & Charles Silver, *How Liability Insurers Protect Patients and Improve Safety*, 68 DePaul L. Rev. 211, 226 (2019) ..................................19

Tom Baker & Thomas O. Farrish, *Liability Insurance and the Regulation of Firearms, in Suing the Firearms Industry* 5 (T. Lytton, ed. 2005) ................................................................18, 19

*Underlying Cause of Death Database*, CDC, https://wonder.cdc.gov/ucd-icd10.html (last accessed Feb. 16, 2023) ................................................................1

Wex S. Malone, *Ruminations on the Role of Fault in the History of the Common Law of Torts*, 31 La. L. Rev. 1, 13 (1970) ...........................................15

William W. Hening, ed., The Statutes at Large, Being a Collection of all the Laws of Virginia (Richmond, Va.: Hening) 2:126 (Act CXIX) ................................................................11

## <u>INTEREST OF AMICUS CURIAE</u>

Brady Center to Prevent Gun Violence ("Brady") is the nation's most longstanding nonpartisan, nonprofit organization dedicated to reducing gun violence through education, research, and legal advocacy.  Brady has a substantial interest in ensuring that the Constitution is construed to protect Americans' fundamental right to live.  Brady also has a substantial interest in protecting the authority of democratically elected officials to address the nation's gun violence epidemic.  Brady has filed amicus briefs in many cases involving the regulation of firearms, including *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022); *District of Columbia v. Heller*, 554 U.S. 570 (2008); *Guedes v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 45 F.4th 306 (D.C. Cir. 2022); and *National Ass'n for Gun Rights, Inc. v. City of San Jose*, No. 22-CV-501-BLF, 2023 WL 4552284 (N.D. Cal., July 13, 2023).

## SUMMARY OF ARGUMENT

The Supreme Court has decided that certain law-abiding, responsible citizens have a right to guns for self-defense, but that right is not unlimited. Firearms carry inherent, deadly risk. In the face of the unprecedented rise in numbers of gun deaths,[1] New Jersey has adopted a public-private solution: mandatory liability insurance (the "Insurance Requirement") to better allocate the costs of gun accidents. N.J.P.L. 2022, c. 131 § 4. The District Court invalidated the Insurance Requirement on the ground that it has no "historical analogue," but in doing so, it utilized too narrow a standard, demanding a "dead ringer" level of similarity inconsistent with the nuanced analogic analysis the Supreme Court compelled in *Bruen*. In fact, while an insurance requirement itself might be innovative, it is consistent with the nation's historical tradition of firearm regulation, particularly when viewed in the context of the evolving risks and legal norms of society. This brief highlights three reasons why the District Court's decision should be reversed.

---

[1] In New Jersey, gun deaths increased 20 percent from 2019 to 2020. *Underlying Cause of Death Database*, CDC, https://wonder.cdc.gov/ucd-icd10.html (last accessed Feb. 16, 2023). The number of gun owners in New Jersey tripled during that same period. Alex Napoliello, *N.J. Gun Permit Applications Are Spiking. How Fear Brought Unprecedented Demand*, NJ.COM (Jan. 14, 2021), https://www.nj.com/news/2021/01/nj-gun-permit-applications-are-spiking-how-fear-brought-unprecedented-demand.html.

First, whether the Insurance Requirement is sufficiently similar to analogous historical regulations must be viewed not as a superficial chapter-and-subclause-counting exercise but as a comprehensive analysis of the purpose of the law and the available tools to regulate behavior—in other words, the overarching "how" and "why" of the law. *Bruen*, 142 S. Ct. at 2132–33. When viewed through this lens, the Insurance Requirement is consistent with how early Americans adopted innovative financial systems and responsible gun-safety laws that were considered sensible at the time. As discussed below, the United States has a long history of using innovative financial regulation to solve complex and novel societal problems, including imposing financial obligations on gun owners to preserve public safety.

Second, the modern use of insurance as a component of regulation is not as dissimilar from our nation's early tort liability systems as the District Court wrongly assumed. From strict liability to negligence to insurance protection, the common thread is allocation of risk and responsibility. Today, liability insurance forms an integral part of our systems for spreading the costs associated with many kinds of risks. While these might be "circumstances beyond those the Founders specifically anticipated," (*Bruen*, 142 S. Ct. at 2132), the Insurance Requirement's cost-allocating function is an outgrowth of the historical precedents of the Founders.

Third, New Jersey's use of insurance properly acknowledges the evolution of modern societal values while remaining consistent with historical approaches to firearms-related public safety and allocation of losses and liabilities.  As the Supreme Court has acknowledged, "[t]he regulatory challenges posed by firearms today are not always the same as those that preoccupied the Founders in 1791 or the Reconstruction generation in 1868." *Bruen*, 142 S. Ct. at 2132.  Further, the "unprecedented societal concern" of ever-increasing harm from guns requires a "nuanced approach" to evaluating firearms regulations.  *Id*.  The Insurance Requirement is exactly the kind of modern regulation envisioned by *Bruen*:  one that achieves the same aims ("why") as early firearm regulations through similar means adapted for modern society and the challenges it faces ("how").  The District Court's ruling was erroneous and should be overturned.

## **ARGUMENT**

I.    **The District Court applied too restrictive a standard in assessing whether the Insurance Requirement is relevantly similar to historical regulations.**

In concluding that the Insurance Requirement is "too dissimilar" from 18th century surety laws and 19th century tort liability laws (Op. at 89), the District Court essentially insisted on a near "twin" or "dead ringer" for the regulation's historical analogues.  But this is not what the law requires after *Bruen*.

According to *Bruen*, in assessing whether a challenged regulation is consistent with historical tradition, courts must reason by analogy to determine whether two regulations are "relevantly similar." *Id.* at 2132 (quoting Cass R. Sunstein, *On Analogical Reasoning Commentary*, 106 Harv. L. Rev. 741, 773 (1993)). To show relevant similarity, the government must only "identify a well-established and representative historical *analogue*, not a historical *twin*." *Bruen*, 142 S. Ct. at 2133 (emphasis in original). In acknowledgment of inevitable societal evolution, *Bruen* directed that cases involving "unprecedented societal concerns," such as the epidemic of gun violence, require a "more nuanced approach." 142 S. Ct. at 2132.

Under *Bruen,* two guideposts inform the analysis: "how and why the regulations burden a law-abiding citizen's right to armed self-defense." 142 S. Ct. at 2132–33. The Insurance Requirement imposes an economic obligation on gun owners (the "how") to accomplish the goal of allocating the costs borne of gun ownership and its inherent risk (the "why"). To be sure, there are differences between the Insurance Requirement and historical gun regulations and tort liability laws. But the differences are insufficient to defeat the Insurance Requirement.

### A.    The Insurance Requirement is a "modern regulation" that is "relevantly similar" to historical regulatory schemes.

The Supreme Court stated in *Bruen* that the Second Amendment "can, and must, apply to circumstances beyond those the Founders specifically anticipated."

142 S. Ct. at 2132 (quoting *McCulloch v. Maryland*, 17 U.S. 316, 415 (1819)).

Accordingly, the Supreme Court found that the Second Amendment is flexible

enough to permit "modern regulations that were unimaginable at the founding."

*Id*. The Insurance Requirement is just such a modern regulation, while being

"relevantly similar" to other firearm-related financial requirements throughout

American history.

> **1.    The Insurance Requirement is relevantly similar to historical firearms regulations, including surety laws.**

As the District Court acknowledged, historical surety laws imposed financial

burdens on gun owners and were enacted for public safety purposes. Op. at 83–84.

That the surety laws had different procedural elements and different consequences

for their violation (*see id*.) does not take them outside the realm of "relevant[]

similarity." The fact that governments regulated the carrying of firearms with a

financial bond in order to decrease gun harm is what makes such laws sufficiently

analogous to the Insurance Requirement. A historical "twin" is not required.

*Bruen*, 142 S. Ct. at 2133.

The District Court's analysis found surety laws "too dissimilar" based on:

(1) the persons they applied to ("an identified arms bearer found to be dangerous"

as opposed to "all seeking to carry"); (2) the extent and duration of the restriction

("partial, conditional" and "temporally limited to six months to a year"); and

(3) various exceptions to the laws ("special need to carry," "self-defense"). Op. at 47, 84.

But these distinctions rely on superficial comparisons and do not change the fundamental nature of the Insurance Requirement: like the surety laws, it regulates the carrying of firearms with a financial requirement tailored to the individual for the purposes of public safety. *See Nat'l Ass'n for Gun Rights, Inc.*, 2023 WL 4552284, at *7 (finding that although liability insurance mandate for firearm accidents "applies to all gun owners, the actual amount of the burden involves a risk evaluation tailored to the individual and analogous to 'reasonable cause' determinations under [historical] surety statutes"). Further, the District Court's enumeration of these superficial distinctions implies that the only modern regulations the court would deem acceptable are regulations that apply all of the same provisions, including a conditional, partial, time-limited restriction, on only those deemed dangerous upon a showing of cause, with an exception for self-defense. This asks not for a "relevantly similar" law, but a "twin," contrary to the Supreme Court's direction. *Bruen*, 142 S. Ct. at 2132–33.

> **2.**     **The Founders embraced responsible financial practices and innovative financial regulations, including insurance, to address societal problems.**

Though insurance was newly emerging at America's founding, the Framers of the Constitution upheld the values that underscore insurance: the adoption of

sound financial practices and openness to innovative financial tools as a means to combat the many new societal issues facing the new nation. Indeed, insurance has developed into the system we know today on the foundation of these early ideas.

For example, Alexander Hamilton established the first Bank of the United States out of whole cloth in order to ensure a sound and uniform currency, lend money to the federal government, and assume state debt after the Revolution. Alexander Hamilton, *Final Version of an Opinion on the Constitutionality of an Act to Establish a Bank* (Feb. 23, 1791), https://perma.cc/7XE7-N59E. Although Hamilton's bank was controversial and its constitutionality hotly contested at the time, even its most ardent opponents eventually came to realize the necessity of this innovation to the young nation. *See McCulloch v. Maryland*, 17 U.S. 316, 402 (1819) (observing that "those who were most prejudiced against" the Bank were "convinced . . . of its necessity" after "a short experience of the embarrassments to which the refusal to revive it exposed the government").

Indeed, the Framers recognized that the implementation of innovative laws and regulations is a *duty* of a government tasked with "promot[ing] the general Welfare" and "insur[ing] domestic Tranquility." U.S. Const., preamble. As John Adams summarized in his Declaration of Rights for the Massachusetts constitution, drafted in 1780:

> Government is instituted for the common good; for the
> protection, safety, prosperity and happiness of the

> people . . . Therefore the people alone have an
> incontestable, unalienable, and indefeasible right to
> institute government; and to reform, alter, or totally
> change the same, when their protection, safety, prosperity
> and happiness require it.

Mass. Decl. of Rights, art. 7.

The Constitution itself demonstrates the Framers' acknowledgment that innovative financial regulations would be necessary to address the unforeseen, novel problems that undoubtedly would arise over time. Indeed, much of the Constitution is dedicated to enabling and facilitating future commercial and financial activity, including granting the power to lay and collect taxes, U.S. Const. art. I, § 8, cl. 1, borrow money on the credit of the United States, *id.* cl. 2, coin money, *id.* cl. 5, and punish counterfeiting, *id.* cl. 6.[2]

Notably, the Constitution grants Congress the ability to "regulate Commerce with foreign Nations, and among the several States," U.S. Const. art. I, § 8, cl. 3., and "[t]o establish . . . uniform Laws on the subject of Bankruptcies throughout the United States." U.S. Const. art. I, § 8, cl. 4. In the more than two centuries since the Constitution's ratification, Congress has expanded—and courts have largely upheld—the use of the Commerce Clause to respond to societal problems, relying

---

[2] Other related powers granted by the Constitution to Congress include the power to establish a national postal system and roads (U.S. Const. art. I, § 8, cl. 7), provide for freedom of shipping (*id.* cl. 3), protect intellectual property, (*id.* cl. 8), provide for a regular statement of accounts for money drawn from the Treasury (*id.* § 9, cl. 7), limit the ability of states to interfere with many of these things (*id.* § 8, cl. 3), and limit the ability to interfere with contracts (*id.* § 10, cl. 1).

on its authority to validate criminal statutes, securities laws, civil rights laws, and environmental laws, to name a few. *See* Erwin Chemerinsky, *Constitutional Law* 250 (5th Ed. 2015). So too, the Bankruptcy Clause was used to enact statutes expanding the rights of creditors as well as the relief available to debtors. *See* Thomas E. Plank, *The Constitutional Limits of Bankruptcy*, 63 Tenn. L. Rev. 487, 499 (1996) (writing that courts and scholars have concluded that the boundaries of the Bankruptcy Clause are constantly expanding to meet the new demands and forms of commercial and business development). This broad delegation and license for Congressional innovation in these regulatory areas was seen as crucially important, relatively non-controversial,[3] and just good common sense.

The Framers also were well aware of and endorsed the concept of insurance. In 1752, more than two decades before signing the Declaration of Independence, Benjamin Franklin co-founded one of the first insurance companies in the United States—the Philadelphia Contributionship for the Insurance of Houses from Loss by Fire, which is still in business today. *See* Nicholas B. Wainwright,

---

[3] Hamilton wrote in the Federalist No. 11, "The importance of the Union, in a commercial light, is one of those points about which there is least room to entertain a difference of opinion, and which has, in fact, commanded the most general assent of men who have any acquaintance with the subject." The Federalist No. 11 (Alexander Hamilton). Madison agreed that the wide-ranging bankruptcy power was "so intimately connected with the regulation of commerce, and will prevent so many frauds where the parties or their property may lie or be removed into different States, that the expediency of it seems not likely to be drawn into question." The Federalist No. 42 (James Madison).

*Philadelphia's Eighteenth-Century Fire Insurance Companies*, 43 Transactions of

Am. Philosophical Soc'y 247, 247–48 (1953).  Franklin, who also founded

Philadelphia's first volunteer fire department, famously held the view that

preparation in advance of a tragedy was the best way to avoid such an outcome,

immortalizing the maxim that "an Ounce of Prevention is worth a Pound of Cure."

Benjamin Franklin, *On Protection of Towns from Fire*, The Pennsylvania Gazette

(Feb. 4, 1735), https://founders.archives.gov/documents/Franklin/01-02-02-0002.

Today's insurance system, which both facilitates funding and allocating the

costs associated with losses and provides a mechanism for prudent financial

planning to avoid financial devastation in the wake of disaster, is consistent with

the Framers' financial values and priorities.

> **3.    The Insurance Requirement is consistent with historical regulation of firearms to address threats to the orderly functioning of society.**

American legislatures historically regulated firearm possession where

appropriate to address "the threat to the orderly functioning of society."  *Range v.*

*Att'y Gen. United States of Am.,* 69 F.4th 96, 110 (3d Cir. 2023) (*en banc*) (Ambro,

J., concurring). This was true during the time of the ratification debates, when local

legislatures prohibited certain citizens from possessing firearms "to address the

threat purportedly posed by entire categories of people to an orderly society and

compliance with its legal norms" at the time.  *United States v. Coleman,* No. 3:22-

CR-8-2, 2023 WL 122401, at *3 (N.D. W. Va. Jan. 6, 2023) (internal citations omitted).  The Insurance Requirement sits squarely within the bounds of this tradition by providing a reliable method to equitably address the cost of gun accidents, to ensure that victims of gun accidents are compensated for their injuries, to protect gun owners from bankruptcy in the unfortunate—but not uncommon—event of an accident involving their firearm, and to encourage responsible, safe gun practices.

Specifically, legislatures historically "disarm[ed] even nonviolent citizens who disregarded the law or possibly posed a threat to social order and established norms." *Coleman,* 2023 WL 122401, at *3.  For example, in the 17th century, the colony of Virginia outlawed the use of firearms alongside "drinkinge or enterteynments."  1631 Va. Acts 173, Acts of February 24th, 1631, Act L.  Additionally, the colony enforced its prohibition against frivolous shooting of  guns at "drinking or marriages" with a fine of 200 pounds of tobacco, to be taken by "distresse in in case of refusal."  William W. Hening, ed., The Statutes at Large, Being a Collection of all the Laws of Virginia (Richmond, Va.: Hening) 2:126 (Act CXIX).  Recognizing the inherent danger of firearms, the Virginia colony imposed regulations to safeguard against harm to its citizens.  This practice continued into the 19th century.  In 1886, the Supreme Court of Missouri upheld as

constitutional a law criminalizing the carrying of a weapon while intoxicated. *See State v. Shelby*, 90 Mo. 302, 2 S.W. 468, 468 (1886).

The founding era also saw laws related to the safe storage of firearms and related items, in order to protect society from the dangers these weapons posed even when owned by nonviolent, law-abiding citizens. In Massachusetts, gunpowder in excess of the legal limit had to be kept, at the owner's expense, in a public magazine. Saul Cornell & Nathan DeDino, *A Well Regulated Right: The Early American Origins of Gun Control*, 73 Fordham L. Rev. 487, 511 (2004) (citing Act of June 19, 1801, ch. XX, 1801 Mass. Acts 507; Act of Oct. 4, 1780, ch. V, 1780 Mass. Acts 326). Here, for the purposes of public safety, the colony required firearm owners to incur personal expenses associated with their firearms—much like the Insurance Requirement does.

Early surety laws are yet another example of 18th century laws designed to effect an orderly, safe society. As noted in *Bruen*, surety statutes "provide[d] financial incentives for responsible arms carrying." 142 S. Ct. at 2150. These laws imposed a financial cost in order to discourage gun harm. As the District Court correctly notes, the funds provided as surety bond did not go to victims or pay costs directly incurred due to gun harm, while the Insurance Requirement does serve a victim-compensation purpose. *See* Op. at 83. But although their precise mechanisms differ, both surety bonds and the Insurance Requirement are financial

regulations meant to ensure public safety through responsible, orderly gun usage. *See id.* (citing *Wrenn*, 864 F. 3d at 661).

As another federal district court has found, a gun liability insurance requirement can promote public safety because competition in the industry and the nature of the underwriting process will come to identify safe, responsible practices and incentivize adoption of those practices through lower premiums. *See Nat'l Ass'n for Gun Rights*, 2023 WL 4552284, at *7, citing* Stephen G. Gilles & Nelson Lund, *Mandatory Liability Insurance for Firearm Owners: Design Choices and Second Amendment Limits*, 14 Engage 18 (2013) ("Competitive pressures would lead insurance carriers to keep the premiums for low-risk gun owners low, while charging higher premiums to those who are more likely to cause injuries to other people."). The District Court here did not recognize this similarity between the Insurance Requirement and surety laws.[4]

The misuse of firearms poses a threat to an "orderly functioning society," even when the individuals wielding them are nonviolent, law-abiding citizens. As discussed above, colonial governments recognized this problem and sought to address it through regulation. Today, the heightened risk of danger posed by

---

[4] The District Court also ignored a difference that is to the Insurance Requirement's credit: unlike surety bonds that were forfeited to the issuing authority, insurance premiums are paid to insurance companies, which then fund payment to accident victims, shielding gun owners from potentially dire financial consequences of having to fund those costs themselves.

modern firearms likewise necessitates regulations to maintain an "orderly

functioning society," which includes protecting individuals from physical and

financial harm.

### B.    The District Court failed to acknowledge the origins of insurance in America's historical tort system.

The District Court conceded that our nation's historical tort regimes

"overlap with the Insurance Mandate" (Op. at 87), yet disregarded that their cost-

allocating function makes them analogous by distinguishing when each becomes

effective:  tort liability applies "only after an injury" whereas the Insurance

Requirement is a "prophylactic approach."  Op. at 88.  The "when" is immaterial.

Historical tort liability schemes are analogous to the Insurance Requirement in

their "why" and "how":  they share the purpose of providing redress for individuals

accidentally injured by firearms by allocating costs to responsible parties.  This is

sufficient to meet the *Bruen* test.

Insurance as we know it was in its infancy when the Second Amendment

was ratified, and thus the Founders could not have "specifically anticipated"

insurance requirements related to the carrying of firearms.  *See Bruen*, 142 S. Ct. at

2118.  Regardless of whether early Americans could have foreseen such a public-

private mechanism to address financial risks, the Insurance Requirement achieves

cost-allocating ends that flow from the historical precedents of the Founders.  As

*Bruen* directed, cases involving "unprecedented societal concerns," such as the

current epidemic of gun violence (discussed at part I.C *infra*) require a "more nuanced approach." 142 S. Ct. at 2132. The District Court's dismissal of the similarities between the cost allocation goals of the historical tort system and insurance—a part of today's tort system—lacks the requisite nuance. Instead, the District Court found no similarity in the "how" of insurance and the historical tort system, missing entirely that insurance is borne of that very system. Rather than an entirely different "how" to allocate costs, insurance is just a lower cost, more efficient "short cut" within the tort system.

Today's modern systems for risk allocation have their roots in the historical tort system, which cannot be characterized as "materially different." Liability insurance grew up in tandem with the development of American tort law, and today it forms an integral part of our systems for spreading—and even reducing—the costs associated with many kinds of risks.

In the earliest days of the American tort system, American courts adopted a strict liability approach to firearms, inherited from the English common law, where the rule had been that "where one shoots at [a mark] and wounds a man, although it be against his will, yet he shall be called a trespasser against his will." *See* Wex S. Malone, *Ruminations on the Role of Fault in the History of the Common Law of Torts*, 31 La. L. Rev. 1, 13 (1970) (quoting Tithe, Y.B. 21 Hen. 7, f. 27, pl. 5). Strict liability continued to be the rule in both England and the United States

throughout the founding era through the mid-19th century.  *See* Fred E. Inbau,

*Firearms and Legal Doctrine*, 7 Tul. L. Rev. 529, 549–50 (1932–33) (reviewing

19th century cases that "indicate the strict accountability to which a person has

been held for injury caused to another in the vicinity by a discharge incident to the

handling of a firearm."); *see also, e.g.*, *Moody v. Ward*, 13 Mass. 299 (1816); *Cole*

*v. Fisher*, 11 Mass. 137 (1814).

In the mid-1800s American courts developed a negligence standard, under

which liability would be imposed only if "the actor were guilty of some fault or

neglect."  Cornelius J. Peck, *Negligence and Liability Without Fault in Tort Law*,

46 Wash. L. Rev. 225, 227 (1971); *see also* John Fabian Witt, *Toward a New*

*History of American Accident Law*, 114 Harv. L. Rev. 690, 694 (2001) (describing

the "accident crisis" during the 19th century, which gave rise to changes in the tort

system, as well as insurance-related innovations).  As this new standard emerged,

courts began to apply the negligence standard to cases involving firearm accidents.

*See, e.g., Morgan v. Cox*, 22 Mo. 373, 376–77 (1856) (critiquing the old, "much

stricter" liability standard because "it was no defence … that the act occurred by

misadventure, and without the wrong-doer's intending it").

Alongside the development of negligence law came liability insurance, "to

insure against the consequences of negligence."  Kenneth S. Abraham, *Liability*

*Insurance and Accident Prevention: The Evolution of an Idea*, 64 Md. L. Rev. 573,

576 (2005); *id.* at 573 (describing the "symbiotic relationship between tort liability and insurance during this entire period" of "the middle of the nineteenth century to the present"). The precursors of modern liability insurance were first sold in the United States in the second half of the 19th century. *See, e.g.*, *id.* at 580 ("Liability insurance was first marketed in the United States in the 1880s, having been imported from Great Britain, where it was also a very recent invention"); *Accident Insurance*, 7 Am. L. Rev. 585, 585 (1873) (commenting in 1873 that "[a]ccident insurance is of modern origin" and "the first American company is only ten years old"). The Supreme Court recognized in 1886 that liability insurance could function both to insulate defendants from liability and to compensate victims for the costs of accidents: "By obtaining insurance," the insured "increases his means of meeting th[e] responsibility" to compensate the victims of his negligence. *Phoenix Ins. Co. v. Erie & W. Transp. Co.*, 117 U.S. 312, 324 (1886).

Given the symbiotic benefits of tort law and liability insurance, it did not take long for governments to begin *requiring* liability insurance as a way to ensure payment of accident costs. *See* Abraham, at 585 (workers' compensation laws), 594 (mandatory auto insurance). As government-required liability insurance created large risk pools, liability insurance came to be understood as not merely a way for the insured to "meet its responsibility" to pay for the costs of accidents, but also as a powerful mechanism for "spreading the risk of loss" among all

members of the community engaged in the activity. *Id.* at 606; *see also*, Peter

Kochenburger, *Liability Insurance and Gun Violence Symposium*, 46 Conn. L.

Rev. 1265, 1295 (2014) (describing problems where "[t]hose most likely" to cause

injury "are not likely to be insured"); Jennifer B. Wriggins, *Mandates, Markets,*

*and Risk: Auto Insurance and the Affordable Care Act*, 19 Conn. Ins. L.J. 275, 287,

291 (2013) (describing problems where only the highest risk individuals are

required to obtain insurance). As one commentator writing in the mid-20th century

put it:

> There is a growing belief that in this mechanical age the
> victims of accidents can, as a class, ill afford to bear their
> loss; that the social consequences of uncompensated loss
> are dire and far exceed the amount of the loss itself; and
> that more good will come from *distributing these losses*
> *among all the beneficiaries of mechanical progress than*
> *by letting compensation turn upon an inquiry into fault.*

James Fleming, Jr., *Accident Liability: Some Wartime Developments*, 55 Yale L.J.

365, 365 (1946) (emphasis added). By requiring all participants in a risky activity

to obtain insurance, insurance mandates ensure that the costs of the risk are

optimally distributed.

By the 1960s and 1970s, Americans began considering not only the victim-

compensation and cost-spreading benefits of the tort-liability-insurance system, but

also "the relation between liability insurance and accident *prevention*." Abraham,

at 610 (emphasis added); *See* Tom Baker & Thomas O. Farrish, *Liability Insurance*

*and the Regulation of Firearms*, in Suing the Firearms Industry 5 (T. Lytton, ed. 2005) ("Once an insurance institution assumes responsibility for the financial consequences of a given harm, it has an incentive to prevent that harm."); Kochenburger, at 1270–71 ("There is a long and often favorable story to tell of how insurance has enhanced public safety.").  For example, workers' compensation insurers offer better rates to businesses that make their workplaces safer.  *See* Occupational Safety and Health Administration, *Business Case for Safety and Health*, https://www.osha.gov/businesscase/benefits (noting multiple studies that find safer workplaces result in lower workers' compensation costs). Similarly, medical malpractice insurance identifies risky providers, encourages safer practices, and collects data that pinpoint the causes of medical errors.  *See* Tom Baker & Charles Silver, *How Liability Insurers Protect Patients and Improve Safety*, 68 DePaul L. Rev. 211, 226 (2019).  Auto insurance offers lower premiums for certain vehicle safety measures and rewards safe drivers.  *See, e.g.*, Allstate, *7 Easy Ways to Help Lower Your Car Insurance Premiums* (Sept. 2019), https://www.allstate.com/resources/car-insurance/how-to-lower-car-insurance-premiums; State Farm, *Be Rewarded With Drive Safe & Save Discounts*, https://www.statefarm.com/insurance/auto/discounts/drive-safe-save; Allstate, *Safe Driving Bonus*, https://www.allstate.com/auto-insurance/safe-driver-savings. Insurance mandates thus contribute to safer practices.

Beyond their practical benefits, liability-insurance mandates are also consistent with American free-market ideals.  Mandatory liability insurance creates a public-private partnership "based on the very American idea that competition among insurance companies, combined with laws requiring coverage, will benefit consumers more than having a government program alone deal with the situation." Wriggins, at 297.  The resulting system "might not only be more effective and less costly than a government program," but also minimizes "governmental intrusion." Kochenburger, at 1296.

In sum, although insurance as we now know it did not exist in the United States at the time of the founding, modern liability insurance has developed in step with our nation's historical evolution of accident risk, costs, and the legal systems for assigning those costs.  Today, the Insurance Requirement carries out the same function as the historical strict liability scheme:  to allocate the risks implicated by firearm ownership.

### C.    The District Court disregarded that societal values have evolved regarding 18th Century restrictions on carrying firearms.

Societal values regarding the restriction of firearms have changed since the founding era.  Just as certain modern regulations may have been "unimaginable at the founding," certain 18th-century restrictions on firearms seem unimaginable by today's standards.  The U.S. Supreme Court acknowledged this reality in *Bruen*, noting that historically, "Catholics . . . fell beyond the protection of the right to

have arms." *Bruen*, 142 S. Ct. at 2142.  Such a classification obviously would not pass constitutional muster today.  Similarly, this Court noted in *Range* that "legislatures traditionally used status-based restrictions to disarm certain groups of people," including Loyalists, Native Americans, Quakers, Catholics, and Black Americans, and that "those restrictions based on race and religion now would be unconstitutional under the First and Fourteenth Amendments."  69 F.4th at 104–05 (*en banc*) (internal citations omitted); *see also United States v. Jackson*, 69 F.4th 495, 503 (8th Cir. 2023) (noting that status-based restrictions on firearm ownership "of course would be impermissible today under other constitutional provisions").

Other American societal values bearing on criminal offenses and the rule of law have also significantly evolved.  At the founding, lower-level criminal offenses—including forgery and horse theft—were often punished with death, reflecting "the founding generation's judgment about the gravity of those offenses."  *Range*, 69 F.4th at 105.

It is indisputable that American society, laws, values, and technology today are vastly different from what they were at the founding.  Although the *Bruen* framework relies on an appeal to history, the *Bruen* Court acknowledged the reality that 250 years of massive societal evolution cannot be ignored.  *Bruen*, 142 S. Ct. at 2132 (noting that the "unprecedented societal concern" of increasing gun violence requires "a more nuanced approach" to evaluating firearm regulations).

As we have relaxed our view of the gravity of crimes like horse theft, and greatly enhanced the killing capacity of firearms, American values also have evolved with respect to reasonable, appropriate restrictions on firearms to prevent harm and address associated costs. *See* Jennifer Tucker, Opinion, *Now That Guns Can Kill Hundreds in Minutes, Supreme Court Should Rethink the Rights Question*, CNN (Oct. 20, 2021), https://www.cnn.com/2021/10/20/opinions/supreme-court-gun-rights-case-lethality-tucker/index.html.  The modern trend toward greater regulation is no doubt a response to the greater harm and costs that can be inflicted by today's firearms. *See* Mike Stobbe, *Gun Injuries in US Surged During Pandemic, CDC Study Shows*, Associated Press (Mar. 30, 2023) https://apnews.com/article/gun-injuries-violence-cdc-study-pandemic-308741db0a1130d79c601ec966ecf542; *Friedman v. City of Highland Park, Illinois*, 784 F.3d 406, 410 (7th Cir. 2015) ("Most guns available [in 1791] could not fire more than one shot without being reloaded; revolvers with rotating cylinders weren't widely available until the early 19th century"); Darrell A. H. Miller & Jennifer Tucker, *Common Use, Lineage, and Lethality*, 55 U.C. Davis L. Rev. 2495, 2509 (2022) ("weapons have increased sharply in lethality from the mid-nineteenth century to the present day"); *see also* N.J. Public Law 2022, Chapter 131, § 1(c) (referring to "the impact of having more people carrying guns in public places").

22

The District Court failed to consider these evolutions when assessing New Jersey's insurance requirement. This Court should, instead, follow *Bruen's* lead and adhere to its directive to reason by analogy and look to similarities, not require regulations that are a mirror image of 18th century laws. A nuanced comparison, allowing for differences in the precise parameters of historical regulation, is warranted because, although firearms existed at the founding, they were simply not capable of inflicting the level of harm we see today. Accidents involving firearms can result in exponentially greater harm. Thus, the need to protect against accidents involving firearms has dramatically increased in the two centuries since the Constitution's adoption.

In the modern era, the United States experiences alarmingly high rates of gun accidents—between 2015 and 2022, there were 2,800 incidents in which a child under the age of 18 unintentionally shot themselves or others. *See Preventable Tragedies: Unintentional Shootings by Children,* Everytown for Gun Safety (Apr. 26, 2023), https://everytownresearch.org/report/notanaccident/. In 2023 alone, there were at least 217 unintentional shootings by children, resulting in 76 deaths and 149 injuries nationally. *#NotAnAccident Index*, Everytown for Gun Safety, https://everytownresearch.org/maps/notanaccident/, (last accessed July 18, 2023). Additionally, it was reported earlier this year that the Sig Sauer P320, a popular model of handgun, carries manufacturing defects that resulted in 80 people

23

being wounded in gun accidents since 2016.  Champe Barton & Tom Jackman, *Popular Handgun Fires Without Anyone Pulling the Trigger, Victims Say*, Wash. Post (Apr. 11, 2023), https://www.washingtonpost.com/dc-md-va/2023/04/11/sig-sauer-p320-fires-on-own//.  And the rates of gun accidents tend to be higher in states with more permissive firearm laws.  Jennifer Mascia, *In America, Accidental Shootings Among Children Occur Nearly Every Other Day*, The Trace (June 1, 2023), https://www.thetrace.org/2023/06/children-gun-safety-accidental-shootings/.  New Jersey is by no means immune, with gun deaths increasing 20 percent from 2019 to 2020 while the number of gun owners in the state tripled during that same period.  *See supra,* n.1.

The scale and nature of gun harm today would have been unimaginable at the founding, and thus is certainly an "unprecedented societal concern" requiring innovative solutions.  New Jersey's Insurance Requirement aligns with the values of financial and personal responsibility embraced by the Founders and reflected in the regulations and liability schemes of our country in its earliest days.

II.    **American courts have consistently recognized government-mandated liability insurance is constitutional.**

Although the Insurance Requirement may impose an economic cost on some New Jersey gun owners,[5] it is only a minimal *financial requirement* associated with gun ownership, which American governments have always imposed and courts have not struck down.[6]

Notably, early Americans may not have considered such financial requirements to implicate the Second Amendment at all.  *See* Saul Cornell, *History and Tradition or Fantasy and Fiction: Which Version of the Past Will the Supreme Court Choose in NYSRPA v. Bruen?*, 49 Hastings Const. L.Q. 145, 154 (2022) (stating that these financial requirements "posed no constitutional issues for Americans in the pre-Civil War era," and only "intensified" in the period following the Civil War).  For example, some of the same 19th-century laws that required

---

[5] The Insurance Requirement does not impose *any* financial burden on many New Jersey gun owners, as most ordinary homeowners' and renters' insurance likely satisfies the Requirement.

[6] *See, e.g.*, 1844 Miss. Laws, Rates of Taxation § 1, Revenue, An Act to Amend and Reduce into one the several Acts in Relation to the Revenue of this State, and for other purposes (1844) (Mississippi law requiring "two dollars on each dueling or pocket pistol"); 1851 R.I. Pub. Laws 9 § 2 (1851) ("[T]wo hundred dollars per annum on any person who shall own or keep a pistol gallery [or] rifle gallery."); Ordinances and Joint Resolutions of the City of San Francisco § 13 (1854) (San Francisco ordinance requiring "ten dollars per quarter" required from "[e]very person, house, or firm engaged in keeping a pistol or rifle shooting gallery"); 1856–1857 N.C. Sess. Laws 34, Pub. Laws, An Act Entitled "Revenue," ch. 34, § 23, pt. 4. (1856–1857) ("On every pistol, except such as are used exclusively for mustering, and on every bowie-knife, one dollar and twenty five cents . . . .").

"rifle" and "pistol galleries" to pay annual sums applied equally to "bowling alleys," demonstrating that early Americans found it reasonable to impose costs on potentially dangerous activities regardless of the involvement of firearms.  These laws make clear there was no understanding then that the Second Amendment warrants differential treatment from other facilities providing potentially dangerous recreation or creates any special constitutional protection from payments related to gun use.  *See* Laws of the State of Texas, An Act Authorizing the Corporate Authorities of the Town of Dangerfield, Fairfield and Springfield, to tax ten pin alleys, billiard tables, and pistol galleries § 1 (1860); 1870 La. Acts 127, Persons, Trades, Professions and Occupations Subject to Taxation, § 3, pt. 6 (1870).

The historical tradition of allowing financial obligations on gun owners shows that early Americans understood such requirements to be consistent with the Second Amendment, and modern courts have not hesitated to uphold gun-related fees and costs as constitutional.  *See, e.g.*, *Bauer v. Becerra*, 858 F.3d 1216, 1227 (9th Cir. 2017) (upholding California's use of portion of firearm sale fees to fund a firearms-related law enforcement program); *Kwong v. Bloomberg*, 723 F.3d 160, 166-67 (2d Cir. 2013) (upholding "residential handgun licensing fee"); *Nat'l Ass'n for Gun Rights*, 2023 WL 4552284, at *6-8 (upholding insurance mandate). Although some of these cases pre-date *Bruen*, the fact that courts have not struggled with the constitutionality of firearm regulation fees shows they are well-

established as consistent with the Second Amendment in American culture, past and present.

As discussed above, these financial obligations—including relevantly similar surety laws and historical tort liability schemes—were for purposes of public safety, often were imposed on entire populations, and sometimes carried criminal penalties.  The Insurance Requirement is similar and consistent with many other firearm-related financial requirements throughout American history.  *See Nat'l Ass'n for Gun Rights*, 2023 WL 4552284, at *7 (finding a similar firearm liability insurance requirement permissible under *Bruen* because it "is consistent with the Nation's historical traditions" and "[a]lthough the [San Jose] Insurance Regulation is not a 'dead ringer' for 19th century surety laws, the other similarities between the two laws would render the Ordinance "analogous enough to pass constitutional muster.").

## CONCLUSION

For the foregoing reasons, as well as the reasons set forth in New Jersey's briefing, Brady urges this Court to reverse the District Court's grant of a preliminary injunction with respect to the Insurance Requirement.

Dated: July 27, 2023                          Respectfully submitted:

                                                  */s/ David A. Luttinger, Jr.*

*Of Counsel:*

Douglas N. Letter
Shira Lauren Feldman
**BRADY CENTER TO PREVENT
GUN VIOLENCE**
840 First Street, NE Suite 400
Washington, DC 20002
(202) 370-8100
dletter@bradyunited.org
sfeldman@bradyunited.org

Suzan Charlton
Aroosa Khokher
Ryan Partelow
Elizabeth Upton
**COVINGTON & BURLING LLP**
One CityCenter
850 Tenth Street, NW
Washington, DC 20001-4956
Tel.: (202) 662-6000
scharlton@cov.com
akhokher@cov.com
rpartelow@cov.com
eupton@cov.com

David A. Luttinger, Jr. (DL3180)

**COVINGTON & BURLING LLP**
The New York Times Building
620 Eighth Avenue
New York, NY 10018-1405
Tel.: (212) 841-1134
dluttinger@cov.com

*Counsel for Amicus Curiae*

## CERTIFICATE OF BAR MEMBERSHIP

In accordance with Local Rule of Appellate Procedure 28.3(d), I certify that

I am a member of the bar of the United States Court of Appeals for the Third

Circuit.

Dated: July 27, 2023                    By: */s/ David A. Luttinger, Jr.*

David A. Luttinger, Jr.

*Attorney for Amicus Curiae Brady*

## <u>CERTIFICATE OF COMPLIANCE</u>

1.  This brief complies with the type-volume limitation of Federal Rule of
    Appellate Procedure 32(a)(7)(B).  The brief contains 5,877 words, excluding
    the parts of the brief exempted by the rules.

2.  This brief complies with the typeface requirements of Federal Rule of Appellate
    Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate
    Procedure 32(a)(6) because this brief has been prepared in a proportionally
    spaced typeface using Microsoft Word 2016 in 14-point Times New Roman
    type.

Dated: July 27, 2023                         By: */s/ David A. Luttinger, Jr.*

                                               David A. Luttinger, Jr.

                                               *Attorney for Amicus Curiae Brady*

## <u>ELECTRONIC DOCUMENT CERTIFICATE</u>

Pursuant to Third Circuit Local Appellate Rule 31.1(c), I hereby certify that the text of the electronic pdf version of this brief filed via the CM/ECF system is identical to the text in the paper copies.

The brief was scanned for viruses using Cortex XDR version 7.9.0 and no virus was detected.

Dated: July 27, 2023                    By:    */s/ David A. Luttinger, Jr.*

David A. Luttinger, Jr.

*Attorney for Amicus Curiae Brady*

## **CERTIFICATE OF SERVICE**

I, David A. Luttinger, Jr., hereby certify that, on this 27th day of July, 2023, the foregoing Brief of *Amicus Curiae* Brady in Support of Appellants was served on all counsel of record by filing it on the Court's CM/ECF system. Ten identical paper copies will be delivered to the Clerk's Office within five days.


Dated: July 27, 2023          By:    */s/ David A. Luttinger, Jr.*

David A. Luttinger, Jr.

*Attorney for Amicus Curiae Brady*