UNITED STATES COURT OF APPEALS

THIRD CIRCUIT

------------------------------------------X

RONALD KOONS; et al.                          X

   Appellant,                                 X

v.                                            X

ATTORNEY GENERAL NEW JERSEY AND               X

SUPERINTENDENT NEW JERSEY STATE POLICE, X

PRESIDENT OF THE NEW JERSEY STATE             X

SENATE, SPEAKER OF THE NEW JERSEY             X

GENERAL ASSEMBLY,                             X

   Appellees,                                 X

                   AND                    X

AARON SIEGEL; et al.                          X

   Appellant,                                 X

v.                                            X

ATTORNEY GENERAL NEW JERSEY; et al.      X

PRESIDENT OF THE NEW JERSEY STATE             X

SENATE, SPEAKER OF THE NEW JERSEY             X

GENERAL ASSEMBLY,                             X

   Appellees.                                 X

    Case Nos. 23-1900/23-2043             X

------------------------------------------X

BEFORE: HARDIMAN, SHWARTZ, KRAUSE, RESTREPO, BIBAS,

PORTER, MATEY, PHIPPS, FREEMAN, MONTGOMERY-REEVES,

    CHUNG, BOVE and MASCOTT, Circuit Judges;

CHAGARES, Chief Judge

Oral Argument

Wednesday, February 11, 2026

The Albert Branson Maris Courtroom, 19th Floor

Job No.: 7908780

Pages: 1 - 91

Transcribed by: Jackie Scheer

A P P E A R A N C E S

ON BEHALF OF THE STATE OF NEW JERSEY:

     ANGELA CAI, ESQUIRE

     JEREMY FEIGENBAUM, ESQUIRE

     (Liaison Counsel)

     Office of Attorney General of New Jersey

     25 Market Street

     Richard J. Hughes Justice Complex

     Trenton, New Jersey  08611

     Telephone: (609) 376-2690

ON BEHALF OF THE SIEGEL PLAINTIFFS:

     ERIN E. MURPHY, ESQUIRE

     Clement & Murphy

     706 Duke Street

     Alexandria, Virginia  22314

     Telephone: (202) 742-8900

ON BEHALF OF THE KOONS PLAINTIFFS:

     PETER A. PATTERSON, ESQUIRE

     Cooper & Kirk

     1523 New Hampshire Avenue, N.W.

     Washington, D.C.  20036

     Telephone: (202) 220-9670

C O N T E N T S

ARGUMENT                                              PAGE

   By Ms. Cai                                       4, 80

   By Ms. Murphy                                       34

   By Mr. Patterson                                    66


QUESTIONS FROM THE JUDGE PANEL

   For Ms. Cai                                      9, 80

   For Ms. Murphy                                      40

   For Mr. Patterson                                   66

Page 4

P R O C E E D I N G S

CHIEF JUDGE CHAGARES:  Good morning and welcome to the United States Court of Appeals for the Third Circuit.  We're glad you're here.  And we will hear our first case, Koons versus Attorney General, Number 23-1900, and Siegel versus Attorney General of New Jersey, 23-2043.

You may proceed.

MS. CAI:  Thank you, Chief Judge Chagares, and may it please the court, Angela Cai for the State of New Jersey.  I'd like to reserve five minutes for rebuttal.

CHIEF JUDGE CHAGARES:  That will be granted.

MS. CAI:  The Supreme Court thrice confirmed in Heller, McDonald, and Bruen that nothing about the copious history they reviewed cast doubt on the constitutionality of longstanding laws prohibiting firearms at sensitive locations such as schools, government buildings, and -- and the like.

That is because the totality of this nation's history from the Colonial Era to reconstruction and beyond confirms that legislatures could ban firearms at such locations.

In Chapter 131, the New Jersey legislature identified modern locations as sensitive and limited firearms except those carried by law enforcement and those authorized to provide security.  The history supporting that democratic decision is cut from the same cloth as the history supporting restrictions at schools, courts, polling places, and legislatures.  Here, throughout the 17 and 1800s, dozens of legislative bodies around the nation restricted firearms at identical or analogous locations to Chapter 131.  That includes fairs and markets of the Founding Era, ballrooms and parks in the Antebellum Period, and schools and zoos and theaters and more immediately after states ratified the Fourteenth Amendment.

Importantly, plaintiffs cannot identify a single court or a legislator or a legal scholar or even lay commentator who contemporaneously doubted the validity of any of these historical laws.  In fact, state court decisions cited favorably by both Heller and Bruen reviewed these laws and found them consistent with the individual right to bear arms.  That is precisely the kind of historical tradition that makes the cut under Bruen.  To be sure, modern regulations could flunk Bruen's test if no historical legislature adopted an analogous law when faced with the same enduring social problem.  Modern regulations could also flunk Bruen if historical courts struck down their historical predecessors.  But where history and tradition point in only one direction, as they do here, we must accept the destination.

Plaintiffs' arguments are simply incompatible with the Supreme Court's instructions.  First, against the state's

Page 7

30-plus historical park restrictions or 10 historical laws banning guns at places of entertainment, plaintiffs insist that these historical precursors weren't identical enough or came too late or weren't universally adopted.  But those arguments would require defying the Supreme Court's thrice repeated statements about schools and government buildings.  After all, at the founding, there were no firearm bans at schools, and any such bans at legislatures, polling places, and courthouses were sparse.

Second, plaintiffs' argument requires that this court accept that the mere lack of an affirmative regulation at any given point in time would forever cabin legislative decisions in the future.  But the Supreme Court's most recent decision in Rahimi teaches us that is incorrect.  The Second Amendment is not so shortsighted so as to leave us with only a menu of laws trapped in amber from centuries ago.  And as Justice

Barrett warned, federalism is incompatible with use it or lose it constitutionalism.

Third, plaintiff argued that only places with government-provided metal detectors could be sensitive places, but history shows nothing of the sort, and that theory would eviscerate longstanding polling place restrictions across the nation or restrictions at locations like day cares or nursing homes.  It is telling that no other court has agreed with this theory.

Fourth, plaintiffs' in loco parentis theory about schools make little sense.  The Supreme Court thrice named schools as a paradigmatic sensitive place for prohibition of firearms.  It did not single out students as a class of people who could not have firearms.  Instead, following Rahimi's principle-based rule means the historical tradition from firearm restrictions at schools amply justifies Chapter 131's regulations at playgrounds, field sports

events, and designated children's areas of public libraries and museums.  Luckily, four other Courts of Appeal to consider sensitive places restrictions post-Bruen have rejected plaintiffs' arguments, and as this court has repeatedly stated, it should be reluctant to contradict the unanimous position of other circuits.  Fidelity to that principle and fidelity to the Supreme Court's teachings means this court should reject plaintiffs' facial challenge.  I welcome this court's questions.

CHIEF JUDGE CHAGARES:  Thank you. You -- you mentioned history rather generally and I'm afraid we're gonna have to get a little more granular on that.  You -- you argue in your brief in various places, in particular your -- your reply brief at page 18, that in the event of a clash between Founding Era and Reconstruction Era historical analogue that the latter ought to control for purposes of our inquiry under --

under Bruen.  Doesn't Bruen tell us something different?  Doesn't Bruen tell us that -- that we should treat evidence from the late 19th century as having minimal probative value when it conflicts with earlier evidence?  I'd -- I'd be interested in your position on that.

MS. CAI:  So, Your Honor, I think I would urge this court not to overread references in Bruen as saying it has to be evidence from 1791 or 1868 because Bruen and Rahimi explicitly said they were not deciding that very interesting academic question.  All this court needs to do is do what the Supreme Court said was appropriate.

CHIEF JUDGE CHAGARES:  Well, well, but if I could just -- if I could just quote it, the -- the opinion says on page 66:  Late 19th century evidence cannot provide much insight into the meaning of the Second Amendment when it contradicts earlier evidence.

Isn't that rather specific?

MS. CAI:  I think that is important to understand because it's qualified.  It's insufficient when it contradicts the overwhelming weight of other evidence, so the court said that in reference to the single Texas 17 -- 1871 section, that banned all public carry, because, quote, a single law in effect in a single state that contradicts the weight of other evidence is insufficient.  And that other evidence included not only Founding Era or rather Antebellum cases that went the other way, but also other cases from that time period that also went the other way.  We don't have that here.  You will not find a single case that plaintiff has cited from either the Founding Period or the Antebellum Period or Reconstruction that says restrictions at sensitive places -- and many locations, many jurisdictions adopted them -- would have been -- was unconstitutional.

In fact, you have decisions like

Andrews, the Tennessee 1871 case that Heller cited three times and Bruen cited once positively for the idea that it recognized an individual right to bear arms.  In Andrews, the court said that is true, therefore you cannot have a total ban on carrying of firearms, but it also said unequivocally that restrictions at places -- at sensitive locations like public assemblies and the like were constitutional.  So I think those cases, like that case as well as Shelby, the Missouri case, also cited by -- by Bruen positively, is going the same direction.  It is not what Bruen was looking at, which is one law that was then contradicted by other evidence either earlier or contemporaneously.

JUDGE MATEY:  Speaking of overreading Bruen, should we really be overreading Heller's colorful use of the phrase "sensitive places" as actually creating a doctrine?  It strikes me as similar to, I don't know, large capacity magazines or

Page 13

assault weapons as a regulatory term that could be applied to anything that a regulator wants to regulate and then used as a claim for historical justification.  So how -- do you really think they were intending to create that, particularly when Bruen says, well, we don't need to define the metes and bounds of that -- of that reference?

MS. CAI:  I do agree with you, Judge Matey, that I don't think the Supreme Court defined the metes and bounds of what are sensitive places and what are not, and I think Bruen was pretty explicit that it's just an example or a set of examples.  But I will suggest that it is not just a stray line type of dicta.  It was said first in Heller. It was repeated as an assurance in McDonald when the court understood that it was now applying the Second Amendment to all states, and in Bruen it was repeated for a third time in the -- as a paradigmatic example as the court was trying to explain to the lower

courts how to do the history and tradition analysis. Not for the first time but for the --

JUDGE MATEY: -- yeah, I mean, but -- but couldn't it -- but it's never been defined, right. I mean, and I understand at least one example of what it means could be places where government provided comprehensive security, right. And so we would know that that courthouse, a military base, these are places where going arms was, you know, going armed was severely restricted. I mean, isn't that a helpful way of thinking about this?

MS. CAI: I'll note that, you know, that argument has to be based on history, and the history is just not there. So, you know, I think we're all trying to do what Rahimi taught us to do, which is define the historical principle that undergirds all these -- all these historical analogues. And --

JUDGE MASCOTT:  -- so, Counselor, on that, the New Jersey law right now has a pretty comprehensive list of sensitive places.  What is the state's position on public locations that could not be regulated as sensitive places?

MS. CAI:  Sure.

JUDGE MASCOTT:  What falls outside?

MS. CAI:  I think that, you know, I think there's a reason why historical legislatures never chose places like bakeries and individual shops as sensitive places. There's --

JUDGE MASCOTT:  -- wait, why is a bakery different from a zoo or a library?

MS. CAI:  Because it's not -- so zoos and libraries were understood as locations where people gathered for literary or scientific purposes.  So that's not the case for a bakery as far as I can tell, right.  So those are -- those are statutes that Texas and Missouri and other courts that had Second

Amendment analogues chose as locations to deem as sensitive.

JUDGE MASCOTT:  But what's --

MS. CAI:  -- and so we're --

JUDGE MASCOTT:  -- so you're telling me there's a constitutionally significant distinction in the Second Amendment between a bakery and a zoo or museum?

MS. CAI:  Yes.  And that is grounded by history --

JUDGE MASCOTT:  -- because of a Texas state statute and how Texas defined it at one point in time?

MS. CAI:  Texas is just one example.  We cite a number of other examples, including specific restrictions at zoos as soon as they came into existence, which they were all inside parks, and those parks generally prohibited firearms in them as well and that's --

JUDGE MASCOTT:  -- (incomprehensible) purpose so if a bakery in -- bakeries in the

states are being used for book clubs, literary meetings, they -- now all of a sudden the ban can apply?

MS. CAI:  I think that's a question that, you know, hasn't been presented to us and we would think about, you know, I don't think a bakery in general is used -- just because it can be sometimes used as a location for X purpose doesn't mean that it is a sensitive location.  I think that has to be designed and dedicated to that purpose, so I don't think that necessarily applies.

JUDGE MASCOTT:  In addition to bakeries in New Jersey, where else can people possess firearms without being -- them being regulated as sensitive places?

MS. CAI:  Sure.  So any number of commercial establishments.  Banks, coffee shop, pizzeria, grocery store.  You know, I could --

JUDGE MASCOTT:  -- bank?  I mean, a bank seems like it creates more security issues,

doesn't it, than a public library?

MS. CAI:  So as far as I understand, there is not a specific historical tradition of prohibiting firearms at banks, and that is why New Jersey has not regulated firearms at banks specifically.

JUDGE PORTER:  What's the -- what's -- what's the national historical tradition of banning firearms in schools?

MS. CAI:  That's a really good question, Judge Porter.  So the history, as we understand it, from both looking in this case and at the sources that Bruen cited, the first time you will see a location-based restriction for all who enter a school are the same historical citations that we cited for other locations like entertainment and literary gatherings and things of that sort. That started, we believe, in Texas in 1870 but was repeated by Missouri and many other jurisdictions later on.  There were student-based restrictions at certain

Universities in the 1820s and '30s and so forth at individual schools.  So you could look at that and --

JUDGE PORTER:  -- imposed by the schools themselves?

MS. CAI:  Correct.  Correct.  So --

JUDGE PORTER:  -- does that count as part of our national regulatory tradition?

MS. CAI:  You know, I think you could look at it in context and say that's an interesting thing that some schools chose to do, and -- and perhaps they were concerned by some of the same issues that the Texas legislature and Missouri legislature was concerned about and chose to go at it from a different policy perspective.  But the fact that they didn't choose a different regulatory tool, a sensitive place restriction at any given point in time, doesn't mean that they were saying that's unconstitutional as a matter of Second Amendment.  In fact, I think some of the

schools that chose those student-based restrictions wouldn't have been bound by an understanding of the Second Amendment in the time when they chose those decisions. So it's not the Second Amendment that was stopping them. It was policy decisions, and federalism requires that, you know, different states and different institutions within the states be able to choose what policy decisions fit, you know, the democratic purpose.

JUDGE PORTER: And Bruen and Rahimi -- Bruen and Rahimi are concerned about state action, right?

MS. CAI: Correct.

JUDGE SHWARTZ: If -- if you have a scenario where there is silence in the legislative record, where does the court go to figure out if there's some kind of tradition? For example, do we look at the common criteria, objective criteria that the four locations that the Supreme Court has on

multiple times identified, guide our efforts to try to identify a tradition?  Or is that irrelevant and we're stuck with what the legislative record would be, the regulatory record would be?

MS. CAI:  I think you would have to first look at whether there is a natural explanation for the silence as important, relevant context.  So if you have, for example, a longstanding acute social problem that if you are looking back to, you know, 1800 or 1850 or 1868, that those legislatures understood was a huge problem for them, and if none of them chose to regulate that problem with any kind of firearm restriction, and that would have been the natural thing to do, and perhaps especially if it was written about as something that is a problem and perhaps a firearm restriction was debated and they chose not to do so, I think that is relevant.  I don't think that's dispositive.  But I think that's -- that's relevant

evidence, and if we had that in this case, I think we would have a much harder time.

But you don't have that here.  The locations that we're talking about either were regulated in some form at some point, you know, in the first decades of this nation's history, and especially after the social problem became acute.  So we discuss in our briefs, and I think a lot of the -- the historical evidence bears this out, that before 1850 or the 1840s and '50s the commercial market for handguns was really just very, very small, and in fact Samuel Colt himself had a hard time establishing a commercial base.  And it wasn't until the Colt Revolver patent expired in 1850 that these relatively easy to obtain cheap revolvers started flooding the market.  And there may be other historical reasons why people started getting them, but then you start reading about interpersonal violence, riots, and other kinds of social problems

Page 23

emerging especially in the reconstruction south, and the radical republicans in Texas and other states that wanted to deal with this problem, especially as it related to suppression of people's right to vote, including freed slaves' right to vote, then enacted these restrictions.  And a lot of them in fact were in states that had a Second Amendment analogue to the individual right to bear arms, and it had happened exactly also at the time when the Second Amendment became incorporated against the states through the Fourteenth Amendment --

JUDGE SHWARTZ:  -- can I ask you about, Judge, and I'll -- I'll yield the floor.  These are smaller items, not the sensitive places it goes to, the insurance requirement and a fee.  You are in a preliminary injunction setting.  We're looking for irreparable harm.  Dollars are being spent if these -- if these laws are enacted.  Is the state foregoing a sovereign immunity argument

Page 24

as it relates to compensating the expenditure of these funds should these statutes ultimately be deemed unconstitutional?

MS. CAI:  Yeah.  So two answers to that. So as to the insurance provision, I think it's not the case that every time a person -- a litigant stands to lose a dollar or $50 that it suddenly translates to irreparable harm, even if there's no cause of action or, you know, some other doctrine may prevent them from recovering that money from the state.  If that's true, then you have preliminary injunctions from all kinds of cases where there is no defined path to collection.  And as to the fees, you know, it's interesting because the irreparable harm has to be geared towards their legal theory and not just the amount of money they happen to be saving as a response.  Plaintiffs never argue that the $200 fee, which is just, you know, accounts for the rate of inflation since 1970, is something that they couldn't

Page 25

afford or is not the right number.  Their only objection is where $50 of that $200 legislature in one year has decided to allocate to a certain fund.  And that's just --

JUDGE SHWARTZ:  -- and the record is unclear exactly how that all works, correct.

MS. CAI:  I think the -- I don't think you need a record because a binding New Jersey law --

JUDGE SHWARTZ:  -- district court, though, at that point was not clear, right --

MS. CAI:  -- yeah, there is binding New Jersey law that, you know, with all respect to the legislature who enacted that provision, that does not bind future legislatures as to where money in the budget goes.  So I -- I think that, even putting that aside, their only objection to it is where the money goes --

JUDGE SHWARTZ:  -- I'm aware of what their objection is.  I'm asking you a

Page 26

different question, though.  It's a -- it's a monetary relief and the question I had was whether or not this is a -- the kind of relief that should be subject to a preliminary injunction, and -- and as I understand from the briefing, sovereign immunity was sort of discussed by the other side as an impediment to relief, and that was my question.  Is there an assertion of sovereign immunity as a -- as a bar to re-compensating them for the -- the monetary amounts in those two areas?

MS. CAI:  Thank you, Judge Shwartz.  Yes.  The state is not waiving sovereign immunity.  We're just suggesting that not every time you stand to lose a dollar or two that that suddenly becomes irreparable injury.

JUDGE SHWARTZ:  Thank you.

CHIEF JUDGE CHAGARES:  Judge Krause.

JUDGE KRAUSE:  Thank you.

Ms. Cai, I'd like you to assume that,

Page 27

notwithstanding the Supreme Court authority you cited, that this court concludes that laws after 1791 have minimal, if any, relevance as historic analogues, even when there's not a conflict.  Under those circumstances, do various sensitive places in the -- the list that New Jersey has generated no longer qualify or are concepts of affray and causing terrorizing the -- the populace dating back to the founding a sufficient analogue for those locations, can we think about analogues at even that level of generality?

MS. CAI:  I think you can.  I will make one observation first before I get to the -- the crux of your question.  If you make that assumption, then it cannot be that courthouses or schools can be sensitive locations, because I am not aware of any statute pre-1776 or enacted by colonial legislature that prohibited firearms at schools or courthouses.  And you only have

one state that did so at legislative assemblies, and I'm aware of only one at polling places, and that's Delaware. So that's just the outcome if that is -- if that is the -- the methodological angle that we're taking.

But with respect to your question, you know, I -- I do think that you could look at the Statute of Northampton as it was understood by the people in the colonies and immediately thereafter. And the Statute of Northampton has at least two different components. So it is true in Bruen the court discussed that the component that says that, you know, nor bring no force in affray of the peace is a qualifier on all blanket restrictions on public carry. So in order to prohibit public carry, you have to have that qualifier, because it was understood in the Statute of Northampton as a qualifier. It can't be that if you're just going about for self-defense and you're not acting in affray

or breach of the peace that you could restrict that. But there's a separate line that says nor to go nor ride armed by night nor by day in fairs, markets, nor in the presence of justices or other ministers.

That is the sensitive place history and tradition that started with the Statute of Northampton that justifies restrictions at courts in the same breath as restrictions at fairs and markets, it's all the same clause. And so when it was codified in states like Virginia in 1786 and in North Carolina in 1792, that same fact is true. There are different clauses for the affray clause and sensitive place clause. So you could use the fairs and markets and courts as its own tradition and analogize from there, and that's perhaps how you get to schools as sensitive places, because they are places where people who are -- where if you have even self-defense discharge or -- or display of a firearm, that may cause more harm to the

people gathered there because of the state that they're in or because of the social activities going on there.

If you were to just look at the affray clause on its own, I think there is some theory that I don't think has been well briefed here, but let me offer it here, that in affray would automatically be the case if a firearm is even used in self-defense at these particular locations, and then you could then analogize from there, if that's true at fairs and markets and courthouses in 1786 or 1700, whether or not that is true at locations today.  I don't think you need to do that, because at no point in any of the courts, Supreme Courts' cases, have they said you can only look to history that predate the founding.  You don't see that in the cases that we cite or plaintiffs cite.  In Gamble, for example, on the double jeopardy clause and the meaning thereof, the Supreme Court said you don't have a lot of cases where both

sovereigns prosecuted an individual for all kinds of reasons before the mid 1800s. And so then they look to cases from 1840s and onwards up till 1922 to understand the meaning and the application of the double jeopardy cause.

Here, for different reasons, there was no particular social problem that -- that many legislatures saw before 1850, and so that's the same reason of why we look to cases from the late 1800s when, by the way, a lot of states started enacting their own Second Amendment analogues, and at that very moment, those very states, like Missouri and Tennessee and Texas, also started enacting sensitive place restrictions. Courts then passed upon them and said these are constitutional. And so I think in terms of history, we have an exceedingly robust history of a history tradition of legislative experimentation with particular places, and the fact that some legislatures chose to go

right up to the constitutional line and some legislatures did not, I don't think it's --

JUDGE PORTER:  -- what is -- what is the -- the new social problem that was identified?  Would you say it's the presence of guns where people congregate?  Like, how do you define that new social problem?

MS. CAI:  In -- in the, like, 1870s --

JUDGE PORTER:  -- yeah.

MS. CAI:  So I think it's a couple different things.  So people bringing firearms to daily life, activities of daily life I think was a problem that they saw, and you see that in the history, in the record. How they solved that social problem was not to generally prohibit firearms everywhere, but to locate specific locations where these problems are particularly acute.  At places, for example, where designed for civic and democratic participation, locations designed for the needs of vulnerable people like students and the inebriated, and in places

where the firearms presence -- firearms even among the law-abiding, could really jeopardize the safety of others.

JUDGE PORTER:  Why is that a new social problem that had never been contemplated before?  Isn't that exactly the kind of thing that was addressed by the Statute of Northampton going back 600 years?

MS. CAI:  I see my time has expired.

CHIEF JUDGE CHAGARES:  Go ahead, you can answer that question.

MS. CAI:  I do think that legislatures -- some legislatures may have recognized and paid attention to that social problem.  I think it became a much bigger social problem when people were carrying handguns with them more frequently in the -- after the 1850s.  You see cases like Huntley, the North Carolina case that Heller cites. It talks about how you have a general right to -- to self-defense, but it also observes as a matter of sociological fact at the time,

that nobody goes around carrying firearms, and it's sort of, like, an unseemly thing to do. And if people weren't doing it because of social mores, then legislatures, including legislatures that were not bound by the Second Amendment or any state analogue thereof, chose not to enact those laws. And I think the decision of our friends in Delaware in, you know, the 1800s not to restrict firearms at -- at theaters and performances, shouldn't and couldn't in a federalist system bind the decisions of Pennsylvania in 1870 or New Jersey in 2022 from enacting a restriction like that just because one state did not choose to do so.

CHIEF JUDGE CHAGARES: Thank you, Counsel. We'll get you on rebuttal.

We'll hear from the Siegel plaintiffs. Ms. Murphy.

MS. MURPHY: Good morning, Your Honors, and may it please the court. Erin Murphy on behalf of the Siegel plaintiffs.

Bruen made clear that states may not impose ahistorical conditions on those seeking a permit to carry a handgun for self-defense.  And while Bruen acknowledged that the Second Amendment allows states to prohibit firearms in certain sensitive places, it went out of its way to make clear that the historical record revealed relatively few of these, quote, exceptional places and expressly cautioned against defining the category of sensitive places so broadly as to eviscerate the general right to publicly carry arms for self-defense.

Rather than heed those teachings, New Jersey's response to Bruen largely defies them.  The state has conditioned the exercise of the right to carry a handgun on the ability to produce four reputable persons willing to provide a written character endorsement and sit for a follow-up interview.  It has imposed a novel insurance mandate that treats law-abiding citizens as

Page 36

walking liability risks simply because they want to exercise their Second Amendment rights.  It has imposed an application fee that forces law-abiding permit applicants to shoulder costs generated by violent criminals.  And it has declared nearly the entirety of New Jersey sensitive places that are off limits to the carrying of handguns, even by those who are fortunate enough to secure a carry permit.  Any definition of sensitive places that sweeps so broadly as to encompass parks, museums, beaches, libraries entertainment facilities, public gatherings, all modes of transportation and more, is the epitome of a definition so broad as to eviscerate the general right to carry arms for self-defense.

Now, while New Jersey has taken a blunderbuss approach to identifying sensitive places, we haven't responded in kind with a blunderbuss attack.  Of the 25 categories that New Jersey has identified, we've

Page 37

actually challenged at this point fewer than half of them and we aren't even challenging each of those categories in their entirety. And that's because we don't take issue with the proposition that there are certain places where handguns can be permitted -- can be prohibited, consistent with historical tradition.

I think it's common ground that there's a category of places where a core, deliberative, sensitive functions of government take place, the courthouses, the polling places, legislative assemblies, et cetera.  We also don't take issue with provisions that are focused around places that have physical attributes that make a firearm a safety hazard in the same way that historically there were laws to deal with when gun powder posed a safety hazard.  So, for instance, a provision here that deals with power plants where, you know, the presence of a firearm might cause an

explosion, independent from concerns about criminals misusing them.

We also don't take issue with the notion that the state can have prohibitions in places that are dedicated to housing individuals who are themselves dangerous and not allowed to carry firearms. So there's several provisions in this law that deal with things like correctional facilities or things like certain types of mental health facilities, certain types of perhaps drug addiction facilities. The through line, though, among those categories is that they tend to be places where you have either or both of restricted access and heightened security because of the recognition that they aren't like parks and zoos and museums and libraries, but rather are the kinds of places where you have dangerous activities, important activities, sensitive activities, dangerous people, qualities of the physical property that are dangerous. Things that

call for treating them as sensitive, not just for purposes of carrying a firearm, but more generally. And so if the state stays within those bounds, we don't take issue with the idea that there are places where firearms may be prohibited.

What we very much take issue with is the notion that firearms may be prohibited essentially anywhere where people congregate, whether they are congregating to engage in First Amendment activity, civic activity, recreational activity, to watch a sporting event, to watch some theater, to just take your kids out for the -- a day at the park, whatever it may be. Anywhere that people seem to gather, which seems to be the state's approach. If that were the law, we would have seen, as a matter of historical tradition, we would have seen far more than four laws from four states in the 1860s that took the approach of imposing these kinds of broad prohibitions. Instead what we saw, as

Page 40

concerns about things like handguns arose in the 1800s, are concealed carry restrictions. Even some of the laws the state is relying on here were concealed carry restrictions, not efforts to say, oh, my goodness, now that there's handguns, we're not gonna allow anybody to carry firearms anywhere. The few jurisdictions that took that approach are the exact same jurisdictions for the most part that Bruen already said were taking outlier approaches to the right to carry generally, which makes them a very poor place to look to understand the tradition surrounding what could be deemed a sensitive place.

CHIEF JUDGE CHAGARES: Today and in your briefing you seem to limit your challenge to playgrounds and youth sports events to sort of off campus locations. Do you concede that Chapter 131's restrictions on playgrounds and youth events could be constitutional in so far as they take place at schools? And if so, how does that affect your facial

challenge?

MS. MURPHY:  So the reason -- this stems from how we understand the law.  We think that if they're taking place on school property they're already covered by the school provision, which we're not challenging.  So we understand these separate provisions about playgrounds and youth sporting events to be there precisely to capture anything that's happening not on school property, so our challenge is confined in the sense of how we understand those provisions to be confined, which is why I do think as to those particular provisions, it is a facial problem, independent from, you know, we can certainly have a debate about the constitutionality of -- of limitations on schools themselves.

JUDGE SHWARTZ:  If I could just follow-up on that.  Assume you have a school that it could be a (incomprehensible) or whatever that the -- the field where the

practices take place and the games take place are actually located in the town's park.

MS. MURPHY:  Uh-huh.

JUDGE SHWARTZ:  So if it had been contiguous with the school, your position would be that would be a place that could be restricted, but is it your position simply because it's located off the school grounds, it's no longer protected even though the same activity is occurring?

MS. MURPHY:  I mean, that's ultimately the scope of our challenge.  I do wanna be clear, I mean, we haven't challenged schools.  That's not because I'm gonna stand here and concede that I think everything about a restriction on schools is necessarily constitutional.  We chose not to press that in this case.  I think the Supreme Court, you know, has mentioned schools without providing much guidance at all about exactly what they mean by that, if they think it is students, if they think it is the whole property, if

they think it's teachers, all of that. And -- and I'm happy to, you know, discuss our -- our views on that. But to the extent we have a distinction here, it's a distinction that's grounded in the provisions we chose to challenge, not necessarily because I'm here to tell you I think that there's a radically constitutionally significant difference if you have the park kind of off the school property versus on the school property --

JUDGE SHWARTZ: -- and so what's the distinction that you're drawing? Because it's open and not on school premises?

MS. MURPHY: Well, I think what I was just suggesting is I'm -- I'm -- I'm not necessarily trying to tell you there's a constitutional distinction. I'm telling you that just because we didn't challenge the school's provision doesn't mean we don't think that it might be a little bit overbroad.

JUDGE SHWARTZ:  So what if -- I'm gonna go back to following up on Judge -- to Judge Chagares' question.  The activity in the park that happened to be school-sanctioned practice.

MS. MURPHY:  Sure.

JUDGE SHWARTZ:  Is that -- and it's not youth, it's high school.  Is that --

MS. MURPHY:  -- sure.  We would be challenging -- we're -- challenge this provision even if it's -- if it's school-sanctioned activity that's going on, because we don't think the fact that activity is happening somewhere that's sanctioned by a school necessarily translates into converting that place into a sensitive place.  And I think that if you look at the tradition about schools, you know, as the laws that were suggested by -- by the state here that tend to be provisions that were focused on dealing with students while they're on campus engaged in school activities, that's an in loco

Page 45

parentis tradition, you know, we could have a debate about exactly how broadly that goes and at what point you're no longer in loco parentis, if you are, if you're not, if you're engaged in, you know, a school-sanctioned activity at a park.  But I think that by virtue of the way that the state has set up its law that that's probably outside the scope of our challenge since I understand the provision we're challenging to be there to kind of deal with situations that are not part of school activities.

JUDGE SHWARTZ:  Thank you.

JUDGE KRAUSE:  Ms. Murphy, you identified as one category of locations the physical attributes that would make the firearm a safety hazard.

MS. MURPHY:  Uh-huh.

JUDGE KRAUSE:  At that -- at that locale.  So we -- I don't think there's any debate that there's been significant technological changes in the decades since --

Page 46

since the founding, and we have firearms now that, you know, for example, in Dayton, Ohio killed nine people, injured 17 in 32 seconds. Why in that circumstance is it unreasonable for a legislature to make the determination that the presence of firearms where it -- it terrorizes people, where the public that's there, they anticipate may over-react or even law enforcement over-react, leading to violence, to use those locations as sensitive places?  Why doesn't that fit into your category of those locations that have the attributes that would make a firearm safety hazard?

     MS. MURPHY:  Sure.  So I wanna kind of offer two responses.  First, just to be clear about the scope of what I had in mind when I'm talking about physical attributes, I mean the physical attribute in the sense of there's something at the property that makes it likely to explode or makes it more likely that you're going to have a fire or that kind

Page 47

of safety risk that generates in the same way that there were concerns about where you could have a -- a gun powder factory --

JUDGE KRAUSE:  -- but not that there would be a stampede or that other people may pull out their firearms --

MS. MURPHY:  -- sure, I -- that's not the -- you know, just to be clear, the -- that is not what I mean by physical attributes.  And I think the concern with once you start defining it the way that you have suggested, is I'm not sure where there's any limiting principle.  I mean, I'm just -- once -- you necessarily end up reaching any place where people congregate in significant numbers.  That is precisely the argument that New Jersey -- that New York made in Bruen. They said, look, times have changed and we have, you know, way more people around today. New York City is an incredibly populous place.  If we have firearm violence there, it's going to create massive problems and we

have a police presence around today that we did not have at the founding, so times have changed in a way where we have to have -- and this was a sensitive places argument that they made.  We have to have a different conception of sensitive places, and the Supreme Court specifically rejected that argument and said if you define sensitive places at the level of places where people congregate and there's a police presence, then you have eviscerated the right to carry.

And I think that's the problem here.  We see that in practice with the way this law operated, because once New Jersey started with the conception of, well, we don't want firearms in places where there's people, where there's a significant number of people, you end up with a laundry list that, I mean, to be fair, it actually covers bakeries, because the state's law says all private property even is a sensitive place unless and until somebody says we will allow you to

carry here, notwithstanding that it is a private -- a private property. So you end up with a definition where the last time we were before this court when asked the question, you know, the state said the only place you could carry was on the streets. It can't be that sensitive places is a concept so broad that it covers everywhere outside the home that people actually go.

JUDGE KRAUSE: But every one of the circuits that has upheld that they're sensitive places laws has used approximately the same four categories and defined it in terms of the -- the particular attributes of those places. In the majority panel opinion here, we formulated it as a discrete location set aside for particular civic functions where the presence of firearms was historically regulated as jeopardizing the peace or posing a physical danger to others. Why doesn't that put bounds on the -- the -- the types of places that would fall within

the sensitive places doctrine?

MS. MURPHY:  I mean, I think the -- the proof is a little bit in the -- the pudding. The discrete locations are everything from parks, beaches, museums, libraries, entertainment facilities, anywhere where people are engaged in a public gathering, people at movie sets.  I mean, people at virtually anything you can think of is a discrete location.  I think the concept of discreteness has kind of crept out of what we're talking about.

But I would like to talk a little bit more about the specific history that's being relied upon by the cases -- the cases that have gone that way, which notably, you know, do happen to be courts that got reversed in Bruen.  But I think that the historical analysis is not really being faithful to the history, and -- and I'd like to bring up a point in particular.  The state brought up the Northampton laws and the way in which

they have kind of two components to them. Well, the state left out the fact that Virginia's law, actually the way it has a distinction is by saying that the restriction on fairs and markets applies only if you are carrying to terror -- in terror of the country. That's how these were set up. They -- but the distinction they drew is to actually say, on the one hand, you can't carry arms at all in the courts, the -- before the ministers of justice. You cannot do so at all, Virginia's 1870s -- 1786 law is a good example of this. And then it says on the other hand, nor can you ride armed by night nor by day in fairs or markets or in other places in terror of the country. And that is the tradition that came to this country. That is specifically, again, an argument that Bruen confronted, because New York pointed to the same laws and said there's no right to carry generally because you could ban it in fairs and marketplaces,

which were the principle places that people went historically.  These Northampton laws show that you couldn't carry historically.  The court didn't distinguish those laws by saying they were actually sensitive places laws that treated fairs and markets differently.  It said that New York fundamentally misunderstood how those laws operated, and what they actually did is prohibited carrying in those places only if you were doing so with malintent or carrying dangerous and unusual weapons.

So the court has already considered and rejected the argument that Northampton statutes reflect a tradition of prohibiting carrying in places like fairs and marketplaces.  And that leaves the state really having to rely on, you know, four state laws and a couple of territories all coming after 1869, two of which are the same states, Texas and Tennessee, that the Supreme Court said in Bruen had outlier approaches.

Three of -- the three territories are the same territories that were considered in Bruen and rejected and in fact, the argument in support of those territories is worse here, because the laws at issue were laws -- they're the same laws.  So in Bruen, Bruen considered the part of them that banned carrying entirely and said that's not relevant at all.  There's not a separate sensitive places restriction.  What those laws did is they banned carrying entirely, and in those territories imposed a heightened penalty if you carried in certain places.  So if they're not even relevant because (incomprehensible) ban and carry was not consistent with our historical tradition, they seem to be even less relevant when you're pointing to them as evidence of how states were deciding where you could and couldn't carry if you're talking about a territory that said you couldn't carry anywhere in the first place.

CHIEF JUDGE CHAGARES:  Judge Mascott --

JUDGE MASCOTT:  -- for going through the -- the historical examples, but going back to just in general the category of sensitive places and how you all would suggest defining it.  I wanna -- I don't wanna pick back up on some of my colleagues' questions about the school doctrine versus --

MS. MURPHY:  -- sure.

JUDGE MASCOTT:  -- playgrounds, and I know that you said the contours of your challenge are partly governing what you think the distinctions are or aren't there.  But if we -- but if we look at other things that are outside of the traditional public school or institutional setting, like ballet schools, sports academies, things that are recreational like a park but outside of the school setting, maybe that example could help us understand what you think is the constitutionally significant distinction, if anything, be -- between the kinds of

regulations you would think might be appropriate at a school.

MS. MURPHY:  Sure.

JUDGE MASCOTT:  And what's inappropriate about designating a playground a sensitive location?

MS. MURPHY:  Sure.  So I think there's a couple different ways to think about schools. One is if you're focusing on the in loco parentis tradition, and if that's the justification the Supreme Court has in mind for schools, then I think it necessarily does not reach really beyond -- it's certainly not gonna reach parks.  You're not -- your -- your -- your parents are probably in control of you at a park, not a school.  You're not in the custody of a school.  Perhaps there are going to be situations, you know, where you're dealing with --

JUDGE MASCOTT:  -- but a camp, a camp could be regulated --

MS. MURPHY:  -- a camp, but again, the

Page 56

in loco parentis doctrine is gonna focus on the students or the children or, you know, whoever's in custody. It's not going to focus on the adults who are there engaging in the activities who is -- who we're focused on. I mean, we're certainly not here to assert a right for children to be carrying firearms at parks. It's about their parents being able to carry them to protect their children when they're at a park. And so I think if the in loco parentis doctrine is what the court has in mind, the Supreme Court, then it doesn't reach really, you know, the types of carrying that we are focused on.

If the court is thinking about it more from the perspective of, look, schools are a -- a, you know, somewhat closed environment that you could think of as I was talking a little bit before about places that have more restricted access where you're not really supposed to be coming in off the street and

Page 57

that you -- if you have limitations on the ability of the public to be somewhere in the first place, that may provide greater latitude for imposing restrictions, given that you have children there who are not themselves entitled to carry firearms --

JUDGE MASCOTT:  -- or a rec center that maybe has a security guard in the middle of a city?

MS. MURPHY:  Sure.

JUDGE MASCOTT:  That would be a sensitive place.

MS. MURPHY:  I -- I don't think it would be.  I don't think it would be because it's not a place that is dedicated to, you know, it's not like, well, all you do at a rec center is only have children present, and I don't think the mere presence of a security guard is what makes all the difference between whether something is sensitive or not.  I think it would have struck the founders as pretty extraordinary to think

that the way to eliminate your right to carry a firearm is by ensuring that lots more government actors were carrying firearms.  So I don't think that's really -- can be the whole distinction.

I think it's relevant in the sense of if the government is treating a place as the type of place that needs heightened security, you know, that tends to show you that there's something going on there that may be more in the vein of sensitive activities or housing dangerous persons or physical attributes of what's, you know, the activities there that make the place a safety risk --

CHIEF JUDGE CHAGARES:  -- Judge Freeman.

JUDGE FREEMAN:  Yeah, I have a couple questions for you about your facial challenges.  I know that you said that you've challenged fewer than half of the -- the list of places that New Jersey has designated as sensitive.  But are -- is your facial challenge as to each numbered subsection

individually that you have a facial challenge to, for instance, subsection 11?

MS. MURPHY: So -- so it -- some of them are to the provision in their entirety and some are as to certain applications, and one good illustration -- I mean, actually I'll give you two illustrations. Like, for one, the zoo is in a provision that lists multiple things. We're only challenging zoos in that provision. So it's a facial challenge as to zoos, but not as to the other things and then --

JUDGE FREEMAN: -- so what -- what allows you to have a facial challenge to just a part of a statutory provision?

MS. MURPHY: Oh, I -- I think it -- I mean, as -- as long as you're singling out something that is a facial component, I don't think we have to challenge four items in a list of four to be able to challenge one of them facially. We're not asking for that provision to be invalidated in -- on -- in

its entirety.  We're only asking for the restriction as to zoos to be invalidated.

JUDGE FREEMAN:  So what about the example of playgrounds where you said you've -- you've excluded from your challenge playgrounds that are on school grounds?

MS. MURPHY:  I -- I wanna be clear again.  It's not that we've excluded them from our challenge.  We don't understand the provision that we're challenging to cover them.  We understand playgrounds on schools to be covered by the school's provision that we're not challenging.  So it's not that that's an as-applied aspect of our playground's challenge.  It's that I understand New Jersey to have added a separate provision for playgrounds to ensure that it also reached playgrounds that are not covered by the provision that already deals with school property.

JUDGE FREEMAN:  Okay.  So all of the -- your comments about the youth sporting events

Page 61

and recreational activities where you -- you are not excluding them -- you're -- you're -- you -- you think that if they are on school grounds, they are otherwise covered by --

MS. MURPHY:  -- they are already covered by the school.  That is how we have always understood the statute.  We've said that in our briefs multiple times and I take the state to agree with us that that is the right way to read the statute.  And so we are only challenging the provisions that are there to reach things that are not happening on school property.

CHIEF JUDGE CHAGARES:  Off campus, as we say.

MS. MURPHY:  Yes.  Exactly, exactly.

JUDGE CHUNG:  Could you -- following up on the facial challenge questions.  For maybe, like, the insurance or the four reputable persons.  If the law had been drafted if you have a prior conviction, you know, for harming someone or a negligence

finding for accidentally shooting someone, if it were confined to that group of people, would it be a constitutional application?

MS. MURPHY:  I mean, I -- I'd -- I'd have to, like, think a little bit more about it because that's just not the law the state wrote.  But, you know, if --

JUDGE FREEMAN:  -- but I'm just trying to understand --

MS. MURPHY:  -- yeah, and I -- and I guess, you know, to the extent --

JUDGE CHUNG:  -- (incomprehensible) --

MS. MURPHY:  -- you're suggesting that that would be enough to defeat a facial challenge, I mean, that's just not really -- I've never understood facial challenge doctrine to mean that if you can come up with, like, a completely different law the state could have written and shoehorn that in then your facial challenge fails, because the whole point of this law is to say, no, you have to pay the fee, we don't care if you've

ever done anything wrong.  You have to pay the fee anyway.  And so --

JUDGE CHUNG:  -- right.

MS. MURPHY:  -- to say all the people who've never done anything wrong can't get any relief because maybe there's someone out there who did do something wrong, you know --

JUDGE CHUNG:  -- I'm just trying to understand if there is a constitutional application --

MS. MURPHY:  -- yeah --

JUDGE CHUNG:  -- of an insurance requirement and --

MS. MURPHY:  -- right --

JUDGE CHUNG:  -- and based on the analogues asserted.

MS. MURPHY:  Yeah, and -- and I -- just to be, like, very precise in my language, I don't think there's a constitutional application of this statute.  There may be a constitutional statute that could be written that is -- is designed to deal with people

Page 64

who actually have, you know, that -- that fits more into the tradition of surety laws that says if you've engaged in misconduct, then we can impose different restrictions on your ability to carry firearms going forward. That may be a law with which we, you know, wouldn't take the same Second Amendment issue.  I don't think you can read that into this particular law, but --

JUDGE CHUNG:  -- but if this one --

MS. MURPHY:  -- but I think that --

JUDGE CHUNG:  I just wanna follow your concept of facial challenges.  So if this one had said for those people some sort of finding of special danger of misuse, they need $300,000 insurance, everyone else 10,000, then maybe your challenge would be cabined to the 10,000 people.

MS. MURPHY:  Probably, just given the nature of the people I'm representing in this case that would be the focus of our challenge would have been to say, okay, if you've got

two applications, we're gonna challenge the, you know, you got two provisions of the statute, we're challenging the provision that's relevant to my plaintiffs, and we're not here to challenge the provision that would deal with people who have engaged in misconduct and have presented a -- a credible threat of fear to another.  Which I think that gets to, you know, the core point of our challenge which is that, you know, it's one thing to have those types of restrictions if somebody has engaged in misconduct but as a historical basis, there's just no tradition that says that we're gonna treat anybody who wants to exercise their rights the same way we would as somebody who has been found to pose a credible threat of fear to -- to -- to others.

CHIEF JUDGE CHAGARES:  Thank you, Counsel.

We'll hear from the Koons plaintiffs now.

Page 66

MR. PATTERSON:  Thank you, Your Honor. Pete Patterson for the Koons plaintiffs.

We do take a little bit of a different approach than the Siegel plaintiffs in -- in terms of the key principle here, and so if I could, I would like to say why we think security is the key for sensitive places and places frequented by the general public and for four reasons, if I could quickly.  One, Bruen said we could analogize to the Founding Era legislatures, polling places, and courthouses, and we have to look at how and why.  And as we've shown, those were all secured locations, so as to the how.

Second as to the why, as the Siegel plaintiffs indicated, there may be many reasons why a place is sensitive, but the key distinguishing factor of them is that they're secure.  That's the way to tell whether they actually are sensitive.

JUDGE FREEMAN:  Does that apply to schools, too, in your view?

MR. PATTERSON:  I'm talking here about places that are frequented by the general public.  Schools are generally not open to the general public.  They are typically -- the kids are under in loco parentis authority of the school, and so we could have a discussion about the history around the school, but that's a different category.

And so in terms of the places we're talking about, if it truly is the exceptional type of place that -- that Bruen talks about, the government will be compelled to secure it, wholly independent of Second Amendment reasons.  This is places like nuclear power plants, places like commercial airliners.  It's not sensitive because it's secured.  It's secured because it's sensitive, the government will do it anyway.

Third and relatedly, it's judicially administrable.  In case of a place open to the public, a basic rule is if a criminal can freely go into the place with a firearm

undetected, I have the right then to go in as a law-abiding citizen with a firearm to defend myself.

And fourth and relatedly, it's the principle that's consistent with the principles underlying the Second Amendment, which Rahimi says we are to look to, and that is that I have an individual right to self-defense. If the government is not handling self-defense itself by ensuring that bad actors are not going to be in a place with a firearm, I have a right to defend myself with a firearm in that place.

MALE JUDGE: All right --

JUDGE BIBAS: -- I'm not sure that works for polling places. Plenty of them don't have security.

MR. PATTERSON: Well, what -- what Bruen said is we analogize to Founding Era polling places, and Founding Era polling places it did, because there was not a secret ballot. And so there was a fundamental change in

polling places when the secret ballot came into place, and all of a sudden the concerns about intimidation weren't there. So for analogizing to Founding Era polling places is completely consistent with the theory. And -- and what -- and this is consistent with Bruen itself, which said that things can move in and out of categories based on different facts in the ground. It said, for example, handguns may have been dangerous and unusual at the founding or during colonial times and therefore could have been banned. But they no longer are.

And I'd also like to address the issue about silence versus contradiction. This is not a --

CHIEF JUDGE CHAGARES: -- well, before you get there, 'cuz you have very little time.

MR. PATTERSON: Yes.

CHIEF JUDGE CHAGARES: Is it your position that Reconstruction Era evidence

Page 70

taken alone can never establish a historical tradition, and if so, why?

MR. PATTERSON:  Correct.  Because it is far removed from the founding.  The Supreme Court's been very clear that it can be confirmatory.  It cannot establish the tradition itself, and that's true whether it's 1791 or 1868, because the tradition would have had to have been in place at that time.  Not now --

JUDGE SHWARTZ:  -- how do you -- how do you reconcile that with a new societal issue that arises post-1791?

MR. PATTERSON:  Yeah.

JUDGE SHWARTZ:  Are you saying that you regulate --

(Cross talk.)

MR. PATTERSON:  -- you have to take the principles --

JUDGE SHWARTZ:  -- just one sec.

MR. PATTERSON:  Oh, sorry, sure.

JUDGE SHWARTZ:  Are you saying that the

legislature, I think Judge Krause was talking to either you or your adversary about this, your co-counsel, rather, that the legislature can't address a new social problem?

MR. PATTERSON:  It can address it using the principles that were in place at the founding.  And so here, again, there's not silence at the founding.  There's a hundreds of years long tradition of banning only terrifying carry at places of public congregation like fairs and markets.  And so the legislature can take that tradition and say if we have a new problem, we can ban terrifying carry in a new sort of place.

What you can't do is move beyond the tradition.  And these also aren't new places. There were places of literary educational gathering in the colonial and Founding Era times.  A key place is churches, where people were vulnerable during colonial times, the whole community was gathered.  And what do we see?  The legislatures either freely allowed

Page 72

carry or required it.  And so the analogous restriction here would be, okay, say we've got a sensitive place where we're having a lot of problems.  Everybody with a carry permit, you have to carry your firearm to that location.  Because we're going to -- we can't secure that place, but we're relying on you, the people who are protected by the Second Amendment, to exercise your rights to -- to carry firearms in those locations.

JUDGE HARDIMAN:  Counsel, Judge Krause mentioned the four circuit courts that go the other way and I was interested to see how the district courts in Hawaii and California and New York largely supported your position. I'm interested to hear if you can explain to us what move the circuit courts made in your view that was wrong and what move or moves the district courts made in those cases that were correct.  Is there a way to sort of synthesize what went wrong in those cases from your perspective?

MR. PATTERSON:  Yeah, I think it's clear what went wrong is just improper and too loose historical analysis, and they -- they tend to center around things like whether a place is crowded, whether there are vulnerable people there, or whether there are other constitutionally-protected activities taking place in a location.  But it's wholly unsupported historically that you can ban firearms in those sorts of locations, because, again, the history shows only terrorizing --

JUDGE HARDIMAN:  -- was it wholly unsupported historically or just unsupported relevantly historically?

MR. PATTERSON:  Unsupported relevantly historically.  And so, yes, there are some outlier --

JUDGE HARDIMAN:  -- so really this case is gonna turn on whether we're looking at the 1880s and beyond or -- or focused on Founding Era.

MR. PATTERSON:  Correct.  And the -- well, even as of 1868, again, there was nothing, but also there's misinterpretation of Founding Era evidence, such as the affray laws which only restricted, again, terrifying carry.

JUDGE PORTER:  If there's a --

MR. PATTERSON:  -- it did not restrict peaceable carry.

JUDGE PORTER:  If there are a lot of laws in the 1870s and '80s and so on, Gilded Age, and there aren't -- you don't find such laws around the Ratification Era, is that an inconsistency or is it just -- is it just irrelevant because, well, those states could have regulated more aggressively than they did but they didn't, but that doesn't mean it's inconsistent with the later decades?

MR. PATTERSON:  It is inconsistent because we have the Second Amendment at the founding.  Even if there was a silence, that creates a presumption that people have a

Page 75

right to carry.  The state has a burden to come forward with a tradition of regulation. Nothing is not a tradition of regulation.  So then states coming in is an inconsistency. But even if -- the Supreme Court in Espinoza said more than 30 state laws from after -- from the late 18th, 19th century cannot create an early American tradition.  And so here you've got four and three territories. So if more than 30 cannot create an early American tradition, it's clear that the four that you've got here that are outliers, geographically concentrated in states, again, the Supreme Court has pointed out did not have a proper understanding of the Second Amendment.

JUDGE FREEMAN:  How do we reconcile that with Bruen's brief discussion of sensitive places where they say in the 18th and 19th centuries and together there were relatively few restrictions in these sensitive places that are listed, but -- but they then said

Page 76

courts can use analogies to those historical regulations, that was enough?

MR. PATTERSON:  Well, they, again, the later evidence can be confirmatory of what was in place at the founding.  So if it's there at 1791, you can say and then that tradition continued on.

JUDGE FREEMAN:  Right, but I guess my specific question is that -- that they say there were very few sensitive places where weapons were altogether prohibited.  There are very few examples, and then they cite in a law review article and -- and basically there are a couple.  You know, say one or two examples of banning -- banning carry in legislative assemblies and -- and courthouses, and they said but -- but that's enough for us.  So why do we now need many more than that?

MR. PATTERSON:  Well, because -- so here's a distinction between an analogue that you look at and the broader tradition that is

establishing the historical practice.  And so the Supreme Court has said you need a well-established and representative analogue, but it's not the analogue that is establishing the historical practice.  In terms of the sensitive places, the affray tradition, again, which was a hundreds of years long tradition, that said generally in places frequented by the general public, only terrifying carry was banned.  But then as we see in the 1786 Virginia statute, which codified the common law, the Supreme Court said that in Bruen, the first half of it said that nobody can carry in courts.  This is exceptionally sensitive place, except for the justices and those assisting them.  So it shows this tradition at the founding, and again, this is a background codifying the common law, something that's generally applicable across the states, the colonies, that arms could be barred in highly sensitive places that the government secured.

JUDGE CHUNG: But the North Carolina one in 1792 is exactly the same as Northampton.

MR. PATTERSON: There was no 1792 North Carolina statute. That was in a private lawyer's collection of the laws he posited, the British laws he posited that were still in effect in North Carolina. So that was not, you know, North Carolina did not pass a statute in 1792 referencing the king. That was just a private lawyer, like one of us, you or me, writing a commentary and saying we think these are the British laws that are still in effect in North Carolina, and he included that one. And there was a later north --

JUDGE CHUNG: -- my question is, though --

MR. PATTERSON: -- yes.

JUDGE CHUNG: -- would that not suggest it's part of the common understanding at the time?

MR. PATTERSON: Yes, and that is exactly

the same -- the North Carolina Supreme Court in 1847 interpreted this tradition, it said there's this debate about whether the statute's still in effect or not.  It doesn't matter, it just codified the common law, and what the common law said is in places frequented by the general public like fairs and markets, only terrifying carry is banned.  Peace able carry was always allowed.

CHIEF JUDGE CHAGARES:  Well, your -- your time is up.  Could I just ask you one thing?  If you could just very briefly respond to my Sister Judge Shwartz here asked about irreparable harm with respect to the insurance regulation and the VCCO.  Do you have a response to what your -- your friend across the aisle said?

MR. PATTERSON:  Well, I -- I am going to adopt by reference here because we don't have an insurance claim in this case.

CHIEF JUDGE CHAGARES:  Oh, that's true.

MR. PATTERSON:  We're only focused on

the sensitive places, so.

CHIEF JUDGE CHAGARES:  Okay.  All right. Thank you, Counsel.

MR. PATTERSON:  Thank you.

CHIEF JUDGE CHAGARES:  And we'll hear rebuttal from the state.

MS. CAI:  In order for plaintiffs to be correct, Your Honors must believe that Heller and Bruen and McDonald all got it wrong. Both sets of plaintiffs twist themselves into knots trying out theories that are totally unsupported by history and instead base -- are based on their own free-wheeling means-end scrutiny analysis --

JUDGE HARDIMAN:  -- what -- what history?  Can you address my question of Mr. Patterson about what's relevant history? You've got history, but is it relevant? Because it's -- it's too late.  In other words, doesn't this case turn on whether we focus on Founding Era and the few decades after the founding or we focus on

Page 81

Reconstruction Era and the few decades after reconstruction?

MS. CAI:   I think this court does not need to reach the question that it did reach in Lara (phonetic), because in Lara this court found that there was contrary affirmative evidence from the founding in the form of the 1782 militia laws that then contradicted later evidence.   You do not have that here.   There is no evidence from the founding or from any of the decades following the founding that sensitive place restrictions were unconstitutional.

JUDGE HARDIMAN:   But where does the tradition start, from your perspective?

MS. CAI:   I think the tradition certainly starts with the Statute of Northampton, which was --

JUDGE HARDIMAN:   -- well, let's set that aside because --

MS. CAI:   -- sure.

JUDGE HARDIMAN:   -- the Supreme Court,

you know, didn't really lean into that in Heller, you'd agree, right.  I mean, the dissent leaned into it in Heller.

MS. CAI:  I think that is true and we accept that for the purposes of the affray clause.  But that is just a separate clause --

JUDGE HARDIMAN:  -- all right.  So let's just set aside --

MS. CAI:  -- put that aside --

JUDGE HARDIMAN:  -- let's set aside the British history.  Let's focus on Founding Era.

MS. CAI:  Yeah.

JUDGE HARDIMAN:  What -- where do you pin the tradition starting the Founding Era?

MS. CAI:  So you have the few laws that the court in Heller cited for the polling place restriction, which was just in Delaware as far as we're aware.

JUDGE HARDIMAN:  All right.  They've conceded polling places, they've conceded

schools, they've conceded legislatures and courts, so --

MS. CAI: -- I'm not so sure.

JUDGE HARDIMAN: -- you have to pin it -- if we're talking sensitive places, those are -- those are agreed upon.

MS. CAI: I'm not so sure they have actually, from what I've heard from -- from my friends on the other side, but I can come back to that later. You start with other jurisdictions that started enacting sensitive place restrictions. New Orleans in ballrooms in 1817. Parks, as soon as Central Park and parks like that came to be in the 1850s, just about every single park --

JUDGE HARDIMAN: -- all right. So let me just press you on that a little bit. You said 1817 and then you said 1850s. You've got one New Orleans law from 1817 and then you -- you go right to 1850s. Do you have anything else closer to 1800?

MS. CAI: So in terms of the statutes

Page 84

that we are looking at, no, Your Honor, but I think the reason is because legislatures just chose not to regulate.

JUDGE HARDIMAN:  All right.  So --

MS. CAI:  -- and that includes places that didn't have Second Amendment components.

JUDGE HARDIMAN:  All right.  So you're falling back on I think Justice Barrett has written about this, that it's -- it's whether or not -- we shouldn't assume the legislature maximally exercises power.

MS. CAI:  That's right --

JUDGE HARDIMAN:  -- that's really the -- the -- has to be the focus of your argument if all you have is one 1817 law and then you go to 1850s, right?

MS. CAI:  I -- I had one more gloss in addition to that, which is not just that, you know, not every legislature's always maximally regulating, but then you see legislatures choosing to go up to the max in some places and not in others, and I think

that kind of heterogeneity in policy decisions across the states, including decisions by legislatures that were bound by an individual right to bear arms in their state legislature -- state constitutions, choosing those very policies, I think that is really, really relevant.  It's not just like we always have silence and we have nothing to show for it.  We have a tradition of states that were bound by their individual right to bear arms and choosing these particular policies and then courts that were cited by Heller and Bruen approvingly actually upholding those laws.  I think that is a very different set of facts than what you have in Espinoza, for example, where you have contrary earlier evidence about the limitations and the inner play between the Establishment Clause and the Free Exercise Clause that was contradicting later evidence. You do not have that here.  And for plaintiffs to be right, that means a very

Page 86

extreme version of constitutionalizing every policy choice, which is antithetical to federalism.

But in order for them to be right, going back to my other point about polling places and schools -- I'm sorry, Your Honor, did you have a question?

CHIEF JUDGE CHAGARES:  Judge Phipps.

JUDGE PORTER:  I -- I'd just like to -- to weave in a thought that you had in response to Judge Krause's question on your initial -- on your initial argument where you said, hey, if we use 1791, then we've got a real problem because there's no basis for -- there's no historical regulation of courthouses and schools.  But how do you reconcile that with this kind of use it or lose it theory that you don't always have to maximally regulate?  But would it be possible to look at 1791 and say the absence of regulation in schools and courthouses is -- is a situation in which we say that wasn't

maximal regulation?  Or do you say, no, this is a case where we can view the fact that there weren't regulations in that -- those spaces as indicative of that's -- that's actually the top, that's the ceiling?  What -- what do you say to that?

MS. CAI:  So I -- I agreed with what Your Honor was saying earlier, that the fact that legislatures did not choose to regulate schools and courthouses at the founding, you can't read into that, that they were restrained by the Second Amendment, because if that were true, that -- first of all, that doesn't make sense, because many of those legislatures were not bound by the Second Amendment or any state version thereof.  So it would make most sense to say, oh, they must have been making that decision in Delaware because Delaware was not bound by it.  So the same has to apply for states that were bound by the Second Amendment --

JUDGE PORTER:  -- do we take that into

Page 88

account, that when legislatures legislate, they're not bound by the Second Amendment or a baby -- or a baby Second Amendment?

MS. CAI:  It -- it was a thought that occurred to me as I was reading your --

JUDGE PORTER:  -- but it's relevant, right?

MS. CAI:  I think it's relevant if you're -- if -- as a counter-point to their theory.  Now, I don't think that's what Bruen was looking at, because they cited --

JUDGE PORTER:  -- no, is it relevant when we're doing Bruen and Rahimi type analysis and trying to find a national historical regulatory tradition?

MS. CAI:  So what I'm suggesting is that in response to the other side's argument that, you know, silence must mean the constitution forbade it.

JUDGE PORTER:  Right.

MS. CAI:  That doesn't make sense.

JUDGE PORTER:  I get it.  What about my

question?

MS. CAI:  I don't think that Bruen and Rahimi were looking to that methodology, because they did not square the citations of the state laws that they were looking at with states that had or didn't have the Second Amendment.  So I don't --

JUDGE PORTER:  -- and we do that?

MS. CAI:  I think that would be --

JUDGE PORTER:  -- should we do it?

MS. CAI:  I don't think the contra-positive is -- is correct, because just because a state had the Second Amendment doesn't mean that they were always legislating, that that was always the barrier.  And in fact in this case you can look at states like Tennessee and Missouri, which did have that barrier and yet still found these to be constitutional.

CHIEF JUDGE CHAGARES:  Your time is up, Counsel.

MS. CAI:  Thank you, Your Honors.

CHIEF JUDGE CHAGARES:  Thank you.  We'll take this --

(The recording was concluded.)

CERTIFICATE OF TRANSCRIBER

I, Jackie A. Scheer, do hereby certify that this transcript was prepared from the digital audio recording of the foregoing proceeding; that said transcript is a true and accurate record of the proceedings to the best of my knowledge, skills, and ability; and that I am neither counsel for, related to, nor employed by any of the parties to the case and have no interest, financial or otherwise, in its outcome.

JACKIE A. SCHEER

FEBRUARY 16, 2026

## CERTIFICATION OF ACCURACY

I certify that I coordinated with all counsel on the production of this transcript. On behalf of all counsel, I certify that this transcript is a true and accurate record of the proceedings to the best of my knowledge.

/s/ *Jeremy Feigenbaum*

Jeremy M. Feigenbaum
Solicitor General
Office of the New Jersey Attorney General

Dated: February 24, 2026

**[& - acknowledged]**                                        Page 1

**&**

**&** 2:10,15

**0**

**08611** 2:7

**1**

**1** 1:21
**10** 7:1
**10,000** 64:17,18
**11** 1:17 59:2
**131** 5:6,18
**131's** 8:21
  40:19
**1523** 2:16
**16** 91:17
**17** 5:15 11:7
  46:3
**1700** 30:13
**1776** 27:20
**1782** 81:8
**1786** 29:12
  30:13 51:12
  77:11
**1791** 10:11
  27:3 70:8,13
  76:6 86:13,20
**1792** 29:13
  78:2,3,9
**18** 9:19
**1800** 21:12
  83:21
**1800s** 5:15 31:2
  31:11 34:9

40:2
**1817** 83:13,18
  83:19 84:15
**1820s** 19:1
**1840s** 22:11
  31:3
**1847** 79:2
**1850** 21:12
  22:11,16 31:9
**1850s** 33:18
  83:14,18,20
  84:16
**1860s** 39:20
**1868** 10:11
  21:12 70:8
  74:2
**1869** 52:20
**1870** 18:19
  34:13
**1870s** 32:8
  51:12 74:11
**1871** 11:7 12:1
**1880s** 73:21
**18th** 75:7,19
**1922** 31:4
**1970** 24:22
**19th** 1:18 10:4
  10:19 75:7,19

**2**

**200** 24:20 25:2
**20036** 2:16
**202** 2:12,17

**2022** 34:13
**2026** 1:17
  91:17
**20692** 91:15
**220-9670** 2:17
**22314** 2:11
**23-1900** 4:6
**23-1900/23-...**
  1:12
**23-2043** 4:8
**25** 2:6 36:21

**3**

**30** 7:1 75:6,10
**300,000** 64:16
**30s** 19:1
**32** 46:3
**34** 3:4
**376-2690** 2:7

**4**

**4** 3:3
**40** 3:9

**5**

**50** 24:7 25:2
**50s** 22:11

**6**

**600** 33:8
**609** 2:7
**66** 3:5,10 10:18

**7**

**706** 2:11
**742-8900** 2:12

**7908780** 1:20

**8**

**80** 3:3,8
**80s** 74:11

**9**

**9** 3:8
**91** 1:21

**a**

**aaron** 1:8
**abiding** 33:2
  35:22 36:4
  68:2
**ability** 35:18
  57:2 64:5 91:7
**able** 20:9 56:9
  59:20 79:9
**absence** 86:20
**academic** 10:13
**academies**
  54:17
**accept** 6:19
  7:14 82:5
**access** 38:15
  56:21
**accidentally**
  62:1
**account** 88:1
**accounts** 24:21
**accurate** 91:5
**acknowledged**
  35:4

**[acting - applicants]**

**acting** 28:22

**action** 20:14 24:9

**activities** 30:3 32:12 38:19,20 38:20 44:22 45:12 56:5 58:11,13 61:1 73:7

**activity** 39:11 39:11,12 42:10 44:3,12,13 45:6

**actors** 58:3 68:11

**actually** 12:20 37:1 42:2 48:19 49:9 51:3,9 52:5,9 59:6 64:1 66:20 83:8 85:13 87:5

**acute** 21:10 22:8 32:18

**added** 60:16

**addiction** 38:12

**addition** 17:13 84:18

**address** 69:14 71:4,5 80:16

**addressed** 33:7

**administrable** 67:20

**adopt** 79:19

**adopted** 6:13 7:6 11:20

**adults** 56:4

**adversary** 71:2

**affect** 40:22

**affirmative** 7:15 81:7

**afford** 25:1

**affray** 27:8 28:15,22 29:14 30:4,8 74:4 77:6 82:5

**afraid** 9:15

**age** 74:12

**aggressively** 74:16

**ago** 7:22

**agree** 13:9 61:9 82:2

**agreed** 8:11 83:6 87:7

**ahead** 33:10

**ahistorical** 35:2

**airliners** 67:15

**aisle** 79:17

**al** 1:3,8,10

**albert** 1:18

**alexandria** 2:11

**allocate** 25:4

**allow** 40:6 48:22

**allowed** 38:7 71:22 79:9

**allows** 35:5 59:14

**altogether** 76:11

**amber** 7:22

**amendment** 5:22 7:20 10:21 13:19 16:1,7 19:22 20:3,5 23:9,11 23:13 31:13 34:6 35:5 36:2 39:11 64:7 67:13 68:6 72:9 74:20 75:16 84:6 87:12,16,21 88:2,3 89:7,13

**american** 75:8 75:11

**amount** 24:18

**amounts** 26:12

**amply** 8:21

**analogies** 76:1

**analogize** 29:17 30:11 66:10 68:19

**analogizing** 69:4

**analogous** 5:17 6:13 72:1

**analogue** 9:21 23:9 27:11 34:6 76:21 77:3,4

**analogues** 14:21 16:1 27:4,12 31:13 63:16

**analysis** 14:2 50:19 73:3 80:14 88:14

**andrews** 12:1,4

**angela** 2:4 4:11

**angle** 28:5

**answer** 33:11

**answers** 24:4

**antebellum** 5:20 11:12,18

**anticipate** 46:8

**antithetical** 86:2

**anybody** 40:7 65:14

**anyway** 63:2 67:18

**appeal** 9:3

**appeals** 1:1 4:3

**appellant** 1:4,9

**appellees** 1:7 1:12

**applicable** 77:20

**applicants** 36:4

**application** 31:5 36:3 62:3 63:10,20

**applications** 59:5 65:1

**applied** 13:2 60:14

**applies** 17:12 51:5

**apply** 17:3 66:21 87:20

**applying** 13:19

**approach** 36:19 39:17,21 40:8 66:4

**approaches** 40:11 52:22

**appropriate** 10:15 55:2

**approvingly** 85:13

**approximately** 49:12

**areas** 9:1 26:12

**argue** 9:17 24:20

**argued** 8:3

**argument** 1:17 3:2 7:13 14:16 23:22 47:16 48:4,8 51:19 52:14 53:3 84:14 86:12 88:17

**arguments** 6:20 7:6 9:5

**arises** 70:13

**armed** 14:12 29:3 51:14

**arms** 6:9 12:4 14:11 23:10 35:13 36:16 51:10 77:21 85:4,11

**arose** 40:1

**article** 76:13

**aside** 25:19 49:17 81:20 82:9,10,11

**asked** 49:4 79:13

**asking** 25:22 59:21 60:1

**aspect** 60:14

**assault** 13:1

**assemblies** 12:9 28:2 37:13 76:16

**assembly** 1:7 1:11

**assert** 56:7

**asserted** 63:16

**assertion** 26:9

**assisting** 77:16

**assume** 26:22 41:20 84:10

**assumption** 27:17

**assurance** 13:17

**attack** 36:21

**attention** 33:14

**attorney** 1:5,10 2:5 4:6,7

**attribute** 46:19

**attributes** 37:16 45:16 46:13,18 47:10 49:14 58:12

**audio** 91:4

**authority** 27:1 67:5

**authorized** 5:10

**automatically** 30:8

**avenue** 2:16

**aware** 25:21 27:19 28:2 82:20

**b**

**baby** 88:3,3

**back** 21:11 27:10 33:8 44:2 54:4,7 83:10 84:8 86:5

**background** 77:18

**bad** 68:11

**bakeries** 15:11 16:22 17:13 48:19

**bakery** 15:14 15:20 16:8,22 17:7

**ballet** 54:16

**ballot** 68:21 69:1

**ballrooms** 5:19 83:12

**ban** 5:4 12:6 17:3 51:22 53:15 71:13 73:9

**bank** 17:21,21

**banks** 17:18 18:4,6

**banned** 11:7 53:7,11 69:12 77:10 79:8

**banning** 7:2 18:9 71:9 76:15,15

**bans** 7:10,11

**bar** 26:10

**barred** 77:21

**barrett** 8:1 84:8

**barrier** 89:16 89:18

**base** 14:11 22:15 80:12

**based** 8:19 14:16 18:14,22 20:1 63:15 69:8 80:13

**basic** 67:21

**basically** 76:13

**basis** 65:13 86:14

**beaches** 36:12 50:5

**bear** 6:9 12:4 23:10 85:4,11

**bears** 22:10

**behalf** 2:3,9,14 34:22

**believe** 18:19 80:8

**best** 91:6

**beyond** 5:3 55:13 71:15 73:21

**bibas** 1:14 68:15

**bigger** 33:15

**bind** 25:16 34:12

**binding** 25:9 25:13

**bit** 43:21 50:3 50:13 56:20 62:5 66:3 83:17

**blanket** 28:16

**blunderbuss** 36:19,21

**bodies** 5:16

**book** 17:1

**bound** 20:2 34:5 85:3,10 87:15,19,21 88:2

**bounds** 13:8,11 39:4 49:21

**bove** 1:15

**branson** 1:18

**breach** 29:1

**breath** 29:9

**brief** 9:17,18 75:18

**briefed** 30:7

**briefing** 26:6 40:16

**briefly** 79:12

**briefs** 22:9 61:8

**bring** 28:15 50:20

**bringing** 32:11

**british** 78:6,12 82:12

**broad** 36:15 39:22 49:7

**broader** 76:22

**broadly** 35:12 36:11 45:2

**brought** 50:21

**bruen** 4:17 6:7 6:11,16 9:4

10:1,1,2,10,11 12:2,12,14,18 13:6,13,20 18:13 20:12,13 28:13 35:1,4 35:15 40:10 47:17 50:18 51:19 52:22 53:3,6,6 66:10 67:11 68:18 69:7 77:13 80:9 85:13 88:10,13 89:2

**bruen's** 6:12 75:18

**budget** 25:17

**buildings** 4:22 7:9

**burden** 75:1

**c**

**c** 2:1 3:1 4:1

**cabin** 7:16

**cabined** 64:18

**cai** 2:4 3:3,8 4:10,12,16 10:8 11:2 13:9 14:15 15:7,9 15:16 16:4,9 16:14 17:4,17 18:2,10 19:6,9 20:15 21:6 24:4 25:8,13 26:13,22 27:14

32:8,10 33:9 33:12 80:7 81:3,16,21 82:4,10,14,17 83:3,7,22 84:5 84:12,17 87:7 88:4,8,16,21 89:2,9,11,22

**california** 72:14

**call** 39:1

**camp** 55:20,20 55:22

**campus** 40:18 44:21 61:14

**capacity** 12:22

**capture** 41:10

**care** 62:22

**cares** 8:9

**carolina** 29:12 33:19 78:1,4,7 78:8,13 79:1

**carried** 5:9 53:13

**carry** 11:8 28:17,18 35:3 35:13,17 36:10 36:16 38:7 40:2,4,7,11 48:11 49:1,6 51:10,21 52:3 53:15,20,21 56:9 57:6 58:1 64:5 71:10,14

72:1,4,5,10 74:6,9 75:1 76:15 77:10,14 79:8,9

**carrying** 12:6 33:16 34:1 36:8 39:2 51:6 52:10,11,16 53:8,11 56:7 56:14 58:3

**case** 1:12 4:5 11:16 12:1,11 12:12 15:19 18:12 22:1 24:6 30:8 33:19 42:18 64:21 67:20 73:19 79:20 80:20 87:2 89:16 91:9

**cases** 11:12,13 12:10 24:14 30:16,18,22 31:3,11 33:18 50:15,15 72:19 72:21

**cast** 4:19

**categories** 36:21 37:3 38:13 49:13 69:8

**category** 35:11 37:10 45:15 46:12 54:4

67:8

**cause** 24:9 29:22 31:6 37:22

**causing** 27:9

**cautioned** 35:10

**ceiling** 87:5

**center** 57:7,17 73:4

**central** 83:13

**centuries** 7:22 75:20

**century** 10:4,19 75:7

**certain** 18:22 25:4 35:6 37:5 38:10,11 53:13 59:5

**certainly** 41:16 55:13 56:6 81:17

**certificate** 91:1

**certify** 91:2

**cetera** 37:14

**chagares** 1:16 4:2,11,14 9:13 10:16 26:20 33:10 34:16 40:15 44:3 54:1 58:15 61:14 65:19 69:17,21 79:10 79:21 80:2,5

86:8 89:20 90:1

**challenge** 9:11 40:16 41:1,11 42:12 43:6,19 44:10 45:9 54:12 58:22 59:1,10,14,19 59:20 60:5,9 60:15 61:18 62:15,16,20 64:17,21 65:1 65:5,10

**challenged** 37:1 42:13 58:19

**challenges** 58:18 64:13

**challenging** 37:2 41:7 44:10 45:10 59:9 60:10,13 61:11 65:3

**change** 68:22

**changed** 47:18 48:3

**changes** 45:22

**chapter** 5:6,18 8:21 40:19

**character** 35:19

**cheap** 22:17

**chief** 1:16 4:2 4:10,14 9:13

10:16 26:20 33:10 34:16 40:15 54:1 58:15 61:14 65:19 69:17,21 79:10,21 80:2 80:5 86:8 89:20 90:1

**children** 56:2,7 56:10 57:5,17

**children's** 9:1

**choice** 86:2

**choose** 19:17 20:9 34:15 87:9

**choosing** 84:21 85:6,11

**chose** 15:11 16:1 19:11,15 20:1,4 21:14 21:20 31:22 34:7 42:17 43:6 84:3

**chung** 1:15 61:17 62:12 63:3,8,12,15 64:10,12 78:1 78:16,19

**churches** 71:19

**circuit** 1:2,15 4:4 72:12,17

**circuits** 9:8 49:11

circumstance 46:4

circumstances 27:6

citations 18:16 89:4

cite 16:15 30:19 30:19 76:12

cited 6:6 11:16 12:2,2,12 18:13,16 27:2 82:18 85:12 88:11

cites 33:19

citizen 68:2

citizens 35:22

city 47:20 57:9

civic 32:19 39:11 49:17

claim 13:3 79:20

clash 9:19

class 8:17

clause 29:10,14 29:15 30:5,20 82:6,6 85:19 85:20

clauses 29:14

clear 25:12 35:1,7 42:13 46:16 47:8 60:7 70:5 73:1 75:11

clement 2:10

closed 56:18

closer 83:21

cloth 5:12

clubs 17:1

codified 29:11 77:12 79:5

codifying 77:18

coffee 17:18

colleagues 54:7

collection 24:15 78:5

colonial 5:2 27:20 69:11 71:18,20

colonies 28:10 77:20

colorful 12:19

colt 22:14,16

come 62:17 75:2 83:9

coming 52:20 56:22 75:4

commentary 78:11

commentator 6:3

comments 60:22

commercial 17:18 22:12,15 67:15

common 20:21 37:9 77:12,19

78:20 79:5,6

community 71:21

compelled 67:12

compensating 24:1 26:11

completely 62:18 69:5

complex 2:6

component 28:14 59:18

components 28:13 51:1 84:6

comprehensive 14:9 15:3

concealed 40:2 40:4

concede 40:18 42:15

conceded 82:22 82:22 83:1

concentrated 75:13

concept 49:7 50:10 64:13

conception 48:6,15

concepts 27:8

concern 47:10

concerned 19:12,15 20:13

concerns 38:1 40:1 47:2 69:2

concluded 90:3

concludes 27:2

conditioned 35:16

conditions 35:2

confined 41:11 41:13 62:2

confirmatory 70:6 76:4

confirmed 4:17

confirms 5:3

conflict 27:5

conflicts 10:5

confronted 51:19

congregate 32:6 39:9 47:15 48:10

congregating 39:10

congregation 71:11

consider 9:3

considered 52:13 53:2,7

consistent 6:8 37:7 53:16 68:5 69:5,6

constitution 88:19

constitutional 12:10 31:18

32:1 40:20 42:17 43:18 62:3 63:9,19 63:21 89:19

**constitutional...** 8:2

**constitutional...** 4:19 41:17

**constitutional...** 86:1

**constitutional...** 16:6 43:8 54:21 73:7

**constitutions** 85:5

**contemplated** 33:5

**contemporan...** 6:4 12:16

**context** 19:10 21:9

**contiguous** 42:5

**continued** 76:7

**contours** 54:11

**contra** 89:12

**contradict** 9:7

**contradicted** 12:15 81:9

**contradicting** 85:20

**contradiction** 69:15

**contradicts** 10:21 11:4,9

**contrary** 81:6 85:17

**control** 9:22 55:15

**converting** 44:15

**conviction** 61:21

**cooper** 2:15

**copious** 4:18

**core** 37:10 65:9

**correct** 19:6,6 20:15 25:7 70:3 72:20 74:1 80:8 89:12

**correctional** 38:9

**costs** 36:5

**counsel** 2:5 34:17 65:20 71:3 72:11 80:3 89:21 91:7

**counselor** 15:1

**count** 19:7

**counter** 88:9

**country** 51:7 51:16,18

**couple** 32:10 52:19 55:8 58:16 76:14

**court** 1:1 4:3 4:11,16 6:2,6 7:14 8:11,14 9:5,10 10:9,14 10:15 11:6 12:5 13:10,18 13:22 20:18,22 25:11 27:1,2 28:13 30:21 34:21 42:18 48:7 49:4 52:4 52:13,22 55:11 56:12,13,16 75:5,14 77:2 77:12 79:1 81:3,6,22 82:18

**court's** 6:21 7:7 7:18 9:9,11 70:5

**courthouse** 14:10

**courthouses** 7:12 27:18,22 30:12 37:12 66:12 76:17 86:16,21 87:10

**courtroom** 1:18

**courts** 5:13 6:16 9:3 14:1 15:22 29:9,16 30:16,16 31:16 50:17 51:10 72:12,14,17,19

76:1 77:14 83:2 85:12

**cover** 60:10

**covered** 41:5 60:12,19 61:4 61:5

**covers** 48:19 49:8

**create** 13:6 47:22 75:8,10

**creates** 17:22 74:22

**creating** 12:20

**credible** 65:7 65:17

**crept** 50:11

**criminal** 67:21

**criminals** 36:6 38:2

**criteria** 20:21 20:21

**cross** 70:17

**crowded** 73:5

**crux** 27:16

**custody** 55:17 56:3

**cut** 5:11 6:11

**cuz** 69:18

| d |
|---|

**d** 4:1

**d.c.** 2:16

**daily** 32:12,12

**danger** 49:20
  64:15
**dangerous** 38:6
  38:19,21,22
  52:12 58:12
  69:10
**dating** 27:10
**day** 8:9 29:4
  39:14 51:15
**dayton** 46:2
**deal** 23:3 37:18
  38:8 45:11
  63:22 65:6
**dealing** 44:20
  55:19
**deals** 37:20
  60:19
**debate** 41:16
  45:2,21 79:3
**debated** 21:19
**decades** 22:6
  45:22 74:18
  80:21 81:1,11
**decided** 25:3
**deciding** 10:12
  53:19
**decision** 5:11
  7:18 34:8
  87:18
**decisions** 6:6
  7:17 11:22
  20:4,6,10
  34:12 85:2,3

**declared** 36:6
**dedicated**
  17:11 38:5
  57:15
**deem** 16:2
**deemed** 24:3
  40:14
**defeat** 62:14
**defend** 68:3,12
**defense** 28:22
  29:21 30:9
  33:21 35:4,13
  36:17 68:9,10
**defies** 35:15
**define** 13:7
  14:19 32:7
  48:8
**defined** 13:11
  14:6 16:12
  24:14 49:13
**defining** 35:11
  47:11 54:6
**definition**
  36:10,15 49:3
**defying** 7:7
**delaware** 28:3
  34:9 82:19
  87:19,19
**deliberative**
  37:11
**democratic**
  5:11 20:10
  32:20

**designated** 9:1
  58:20
**designating**
  55:5
**designed** 17:11
  32:19,20 63:22
**destination**
  6:19
**detectors** 8:4
**determination**
  46:5
**dicta** 13:16
**difference** 43:9
  57:19
**different** 10:2
  15:15 19:16,17
  20:7,8 26:1
  28:12 29:14
  31:7 32:11
  48:5 55:8
  62:18 64:4
  66:3 67:8 69:9
  85:15
**differently** 52:7
**digital** 91:3
**direction** 6:18
  12:13
**discharge**
  29:21
**discrete** 49:16
  50:4,10
**discreteness**
  50:11

**discuss** 22:8
  43:2
**discussed** 26:7
  28:14
**discussion** 67:7
  75:18
**display** 29:21
**dispositive**
  21:21
**dissent** 82:3
**distinction** 16:7
  43:4,5,13,18
  51:4,8 54:21
  58:5 76:21
**distinctions**
  54:13
**distinguish**
  52:4
**distinguishing**
  66:18
**district** 25:11
  72:14,19
**doctrine** 12:21
  24:10 50:1
  54:8 56:1,11
  62:17
**doing** 34:3
  52:11 88:13
**dollar** 24:7
  26:16
**dollars** 23:20
**double** 30:20
  31:5

**doubt** 4:19
**doubted** 6:4
**dozens** 5:15
**drafted** 61:21
**drawing** 43:13
**drew** 51:8
**drug** 38:11
**duke** 2:11

**e**

**e** 2:1,1,10 3:1
  4:1,1
**earlier** 10:5,21
  12:16 85:17
  87:8
**early** 75:8,10
**easy** 22:17
**educational**
  71:17
**effect** 11:9 78:7
  78:13 79:4
**efforts** 21:1
  40:5
**either** 11:17
  12:16 22:4
  38:14 71:2,22
**eliminate** 58:1
**emerging** 23:1
**employed** 91:8
**enact** 34:7
**enacted** 23:7,21
  25:15 27:20
**enacting** 31:12
  31:15 34:14

83:11
**encompass**
  36:12
**endorsement**
  35:20
**enduring** 6:14
**enforcement**
  5:9 46:9
**engage** 39:10
**engaged** 44:21
  45:5 50:7 64:3
  65:6,12
**engaging** 56:4
**ensure** 60:17
**ensuring** 58:2
  68:10
**enter** 18:15
**entertainment**
  7:3 18:17
  36:13 50:6
**entirely** 53:8,11
**entirety** 36:7
  37:3 59:4 60:1
**entitled** 57:6
**environment**
  56:18
**epitome** 36:15
**era** 5:2,19 9:20
  9:20 11:12
  66:11 68:19,20
  69:4,22 71:18
  73:22 74:4,13
  80:21 81:1
  82:13,16

**erin** 2:10 34:21
**especially**
  21:17 22:7
  23:1,4
**espinoza** 75:5
  85:16
**esquire** 2:4,4
  2:10,15
**essentially** 39:9
**establish** 70:1,6
**established**
  77:3
**establishing**
  22:14 77:1,5
**establishment**
  85:19
**establishments**
  17:18
**et** 1:3,8,10
  37:13
**event** 9:19
  39:13
**events** 9:1
  40:17,20 41:9
  60:22
**everybody** 72:4
**evidence** 10:3,6
  10:11,19,22
  11:5,10,11
  12:16 22:1,10
  53:18 69:22
  74:4 76:4 81:7
  81:9,10 85:17
  85:20

**eviscerate** 8:7
  35:12 36:16
**eviscerated**
  48:11
**exact** 40:9
**exactly** 23:10
  25:7 33:6
  42:20 45:2
  61:16,16 78:2
  78:22
**example** 13:14
  13:21 14:7
  16:14 20:20
  21:10 30:20
  32:19 46:2
  51:13 54:19
  60:4 69:10
  85:16
**examples** 13:14
  16:15 54:3
  76:12,15
**exceedingly**
  31:19
**except** 5:8
  77:15
**exceptional**
  35:9 67:10
**exceptionally**
  77:15
**excluded** 60:5,8
**excluding** 61:2
**exercise** 35:16
  36:2 65:15
  72:9 85:19

**[exercises - forces]**

exercises 84:11
existence 16:17
expenditure 24:1
experimentat... 31:21
expired 22:16 33:9
explain 13:22 72:16
explanation 21:8
explicit 13:13
explicitly 10:12
explode 46:21
explosion 38:1
expressly 35:10
extent 43:3 62:11
extraordinary 57:22
extreme 86:1

**f**

faced 6:14
facial 9:11 40:22 41:15 58:17,21 59:1 59:10,14,18 61:18 62:14,16 62:20 64:13
facially 59:21
facilities 36:13 38:9,11,12

50:6
fact 6:5 11:22 19:16,22 22:13 23:8 29:13 31:22 33:22 44:13 51:2 53:3 87:2,8 89:16
factor 66:18
factory 47:3
facts 69:9 85:15
fails 62:20
fair 48:19
fairs 5:18 29:4 29:10,16 30:12 51:5,15,22 52:6,16 71:11 79:7
faithful 50:19
fall 49:22
falling 84:8
falls 15:8
far 15:20 18:2 39:19 40:21 70:4 82:20
favorably 6:6
fear 65:8,17
february 1:17 91:17
federalism 8:1 20:7 86:3
federalist 34:12

fee 23:18 24:20 36:3 62:22 63:2
fees 24:15
feigenbaum 2:4
fewer 37:1 58:19
fidelity 9:8,9
field 8:22 41:22
figure 20:19
financial 91:10
find 11:16 74:12 88:14
finding 62:1 64:15
fire 46:22
firearm 7:10 8:20 21:15,19 29:22 30:9 37:17,22 39:2 45:17 46:13 47:21 58:2 67:22 68:2,12 68:13 72:5
firearms 4:20 5:4,8,16 8:16 8:18 12:7 16:19 17:15 18:4,5,9 27:21 32:12,16 33:1 33:1 34:1,10 35:6 38:7 39:5 39:8 40:7 46:1 46:6 47:6

48:16 49:18 56:8 57:6 58:3 64:5 72:10 73:10
first 4:5 6:22 13:16 14:2 18:14 21:7 22:6 27:15 39:11 46:16 53:22 57:3 77:13 87:13
fit 20:10 46:11
fits 64:2
five 4:13
flooding 22:18
floor 1:18 23:15
flunk 6:12,15
focus 56:1,4 64:21 80:21,22 82:12 84:14
focused 37:15 44:20 56:5,15 73:21 79:22
focusing 55:9
follow 35:20 41:20 64:12
following 8:18 44:2 61:17 81:11
forbade 88:19
force 28:15
forces 36:4

**foregoing** 23:22 91:4
**forever** 7:16
**form** 22:5 81:8
**formulated** 49:16
**forth** 19:2
**fortunate** 36:9
**forward** 64:5 75:2
**found** 6:8 65:16 81:6 89:19
**founders** 57:22
**founding** 5:19 7:10 9:20 11:12,17 27:10 30:18 46:1 48:2 66:10 68:19,20 69:4 69:11 70:4 71:7,8,18 73:21 74:4,21 76:5 77:17 80:21,22 81:7 81:11,12 82:12 82:16 87:10
**four** 9:2 20:22 35:18 39:20,20 49:13 52:18 59:19,20 61:19 66:9 72:12 75:9,11

**fourteenth** 5:22 23:13
**fourth** 8:12 68:4
**free** 80:13 85:19
**freed** 23:6
**freely** 67:22 71:22
**freeman** 1:14 58:15,16 59:13 60:3,21 62:8 66:21 75:17 76:8
**frequented** 66:8 67:2 77:9 79:7
**frequently** 33:17
**friend** 79:16
**friends** 34:8 83:9
**functions** 37:11 49:17
**fund** 25:4
**fundamental** 68:22
**fundamentally** 52:8
**funds** 24:2
**future** 7:17 25:16

**g**

**g** 4:1
**gamble** 30:19
**games** 42:1
**gather** 39:16
**gathered** 15:18 30:1 71:21
**gathering** 50:7 71:18
**gatherings** 18:18 36:13
**geared** 24:17
**general** 1:5,7 1:10,11 2:5 4:6 4:7 17:7 33:20 35:12 36:16 54:4 66:8 67:2 67:4 77:9 79:7
**generality** 27:13
**generally** 9:14 16:18 32:16 39:3 40:11 51:21 67:3 77:8,19
**generated** 27:7 36:5
**generates** 47:1
**geographically** 75:13
**getting** 22:20
**gilded** 74:11

**give** 59:7
**given** 7:15 19:19 57:4 64:19
**glad** 4:4
**gloss** 84:17
**go** 19:15 20:18 29:3 31:22 33:10 44:2 49:9 67:22 68:1 72:12 83:20 84:16,21
**goes** 23:17 25:18,20 34:1 45:2
**going** 12:13 14:11,12 28:21 30:3 33:8 44:12 46:22 47:22 54:2,3 55:18 56:3 58:10 64:5 68:11 72:6 79:18 86:4
**gonna** 9:15 40:6 42:14 44:1 55:14 56:1 65:1,14 73:20
**good** 4:2 18:10 34:20 51:13 59:6
**goodness** 40:5

**governing** 54:12

**government** 4:22 7:9 8:4 14:8 37:12 58:3,7 67:12 67:18 68:9 77:22

**granted** 4:15

**granular** 9:16

**greater** 57:3

**grocery** 17:19

**ground** 37:9 69:9

**grounded** 16:9 43:5

**grounds** 42:8 60:6 61:4

**group** 62:2

**guard** 57:8,19

**guess** 62:11 76:8

**guidance** 42:20

**guide** 21:1

**gun** 37:19 47:3

**guns** 7:2 32:6

**h**

**half** 37:2 58:19 77:13

**hampshire** 2:16

**hand** 51:9,14

**handgun** 35:3 35:17

**handguns** 22:12 33:17 36:8 37:6 40:1 40:6 69:10

**handling** 68:10

**happen** 24:18 50:17

**happened** 23:10 44:4

**happening** 41:10 44:14 61:12

**happy** 43:2

**hard** 22:14

**harder** 22:2

**hardiman** 1:14 72:11 73:13,19 80:15 81:14,19 81:22 82:8,11 82:15,21 83:4 83:16 84:4,7 84:13

**harm** 23:20 24:9,16 29:22 79:14

**harming** 61:22

**hawaii** 72:14

**hazard** 37:17 37:19 45:17 46:14

**health** 38:10

**hear** 4:5 34:18 65:21 72:16 80:5

**heard** 83:8

**heed** 35:14

**heightened** 38:15 53:12 58:8

**heller** 4:17 6:7 12:1 13:16 33:19 80:8 82:2,3,18 85:13

**heller's** 12:19

**help** 54:19

**helpful** 14:13

**heterogeneity** 85:1

**hey** 86:13

**high** 44:8

**highly** 77:21

**historic** 27:4

**historical** 6:5 6:10,13,16,17 7:1,2,4 8:19 9:21 13:4 14:20,21 15:10 18:3,8,16 22:10,19 35:8 37:7 39:18 50:18 53:16 54:3 65:13 70:1 73:3 76:1 77:1,5 86:15

88:15

**historically** 37:18 49:19 52:2,3 73:9,14 73:15,17

**history** 4:18 5:2,10,12 6:17 8:5 9:14 14:1 14:16,17 16:10 18:11 22:7 29:6 30:17 31:19,20,20 32:14 50:14,20 67:7 73:11 80:12,16,17,18 82:12

**home** 49:8

**homes** 8:10

**honor** 10:8 66:1 84:1 86:6 87:8

**honors** 34:20 80:8 89:22

**housing** 38:5 58:11

**huge** 21:13

**hughes** 2:6

**huh** 42:3 45:18

**hundreds** 71:8 77:7

**huntley** 33:18

**i**

**idea** 12:3 39:5
**identical** 5:17
 7:4
**identified** 5:7
 21:1 32:5
 36:22 45:15
**identify** 6:1
 21:2
**identifying**
 36:19
**illustration**
 59:6
**illustrations**
 59:7
**immediately**
 5:21 28:11
**immunity**
 23:22 26:7,10
 26:15
**impediment**
 26:8
**important** 11:2
 21:8 38:20
**importantly**
 6:1
**impose** 35:2
 64:4
**imposed** 19:4
 35:21 36:3
 53:12
**imposing** 39:21
 57:4

**improper** 73:2
**inappropriate**
 55:4
**included** 11:11
 78:14
**includes** 5:18
 84:5
**including** 16:15
 23:6 34:4 85:2
**incompatible**
 6:21 8:1
**incomprehen...**
 16:21 41:21
 53:15 62:12
**inconsistency**
 74:14 75:4
**inconsistent**
 74:18,19
**incorporated**
 23:12
**incorrect** 7:19
**incredibly**
 47:20
**independent**
 38:1 41:15
 67:13
**indicated** 66:16
**indicative** 87:4
**individual** 6:8
 12:4 15:12
 19:2 23:9 31:1
 68:8 85:4,10
**individually**
 59:1

**individuals**
 38:6
**inebriated**
 32:22
**inflation** 24:21
**initial** 86:12,12
**injunction**
 23:19 26:5
**injunctions**
 24:13
**injured** 46:3
**injury** 26:18
**inner** 85:18
**inquiry** 9:22
**inside** 16:18
**insight** 10:20
**insist** 7:3
**instance** 37:20
 59:2
**institutional**
 54:16
**institutions**
 20:8
**instructions**
 6:22
**insufficient**
 11:4,10
**insurance**
 23:17 24:5
 35:21 61:19
 63:12 64:16
 79:15,20
**intending** 13:5

**interest** 91:9
**interested** 10:6
 72:13,16
**interesting**
 10:13 19:11
 24:16
**interpersonal**
 22:21
**interpreted**
 79:2
**interview** 35:21
**intimidation**
 69:3
**invalidated**
 59:22 60:2
**irrelevant** 21:3
 74:15
**irreparable**
 23:20 24:8,16
 26:17 79:14
**issue** 37:4,14
 38:3 39:4,7
 53:5 64:8
 69:14 70:12
**issues** 17:22
 19:13
**items** 23:16
 59:19

**j**

**j** 2:6
**jackie** 1:22
 91:2,16

**jeopardize** 33:3
**jeopardizing** 49:19
**jeopardy** 30:20 31:6
**jeremy** 2:4
**jersey** 1:5,5,6,6 1:10,10,11 2:3 2:5,7 4:7,12 5:6 15:2 17:14 18:5 25:10,14 27:7 34:13 36:7,18,22 47:17 48:14 58:20 60:16
**jersey's** 35:15
**job** 1:20
**judge** 1:16 3:7 4:2,10,14 9:13 10:16 12:17 13:9 14:4 15:1 15:8,14 16:3,5 16:11,21 17:13 17:21 18:7,11 19:4,7 20:12 20:16 23:14,15 25:6,11,21 26:13,19,20,20 26:21 32:3,9 33:4,10 34:16 40:15 41:19 42:4 43:12 44:1,2,2,7 45:13,14,19

47:4 49:10 54:1,1,2,10 55:4,20 57:7 57:11 58:15,15 58:16 59:13 60:3,21 61:14 61:17 62:8,12 63:3,8,12,15 64:10,12 65:19 66:21 68:14,15 69:17,21 70:11 70:15,20,22 71:1 72:11,11 73:13,19 74:7 74:10 75:17 76:8 78:1,16 78:19 79:10,13 79:21 80:2,5 80:15 81:14,19 81:22 82:8,11 82:15,21 83:4 83:16 84:4,7 84:13 86:8,8,9 86:11 87:22 88:6,12,20,22 89:8,10,20 90:1
**judges** 1:15
**judicially** 67:19
**jurisdictions** 11:20 18:21 40:8,9 83:11
**justice** 2:6 7:22 51:11 84:8

**justices** 29:5 77:16
**justification** 13:4 55:11
**justifies** 8:21 29:8

**k**

**key** 66:5,7,17 71:19
**kids** 39:14 67:5
**killed** 46:3
**kind** 6:10 20:19 21:15 26:3 33:6 36:20 43:10 45:11 46:15,22 50:11 51:1 85:1 86:17
**kinds** 22:22 24:13 31:2 38:18 39:21 54:22
**king** 78:9
**kirk** 2:15
**knots** 80:11
**know** 12:22 14:10,12,15,17 15:9 17:5,6,19 19:9 20:7,10 21:11 22:6 24:10,15,21 25:14 28:8,15 34:9 37:21

41:16 42:19 43:2 44:18 45:1,5 46:2 47:8,19 49:5 50:16 52:18 54:11 55:18 56:2,14,18 57:15 58:9,13 58:18 61:22 62:7,11 63:7 64:1,6 65:2,9 65:10 76:14 78:8 82:1 84:19 88:18
**knowledge** 91:6
**koons** 1:3 2:14 4:5 65:21 66:2
**krause** 1:14 26:20,21 45:14 45:19 47:4 49:10 71:1 72:11
**krause's** 86:11

**l**

**lack** 7:14
**language** 63:18
**lara** 81:5,5
**large** 12:22
**largely** 35:15 72:15
**late** 7:5 10:3,18 31:11 75:7

80:19
**latitude** 57:4
**laundry** 48:18
**law** 5:9 6:14
  11:8 12:15
  15:2 25:10,14
  33:2 35:22
  36:4 38:8
  39:17 41:3
  45:8 46:9
  48:13,20 51:3
  51:12 61:20
  62:6,18,21
  64:6,9 68:2
  76:13 77:12,19
  79:5,6 83:19
  84:15
**laws** 4:20 6:5,7
  7:2,21 23:21
  27:3 34:7
  37:18 39:20
  40:3 44:18
  49:12 50:22
  51:20 52:2,4,6
  52:8,19 53:5,5
  53:6,11 64:2
  74:5,11,13
  75:6 78:5,6,12
  81:8 82:17
  85:14 89:5
**lawyer** 78:10
**lawyer's** 78:5
**lay** 6:3

**leading** 46:9
**lean** 82:1
**leaned** 82:3
**leave** 7:21
**leaves** 52:17
**left** 51:2
**legal** 6:2 24:17
**legislate** 88:1
**legislating**
  89:15
**legislative** 5:15
  7:16 20:18
  21:4 28:1
  31:20 37:13
  76:16
**legislator** 6:2
**legislature** 5:7
  6:13 19:14,14
  25:3,15 27:21
  46:5 71:1,3,12
  84:10 85:5
**legislature's**
  84:19
**legislatures** 5:4
  5:14 7:11
  15:11 21:12
  25:17 31:9,22
  32:2 33:13,13
  34:4,5 66:11
  71:22 83:1
  84:2,21 85:3
  87:9,15 88:1
**level** 27:12 48:9

**liability** 36:1
**liaison** 2:5
**libraries** 9:2
  15:17 36:12
  38:18 50:5
**library** 15:15
  18:1
**life** 32:12,13
**likely** 46:21,21
**limit** 40:16
**limitations**
  41:17 57:1
  85:18
**limited** 5:8
**limiting** 47:13
**limits** 36:8
**line** 13:15 29:2
  32:1 38:12
**list** 15:3 27:7
  48:18 58:19
  59:20
**listed** 75:22
**lists** 59:8
**literary** 15:18
  17:2 18:18
  71:17
**litigant** 24:7
**little** 8:13 9:16
  43:21 50:3,13
  56:20 62:5
  66:3 69:18
  83:17
**locale** 45:20

**locate** 32:17
**located** 42:2,8
**location** 17:9
  17:10 18:14
  49:16 50:10
  55:6 72:6 73:8
**locations** 4:21
  5:5,7,17 8:9
  11:20 12:9
  15:5,17 16:1
  18:17 20:22
  22:4 27:11,19
  30:10,14 32:17
  32:20 40:18
  45:15 46:10,12
  50:4 66:14
  72:10 73:10
**loco** 8:12 44:22
  45:3 55:9 56:1
  56:11 67:5
**long** 59:17 71:9
  77:8
**longer** 27:8
  42:9 45:3
  69:13
**longstanding**
  4:20 8:7 21:10
**look** 19:3,10
  20:20 21:7
  28:8 30:4,17
  31:3,10 40:12
  44:17 47:18
  54:14 56:17
  66:12 68:7

76:22 86:20 89:17

**looking** 12:14 18:12 21:11 23:19 73:20 84:1 88:11 89:3,5

**loose** 73:3

**lose** 8:2 24:7 26:16 86:18

**lot** 22:9 23:7 30:22 31:12 72:4 74:10

**lots** 58:2

**lower** 13:22

**luckily** 9:2

**m**

**made** 35:1 47:17 48:5 72:17,19

**magazines** 12:22

**majority** 49:15

**make** 8:13 27:14,16 35:7 37:16 45:16 46:5,13 58:14 87:14,17 88:21

**makes** 6:10 40:12 46:20,21 57:19

**making** 87:18

**male** 68:14

**malintent** 52:11

**mandate** 35:22

**maris** 1:18

**market** 2:6 22:12,18

**marketplaces** 51:22 52:17

**markets** 5:18 29:4,10,16 30:12 51:5,15 52:6 71:11 79:8

**mascott** 1:15 15:1,8,14 16:3 16:5,11,21 17:13,21 54:1 54:2,10 55:4 55:20 57:7,11

**massive** 47:22

**matey** 1:14 12:17 13:10 14:4

**matter** 19:21 33:22 39:18 79:5

**max** 84:21

**maximal** 87:1

**maximally** 84:11,20 86:19

**mcdonald** 4:17 13:17 80:9

**mean** 14:4,6,13 17:9,21 19:20 42:11,13,21 43:20 46:18 47:9,13 48:18 50:2,8 56:6 59:6,17 62:4 62:15,17 74:17 82:2 88:18 89:14

**meaning** 10:20 30:21 31:5

**means** 8:19 9:10 14:7 80:14 85:22

**meetings** 17:2

**mental** 38:10

**mentioned** 9:14 42:19 72:12

**menu** 7:21

**mere** 7:14 57:18

**metal** 8:4

**metes** 13:7,11

**methodologi...** 28:5

**methodology** 89:3

**mid** 31:2

**middle** 57:8

**military** 14:10

**militia** 81:8

**mind** 46:17 55:11 56:12

**minimal** 10:4 27:3

**ministers** 29:5 51:11

**minutes** 4:13

**misconduct** 64:3 65:7,12

**misinterpreta...** 74:3

**missouri** 12:12 15:22 18:20 19:14 31:14 89:17

**misunderstood** 52:8

**misuse** 64:15

**misusing** 38:2

**modern** 5:7 6:11,15

**modes** 36:14

**moment** 31:14

**monetary** 26:2 26:11

**money** 24:11 24:18 25:17,20

**montgomery** 1:14

**mores** 34:4

**morning** 4:2 34:20

**move** 69:8 71:15 72:17,18

**moves** 72:18

**movie** 50:8
**multiple** 21:1 59:8 61:8
**murphy** 2:10 2:10 3:4,9 34:19,20,21 41:2 42:3,11 43:15 44:6,9 45:14,18 46:15 47:7 50:2 54:9 55:3,7,22 57:10,13 59:3 59:16 60:7 61:5,16 62:4 62:10,13 63:4 63:11,14,17 64:11,19
**museum** 16:8
**museums** 9:2 36:12 38:17 50:5

**n**

**n** 2:1 3:1,1 4:1
**n.w.** 2:16
**named** 8:14
**nation** 5:16 8:8
**nation's** 5:1 22:7
**national** 18:8 19:8 88:14
**natural** 21:7,16
**nature** 64:20

**nearly** 36:6
**necessarily** 17:12 42:16 43:6,17 44:15 47:14 55:12
**need** 13:7 25:9 30:14 64:16 76:18 77:2 81:4
**needs** 10:14 32:21 58:8
**negligence** 61:22
**neither** 91:7
**never** 14:5 15:11 24:19 33:5 62:16 63:5 70:1
**new** 1:5,5,6,6 1:10,10,11 2:3 2:5,7,16 4:7,12 5:6 15:2 17:14 18:5 25:9,13 27:7 32:4,7 33:4 34:13 35:14 36:7,18 36:22 47:17,17 47:20 48:14 51:19 52:7 58:20 60:16 70:12 71:4,13 71:14,16 72:15 83:12,19

**night** 29:3 51:15
**nine** 46:3
**north** 29:12 33:19 78:1,3,7 78:8,13,15 79:1
**northampton** 28:9,12,20 29:8 33:8 50:22 52:2,14 78:2 81:18
**nos** 1:12
**notably** 50:16
**note** 14:15
**notion** 38:3 39:8
**notwithstandi...** 27:1 49:1
**novel** 35:21
**nuclear** 67:14
**number** 4:6 16:15 17:17 25:1 48:17
**numbered** 58:22
**numbers** 47:16
**nursing** 8:10

**o**

**o** 3:1 4:1
**objection** 25:2 25:19,22

**objective** 20:21
**observation** 27:15
**observes** 33:21
**obtain** 22:17
**occurred** 88:5
**occurring** 42:10
**offer** 30:7 46:16
**office** 2:5
**oh** 40:5 59:16 70:21 79:21 87:17
**ohio** 46:2
**okay** 60:21 64:22 72:2 80:2
**once** 12:2 47:11 47:14 48:14
**onwards** 31:4
**open** 43:14 67:3,20
**operated** 48:14 52:9
**opinion** 10:18 49:15
**oral** 1:17
**order** 28:17 80:7 86:4
**orleans** 83:12 83:19
**ought** 9:21

**outcome** 28:4
  91:10
**outlier** 40:10
  52:22 73:18
**outliers** 75:12
**outside** 15:8
  45:9 49:8
  54:15,18
**overbroad**
  43:22
**overread** 10:9
**overreading**
  12:17,18
**overwhelming**
  11:5
**own** 29:16 30:5
  31:12 80:13

**p**

**p** 2:1,1 4:1
**page** 3:2 9:18
  10:18
**pages** 1:21
**paid** 33:14
**panel** 3:7 49:15
**paradigmatic**
  8:15 13:21
**parentis** 8:12
  45:1,4 55:10
  56:1,11 67:5
**parents** 55:15
  56:8
**park** 7:1 39:14
  42:2 43:9 44:3

45:6 54:18
55:16 56:10
83:13,15
**parks** 5:19
  16:18,18 36:12
  38:17 50:5
  55:14 56:8
  83:13,14
**part** 19:8 40:9
  45:12 53:7
  59:15 78:20
**participation**
  32:20
**particular** 9:18
  30:10 31:8,21
  41:14 49:14,17
  50:21 64:9
  85:11
**particularly**
  13:6 32:18
**parties** 91:9
**partly** 54:12
**pass** 78:8
**passed** 31:17
**patent** 22:16
**path** 24:14
**patterson** 2:15
  3:5,10 66:1,2
  67:1 68:18
  69:20 70:3,14
  70:18,21 71:5
  73:1,16 74:1,8
  74:19 76:3,20
  78:3,18,22

79:18,22 80:4
80:17
**pay** 62:22 63:1
**peace** 28:16
  29:1 49:20
  79:9
**peaceable** 74:9
**penalty** 53:13
**pennsylvania**
  34:13
**people** 8:17
  15:18 17:14
  22:20 28:10
  29:20 30:1
  32:6,11,21
  33:16 34:3
  38:21 39:9,15
  46:3,7 47:5,15
  47:19 48:9,16
  48:17 49:9
  50:7,8,8 52:1
  62:2 63:4,22
  64:14,18,20
  65:6 71:19
  72:8 73:6
  74:22
**people's** 23:5
**performances**
  34:11
**period** 5:20
  11:14,17,18
**permit** 35:3
  36:4,10 72:5

**permitted** 37:6
**person** 24:6
**persons** 35:18
  58:12 61:20
**perspective**
  19:16 56:17
  72:22 81:15
**pete** 66:2
**peter** 2:15
**phipps** 1:14
  86:8
**phonetic** 81:5
**phrase** 12:19
**physical** 37:16
  38:21 45:16
  46:18,19 47:9
  49:20 58:12
**pick** 54:7
**pin** 82:16 83:4
**pizzeria** 17:19
**place** 8:7,15
  19:18 29:6,15
  31:16 37:12
  40:12,14,21
  41:4 42:1,1,6
  44:16,16 47:15
  47:21 48:21
  49:5 53:22
  57:3,12,15
  58:7,8,14
  66:17 67:11,20
  67:22 68:11,13
  69:2 70:9 71:6
  71:14,19 72:3

72:7 73:5,8 76:5 77:15 81:12 82:19 83:12
**places** 5:14 7:2 7:12 8:3,5 9:4 9:17 11:19 12:8,20 13:12 14:8,11 15:4,6 15:11,12 17:16 23:17 27:6 28:3 29:19,19 31:21 32:18,22 35:7,10,11 36:7,11,20 37:5,10,13,15 38:5,14,18 39:5 46:11 48:4,6,9,9,16 49:7,12,15,22 50:1 51:16 52:1,5,10,16 53:10,13 54:5 56:20 58:20 66:7,8,11 67:2 67:9,14,15 68:16,20,20 69:1,4 71:10 71:16,17 75:19 75:21 76:10 77:6,9,22 79:6 80:1 82:22 83:5 84:5,22 86:5

**plaintiff** 8:3 11:16
**plaintiffs** 2:9 2:14 6:1,20 7:3 7:13 8:12 9:5 9:10 24:19 30:19 34:18,22 65:4,21 66:2,4 66:16 80:7,10 85:22
**plants** 37:21 67:15
**play** 85:18
**playground** 55:5
**playground's** 60:15
**playgrounds** 8:22 40:17,19 41:8 54:10 60:4,6,11,17,18
**please** 4:11 34:21
**plenty** 68:16
**plus** 7:1
**point** 6:18 7:15 16:13 19:19 22:5 25:12 30:15 37:1 45:3 50:21 62:21 65:9 86:5 88:9
**pointed** 51:20 75:14

**pointing** 53:18
**police** 1:5 48:1 48:10
**policies** 85:6,12
**policy** 19:16 20:6,9 85:1 86:2
**polling** 5:13 7:12 8:7 28:3 37:13 66:11 68:16,19,20 69:1,4 82:18 82:22 86:5
**poor** 40:12
**populace** 27:9
**populous** 47:20
**porter** 1:14 18:7,11 19:4,7 20:12 32:3,9 33:4 74:7,10 86:9 87:22 88:6,12,20,22 89:8,10
**pose** 65:17
**posed** 37:19
**posing** 49:20
**posited** 78:5,6
**position** 9:7 10:7 15:4 42:5 42:7 69:22 72:15
**positive** 89:12
**positively** 12:3 12:13

**possess** 17:14
**possible** 86:19
**post** 9:4 70:13
**powder** 37:19 47:3
**power** 37:21 67:14 84:11
**practice** 44:5 48:13 77:1,5
**practices** 42:1
**pre** 27:20
**precise** 63:18
**precisely** 6:9 41:9 47:16
**precursors** 7:4
**predate** 30:17
**predecessors** 6:17
**preliminary** 23:18 24:13 26:5
**premises** 43:14
**prepared** 91:3
**presence** 29:5 32:5 33:1 37:22 46:6 48:1,10 49:18 57:18
**present** 57:17
**presented** 17:5 65:7
**president** 1:6 1:10

**press** 42:17
83:17
**presumption**
74:22
**pretty** 13:13
15:3 57:22
**prevent** 24:10
**principle** 8:19
9:8 14:20
47:13 52:1
66:5 68:5
**principles** 68:6
70:19 71:6
**prior** 61:21
**private** 48:20
49:2,2 78:4,10
**probably** 45:8
55:15 64:19
**probative** 10:4
**problem** 6:15
21:10,13,15,18
22:8 23:4 31:8
32:4,7,13,15
33:5,15,16
41:15 48:12
71:4,13 86:14
**problems** 22:22
32:18 47:22
72:4
**proceed** 4:9
**proceeding**
91:4
**proceedings**
91:6

**produce** 35:18
**prohibit** 28:18
32:16 35:6
**prohibited**
16:19 27:21
37:7 39:6,8
52:10 76:11
**prohibiting**
4:20 18:4
52:15
**prohibition**
8:15
**prohibitions**
38:4 39:22
**proof** 50:3
**proper** 75:15
**property** 38:22
41:5,11 42:22
43:10,11 46:20
48:21 49:2
60:20 61:13
**proposition**
37:5
**prosecuted**
31:1
**protect** 56:9
**protected** 42:9
72:8 73:7
**provide** 5:10
10:19 35:19
57:3
**provided** 8:4
14:8

**providing**
42:19
**provision** 24:5
25:16 37:20
41:6 43:20
44:11 45:10
59:4,8,10,15,22
60:10,12,17,19
65:3,5
**provisions**
37:15 38:8
41:8,13,14
43:5 44:20
61:11 65:2
**public** 9:2 11:8
12:9 15:5 18:1
28:17,18 36:13
46:7 50:7
54:15 57:2
66:8 67:3,4,21
71:10 77:9
79:7
**publicly** 35:13
**pudding** 50:3
**pull** 47:6
**purpose** 16:22
17:9,11 20:11
**purposes** 9:22
15:19 39:2
82:5
**put** 49:21 82:10
**putting** 25:18

**q**

**qualified** 11:3
**qualifier** 28:16
28:19,20
**qualify** 27:8
**qualities** 38:21
**question** 10:13
17:4 18:10
26:1,2,9 27:16
28:7 33:11
44:3 49:4 76:9
78:16 80:16
81:4 86:7,11
89:1
**questions** 3:7
9:12 54:8
58:17 61:18
**quickly** 66:9
**quote** 10:17
11:8 35:9

**r**

**r** 2:1 4:1
**radical** 23:2
**radically** 43:8
**rahimi** 7:18
10:12 14:18
20:12,13 68:7
88:13 89:3
**rahimi's** 8:18
**rate** 24:21
**rather** 9:14
11:1,12 35:14
38:18 71:3

**ratification** 74:13

**ratified** 5:22

**reach** 55:13,14 56:13 61:12 81:4,4

**reached** 60:18

**reaching** 47:14

**react** 46:8,9

**read** 61:10 64:8 87:11

**reading** 22:21 88:5

**real** 86:14

**really** 12:18 13:5 18:10 22:12 33:2 50:19 52:18 55:13 56:13,21 58:4 62:15 73:19 82:1 84:13 85:7,7

**reason** 15:10 31:10 41:2 84:2

**reasons** 22:19 31:2,7 66:9,17 67:14

**rebuttal** 4:13 34:17 80:6

**rec** 57:7,16

**recent** 7:18

**recognition** 38:16

**recognized** 12:3 33:14

**reconcile** 70:12 75:17 86:17

**reconstruction** 5:3 9:20 11:18 23:1 69:22 81:1,2

**record** 20:18 21:4,5 25:6,9 32:14 35:8 91:5

**recording** 90:3 91:4

**recovering** 24:11

**recreational** 39:12 54:18 61:1

**reeves** 1:14

**reference** 11:6 13:8 79:19

**references** 10:10

**referencing** 78:9

**reflect** 52:15

**regulate** 13:3 21:14 70:16 84:3 86:19 87:9

**regulated** 15:5 17:16 18:5 22:5 49:19

55:21 74:16

**regulating** 84:20

**regulation** 7:15 75:2,3 79:15 86:15,21 87:1

**regulations** 6:12,15 8:22 55:1 76:2 87:3

**regulator** 13:2

**regulatory** 13:1 19:8,18 21:4 88:15

**reject** 9:10

**rejected** 9:4 48:7 52:14 53:3

**related** 23:4 91:8

**relatedly** 67:19 68:4

**relates** 24:1

**relatively** 22:17 35:9 75:20

**relevance** 27:4

**relevant** 21:9 21:21,22 53:9 53:14,17 58:6 65:4 80:17,18 85:7 88:6,8,12

**relevantly** 73:15,16

**relied** 50:15

**relief** 26:2,4,8 63:6

**reluctant** 9:6

**rely** 52:18

**relying** 40:3 72:7

**removed** 70:4

**repeated** 7:8 13:17,20 18:20

**repeatedly** 9:6

**reply** 9:18

**representative** 77:3

**representing** 64:20

**republicans** 23:2

**reputable** 35:18 61:20

**require** 7:7

**required** 72:1

**requirement** 23:17 63:13

**requires** 7:13 20:7

**reserve** 4:13

**respect** 25:14 28:7 79:14

**respond** 79:13

**responded** 36:20

**response** 24:19 35:15 79:16 86:11 88:17

| | | | |
|---|---|---|---|
| **responses** 46:16 | **revolver** 22:16 | 58:14 | **schools** 4:21 |
| **restrained** 87:12 | **revolvers** 22:18 | **samuel** 22:13 | 5:13,20 7:8,11 |
| **restrepo** 1:14 | **richard** 2:6 | **sanctioned** 44:4,12,14 | 8:13,14,21 |
| **restrict** 29:2 34:10 74:8 | **ride** 29:3 51:14 | 45:6 | 18:9 19:2,4,11 |
| **restricted** 5:16 | **right** 6:9 12:4 | **saving** 24:19 | 20:1 27:18,22 |
| 14:13 38:15 | 14:6,9 15:2,20 | **saw** 31:9 32:13 | 29:18 40:21 |
| 42:7 56:21 | 20:14 23:5,6,9 | 39:22 | 41:18 42:13,16 |
| 74:5 | 25:1,12 32:1 | **saying** 10:10 | 42:19 44:18 |
| **restriction** | 33:20 35:12,17 | 19:20 51:4 | 54:16 55:8,12 |
| 18:15 19:19 | 36:16 40:11 | 52:5 70:15,22 | 56:17 60:11 |
| 21:15,19 34:14 | 48:11 51:21 | 78:11 87:8 | 66:22 67:3 |
| 42:16 51:4 | 56:7 58:1 61:9 | **says** 10:18 | 83:1 86:6,16 |
| 53:10 60:2 | 63:3,14 68:1,8 | 11:18 13:6 | 86:21 87:10 |
| 72:2 82:19 | 68:12,14 75:1 | 28:14 29:3 | **scientific** 15:19 |
| **restrictions** | 76:8 80:2 82:2 | 48:20,22 51:13 | **scope** 42:12 |
| 5:13 7:1 8:8,9 | 82:8,21 83:16 | 64:3 65:14 | 45:9 46:17 |
| 8:20 9:4 11:19 | 83:20 84:4,7 | 68:7 | **scrutiny** 80:14 |
| 12:8 16:16 | 84:12,16 85:4 | **scenario** 20:17 | **sec** 70:20 |
| 18:22 20:2 | 85:10,22 86:4 | **scheer** 1:22 | **second** 7:13,19 |
| 23:7 28:17 | 88:7,20 | 91:2,16 | 10:20 13:19 |
| 29:8,9 31:16 | **rights** 36:3 | **scholar** 6:3 | 15:22 16:7 |
| 40:2,4,19 57:4 | 65:15 72:9 | **school** 18:15 | 19:21 20:3,5 |
| 64:4 65:11 | **riots** 22:22 | 41:4,6,11,20 | 23:8,11 31:13 |
| 75:21 81:13 | **risk** 47:1 58:14 | 42:5,8 43:10 | 34:6 35:5 36:2 |
| 83:12 | **risks** 36:1 | 43:11,14 44:4 | 64:7 66:15 |
| **revealed** 35:8 | **robust** 31:19 | 44:8,12,15,22 | 67:13 68:6 |
| **reversed** 50:17 | **ronald** 1:3 | 45:6,12 54:8 | 72:9 74:20 |
| **review** 76:13 | **rule** 8:19 67:21 | 54:15,19 55:2 | 75:15 84:6 |
| **reviewed** 4:19 | | 55:16,17 60:6 | 87:12,15,21 |
| 6:7 | **s** | 60:20 61:3,6 | 88:2,3 89:6,13 |
| | **s** 2:1 3:1 4:1 | 61:12 67:6,8 | **seconds** 46:3 |
| | **safety** 33:3 | **school's** 43:20 | **secret** 68:21 |
| | 37:17,19 45:17 | 60:12 | 69:1 |
| | 46:13 47:1 | | |

**section** 11:7
**secure** 36:10
  66:19 67:12
  72:7
**secured** 66:14
  67:16,17 77:22
**security** 5:10
  14:9 17:22
  38:16 57:8,18
  58:8 66:7
  68:17
**see** 18:14 30:18
  32:14 33:9,18
  48:13 71:22
  72:13 77:11
  84:20
**seeking** 35:3
**seem** 39:16
  40:16 53:17
**seems** 17:22
  39:16
**seen** 39:18,19
**self** 28:22 29:21
  30:9 33:21
  35:4,13 36:17
  68:9,10
**senate** 1:6,11
**sense** 8:13
  41:12 46:19
  58:6 87:14,17
  88:21
**sensitive** 4:21
  5:8 8:5,15 9:3
  11:19 12:8,20

13:12 15:3,6
15:12 16:2
17:10,16 19:18
23:16 27:6,18
29:6,15,19
31:16 35:6,11
36:7,11,19
37:11 38:20
39:1 40:14
44:16 46:10
48:4,6,8,21
49:7,12 50:1
52:5 53:10
54:5 55:5
57:12,20 58:11
58:21 66:7,17
66:20 67:16,17
72:3 75:18,21
76:10 77:6,15
77:21 80:1
81:12 83:5,11
**separate** 29:2
  41:7 53:9
  60:17 82:6
**set** 13:14 45:8
  49:17 51:7
  81:19 82:9,11
  85:15
**sets** 50:8 80:10
**setting** 23:19
  54:16,19
**several** 38:8
**severely** 14:12

**shelby** 12:11
**shoehorn** 62:19
**shooting** 62:1
**shop** 17:19
**shops** 15:12
**shortsighted**
  7:20
**shoulder** 36:5
**show** 52:3 58:9
  85:9
**shown** 66:13
**shows** 8:5
  73:11 77:17
**shwartz** 1:14
  20:16 23:14
  25:6,11,21
  26:13,19 41:19
  42:4 43:12
  44:1,7 45:13
  70:11,15,20,22
  79:13
**side** 26:8 83:9
**side's** 88:17
**siegel** 1:8 2:9
  4:7 34:18,22
  66:4,15
**signature** 91:15
**significant** 16:6
  43:9 45:21
  47:15 48:17
  54:21
**silence** 20:17
  21:8 69:15
  71:8 74:21

85:8 88:18
**similar** 12:21
**simply** 6:20
  36:1 42:7
**single** 6:2 8:16
  11:6,8,9,16
  83:15
**singling** 59:17
**sister** 79:13
**sit** 35:20
**situation** 86:22
**situations**
  45:11 55:18
**skills** 91:7
**slaves** 23:6
**small** 22:13
**smaller** 23:16
**social** 6:14
  21:10 22:8,22
  30:2 31:8 32:4
  32:7,15 33:4
  33:14,16 34:4
  71:4
**societal** 70:12
**sociological**
  33:22
**solved** 32:15
**somebody**
  48:22 65:12,16
**somewhat**
  56:18
**soon** 16:16
  83:13

sorry  70:21
  86:6
sort  8:6 18:18
  26:7 34:2
  40:17 64:14
  71:14 72:20
sorts  73:10
sources  18:13
south  23:2
sovereign
  23:22 26:6,10
  26:14
sovereigns  31:1
spaces  87:4
sparse  7:12
speaker  1:6,11
speaking  12:17
special  64:15
specific  11:1
  16:16 18:3
  32:17 50:14
  76:9
specifically
  18:6 48:7
  51:18
spent  23:20
sporting  39:12
  41:9 60:22
sports  8:22
  40:17 54:17
square  89:4
stampede  47:5
stand  26:16
  42:14

stands  24:7
start  22:21
  47:11 81:15
  83:10
started  18:19
  22:18,20 29:7
  31:12,15 48:14
  83:11
starting  82:16
starts  81:17
state  1:5,6,10
  2:3 4:12 6:5
  11:9 16:12
  20:13 23:22
  24:12 26:14
  28:1 30:1 34:6
  34:15 35:16
  38:4 39:3 40:3
  44:19 45:8
  49:5 50:21
  51:2 52:17,19
  61:9 62:6,19
  75:1,6 80:6
  85:5,5 87:16
  89:5,13
state's  6:22
  15:4 39:16
  48:20
stated  9:6
statements  7:8
states  1:1 4:3
  5:22 13:19
  17:1 20:8,9
  23:3,8,12

29:11 31:12,14
  35:1,5 39:20
  52:21 53:19
  74:15 75:4,13
  77:20 85:2,9
  87:20 89:6,17
statute  16:12
  27:20 28:9,11
  28:20 29:7
  33:7 61:7,10
  63:20,21 65:3
  77:11 78:4,9
  81:17
statute's  79:4
statutes  15:21
  24:2 52:15
  83:22
statutory  59:15
stays  39:3
stems  41:2
stopping  20:6
store  17:19
stray  13:15
street  2:6,11
  56:22
streets  49:6
strikes  12:21
struck  6:16
  57:21
stuck  21:3
student  18:22
  20:1
students  8:16
  32:22 42:21

44:21 56:2
subject  26:4
subsection
  58:22 59:2
sudden  17:3
  69:2
suddenly  24:8
  26:17
sufficient  27:10
suggest  13:15
  54:6 78:19
suggested
  44:19 47:12
suggesting
  26:15 43:16
  62:13 88:16
superintendent
  1:5
support  53:4
supported
  72:15
supporting
  5:11,12
supposed  56:22
suppression
  23:5
supreme  4:16
  6:21 7:7,17
  8:14 9:9 10:14
  13:10 20:22
  27:1 30:16,21
  42:18 48:7
  52:21 55:11
  56:12 70:4

75:5,14 77:2 77:12 79:1 81:22

**sure** 6:11 15:7 17:17 44:6,9 46:15 47:7,12 54:9 55:3,7 57:10 68:15 70:21 81:21 83:3,7

**surety** 64:2

**surrounding** 40:13

**sweeps** 36:11

**synthesize** 72:21

**system** 34:12

**t**

**t** 3:1,1

**take** 37:4,12,14 38:3 39:4,7,13 40:21 42:1,1 61:8 64:7 66:3 70:18 71:12 87:22 90:2

**taken** 36:18 70:1

**talk** 50:13 70:17

**talking** 22:4 46:18 50:12 53:20 56:19 67:1,10 71:1

83:5

**talks** 33:20 67:11

**taught** 14:19

**teachers** 43:1

**teaches** 7:19

**teachings** 9:9 35:14

**technological** 45:22

**telephone** 2:7 2:12,17

**tell** 10:1,2 15:20 43:7,17 66:19

**telling** 8:10 16:5 43:18

**tend** 38:14 44:19 73:4

**tends** 58:9

**tennessee** 12:1 31:15 52:21 89:17

**term** 13:1

**terms** 31:18 49:14 66:5 67:9 77:6 83:22

**terrifying** 71:10,14 74:5 77:10 79:8

**territories** 52:19 53:1,2,4 53:12 75:9

**territory** 53:21

**terror** 51:6,6 51:16

**terrorizes** 46:7

**terrorizing** 27:9 73:12

**test** 6:12

**texas** 11:7 15:21 16:11,12 16:14 18:19 19:13 23:2 31:15 52:21

**thank** 4:10 9:13 26:13,19,21 34:16 45:13 65:19 66:1 80:3,4 89:22 90:1

**theater** 39:13

**theaters** 5:21 34:10

**theories** 80:11

**theory** 8:6,11 8:13 24:17 30:6 69:5 86:18 88:10

**thereof** 30:21 34:7 87:16

**thing** 19:11 21:16 33:6 34:2 65:11 79:12

**things** 18:18 32:11 38:9,9

38:22 40:1 54:14,17 59:9 59:11 61:12 69:7 73:4

**think** 10:8 11:2 12:10 13:5,10 13:13 14:18 15:9,10 17:4,6 17:7,10,12 19:9,22 21:6 21:20,21,22 22:2,9 24:5 25:8,8,18 27:11,14 28:8 30:5,6,14 31:18 32:2,10 32:13 33:12,15 34:8 37:9 41:3 41:14 42:15,18 42:21,22 43:1 43:7,15,21 44:13,17 45:7 45:20 47:10 48:12 50:2,9 50:10,18 54:12 54:20 55:1,7,8 55:12 56:11,19 57:13,14,18,21 57:22 58:4,6 59:16,19 61:3 62:5 63:19 64:8,11 65:8 66:6 71:1 73:1 78:12 81:3,16

82:4 84:2,8,22
85:6,14 88:8
88:10 89:2,9
89:11
**thinking** 14:14
  56:16
**third** 1:2 4:4
  8:3 13:20
  67:19
**thought** 86:10
  88:4
**threat** 65:8,17
**three** 12:2 53:1
  53:1 75:9
**thrice** 4:16 7:8
  8:14
**till** 31:4
**time** 7:16 11:14
  13:20 14:2
  16:13 18:14
  19:19 20:4
  22:2,14 23:11
  24:6 26:16
  33:9,22 49:3
  69:19 70:10
  78:21 79:11
  89:20
**times** 12:2 21:1
  47:18 48:2
  61:8 69:12
  71:19,20
**today** 30:14
  40:15 47:19
  48:1

**together** 75:20
**took** 39:21 40:8
**tool** 19:18
**top** 87:5
**total** 12:6
**totality** 5:1
**totally** 80:11
**towards** 24:17
**town's** 42:2
**tradition** 6:10
  6:18 8:20 14:1
  18:3,8 19:8
  20:20 21:2
  29:7,17 31:20
  37:8 39:19
  40:13 44:17
  45:1 51:17
  52:15 53:16
  55:10 64:2
  65:13 70:2,7,8
  71:9,12,16
  75:2,3,8,11
  76:7,22 77:7,8
  77:17 79:2
  81:15,16 82:16
  85:9 88:15
**traditional**
  54:15
**transcribed**
  1:22
**transcriber**
  91:1
**transcript** 91:3
  91:5

**translates** 24:8
  44:15
**transportation**
  36:14
**trapped** 7:21
**treat** 10:3
  65:14
**treated** 52:6
**treating** 39:1
  58:7
**treats** 35:22
**trenton** 2:7
**true** 12:5 24:12
  28:13 29:13
  30:12,13 70:7
  79:21 82:4
  87:13 91:5
**truly** 67:10
**try** 21:2
**trying** 13:22
  14:18 43:17
  62:8 63:8
  80:11 88:14
**turn** 73:20
  80:20
**twist** 80:10
**two** 24:4 26:12
  26:16 28:12
  46:16 51:1
  52:20 59:7
  65:1,2 76:14
**type** 13:16 58:8
  67:11 88:13

**types** 38:10,11
  49:22 56:14
  65:11
**typically** 67:4

**u**

**uh** 42:3 45:18
**ultimately** 24:3
  42:11
**unanimous** 9:7
**unclear** 25:7
**unconstitutio...**
  11:21 19:21
  24:3 81:13
**under** 6:11
  9:22 10:1 27:5
  67:5
**undergirds**
  14:20
**underlying**
  68:6
**understand**
  11:3 14:6 18:2
  18:12 26:6
  31:4 40:13
  41:3,7,12
  45:10 54:20
  60:9,11,16
  62:9 63:9
**understanding**
  20:3 75:15
  78:20
**understood**
  13:18 15:17

21:13 28:10,19 61:7 62:16
**undetected** 68:1
**unequivocally** 12:7
**united** 1:1 4:3
**universally** 7:6
**universities** 19:1
**unreasonable** 46:4
**unseemly** 34:2
**unsupported** 73:9,14,14,16 80:12
**unusual** 52:12 69:11
**upheld** 49:11
**upholding** 85:14
**urge** 10:9
**use** 8:2 12:19 29:15 46:10 76:1 86:13,17
**used** 13:3 17:1 17:7,8 30:9 49:12
**using** 71:5

**v**

**v** 1:4,9
**validity** 6:4

**value** 10:5
**various** 9:17 27:6
**vcco** 79:15
**vein** 58:11
**version** 86:1 87:16
**versus** 4:6,7 43:10 54:8 69:15
**view** 66:22 72:18 87:2
**views** 43:3
**violence** 22:21 46:10 47:21
**violent** 36:5
**virginia** 2:11 29:12 77:11
**virginia's** 51:3 51:12
**virtually** 50:9
**virtue** 45:7
**vote** 23:5,6
**vulnerable** 32:21 71:20 73:6

**w**

**wait** 15:14
**waiving** 26:14
**walking** 36:1
**wanna** 42:12 46:15 54:6,7 60:7 64:12

**want** 36:2 48:15
**wanted** 23:3
**wants** 13:3 65:15
**warned** 8:1
**washington** 2:16
**watch** 39:12,13
**way** 11:13,15 14:13 31:11 35:7 37:17 45:7 47:1,11 47:19 48:3,13 50:16,22 51:3 58:1 61:10 65:15 66:19 72:13,20
**ways** 55:8
**we've** 36:22 60:8 61:7 66:13 72:2 86:13
**weapons** 13:1 52:12 76:11
**weave** 86:10
**wednesday** 1:17
**weight** 11:5,10
**welcome** 4:3 9:11
**went** 11:13,14 35:7 52:2 72:21 73:2

**wheeling** 80:13
**who've** 63:5
**whoever's** 56:3
**wholly** 67:13 73:8,13
**willing** 35:19
**words** 80:20
**works** 25:7 68:15
**worse** 53:4
**writing** 78:11
**written** 21:17 35:19 62:19 63:21 84:9
**wrong** 63:1,5,7 72:18,21 73:2 80:9
**wrote** 62:7

**x**

**x** 1:3,3,4,4,5,5,6 1:6,7,7,8,8,9,9 1:10,10,11,11 1:12,12,13 17:9

**y**

**yeah** 14:4 24:4 25:13 32:9 58:16 62:10 63:11,17 70:14 73:1 82:14
**year** 25:3
**years** 33:8 71:9 77:8

**[yield - zoos]**                                                    Page 28

**yield**   23:15
**york**   47:17,20
  51:20 52:7
  72:15
**youth**   40:17,20
  41:8 44:8
  60:22

**z**

**zoo**   15:15 16:8
  59:8
**zoos**   5:20 15:16
  16:16 38:17
  59:9,11 60:2

Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830