# UNITED STATES COURT OF APPEALS
# FOR THE THIRD CIRCUIT

Nos. 23-1900, 23-2043

RONALD KOONS et al.,
*Plaintiffs-Appellees,*

v.

ATTORNEY GENERAL OF NEW JERSEY et al.,
*Defendants-Appellants*

and

NICHOLAS P. SCUTARI et al.
*Intervenors-Defendants-Appellees*

AARON SIEGEL et al.,
*Plaintiffs-Appellees / Cross-Appellants,*

v.

ATTORNEY GENERAL OF NEW JERSEY et al.,
*Defendants-Appellants / Cross-Appellees*

and

NICHOLAS P. SCUTARI et al.
*Intervenors-Defendants-Appellees*

ON APPEAL FROM THE UNITED STATES DISTRICT
COURT FOR THE DISTRICT OF NEW JERSEY
(Nos. 22-cv-7463, 22-cv-7464 (RMB))

**DEFENDANTS-APPELLANTS' SUPPLEMENTAL BRIEF**

JENNIFER DAVENPORT
  *Attorney General of New Jersey*

JEREMY M. FEIGENBAUM
  *Solicitor General*

JAKE MAZEITIS
  *Deputy Attorney General*

Office of the New Jersey Attorney General
R.J. Hughes Justice Complex
25 Market Street, P.O. Box 080
Trenton, NJ 08625-0080
(609) 414-0197
Jeremy.Feigenbaum@njoag.gov

*Attorneys for New Jersey Attorney General
and Superintendent of New Jersey State
Police*

# TABLE OF CONTENTS

INTRODUCTION.................................................................................1

ARGUMENT .....................................................................................2

iii

# TABLE OF AUTHORITIES

**Page(s)**

*Antonyuk v. James,*
120 F.4th 941 (2d Cir. 2024) ........................................................... 12

*Christian v. James,*
176 F.4th 189 (2d Cir. 2026) ........................................................... 12

*Frey v. City of New York,*
157 F.4th 118 (2d Cir. 2025) ........................................................... 12

*Kipke v. Moore,*
165 F.4th 194 (4th Cir. 2026) ........................................................ 8, 12

*LaFave v. County of Fairfax,*
149 F.4th 476 (4th Cir. 2025) ........................................................... 12

*NYSRPA v. Bruen,*
597 U.S. 1 (2022) ................................................................... passim

*Schoenthal v. Raoul,*
150 F.4th 889 (7th Cir. 2025) ........................................................... 12

*United States v. Hemani,*
146 S.Ct. 1677 (2026) ............................................................. passim

*United States v. Rahimi,*
602 U.S. 680 (2024) ............................................................... passim

*Wolford v. Lopez,*
116 F.4th 959 (9th Cir. 2024) ........................................................... 13

*Wolford v. Lopez,*
2026 WL 1825723 (June 25, 2026) ................................................. passim

## **INTRODUCTION**

*Wolford v. Lopez*, 2026 WL 1825723 (June 25, 2026), confirms what the Court held in both *United States v. Hemani*, 146 S.Ct. 1677 (2026), and *United States v. Rahimi*, 602 U.S. 680 (2024): a court considering a firearm regulation must identify the relevant "principles that underpin our regulatory tradition," *id.* at 692, and apply those historical principles at the appropriate "level of generality," *id.* at 739 (Barrett, J., concurring). *Wolford*, *Hemani*, and *Rahimi* all put important guardrails on how broadly a tradition may be defined. But they also make clear that courts should not take too cramped an approach in defining the tradition either, lest American laws be frozen in amber.

The traditions on which New Jersey rely all fall within those guidelines. Because it is "settled" that States can regulate firearms in "sensitive places," the only question is how broadly the longstanding and widespread sensitive-places tradition extends. *NYSRPA v. Bruen*, 597 U.S. 1, 30 (2022). A wealth of diverse history proves States can regulate firearms in places where particularly dense crowds gather to engage in democratic governance, recreation, and transportation; where vulnerable people like children congregate; or where firearms mix dangerously with alcohol.

Such regulations are not limited to spaces with TSA-style security, as the *Koons* plaintiffs insist, or to some cramped list that lacks underlying principles, as the *Siegel* plaintiffs suggest. Every other circuit to consider sensitive-place measures post *Bruen* has thus largely upheld them. *Wolford*'s principles-based analysis further supports that consensus.

## <u>ARGUMENT</u>

1. The Court's recent Second Amendment cases make clear the task of a reviewing court is not to search myopically for a historical "twin" to the modern regulation, but to canvass historical evidence for "the principles that underpin our regulatory tradition." *Wolford*, 2026 WL 1825723, *6-7; *see Hemani*, 146 S.Ct. at 1685-86 (contrasting the search for historical *principles* with the demand for "precise historical precursors"); *Rahimi*, 602 U.S. at 692 (same). This inquiry allows a court to consider "[a] variety of sources," including both "scholarship" and "historical analogues"—*i.e.*, "old legal rules from which a court may draw a strong inference that the modern law at issue is consistent with the codified right." *Wolford*, 2026 WL 1825723, *6. In identifying principles, courts may consider the extent of the laws and degree to which they were well-accepted, including tacit acceptance reflected in the lack of challenges. *Id.*

2

The challenge is the level of generality at which to define historical principles. Because modern laws "need not be a 'dead ringer'" to historical regulations, the inquiry cannot be "mechanical." *Id.* Instead, courts ask whether evidence is "close enough to enable a court to say: 'Because this historical law was understood to be compatible with the right codified by the Second Amendment, we can infer that the restriction imposed by the modern law is likewise consistent with that right.'" *Id.* The proper test allows the court to "identify the range of permissible regulatory goals and how far States may go to achieve them"—to ensure "end[s] pursued and means deployed" cohere with those principles. *Id.* at *15 (Barrett, J., concurring). This requires "judgment." *Id.* at *6 (majority op.).

On one hand, reviewing courts cannot define principles "at too high a level of generality." *Id.* at *16 (Barrett, J., concurring). *Bruen* explained that, although the sensitive places tradition allows firearm regulation in discrete locations—including "schools and government buildings"—that cannot stretch to encompass an entire city, no matter how "crowded" or well-policed. 597 U.S. at 30-31. *Wolford* similarly determined a tradition of regulating "unauthorized hunting" could not permit outlawing firearms on "much of" the private property in the State, 2026 WL 1825723,

*3, *12, especially where the statute addressed "[nothing] more specific than the general risk associated with the carry of firearms," *id.* at *17 n.6 (Barrett, J., concurring). And *Hemani* held that regulations disarming only "categorically and unusually dangerous" alcoholics could not justify disarming "millions of Americans who now regularly use marijuana." 146 S.Ct. at 1693. Each case rejected attempts to abstract historical evidence addressing a discrete issue into a sweeping yet unsupported exemption.

But just as the Court cautioned not to read our Nation's regulatory history too broadly, the Court has continued to emphasize time and again that defendants need not identify a "dead ringer" or "historical twin" to pass constitutional muster. *Rahimi*, 602 U.S. at 692. Because historical evidence is not a "straightjacket," *Bruen*, 597 U.S. at 30, freezing our laws in "amber," *Rahimi*, 602 U.S. at 691, courts must identify traditions at a level of generality sufficient to ensure modern legislatures could address "circumstances beyond those the Founders specifically anticipated." *Hemani*, 146 S.Ct. at 1687. Imposing any stricter test would reflect an impermissible "'use it or lose it' view of legislative authority." *Rahimi*, 602 U.S. at 740 (Barrett, J., concurring).

*Rahimi* remains instructive. *See Wolford*, 2026 WL 1825723, *7 (citing *Rahimi* as the most up-to-date precedent reflecting the "difficult exercise of judgment" that this historical analysis requires). In *Rahimi*, the Court asked whether the Constitution permitted disarmament of domestic abusers. Although no historical laws limited access to firearms by domestic abusers, the Court upheld the modern law by identifying a tradition of disarming those "who threaten physical harm to others from misusing firearms." 602 U.S. at 690. In other words, the permissible "end" was not just about dealing with domestic abusers; it was about dangerous individuals generally. *See id.* at 740 (Barrett, J., concurring) (finding the *Rahimi* majority used "just the right" level of generality).

And the Court adopted even broader framing for the laws' "how"—the "means" employed. The Court did not demand some past regulation of disarmament even though the modern law disarmed these individuals. Instead, *Rahimi* relied on a history of surety laws (which required individuals "suspected of future misbehavior"—including firearms misuse—to post a bond) and affray laws (which only restricted "riding or going armed, with dangerous or unusual weapons, to terrify the good people of the land") to justify modern disarmament. *See id.* at 695, 697 (majority

op.). The modern federal regulation was therefore "by no means identical to these founding era regimes," yet they "fit[] neatly" within those historical principles understood at the right level of generality. *Id.* at 698; *see id.* at 740 (Barrett, J., concurring).

This trilogy elucidates why the appropriate generality required upholding the law in *Rahimi* but not *Wolford* and *Hemani*. Most obviously, *Rahimi* implicated a diverse array of prior restrictions. In each of *Wolford* and *Hemani*, the Court identified a single strand of historical regulation on which the government defendant could permissibly rely. *See Wolford*, 2026 WL 1825723, *12 ("laws [prohibiting] unauthorized hunting"); *Hemani*, 146 S.Ct. at 1686 ("'habitual drunkard' laws"). In *Rahimi*, the government could permissibly rely instead on "two distinct legal regimes" which had each "developed [to] specifically address[] firearms violence," 602 U.S. at 694-95—the distinct surety and affray schemes.[1]

---

[1] *Wolford* also emphasized that *Rahimi* confronted a "distinctively modern" problem, 2026 WL 1825723, at *7, an insight that proves challenging for plaintiffs here. *Bruen* was explicit that the Court should adopt higher levels of generality when a court confronts a modern problem—which the challengers say means problems that did not exist at the relevant historical period, like new technologies. *See* 597 U.S. at 27. But there were men who abused their wives at the Founding and Reconstruction. See *Rahimi*, 602 U.S. at 763 (Thomas, J., dissenting). It thus follows inexorably that a problem can be "modern" if our *understanding* of the issue has changed.

It makes good sense, consistent with the principles underlying *Rahimi* and its progeny, that courts would employ the higher level of generality if the government presents multiple related regulations. If a government identifies one strand of historical regulations, meaning the court is confronted only with that specific mechanism dealing with that single concern, it may be more likely the tradition it exemplifies was responsive to that narrow issue. So, if historical lawmakers dealt with a discrete issue—like deer theft—it becomes harder to "infer that the restriction imposed by" a "modern law" with a different how (means) or why (ends) "is likewise consistent with that right." *Wolford*, 2026 WL 1825723, *6; *id.* at *15 (Barrett, J., concurring). But if the historical laws confronted multiple related problems with distinct restrictions, it is far likelier that some higher-order regulatory tradition encompasses these related policies. After all, it is much harder to say that those distinct policy responses each happened to reflect the total outer limits of governmental authority. So, because surety and affray laws used different mechanisms for differ-

---

So it is of no moment there was something called a "park" at the Founding if it was not used like modern parks; instead, when the modern park developed, firearms restrictions were allowed. *See* N.J.Br.20-22 (discussing parks); Reply.Br.31-34 (same).

ent groups of dangerous people, use of *other* modern tools to deal with *other* kinds of dangerous people is more likely allowed, rather than assuming that both surety or affray laws each perfectly hit the outer limits of state power. *See Rahimi*, 602 U.S. at 699.

2. That insight proves overwhelmingly helpful to New Jersey. English and American governments have adopted myriad different sensitive-place measures in myriad different places. These restrictions never operated at the level of a "dense city" or "entire neighborhood," and no history suggests mere legislative say-so is enough to make a place sensitive. But legislative efforts to prevent firearms violence consistently spanned multiple traditions, including:

- Pre-Founding English laws restricting firearms at Parliament, and similar American restrictions at legislative assemblies and polling places. Panel.Op.30-32, 38, 48, 54-55.

- Pre-Founding English laws and colonial and state laws restricting firearms at fairs and markets. Op.33-35, 44-46, 50-52, 60-62.

- Restrictions on nonpeaceable assemblies, "particularly where individuals were armed with weapons." *Kipke v. Moore*, 165 F.4th 194, 214 (4th Cir. 2026).

- Common law and statutes treating "affrays" as "'more serious' when 'officers of justice [were] disturbed in the due execution of their office" or 'where a respect to the particular place ought to restrain and regulate men's behavior." Op.32 (citing Blackstone, *Commentaries on the Laws of England* 145 (1769)).

- Restrictions on firearms at public assemblies. Op.88-95.

- Restrictions on firearms at schools, explicitly approved by the Court. Op.18-20.

- Restrictions on firearms at entertainment spaces, from fairs to ballrooms to racecourses. Op.114-17.

- Restrictions on firearms where alcohol was sold, including a tavern, along with restrictions on alcohol near military encampments, and restrictions on intoxicated persons with firearms or restrictions on using firearms on holidays where "drunkenness … prevails." Op.39-40, 108-13.

- Restrictions on firearms where persons gather "for educational, literary or scientific purposes." Op.62-63 n.83.

- Restrictions on firearms at public parks, including those that housed the first zoos. Op.95-104.

- Restrictions on firearms on mass transit. Op.129-32.

That restrictions range from schools to government facilities to ballrooms to parks indicate that these historical policies reflect a broader set of traditions, not that legislatures happened to maximally use powers to regulate each specific place in each specific statute.[2]

---

[2] And, as New Jersey has explained, there is no countervailing evidence—multiple courts upheld the restrictions; no court invalidated them; and no other commentator or legislature suggested they had constitutional defects. N.J.Br.16, 19; Reply.Br.10-11, 18.

The breadth of historical evidence thus weighs on the question *Wolford* asks: whether a court could "say" the modern regulatory tools fit in the full breadth of what was previously "understood to be compatible with the right." *Wolford*, 2026 WL 1825723, *6. The Koons plaintiffs' unifying principle—permitting restrictions only where a government has provided TSA-style security, *see* Koons.Br.3; Koons.Pet.2—cannot explain much of the record. Schools and polling places, then and now, typically lack such security—not to mention fairs and markets, ballrooms, parks, zoos, taverns, or educational gatherings. *See* N.J.Reply.22-25. That their principle contravenes multiple strands of tradition suggests not merely a cramped position but a wrong one. *Wolford* prohibits its adoption.

The Siegel plaintiffs do not even attempt to identify principles that justify the spaces they recognize can be sensitive—like schools and government buildings—but exclude New Jersey's modern sensitive places. Harkening back to a pre-*Rahimi*/*Wolford*/*Hemani* methodology some circuits used, they launch evidence-by-evidence attacks, calling each piece of history "too slender" or "too late," Siegel.Br.46, 53, insisting upon only historical "dead ringers," *Rahimi*, 602 U.S. at 692, and failing to identify any underlying *principles* which would allow this Court to do more than

10

rely upon a "twin." *Id*. But *Hemani* and *Wolford*, even as they invalidated laws, emphasized that theirs was a search for principles rather than perfect matches; were the latter enough, both opinions could have been much shorter. *Hemani*, 146 S.Ct. at 1687-93; *Wolford*, 2026 WL 1825723, *12-14. And, of course, this theory is contrary to *Rahimi*, which tied disarmament to surety and affray laws that were "by no means identical" to the modern laws. 602 U.S. at 698. The Siegel plaintiffs' emphasis on perfect matches rather than identifying traditions and their "how" and "why" principles reflects the brief period after *Bruen* that the Supreme Court, across multiple lopsided opinions, has tried to correct.

At bottom, the comprehensive, diverse record of historical measures reveals multiple overall principles that can make a place sensitive today. English and American governments have repeatedly regulated firearms in places designated for (1) "the purposes of governmental services and peaceful assembly" to prevent the "violent disruption … of government functions," Op.30, 89-90, (2) "recreation and amusement" to "ensure visitors could participate without the risks and anxieties associated with deadly weapons," Op.98-99, 112, (3) "learned, scientific pursuits" which "demand a peaceful, controlled, and non-violent environment," Op.124,

and/or (4) public purposes requiring particularly confined crowding, like trains, to "ensure order and security," Op.130. These restrictions have historically extended as well to places "where vulnerable populations"— such as children—"are present," Op.125, or in spaces like bars where firearms are "especially susceptible to misuse" given the threat of alcohol, Op.109. That is, because of the diverse array of unchallenged restrictions that cohere with each of these independent traditions, a court looking at these historical laws should "say" they fit what has long been "understood to be compatible with the right." *Wolford*, 2026 WL 1825723, *6.

This overwhelming evidence helps explain why the circuits to have confronted modern sensitive-place restrictions largely uphold them. *See Christian v. James*, 176 F.4th 189 (2d Cir. 2026) (parks); *Kipke v. Moore*, 165 F.4th 194 (4th Cir. 2026) (schools, public assemblies, government buildings, healthcare facilities, museums, parks, casinos, stadiums, bars, and public transportation); *Frey v. City of New York*, 157 F.4th 118 (2d Cir. 2025) (public transportation); *LaFave v. County of Fairfax*, 149 F.4th 476 (4th Cir. 2025) (parks); *Schoenthal v. Raoul,* 150 F.4th 889 (7th Cir. 2025) (public transportation); *Antonyuk v. James*, 120 F.4th 941 (2d Cir. 2024) (parks, zoos, bars, theatres, and healthcare facilities); *Wolford v.*

*Lopez*, 116 F.4th 959 (9th Cir. 2024) (parks, zoos, playgrounds, beaches, bars, casinos, museums, libraries, and stadiums). *Wolford* confirms these circuits have used the proper level of generality in identifying supportive historical principles. It certainly does not support creating a split.

Respectfully Submitted,

JENNIFER DAVENPORT
Attorney General of New Jersey

By:   <u>/s/ Jeremy M. Feigenbaum</u>
      Jeremy M. Feigenbaum
      Solicitor General

Dated: July 8, 2026

## CERTIFICATION OF BAR MEMBERSHIP

I certify that that I am a member in good standing of the bar of the United States Court of Appeals for the Third Circuit.

/s/ Jeremy M. Feigenbaum
Jeremy M. Feigenbaum
Solicitor General

Dated: July 8, 2026

## <u>CERTIFICATION OF COMPLIANCE</u>

Pursuant to Fed. R. App. P. 32(g)(1), as well as L.A.R. 31.1(c), I certify that:

1. This brief complies with the Court's June 26, 2026 Order because this brief contains 2,498 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2016 word-processing system in Century Schoolbook, 14 point font.

3. The text of the electronic brief is identical to the text of the paper copies.

4. The electronic file was scanned with anti-virus software Crowdstrike Falcon Sense version 7.38.21003.0 and no virus was detected.

/s/ Jeremy M. Feigenbaum
Jeremy M. Feigenbaum
Solicitor General

Dated: July 8, 2026

# <u>CERTIFICATION OF SERVICE</u>

I certify that on July 8, 2026, the foregoing brief was electronically filed with the clerk of the court with the United States Court of Appeals for the Third Circuit through the Court's CM/ECF system, which filing effected service upon counsel of record through the CM/ECF system.

<u>/s/ Jeremy M. Feigenbaum</u>
Jeremy M. Feigenbaum
Solicitor General

Dated: July 8, 2026